**NO. 2026-1403**

# United States Court of Appeals for the Federal Circuit

BIRCHTECH CORP., f/k/a Midwest Energy Emissions Corp.,
*Plaintiff-Appellee*,

- v. -

ARTHUR J. GALLAGHER & CO., GALLAGHER CLEAN ENERGY, LLC, AJG COAL LLC, DTE REF HOLDINGS, LLC, DTE REF HOLDINGS II LLC, CERT COAL HOLDINGS LLC, CERT HOLDINGS LLC, CERT HOLDINGS 2018, LLC, CERT OPERATIONS LLC, CERT OPERATIONS III LLC, CHEM-MOD, LLC, THOMAS HILL REFINED COAL LLC, WAGNER COALTECH LLC, JOHN DOE LLCS, BRANDON SHORES COALTECH LLC, GEORGE NEAL SOUTH REFINED COAL, LLC, HURON REFINED COAL, LLC,
*Defendants*.

CERT OPERATIONS II LLC, CERT OPERATIONS IV LLC, CERT OPERATIONS V LLC, CERT OPERATIONS RCB LLC, SENESCENSE ENERGY PRODUCTS LLC, RUTLEDGE PRODUCTS LLC, SPRINGHILL RESOURCES LLC, BUFFINGTON PARTNERS LLC, BASCOBERT (A) HOLDINGS LLC, LARKWOOD ENERGY LLC, COTTBUS ASSOCIATES LLC, MARQUIS INDUSTRIAL COMPANY, LLC,
*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Delaware in Case No. 1:19-cv-01334-CJB,
The Honorable Magistrate Judge Christopher J. Burke.

**CORRECTED NONCONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLANTS**

Chengming Liu
**Skadden, Arps, Slate, Meagher & Flom LLP**
525 University Avenue
Palo Alto, CA 94301
(650) 470-4565

Douglas R. Nemec
Leslie A. Demers
**Skadden, Arps, Slate, Meagher & Flom LLP**
One Manhattan West
New York, NY 10001
(212) 735-2419

## PATENTS CLAIMS AT ISSUE

Claim 25 of U.S. Patent No. 10,343,114 ("the '114 Patent"):

A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein

the coal comprises added $Br_2$, HBr, a bromide compound, or a combination thereof, added to the coal upstream of the combustion chamber, or

the combustion chamber comprises added $Br_2$, HBr, a bromide compound, or a combination thereof, or

a combination thereof,

injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber;

contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition; and

separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas.

Appx397(36:7-23)

Claim 26 of the '114 Patent:

The method of claim 25, wherein the coal comprises the added $Br_2$, HBr, the bromide compound, or a combination thereof, added to the coal upstream of the combustion chamber.

Appx397(36:24-27)

Claim 1 of U.S. Patent No. 10,596,517 ("the '517 Patent"):

A method for reducing mercury in a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, the coal comprising an additive comprising $Br_2$, HBr, a bromide compound, or a combination thereof, to form the mercury-containing gas; and

collecting mercury in the mercury-containing gas with a sorbent added to the mercury-containing gas, the sorbent comprising activated carbon.

Appx472(35:59-67)

Claim 2 of the '517 Patent:

The method of claim 1, further comprising injecting an alkaline sorbent into the mercury-containing gas stream.

Appx472(36:1-2)

**FORM 9. Certificate of Interest** **Form 9 (P. 1)**
**March 2023**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2026-1403 |
| **Short Case Caption** | Birchtech Corp., v. Arthur J. Gallagher & Co., et al. |
| **Filing Party/Entity** | CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescense Energy Products LLC, Rutledge Products LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: August 25, 2026 Signature: */s/Douglas R. Nemec*

Name: Douglas R. Nemec

**FORM 9. Certificate of Interest** **Form 9 (P. 2)**
**March 2023**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| CERT Operations II LLC | | See attached |
| CERT Operations IV LLC | | |
| CERT Operations V LLC | | |
| CERT Operations RCB LLC | | |
| Senescense Energy Products LLC | | |
| Rutledge Products LLC | | |
| Springhill Resources LLC | | |
| Buffington Partners LLC | | |
| Bascobert (A) Holdings LLC | | |
| Larkwood Energy LLC | | |
| Cottbus Associates LLC | | |

☒ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☒ Additional pages attached

| | | |
|---|---|---|
| Cortlan S. Hitch<br>Morris James LLP | Paul J. Lockwood<br>Skadden, Arps, Slate, Meagher & Flom LLP | Nicole A. DiSalvo<br>Skadden, Arps, Slate, Meagher & Flom LLP |
| Daniel S. Atlas<br>Dailey LLP | Robert Scott Saunders<br>Skadden, Arps, Slate, Meagher & Flom LLP | Jessica R. Kunz<br>Skadden, Arps, Slate, Meagher & Flom LLP |
| Benn Wilson<br>Bradley Arant Boult Cummings LLP | Jessica Zurlo<br>Bradley Arant Boult Cummings LLP | Jeff Dyess<br>Bradley Arant Boult Cummings LLP |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☒ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## ADDITIONAL PAGES TO CERTIFICATE OF INTEREST

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Marquis Industrial Company | | See below |

**Answer to Section 3:**

1. CERT Operations II LLC is owned by Greenfuels Energy, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC; and Pine Mountain Holdings (CERT), LLC; and no publicly held company owns 10% or more of its stock.

2. CERT Operations IV LLC is owned by Greenfuels Energy, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC; and Pine Mountain Holdings (CERT), LLC; and no publicly held company owns 10% or more of its stock.

3. CERT Operations V LLC is owned by Greenfuels Energy, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC; and Pine Mountain Holdings (CERT), LLC; and no publicly held company owns 10% or more of its stock.

4. CERT Operations RCB LLC is owned by Greenfuels Energy, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC; and Pine Mountain Holdings (CERT), LLC; and no publicly held company owns 10% or more of its stock.

5. Senescense Energy Products, LLC is a wholly owned subsidiary of SLR RCB Holdings LLC; and no publicly held company owns a 10% or more ownership stake of Senescense Energy Products, LLC. The members of SLR RCB Holdings, LLC are JPM Capital Corporation and Memco CERT 2018, LLC. The members of Memco CERT 2018, LLC are CERT Holdings, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC and Pine Mountain Holdings (CERT), LLC. JPM Capital Corporation is a subsidiary of JPMorgan Chase & Co., a publicly held corporation.

6. Rutledge Products, LLC is a wholly owned subsidiary of SLR RCB Holdings LLC; and no publicly held company owns a 10% or more ownership stake of Rutledge Products, LLC. The members of SLR RCB Holdings, LLC are JPM Capital Corporation and Memco CERT 2018, LLC. The members of Memco CERT 2018, LLC are CERT Holdings, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC and Pine Mountain Holdings (CERT), LLC. JPM Capital Corporation is a subsidiary of JPMorgan Chase & Co., a publicly held corporation.

7. Springhill Resources, LLC is a wholly owned subsidiary of SLR RCB Holdings LLC; and no publicly held company owns 10% or more of its stock. The members of SLR RCB Holdings, LLC are JPM Capital Corporation and Memco CERT 2018, LLC. The members of Memco CERT 2018, LLC are CERT Holdings, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC and Pine Mountain Holdings (CERT), LLC. JPM Capital Corporation is a subsidiary of JPMorgan Chase & Co., a publicly held corporation.

8. Buffington Partners, LLC is held by Bascobert Holdings, LLC and Buffington Holdings (A), LLC; and no publicly held company owns 10% or more of its stock. Bascobert Holdings, LLC is held by CM Coal Holdings, LLC and Kiewit CERT Refined Coal, LLC; and no publicly held company owns 10% or more of its stock. Buffington Holdings (A), LLC is a wholly owned subsidiary of CERT Holdings, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC and Pine Mountain Holdings (CERT), LLC; and no publicly held company owns 10% or more of its stock.

9. Bascobert (A) Holdings, LLC is a wholly owned subsidiary of SLR RCB Holdings LLC; and no publicly held company owns 10% or more of its stock. The members of SLR RCB Holdings, LLC are JPM Capital Corporation and Memco CERT 2018, LLC. The members of Memco CERT 2018, LLC are CERT Holdings, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC and Pine Mountain Holdings (CERT), LLC. JPM Capital Corporation is a subsidiary of JPMorgan Chase & Co., a publicly held corporation.

10. Larkwood Energy, LLC is a wholly owned subsidiary of SLR RCB Holdings LLC; and no publicly held company owns 10% or more of its stock. The members of SLR RCB Holdings, LLC are JPM Capital Corporation and Memco CERT 2018, LLC. The members of Memco CERT 2018, LLC are CERT Holdings, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC and Pine Mountain Holdings (CERT), LLC. JPM Capital Corporation is a subsidiary of JPMorgan Chase & Co., a publicly held corporation.

11. Cottbus Associates, LLC is a wholly owned subsidiary of Cottbus Holdings, LLC, which is a wholly owned subsidiary of Kiewit RC Cottbus, LLC; and no publicly held company owns 10% or more of its stock.

12. Marquis Industrial Company, LLC is owned by Marquis Industrial Holdings (A), LLC and Mylan Special Investments IV, LLC. Marquis Industrial Holdings (A), LLC is a wholly owned subsidiary of CERT Holdings, LLC; W.A.S. Holdings, LLC; Springhill Management Company, LLC; and Pine Mountain Holdings (CERT), LLC. Mylan Special Investments IV, LLC is wholly owned by Viatris Inc., a public company. A publicly held company, Viatris Inc., ultimately owns 10% or more of Marquis Industrial Company, LLC's stock.

**Additional law firms and attorneys**

**4. Legal Representatives.** List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

| | |
|---|---|
| **Ashley M. Robinson**<br>Bradley Arant Boult Cummings LLP | **Paul Sykes**<br>Bradley Arant Boult Cummings LLP |

# TABLE OF CONTENTS


PATENTS CLAIMS AT ISSUE .......... ii

CERTIFICATE OF INTEREST .......... iv

TABLE OF CONTENTS .......... xi

TABLE OF AUTHORITIES .......... xv

STATEMENT OF RELATED CASES .......... 1

JURISDICTIONAL STATEMENT .......... 2

INTRODUCTION .......... 2

STATEMENT OF THE ISSUES .......... 4

STATEMENT OF THE CASE .......... 5

A. The Section 45 Tax Credits .......... 5

B. The Asserted Patents .......... 7

C. The Accused Products and Services .......... 8

D. District Court Proceedings Relevant to Appeal .......... 11

1. *Daubert* Rulings .......... 11

2. The Trial .......... 14

3. Post-Trial Motions and Judgment .......... 15

SUMMARY OF THE ARGUMENT .......... 16

STANDARD OF REVIEW .......... 18

ARGUMENT .......... 20

**I.** THE INDUCED INFRINGEMENT JUDGMENT SHOULD BE REVERSED OR VACATED .......... 20

A. CERT Is Entitled to Judgment as a Matter of Law Because No Reasonable Jury Could Find Induced Infringement Liability. ....... 20

1. The District Court Erred in Applying the Legal Standard of Induced Infringement. ....... 21

2. The Evidence Was Insufficient to Show That CERT Took an Affirmative Act to Encourage a Power Plant to Infringe the Asserted Claims. ....... 24

3. There Was No Evidence at Trial, Let Alone Substantial Evidence, That CERT Caused Direct Infringement. ....... 28

4. The Evidence Was Insufficient to Show that CERT Had Specific Intent to Cause Infringement. ....... 30

B. The Improper Jury Instructions on Induced Infringement Require a New Trial. ....... 32

1. The Induced Infringement Instructions Wrongfully Omitted an Affirmative Act Encouraging Performance of Each and Every Step of the Asserted Claims. ....... 32

2. The Jury Instruction Misstated the Actual Causation Requirement. ....... 33

3. No Properly Instructed Jury Could Have Found CERT Liable for Induced Infringement. ....... 34

**II.** THE CONTRIBUTORY INFRINGEMENT JUDGMENT AGAINST CERT RC SHOULD BE REVERSED OR VACATED. ....... 35

A. CERT Is Entitled to Judgment as a Matter of Law Because No Reasonable Jury Could Find Contributory Infringement Liability. ....... 36

1. The District Court Erred in Applying the Legal Standard for Contributory Infringement. ........................37

2. The Evidence Was Insufficient to Show That Refined Coal Has No Substantial Noninfringing Uses. ........................................................................45

3. There Was No Evidence at Trial, Let Alone Substantial Evidence, That Refined Coal Was Especially Made or Adapted for Infringement. .............46

B. The Improper Jury Instructions Given by the District Court Require a New Trial. ................................................. 48

**III.** THE DAMAGES JUDGMENT SHOULD BE REVERSED OR VACATED. ........................................................................... 49

A. The District Court Erred in Denying CERT's Motion for a New Trial on Damages. ................................................ 50

1. Mr. Green's Reliance on the Expert Report Agreements Was Flawed Because ME2C Did Not Offer Sufficient Evidence of Technical or Economic Comparability. ..................................................51

2. Mr. Green's Reliance on the Alistar Settlement Agreement Is Similarly Flawed. ......................................54

3. Mr. Green Failed to Properly Apportion the Value of the Patented Technology. ............................................56

B. After Properly Excluding Improper Testimony and Inapt Agreements, the Jury's Verdict Is Not Supported by Substantial Evidence. ..................................................... 60

C. If This Court Reverses or Vacates Any Portion of the Liability Judgment, the Entire Damages Judgment Should Be Vacated. ............................................................. 61

CONCLUSION ....................................................................................... 61

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from brief page 12 contains confidential provisions from various contracts, including royalty rate, pricing, and other terms from settlement and license agreements with third parties, and confidential details of the relationship between Appellants CERT RC and Appellees ME2C which the district court filed under seal.

# TABLE OF AUTHORITIES

## CASES

*ACCO Brands, Inc. v. ABA Locks Manufacturers Co.*,
501 F.3d 1307 (Fed. Cir. 2007) ........................................................19

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
561 F.3d 199 (3d Cir. 2009) ..............................................................20

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ..............................................51, 52, 56

*Barry v. DePuy Synthes Cos.*,
164 F.4th 896 (Fed. Cir. 2026) ...................................................19, 20

*In re Bill of Lading Transmission & Processing System Patent Litigation*,
681 F.3d 1323 (Fed. Cir. 2012) ...............................................*passim*

*Carbice Corp. v. America Patents Development Corp.*,
283 U.S. 27 (1931)..................................................................................33

*Carnegie Mellon University v. Marvell Tech. Group*,
807 F.3d 1283 (Fed. Cir. 2015) ........................................................54

*Cox Communications, Inc. v. Sony Music Entertainment*,
146 S. Ct. 959 (2026).........................................................................*passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)...................................................11, 13, 49, 54

*DSU Medical Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) (en banc) ........................................30

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) (en banc) .......................................51

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ...............................................*passim*

*Garretson v. Clark*,
111 U.S. 120 (1884)...............................................................................56

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)........................................................................*passim*

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
438 F.3d 1354 (Fed. Cir. 2006) ..................................................................37

*Gomez v. Allegheny Health Servs., Inc.*,
71 F.3d 1079 (3d Cir. 1995) .......................................................................19

*Grazier ex rel. White v. City of Philadelphia*,
328 F.3d 120 (3d Cir. 2003) ..................................................................35, 49

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) ..............................................................54, 55

*Hodosh v. Block Drug Co.*,
833 F.2d 1575 (Fed. Cir. 1987) ..................................................................41

*HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019) ..............................................................*passim*

*Ingenico Inc. v. IOENGINE, LLC*,
136 F.4th 1354 (Fed. Cir. 2025) .................................................................19

*Ingevity Corp. v. BASF Corp.*,
166 F.4th 1324 (Fed. Cir. 2026) .................................................................19

*Laboratory Corp. of America Holdings v. Qiagen Sciences, LLC*,
148 F.4th 1350 (Fed. Cir. 2025) .................................................................19

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ...............................................51, 52,53, 55, 56

*Leader Technologies, Inc. v. Facebook, Inc.*,
678 F.3d 1300 (Fed. Cir. 2012) ..............................................................60, 61

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993) .........................................................................19

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ..........................................................*passim*

*Marra v. Philadelphia Housing Authority*,
497 F.3d 286 (3d Cir. 2007) ........................................................................61

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)................................................................................*passim*

*Microsoft Corp. v. DataTern, Inc.*,
755 F.3d 899 (Fed. Cir. 2014) ..................................................................*passim*

*Minks v. Polaris Industries, Inc.*,
546 F.3d 1364 (Fed. Cir. 2008) ...................................................................53

*Minnesota Mineral & Manufacturing Co. v. Chemque, Inc.*,
303 F.3d 1294 (Fed. Cir. 2002) ...................................................................30

*Mitek Systems, Inc. v. United Services Automobile Association*,
139 F.4th 1340 (Fed. Cir. 2025) .............................................................*passim*

*Nalco Co. v. Chem-Mod, LLC*,
883 F.3d 1337 (Fed. Cir. 2018) .......................................................42, 43, 44

*Odetics, Inc. v. Storage Technology Corp.*,
185 F.3d 1259 (Fed. Cir. 1999) ...................................................................56

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
843 F.3d 1315 (Fed. Cir. 2016) ...............................................28, 33, 35, 49

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) .........................................................54, 55, 56

*Rodriquez v. Southeastern Pennsylvania Transportation Authority*,
119 F.4th 296 (3d Cir. 2024) .......................................................................19

*Sheridan v. E.I. DuPont de Nemours & Co.*,
100 F.3d 1061 (3d Cir. 1996) (en banc) ......................................................60

*Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharmaceutical Corp.*,
785 F.3d 625 (Fed. Cir. 2015) .....................................................................27

*TI Group Automotive Systems (North America), Inc. v. VDO North America, LLC*,
375 F.3d 1126 (Fed. Cir. 2004) ...................................................................19

*United States v. Gonzalez*,
905 F.3d 165 (3d Cir. 2018) ....................60

*Vectura Ltd. v. GlaxoSmithKline LLC*,
981 F.3d 1030 (Fed. Cir. 2020) ....................59

*Verizon Services Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ....................61

*VirnetX v. Apple Inc.*,
792 F. App'x 796 (Fed. Cir. 2019) ....................61

*Virnetx, Inc. v. Cisco Systems, Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ....................59

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) ....................20, 30, 32

*VLSI Technology LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ....................51, 58

*Wash World Inc. v. Belanger Inc.*,
131 F.4th 1360 (Fed. Cir. 2025) ....................19

*Willis Electric Co. v. Polygroup Ltd.*,
166 F.4th 1363 (Fed. Cir. 2026) ....................60

*Wordtech Systems, Inc., v. Integrated Networks Solutions, Inc.*,
609 F.3d 1308 (Fed. Cir. 2010) ....................34, 56

**STATUTES AND RULES**

26 U.S.C. § 45 .................... *passim*

26 U.S.C. § 45(c)(7) ....................6, 8

26 U.S.C. § 45(c)(7)(B) ....................58

28 U.S.C. § 1331 ....................2

28 U.S.C. § 1338 ....................2

28 U.S.C. § 1295(a)(1) ....................2

35 U.S.C. § 271(b) ....................20, 22, 23, 32

35 U.S.C. § 271(c) ....................35

Fed. R. Evid. 702 ....................*passim*

**STATEMENT OF RELATED CASES**

No appeal from this civil action was previously before this or any other appellate court.

Appellee Birchtech Corp., f/k/a Midwest Energy Emissions Corp. ("ME2C") has asserted U.S. Patent No. 10,343,114 ("the '114 Patent") and U.S. Patent No. 10,596,517 ("the '517 Patent") (collectively the "Asserted Patents") in the following cases: *Midwest Energy Emissions Corp. v. Evergy, Inc. et al.*, No. 5:25-cv-04033 (D. Kan.); *Midwest Energy Emissions Corp. v. Wisconsin Power & Light Co.*, No. 4:25-cv-00038 (S.D. Iowa); *Birchtech Corp. f/k/a Midwest Energy Emissions Corp. v. Evergy, Inc. et al.*, No. 4:25-cv-00050 (W.D. Mo.); *Midwest Energy Emissions Corp. v. Berkshire Hathaway Energy Co. et al.*, No. 2:25-cv-00015 (D. Wyo.); *Midwest Energy Emissions Corp. v. Wisconsin Power & Light Co.*, No. 3:25-cv-00026 (W.D. Wis.); *In Re: Midwest Energy Emissions Corp. Patent Litigation*, No. 4:24-md-03132 (S.D. Iowa); *Midwest Energy Emissions Corp. v. Tucson Elec. Power Co. et al.*, No. 3:24-cv-08145 (D. Ariz.); *Midwest Energy Emissions Corp. v. Ameren Corp. et al.*, No. 4:24-cv-00980 (E.D. Mo.); *Midwest Energy Emissions Corp. v. MidAmerican Energy Company et al.*, No. 4:24-cv-00243 (S.D. Iowa). The following actions also involve the '114 Patent: *Berkshire Hathaway Energy Co. et al. v. Birtchtech Corp.*, IPR2025-00274 (P.T.A.B. Oct. 23, 2025); *Berkshire Hathaway Energy Co. et al. v. Midwest Energy Emissions Corp.*, IPR2025-00278

(P.T.A.B. Oct. 23, 2025). The following actions also involve the ’517 Patent: *Berkshire Hathaway Energy Co. et al v. Midwest Energy Emissions Corp. n/k/a Birchtech Corp.*, IPR2025-00280, IPR2025-00281 (P.T.A.B. Oct. 23, 2025).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. The district court entered final judgment on December 29, 2025. Appx1-5. Appellants CERT Operations II, LLC, CERT Operations IV, LLC, CERT Operations V, LLC and CERT Operations RCB, LLC (collectively referred to as “CERT Operations”), Senescense Energy Products LLC, Bascobert (A) Holdings LLC, Rutledge Products, LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company LLC, Springhill Resources LLC and Buffington Partners LLC (collectively referred to as “CERT RC”) (all appellants collectively referred to as “CERT”) timely appealed on January 28, 2026. Appx729. This court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

This is an appeal from a judgment after a jury trial in the District Court for the District of Delaware (Burke, J.) awarding ME2C $57,082,005 in damages plus pre- and post-judgment interest for infringing method claims in two patents. That award cannot stand, as the record is fundamentally inconsistent with longstanding indirect infringement and damages principles.

***First***, the induced infringement judgment hinges on multiple legal errors. To prove induced infringement, a patent owner must show that the accused inducer *took affirmative steps* to *encourage* infringement of *each and every step* of the asserted claims and that the accused inducer's actions actually caused the direct infringement. The district court expressly declined to apply these requirements in denying JMOL and in instructing the jury. Applying the correct legal standard, the induced infringement judgment as to CERT must be reversed because no reasonable jury could find that CERT induced infringement by providing refined coal when the asserted patents require a multi-step process and are only infringed when third parties burn the coal in a certain way not encouraged or caused by CERT. Even ME2C's expert admitted that CERT never instructed the power plants to perform a claimed step.

***Second***, the contributory infringement judgment also hinges on multiple legal errors. The substantial noninfringing use inquiry turns on whether the accused product is equally capable of uses *other than* infringement. In denying JMOL, the district court expressly disregarded this inquiry, and focused on whether *specific* refined coal used by *specific* power plants during a *specific* period had no substantial noninfringing use. The district court also incorrectly instructed the jury that they may not consider uses of refined coal that fall outside of this narrow scope. Applying the proper inquiry, the contributory judgment as to CERT RC must be reversed

because no reasonable jury could find that CERT RC contributed to infringement through providing the accused refined coal.

***Third***, the damages award cannot stand because the jury's verdict rests on multiple evidentiary errors. The district court erred in admitting the expert opinions from ME2C's damages expert, Philip Green ("Mr. Green") into evidence and by allowing him to testify at trial. Mr. Green neither based his opinions on comparable licenses nor properly apportioned the value of the patented technology out of the overall fee paid for those agreements. In fact, Mr. Green inverted the proper analysis—rather than valuing the technology claimed by ME2C's patents, he excluded it from his royalty calculations and valued tax credits which ME2C did not invent. The jury's verdict of $1 per ton of coal is not supported by any proper evidence in the record.

This Court should accordingly reverse or vacate.

## STATEMENT OF THE ISSUES

1. Whether the judgment of induced infringement should be reversed because the district court applied the incorrect legal standard and ME2C failed to adduce substantial evidence that CERT induced the infringement.

2. Whether, in the alternative, CERT should be awarded a new trial on induced infringement based on errors in instructing the jury.

3. Whether CERT is entitled to JMOL on contributory infringement because the district court applied the incorrect legal standard and ME2C failed to adduce substantial evidence that CERT contributed to infringement.

4. Whether, in the alternative, CERT should be awarded a new trial on contributory infringement based on errors in instructing the jury.

5. Whether the damages judgment should be vacated because the district court erroneously allowed ME2C's expert's damages opinions, given that the royalty rate opinion did not rely on comparable licenses and was not properly apportioned.

## STATEMENT OF THE CASE

ME2C's operative complaint accused dozens of defendants, including CERT, of indirectly infringing five utility patents relating to methods for reducing mercury emissions from coal combustion. The jury found that CERT induced infringement and that CERT RC contributed to infringement of claims 25 and 26 of the '114 Patent and claims 1 and 2 of the '517 Patent (collectively "Asserted Claims").

### A. The Section 45 Tax Credits

In 1990, the United States Environmental Protection Agency ("EPA") received a Congressional mandate to promulgate regulations addressing air pollutants including mercury. Appx2488(¶¶21-22). In 2011, the EPA finalized national standards aimed to reduce mercury and other pollutants, which became known as the Mercury and Air Toxics Standards ("MATS"). Appx1334(¶50);

Appx1753(¶23). A number of power plants installed and used activated carbon systems and other methods to come into compliance with MATS. Appx3842.

While the EPA was formulating MATS, Congress continued its efforts to combat pollution by creating the Section 45 tax credit in 2004. Appx2488-2489(¶25-26). This Congressionally created incentive allowed a refined coal producer to claim a tax credit for each ton of refined coal sold to a power plant that resulted in a reduction in mercury and nitrogen oxide emissions. Appx4159; 26 U.S.C. § 45(c)(7). The tax credit program also required producers to open and begin operating a facility for producing refined coal by December 31, 2011. Appx2489(¶32). The Section 45 tax credit program ended on December 31, 2021. *Id.*

To claim the Section 45 tax credit, each refined coal producer was required to certify that the refined coal it was producing and burning met emission reduction benchmarks compared to raw, untreated coal. Appx3175. For CERT, these benchmarks were a 20% reduction in nitrogen oxide and a 40% reduction in mercury. *Id.* Refined coal producers were required to conduct certification testing to renew their eligibility every six months. Appx3183. The Internal Revenue Service ("IRS") provided various pathways to conduct certification testing, including via pilot scale testing at a site that met certain testing requirements. Appx3175-3177. The Energy & Environmental Research Center ("EERC"), a nonprofit research organization at the University of North Dakota that owned and operated facilities

that met those testing requirements, conducted certification tests for CERT. Appx3621, Appx3171, Appx3783.

**B. The Asserted Patents**

The Asserted Patents recite methods for reducing mercury emissions from power plants by burning coal with an added bromine compound and then injecting an activated carbon sorbent ("ACI"). *See* Appx397(36:7-27); Appx472(35:59-36:02).

Claim 25 of the '114 Patent is a method comprising: (1) adding a bromine compound to the coal before or after it is combusted, (2) "injecting a sorbent material" of activated carbon into the gas resulting from coal combustion, creating a "mercury/sorbent composition," and (3) "separating the mercury/sorbent composition" from the gas. Appx397(36:7-23). Claim 26, which depends on claim 25, further requires that the bromine compound is added before the combustion chamber. *Id.*(36:24-27). The '114 Patent was issued on July 9, 2019. Appx365.

Similarly, claim 1 of the '517 Patent is directed to: (1) combusting coal with an "additive" of a bromine compound, (2) creating gas, (3) adding an activated carbon sorbent to the gas, and (4) "collecting mercury . . . with [the activated carbon] sorbent." Appx472(35:59-67). Claim 2, which depends on claim 1, further requires the addition of an alkaline sorbent. *Id.*(36:1-2). The '517 Patent was issued on March 24, 2020. Appx434.

CERT challenges the judgment of induced and contributory infringement of all Asserted Claims. The damages period ran from July 2019, when the '114 Patent was granted and ME2C filed this suit, to the end of the refined coal program in December 2021. Appx2487(¶15), Appx285, Appx312, Appx2489(¶32).

### C. The Accused Products and Services

CERT provides coal formulated with MerSorb (a solution of calcium bromide) and S-Sorb (cement kiln dust) ("refined coal") designed to reduce the mercury and nitrogen oxide emissions at coal-fired power plants. Appx4371, Appx3255, 26 U.S.C. § 45(c)(7). Refined coal facilities are collections of equipment used to produce refined coal for coal-fired power plants. Appx4338. CERT RC owned refined coal facilities, which were operated by CERT Operations. Appx2491-2493(¶47-¶64). CERT RC sold the refined coal to power plants ME2C accused of direct infringement ("the accused power plants"). Appx3930-3931. ME2C separately sued the operators of the accused power plants, such as Vistra, Talen, AECI and NRG, for direct infringement in its original complaint; ME2C settled with the power plant operators before trial. Appx1756(¶37), Appx1080, Appx1121.

CERT RC would purchase coal from accused power plants. Appx3930. CERT Operations would then treat that coal by spraying on MerSorb and S-Sorb to create refined coal. Appx3930.

The EERC set the amount of MerSorb and S-Sorb CERT needed to add to coal for it to qualify for the Section 45 tax credit. Appx4418-4419. Consistent with Section 45, CERT Operations would spray on that amount of MerSorb and S-Sorb plus an additional 3-5% to ensure the produced refined coal qualified for the credit. Appx4419. The amount of MerSorb and S-Sorb the CERT Operations companies added to coal, and the process for adding those products, was no different before and after the damages period began. Appx4434-4436. After treatment, the power plants would purchase the refined coal from CERT RC at a lower price than what CERT RC originally paid for the coal. Appx3930-3931.

When coal-fired power plants burn coal, this releases several "impurities," including mercury. Power plants then attempt to remove impurities from the gas before they are emitted into the atmosphere. Appx3611-3613. Many coal-fired power plants inject activated carbon sorbent ("ACI") to reduce mercury emissions. Appx4079-4080. Each of the accused power plants also used a baghouse or an electrostatic precipitator ("ESP") to collect mercury from the power plant's flue gas. Appx3951.

The accused power plants each used ACI before and after the damages period. Appx2490(¶¶43-45), Appx4090, Appx284. They did so specifically to help comply with MATS. Appx4079-4080, Appx4090. Only one of the accused power plants used ACI before 2015, the year MATS came into effect. Appx2490(¶¶43-45).

Those plants that used ACI continued doing so after they ceased using refined coal. Appx4090. The accused power plants did not use ACI with every single ton that they burned during the damages period, and ME2C did not offer evidence at trial showing how many tons the power plants burned with ACI during the damages period. *See* Appx3911 (ME2C's expert testifying that plants sometimes shut off ACI systems while refined coal is burned); Appx4050-4051 (ME2C's expert testifying that ACI systems are online "a good percentage of the time" when refined coal is burned); Appx4049 (ME2C's witness admitting he did not read the accused power plants' records of ACI use).

While the accused power plants chose to use ACI to help meet MATS, ACI cannot be used during tests to ensure refined coal qualifies for the Section 45 tax credits. Appx4384-4386.

During the time of the Section 45 program, each CERT appellant sold or treated refined coal at a coal-fired power plant that did not use ACI. Appx4341-4353.

In its initial complaint, ME2C also brought its claims against CERT Operations, LLC and CERT Operations III, LLC (collectively referred to as the "CERT nonappellants") but later withdrew those claims. Appx4358-4359,

*see* Appx315. CERT nonappellants also operated refined coal facilities and provided refined coal to three power plants—Chesterfield Power Station, Mount Storm Power Station and Intermountain Power Plant—that operated for years without ACI. Appx4333-4334, Appx4367-4369. Unlike the CERT RC-owned facilities which refined sub-bituminous and lignite coal, the CERT nonappellants' facilities refined bituminous coal or a mixture of sub-bituminous and bituminous coal. Appx4437, Appx4497.

### D. District Court Proceedings Relevant to Appeal

#### 1. *Daubert* Rulings

Before trial, CERT brought numerous challenges to ME2C's damages expert, Mr. Green, under Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993) ("*Daubert*"). Appx195. Mr. Green offered a reasonable royalty range of 35 to 65 cents in his expert report, based on three sets of agreements (the "Chem-Mod Agreement," the "Nalco Settlement Agreement," and the "ADA-ES Agreement"; collectively the "Expert Report Agreements"). Appx1788(¶195), Appx1775(¶130), Appx1784(¶178).

The Chem-Mod Agreement was entered between Chem-Mod and DTE Energy Resources, LLC ("DTE") in January 2009. Appx7953. Chem-Mod granted DTE a license to technology [redacted]. Appx7956. DTE agreed to [redacted] supplemented by [redacted] Appx7962(§§ 3.1-3.2). [redacted]. Appx7962(§ 3.2).

The Nalco Settlement Agreement was executed in July 2019 between the Nalco corporate family and Chem-Mod to settle two lawsuits brought by Nalco. Appx7840. In both lawsuits, Nalco asserted a patent that injected halogen into flue gas to reduce mercury emissions. *Id.*, Appx8007. To settle the litigation, Chem-Mod agreed to [redacted] to the patented technology. Appx7843-7844(§ 4(a)-§ 5).

The ADA-ES Agreement was entered into by ADA-ES Inc. and Clean Coal Solutions, LLC with an effective date of July 2012. Appx1784(¶174). Clean Coal Solutions was a joint venture between ADA-ES and NextGen Resources Corporation. *Id*(¶175). The Agreement granted Clean Coal Solutions an exclusive license to a patent related to mercury and nitrogen oxide emissions in exchange for a royalty amount that Mr. Green did not specify. *Id*(¶¶176-78). Mr. Green handwaved this by asserting that it "could amount to as much as" $1 per ton based

on associated SEC filings. *Id.*(¶177).

Mr. Green changed his opinion at trial to call for a rate of 65 cents to $1 per ton of coal. Appx4113. He changed his opinion to include a settlement agreement that ME2C entered into with a former defendant in this case, Alistar, in November 2023—days before trial was scheduled to begin. Appx3408-3409. Alistar agreed to pay $107,776 to settle ME2C's claims that it had infringed the Asserted Patents and other patents. Appx9644-9645(§ 4.2). The agreement provided that this was "based on a rate of $1 per ton of accused coal sold during the applicable damages period…." *Id*.

The district court denied CERT's *Daubert* motion. Appx195. The district court held that Mr. Green's opinion passed muster because it reflected technical comparability when considered alongside the opinion of ME2C's technical expert, Philip O'Keefe ("Mr. O'Keefe"). Appx198. Mr. O'Keefe testified that the patents licensed by the Expert Report Agreements are technically comparable to the Asserted Patent "at least in the sense that they are drawn toward the same field of technology." Appx199. As to economic comparability and apportionment, the district court held that Mr. Green provided enough information to show economic similarities to the hypothetical license. Appx203. The district court found that CERT's criticisms of Mr. Green's methodology went to "weight," rather than admissibility. *Id.*

### 2. The Trial

Before trial, ME2C narrowed its infringement and damages claims to the Asserted Claims in the Asserted Patents. Appx2496. The district court held a five-day jury trial from February 26, 2024 to March 1, 2024. Appx328.

On inducement, the district court rejected CERT's request to instruct the jury that CERT must have "encouraged" a power plant to perform each and every step of the Asserted Claims. Appx4538. Instead the district court instructed, over CERT's objection (Appx4535), that the jury should consider whether CERT "actually caused" a power plant to perform each and every step of the patented process with no reference to encouragement. Appx4686. The district court also denied CERT's request to instruct the jury that CERT's actions "instead of other factors" caused a power plant to infringe. Appx4538-4539, Appx4686.

On the issue of substantial noninfringing uses for contributory infringement, the district court denied CERT's request to allow the jury to consider uses of all refined coal. Appx4546. It instead instructed, over CERT's objection (Appx4546), that the jury must only consider whether refined coal "as sold and delivered [to a directly infringing power plant] during the damages period" has substantial noninfringing uses. Appx4689.

The district court then reiterated that in assessing contributory infringement, the only relevant refined coal "is the refined coal that [CERT] supplied during the

damages periods [*sic*] to a power plant that is alleged to have directly infringed the patents-in-suit in this case." Appx4690-4691. The court instructed the jury to "not consider refined coal that the defendants may have sold . . . outside . . . of the damages period," and to not consider "refined coal sold by entities that are not defendants in this case." Appx4691.

At trial, CERT moved for JMOL of no induced infringement, Appx4396, Appx4513, which the district court denied. Appx4414-4416. CERT also moved for JMOL of no contributory infringement by CERT RC, Appx4513-4514, which the court also denied. Appx4527.

On March 1, 2024, the jury returned a verdict for ME2C on all counts and an award for $57,082,005 in damages, reflecting the $1 a ton royalty figure from Mr. Green's opinion. Appx3093-3099.

On May 30, 2024, the district court held a bench trial. Appx231. Issues from the bench trial are not subject to this appeal.

### 3. Post-Trial Motions and Judgment

After trial, CERT renewed its motion for JMOL of no induced infringement by CERT and no contributory infringement by CERT RC. Appx283-284. CERT also moved for a new trial on contributory infringement, induced infringement and damages. Appx328-329. The district court denied those motions. Appx284, Appx329.

On December 29, 2025, the district court entered a final judgment in favor of ME2C. Appx1-5.

## SUMMARY OF THE ARGUMENT

CERT is entitled to JMOL or a new trial on multiple grounds.

***First***, no reasonable jury could find CERT induced infringement as a matter of law. In denying JMOL, the district court overlooked the Supreme Court's and this Court's precedents that induced infringement requires proving that the accused inducer *took affirmative steps* to *encourage* infringement of *each and every step* of the Asserted Claims and that the accused inducer's actions actually caused the direct infringement.

Applying the correct legal standard, here, ME2C failed to prove induced infringement as a matter of law. As to active inducement, no reasonable jury could find that CERT actively encouraged infringement based on CERT's provision of the refined coal. As to specific intent, no reasonable jury could find that CERT possessed specific intent to encourage the power plants' infringement based on CERT's knowledge that the refined coal may have infringing uses. As to causation, no reasonable jury could find CERT caused the power plants to perform every step of the claims when the power plants had independently used ACI for years and used ACI to comply with MATS.

***Second***, as an alternative, a new trial should be granted on induced infringement. The district court's erroneous jury instructions permitted the jury to find inducement without requiring proof of *affirmative encouragement* of *each element* of the claimed methods or actual causation directed to the infringement. Those prejudicial errors, which invited the jury to apply the incorrect legal standard on induced infringement, require a new trial.

***Third***, no reasonable jury could find CERT RC contributed to infringement as a matter of law. In denying JMOL, the district court overlooked this Court's substantial noninfringing use inquiry—whether a product is equally capable of uses other than infringement. The district court instead narrowed the scope of the substantial noninfringing use inquiry to a limited set of refined coal—only that coal physically on the premises of the accused power plants during the damages period. The district court then erroneously rejected as "simply beside the point" essential evidence of uses of refined coal other than infringement in its JMOL decision.

Here, ME2C failed to prove contributory infringement as a matter of law. To begin, no reasonable jury could find that refined coal has no substantial noninfringing uses when power plants (including accused plants) burned refined coal without ACI both before and during the damages period. Further, no reasonable jury could find that refined coal is especially made or adapted for infringement when the chemical composition of refined coal was determined years before the Asserted

Patents were issued and when Section 45 credits could be obtained without using refined coal in an infringing manner.

***Fourth***, in the alternative, a new trial should be granted on contributory infringement. The district court erred in instructing the jury that the substantial noninfringing use inquiry is limited to uses of the specific refined coal sold to the accused power plants during the damages period. The district court then compounded its error by explicitly instructing that jurors “may not consider” other uses of refined coal. These prejudicial errors, which prevented a fair determination of whether refined coal can be used for purposes “other than” infringement, require a new trial.

***Fifth***, the damages judgment should be reversed or vacated. The jury’s damages award rests on evidence that should not have been admitted at trial. Mr. Green’s royalty rate opinion was not based on licenses that are comparable to the hypothetical license here. Nor did he properly apportion the value of the patented technology out of the overall fee paid for those licenses.

Considering only proper evidence presented at trial, the jury’s verdict of $1 per ton of coal is not supported. The verdict should be vacated.

## STANDARD OF REVIEW

This Court reviews a district court’s rulings on post-trial motions, including for judgment as a matter of law (“JMOL”) or a new trial, under the law of the

regional circuit. *Wash World Inc. v. Belanger Inc.*, 131 F.4th 1360, 1367 (Fed. Cir. 2025). "The Third Circuit reviews rulings on motions for judgment as a matter of law *de novo*." *Barry v. DePuy Synthes Cos*., 164 F.4th 896, 903 (Fed. Cir. 2026) (citing *Rodriquez v. Se. Pa. Transp. Auth.*, 119 F.4th 296, 298 (3d Cir. 2024)). JMOL "is appropriate" where "the record is critically deficient of the minimum quantum of evidence," that is, when there is no "evidence upon which a reasonable jury could have found its verdict." *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC*, 375 F.3d 1126, 1133 (Fed. Cir. 2004) (quoting *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995)).

The Third Circuit reviews orders on motions "for a new trial for abuse of discretion unless the court's denial is based on the application of a legal precept, in which case the standard of review is plenary." *Ingevity Corp. v. BASF Corp.*, 166 F.4th 1324, 1333 (Fed. Cir. 2026) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993)). Whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law and is reviewed *de novo*. *Ingenico Inc. v. IOENGINE, LLC*, 136 F.4th 1354, 1363 (Fed. Cir. 2025).

"Infringement is a question of fact that [this Court] review[s] for substantial evidence when tried to a jury." *Lab'y Corp. of Am. Holdings v. Qiagen Scis., LLC*, 148 F.4th 1350, 1357 (Fed. Cir. 2025). A jury's infringement verdict "cannot stand" if it is not supported by substantial evidence in the record. *ACCO Brands, Inc. v.*

*ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1314 (Fed. Cir. 2007). The Third Circuit reviews rulings on motions to exclude evidence for abuse of discretion. *Barry*, 164 F.4th at 902 (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009)).

# ARGUMENT

## I. THE INDUCED INFRINGEMENT JUDGMENT SHOULD BE REVERSED OR VACATED.

Only those who "actively induce[] infringement of a patent" are liable for induced infringement under 35 U.S.C. § 271(b). When determining whether a defendant actively induced infringement, the Supreme Court and this Court's precedents require proof that the accused inducer *took affirmative steps* to *encourage* infringement of *each and every step* of the asserted claims. The district court failed to apply this standard in denying JMOL, and failed to properly instruct the jury of this requirement. Applying the correct legal standard, ME2C did not adduce sufficient evidence of active inducement, specific intent or causation. The induced infringement judgment should be reversed.

### A. CERT Is Entitled to Judgment as a Matter of Law Because No Reasonable Jury Could Find Induced Infringement Liability.

Inducement requires a showing that the alleged inducer (1) knew of the patent, (2) knowingly induced the infringing acts, and (3) possessed a specific intent to encourage another's infringement of the patent. *Vita-Mix Corp. v. Basic Holding,*

*Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009). In *Cox*, the Supreme Court reinforced that induced infringement requires "actively encourag[ing] infringement through specific acts." *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 967 (2026) (citing *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 942 (2005) (Ginsburg, J., concurring)). The accused infringer must also have "an affirmative intent that the product be used to infringe." *Cox*, 146 S. Ct. at 968 (citing *Grokster*, 545 U.S. at 936).

Here, all Asserted Claims include the steps of injecting an activated carbon sorbent and "separating the mercury/sorbent composition from the mercury-containing gas" or "collecting mercury in the mercury-containing gas with a sorbent added to the mercury-containing gas." Appx397(36:16-23), Appx472(35:65-67). No reasonable jury could find that CERT actively induced infringement of these limitations.

### 1. The District Court Erred in Applying the Legal Standard of Induced Infringement.

In denying CERT's JMOL, the district court found that CERT's provision of refined coal with knowledge that it may be used in an infringing manner could stand as CERT's "affirmative action" to induce the power plants' infringement. Appx299. The district court was wrong.

With respect to the active inducement requirement, the Supreme Court has made clear that the adverb "actively" in § 271(b) "suggests that the inducement must

involve the taking of affirmative steps to bring about the desired result." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760 (2011). Inducement thus "premises liability on purposeful, culpable expression and conduct" by the accused inducer. *Id.* at 763.

Inducement of patent infringement requires more than mere "knowledge that [a product] may be put to infringing uses"; rather, it requires "statements or actions directed to promoting infringement." *Grokster*, 545 U.S. at 935. Put differently, induced infringement can be found only when one "actively encourages infringement through specific acts." *Cox*, 146 S. Ct. at 967 (citing *Grokster*, 545 U.S. at 942); *see Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 139 F.4th 1340, 1350 (Fed. Cir. 2025) ("[L]iability under § 271(b) requires *an affirmative act encouraging infringement*" (emphasis added)).

In *Cox*, the Supreme Court reinforced the high threshold for inducement liability. There, the Supreme Court found an Internet service provider did not induce its users' infringement of Sony's copyrighted songs. *Cox*, 146 S. Ct. at 968. The Supreme Court held that merely providing internet service to subscribers did not constitute "evidence of express promotion, marketing, and intent to promote infringement." *Id.* at 968 (citation modified) (quoting *Grokster*, 545 U.S. at 926). Drawing on the "historic kinship" between copyright and patent law, *id.* at 964, the Supreme Court reaffirmed that inducement under § 271(b) requires "express

promotion, marketing, [or] intent to promote" an infringing use—not mere awareness that infringement may occur. *Id.* at 968 (quoting *Grokster*, 545 U.S. at 926). The Supreme Court further explained that § 271(b) "requires that the party express 'an affirmative intent that the product be used to infringe.'" *Id.* (quoting *Grokster*, 545 U.S. at 936). *Cox* thus confirms what *Grokster* and *Global-Tech* established: The accused inducer must have "an affirmative intent" and take affirmative steps that expressly promote or encourage the infringing conduct. *Cox*, 146 S. Ct. at 968; *Grokster*, 545 U.S. at 936, 939 n.12; *see Global-Tech*, 563 U.S. at 760. While the accused infringer took the affirmative step of providing internet service, this step was not enough to encourage infringement. *Cox*, 146 S. Ct. at 968.

Moreover, the patentee must demonstrate that the alleged inducer encouraged the performance of "*every single step* in the method." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014) (emphasis added); *Mitek*, 139 F.4th at 1351 (finding no inducement where the patent owner did not allege encouraging performance of every claim limitation).

The district court overlooked these well-settled principles in denying JMOL. The district court erred in crediting ME2C's infringement theory and in taking an unsupported leap from CERT's affirmative acts (CERT's provision of refined coal to the power plants) to a finding of inducement of patents covering a multi-step process carried out by third parties. Appx295-296. In its ruling, the district court

found that evidence at trial supported CERT's affirmative actions of "providing refined coal to the power plants while being physically located at those very plants, and paying the power plants to take that coal," but did not recite evidence that these actions encouraged infringement of the Asserted Patents. Appx299. This is a reversible error.

#### 2. The Evidence Was Insufficient to Show That CERT Took an Affirmative Act to Encourage a Power Plant to Infringe the Asserted Claims.

Substantial evidence at trial does not show that CERT took an affirmative step to encourage direct infringement of using ACI and "separating" and "collecting" mercury.

***First***, the evidence was insufficient to show CERT affirmatively encouraged the power plants to use ACI. CERT sold refined coal to both power plants that used ACI and those that did not use ACI. Appx4078-4079, Appx4348-4353, Appx4367-4369, Appx4440. As a matter of law, simply providing refined coal to power plants is not enough to "encourage" infringement of a patent that requires a third party to burn the coal in a specific way to infringe. *See Cox*, 146 S. Ct. at 968 (holding no inducement liability when simply providing Internet access, "which is used for many purposes other than copyright infringement"). Tellingly, even ME2C's expert admitted that CERT never instructed the power plants to use ACI. Appx4045-4046; *see Grokster*, 545 U.S. at 935 (induced infringement requires

"statements or actions directed to promoting infringement"); *Global-Tech*, 563 U.S. at 763 (inducement "premises liability on purposeful, *culpable expression* and conduct" (emphasis added)).

***Second***, uncontroverted evidence at trial shows that power plants made their own decision on whether to use ACI in their emission programs. *See* Appx4089-4090 (power plants continued to use ACI after they ceased combusting refined coal); Appx4367-4368, Appx8930 (by March 2016, NRG informed CERT that it "installed activated carbon injection equipment to increase mercury control"); Appx8931 (by March 2016, Ameren included ACI to comply with mercury control). Indeed, power plants that chose to use ACI also combusted refined coal while their ACI system was disabled. Appx3909-3911, Appx4050-4051. This uncontroverted evidence shows that CERT at most sold the refined coal that could be used in an infringing manner by some power plants. This does not come close to "actively encourag[ing]" the power plants to use ACI. *See Cox*, 146 S. Ct. at 967 (citing *Grokster*, 545 U.S. at 942) ("A provider induces infringement if it *actively encourages infringement* through specific acts." (emphasis added)).

This Court's *HZNP* decision is instructive. In *HZNP*, the claimed invention required the user to "(1) apply the inventive formulation, (2) wait for the area to dry, and (3) apply sunscreen, insect repellant, or a second topical medication." *HZNP Meds. LLC v. Actavis Lab'ys UT, Inc.*, 940 F.3d 680, 702 (Fed. Cir. 2019). This Court

found the accused infringer was not liable for induced infringement because the label on its product, a generic version of the patentee's formulation, "only require[s] the first step of this method, nothing else." *Id.* This Court reasoned that the accused infringer's remaining instructions left the decision to the user, "operat[ing] in an 'if/then' manner: *if* the user wants to cover the treated area with clothing or apply another substance over it, *then* the patient should wait until the area is dry." *Id.* Similarly, here, evidence at trial shows that the decision to use ACI is left entirely to the power plants. This is not enough for CERT to be liable for induced infringement. *See HZNP*, 940 F.3d at 702.

***Third***, evidence at trial shows that power plants injected ACI because of third parties—the EPA via its MATS regulations—not "encouragement" from CERT. Appx3944, Appx3949, Appx3992, Appx3993-3994, Appx4079. That alone destroys ME2C's inducement theory. In *Microsoft*, this Court found claim charts failed to "impliedly assert" induced infringement when a third party provided instructions to Microsoft's customers for performing two of the asserted method steps. *Microsoft Corp. v. DataTern, Inc.,* 755 F.3d 899, 905 & n.3 (Fed. Cir. 2014). Absent an instruction from Microsoft for each step of the asserted claims, this Court found that there was no evidence that Microsoft "encouraged the acts accused of direct infringement" because "simply selling a product capable of being used in an infringing manner [was] not sufficient to create a substantial controversy regarding

inducement." *Id.* at 905. Similarly here, because the EPA—not CERT—encouraged the injection of ACI to comply with MATS, CERT cannot be found liable for induced infringement. *See id.*

ME2C also devoted much of its inducement case to communications between CERT and the power plants before the Asserted Patents issued. Appx4019-4020 (2015 requests from power plants to CERT for help optimizing the use of bromine and ACI to comply with MATS); Appx4300 (2012 presentation from CERT to power plants on the benefits of using refined coal); Appx9178, Appx7837. But this evidence at best shows that CERT had general knowledge that the power plants may use ACI in conjunction with refined coal. Selling refined coal with the knowledge that it may be used in an infringing manner is a far cry from affirmatively encouraging plants to perform ACI. *See Cox*, 146 S. Ct. at 968; *Microsoft*, 755 F.3d at 905 ("[S]imply selling a product capable of being used in an infringing manner is not sufficient to create a substantial controversy regarding inducement."); *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 630 (Fed. Cir. 2015) ("[The] sale of a lawful product by lawful means, with the knowledge that an unaffiliated, third party may infringe, cannot, in and of itself, constitute inducement of infringement." (alternation in original)).

The district court also erred in holding that the jury's finding was supported by CERT's act of "providing refined coal to the power plants while being physically

located at those very plants, and paying the power plants to take that coal." Appx298-299 (citing Appx4095, Appx4244, Appx4246). Again, this is nothing more than providing refined coal; this does not speak to encouraging plants to use ACI. Indeed, the evidence relied on by the district court merely showed that CERT sold refined coal to the power plants; CERT was not involved in emission control (i.e., whether to use ACI to burn refined coal) at the power plants. *See* Appx4244 (CERT's corporate witness testified that CERT was not "involved in emissions control equipment at power plants," but was "a fuel manufacturer that qualifies for the Section 45 program"). This evidence lacks any affirmative encouragement by CERT for the power plants to use ACI when burning refined coal, and thus, cannot support the jury's finding of induced infringement. *See HZNP*, 940 F.3d at 702; *Cox*, 146 S. Ct. at 968.

### 3. There Was No Evidence at Trial, Let Alone Substantial Evidence, That CERT Caused Direct Infringement.

To induce infringement of a multi-step method claim, an infringer must act to "cause" a direct infringer to perform each step of the method claim. *See Global-Tech*, 563 U.S. at 760 (requiring "affirmative steps to *bring about* the desired result" (emphasis added)); *HZNP*, 940 F.3d at 701 (requiring "active steps taken to *encourage* direct infringement" (emphasis added)); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016) ("To prevail under a theory of indirect infringement, [plaintiff] must first prove that the

defendants' actions led to direct infringement of the [patent-in-suit]." (citation omitted) (second alterations in original)).

The evidence was insufficient to establish that CERT caused any power plant to perform at least ACI. ***First***, the uncontroverted evidence showed that the power plants had been independently using ACI for years, not that they began using these because of CERT's encouragement. Appx4080 (power plants were using refined coal "for years before they used activated carbon"); Appx4472 (CERT's representative testifying that CERT never did anything "that caused a power plant to continue to use activated carbon"). Indeed, power plants used ACI for extended periods before and after the period when CERT supplied refined coal. Appx2490(¶¶43-45), Appx4468-4469, Appx4090. This evidence confirms the opposite of the jury's findings—the power plants' choices with respect to ACI were wholly independent from CERT and its sale of refined coal. CERT did not cause or encourage the power plants' direct infringement. *See Global-Tech*, 563 U.S. at 760; *HZNP*, 940 F.3d at 702.

***Second***, the uncontroverted evidence also showed the accused power plants only used ACI to comply with the EPA's MATS regulations, which required the power plants to remove a higher percentage of mercury from their emissions. Appx3944, Appx3949, Appx3992, (Mr. O'Keefe testifying that failure to meet mercury regulations would lead to permit revocation and shutdown);

Appx3993-3994, Appx4079 (Mr. O'Keefe testifying that the power plants use ACI "because they have to comply with MATS."); Appx4090 (Mr. O'Keefe testifying that the power plants still use ACI today "because of MATS"). This evidence confirms that CERT did not cause the power plants to perform the steps of the Asserted Claims. *See Ericsson*, 773 F.3d at 1219 (an inducer must "induce[] another party to perform[] every single step in the method"); *Microsoft*, 755 F.3d at 905 (no induced infringement when third-party instructions encouraged infringement of several limitations).

#### 4. The Evidence Was Insufficient to Show that CERT Had Specific Intent to Cause Infringement.

Induced infringement requires a finding that the alleged infringer "possessed specific intent to encourage another's infringement." *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002). "[M]ere knowledge that a service will be used to infringe is insufficient to establish the required intent to infringe." *Cox*, 146 S. Ct. at 968; *see Vita-Mix*, 581 F.3d at 1329 (intent to induce cannot be inferred even if defendant has actual knowledge of potential infringement). Rather, the inducer must have "an affirmative intent that the product be used to infringe." *Cox*, 146 S. Ct. at 968 (quoting *Grokster*, 545 U.S. at 936); *see DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc) ("intent to cause the acts that produce direct infringement" is insufficient; rather, "the inducer must have an affirmative intent to cause direct infringement.").

Contrary to the district court's JMOL ruling (Appx303-305), ME2C failed to show that CERT possessed specific intent to encourage the power plants' infringement. The district court erroneously credited ME2C's theory that specific intent can be inferred based on evidence showing (1) CERT received tax credits through its sale of refined coal to the power plants, and (2) had operations shut down when this suit was filed in 2019, CERT's investors would have lost around $300-350 million in tax credits. Appx303-304 (citing Appx4318-4320), Appx4237–4238 (CERT's corporate representative testifying as to tax credit value), Appx4318-4319, Appx4320 (similar). But this evidence falls short of showing what *Cox*, *Global-Tech* and *DSU* demand. Tax credits are not a sufficient basis to infer intent, particularly given that power plants may not use ACI for certification tests for tax credits under Section 45. Appx4384-4387 (CERT's corporate representative testifying that the EERC did not use ACI for Section 45 testing).

Even drawing all inferences, this evidence at best shows that CERT had a financial interest in selling refined coal to the power plants. But there is always a financial incentive to make a sale, and mere financial motive cannot sufficiently show CERT's specific knowledge that it affirmatively intended the sale of refined coal to cause infringement. *See Cox*, 146 S. Ct. at 974 (supplying Internet services to customers cannot support intent for aiding-and-abetting copyright infringement)

(J. Sotomayor concurring); *Vita-Mix*, 581 F.3d at 1329 (evidence insufficient to show intent despite that the accused product could be used in an infringing manner).

### B. The Improper Jury Instructions on Induced Infringement Require a New Trial.

Additionally, the district court erred in instructing the jury on induced infringement under 35 U.S.C. § 271(b). No properly-instructed jury could have found induced infringement liability based on CERT's provision of refined coal.

#### 1. The Induced Infringement Instructions Wrongfully Omitted an Affirmative Act Encouraging Performance of Each and Every Step of the Asserted Claims.

The district court instructed the jury that ME2C needed to prove CERT "took some affirmative action, intending to cause a power plant to directly infringe one or more asserted claims of the asserted ME2C patents." Appx3071. The district court declined, over CERT's objection (Appx4535-4537) to instruct the jury that ME2C must show "that the defendants *encouraged* the power plants to perform *each and every* step of the asserted claim." Appx4535, Appx3071. This was an error.

As discussed above, the Supreme Court has repeatedly emphasized that the affirmative acts alleged to induce must encourage the specific infringing acts. *See Cox*, 146 S. Ct. at 967; *Global-Tech*, 563 U.S. at 760. Similarly, this Court has made clear that the inducer must take an affirmative act to encourage a third party to infringe. *See HZNP*, 940 F.3d at 701 ("To prove inducement, a plaintiff must present evidence of *active steps taken to encourage* direct infringement; mere knowledge

about a product's characteristics or that it may be put to infringing uses is not enough." (emphasis added)); *Microsoft*, 755 F.3d at 904 (patentee must prove that "the accused inducer *took an affirmative act to encourage infringement* with the knowledge that the induced acts constitute patent infringement" (emphasis added) (citing *Global-Tech*, 563 U.S. at 765)). The district court's instruction omitted these well-settled principles.

**2. The Jury Instruction Misstated the Actual Causation Requirement.**

CERT requested the district court to instruct that ME2C must show "that the Defendant's actions, *as opposed to other factors*, actually caused the power plant to perform each and every step of the asserted claim." Appx2845-2846, Appx4539. The district court issued the instruction, over CERT's objection, Appx4538-4539, without the phrase "as opposed to other factors." Appx4539, Appx3071. These instructional rulings were in error.

Patent infringement is "essentially a tort." *Carbice Corp. of Am. v. Am. Pats. Dev. Corp.*, 283 U.S. 27, 33 (1931). An inducer is *only* liable for direct infringement that resulted from his actions. *See Global-Tech*, 563 U.S. at 760 (requiring "affirmative steps to *bring about* the desired result" (emphasis added)); *HZNP*, 940 F.3d at 701 (requiring "active steps taken to encourage direct infringement"); *Power Integrations*, 843 F.3d at 1332. As this Court held, "[a] defendant's liability for indirect infringement must *relate to* the identified instances of direct infringement."

*Wordtech Sys., Inc., v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1317 (Fed. Cir. 2010) (emphasis added). Under these principles, there is no inducement liability if factors other than the inducer's actions cause the direct infringement. *See HZNP*, 940 F.3d at 702 (no infringement if the accused infringer only instructed some steps of the asserted claim and the customer decided to practice the remaining steps); *Microsoft*, 755 F.3d at 905 (no inducement if alleged infringement of key elements is based on instructions from a third party).

The district court's instruction cannot be reconciled with *HZNP* and *Microsoft*. The teaching in *HZNP* and *Microsoft* is clear: A defendant cannot be liable for direct infringement that it did not cause. The district court's instruction on causation is erroneous.

#### 3. No Properly Instructed Jury Could Have Found CERT Liable for Induced Infringement.

Based on the district court's erroneous instructions, the jury found CERT liable for induced infringement and awarded damages. But a properly instructed jury never would have found that CERT induced infringement.

***First***, the district court's instructions allowed the jury to mistakenly find liability for induced infringement based merely on the sale of refined coal. This omission misled the jury regarding the requirement of induced infringement and relieved ME2C of the burden of proving CERT affirmatively encouraged the power plants to infringe the "injecting" activated carbon and "separating" and "collecting

mercury" steps of the Asserted Claims. As discussed above, *supra* Section I.A.2, substantial evidence presented at trial fails to show that CERT actively encouraged the power plants to perform those claimed steps.

***Second***, failing to give the requested instruction on causation was prejudicial because it invited the jury to find liability for induced infringement even if factors other than CERT's actions actually caused the direct infringement. If properly instructed, the jury could have found that factors other than CERT's conduct—such as the independent decisions of the power plants or the encouragement from EPA—caused the power plants' infringement. *Supra* Section I.A.4.

The district court's error was highly prejudicial because it deprived CERT of a fair trial on induced infringement. Thus, a new trial is warranted. *See Grazier ex rel. White v. City of Phila.,* 328 F.3d 120, 126 (3d Cir. 2003) (the court abuses its discretion with respect to jury instructions "if the instruction was capable of confusing and thereby misleading the jury"); *Power Integrations*, 843 F.3d at 1332 (vacating a jury verdict because the jury instructions "misstated the law of induced infringement").

## II. THE CONTRIBUTORY INFRINGEMENT JUDGMENT AGAINST CERT RC SHOULD BE REVERSED OR VACATED.

Contributory infringement liability attaches only when an accused product is "not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c). Refined coal is simply coal sprayed with

certain additives. Appx4371. Evidence at trial showed substantial quantities of refined coal were combusted without activated carbon—that is, non-infringing use—for years, before and after the ME2C patents issued and by accused and non-accused power plants, all over the country. Appx4333-4334, Appx4463-4464, Appx4341-4353 (each appellant sold refined coal to a power plant not using ACI at the time of the sale); *see* Appx315. The inquiry should end there.

When considering whether an accused product has substantial noninfringing use, this Court considers whether that product is *equally capable* of uses *other than* infringement. *Mitek*, 139 F.4th at 1351-52 (citing *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012)). But the district only considered the *specific* refined coal as used by *specific* power plants during one *specific* period of time in denying JMOL. At trial, the district court instructed the jury to ignore all other uses of refined coal. ME2C did not adduce sufficient evidence to support that refined coal has no substantial noninfringing uses or that refined coal is especially made or adapted for infringement. The contributory infringement judgment against CERT RC should be reversed.

### A. CERT Is Entitled to Judgment as a Matter of Law Because No Reasonable Jury Could Find Contributory Infringement Liability.

CERT RC is liable for contributory infringement only if the refined coal (1) is especially made or adapted for an infringing use and (2) has no substantial noninfringing uses. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed.

Cir. 2009). ME2C has the burden of proving CERT contributed to the power plants' direct infringement. *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006).

### 1. The District Court Erred in Applying the Legal Standard for Contributory Infringement.

In denying CERT's motion for JMOL, the district court focused exclusively on "the accused coal 'as sold and delivered' by [CERT RC] to the directly infringing power plants" during the damages period. Appx319. But that narrow inquiry does not reflect what this court considers when determining if a product has substantial noninfringing uses. Where a product is "equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses," a claim for contributory infringement "does not lie." *Bill of Lading,* 681 F.3d at 1338. That is, sale of a product does not contribute to infringement if that product "can be used for purposes *other than* infringement." *Id.* (emphasis original). The district court's interpretation of this requirement was erroneous.

#### a. The Substantial Noninfringing Use Inquiry Requires Analysis of the Capabilities of an Accused Product Without Limitation to Certain Users.

In denying JMOL, the district court incorrectly focused only on "whether the *accused* refined coal *as sold and delivered* [by CERT RC to its power plant customers] lacks substantial noninfringing use." Appx314 (emphasis original). But the district court did not inquire whether refined coal is "equally capable of"

infringing and substantially noninfringing use as instructed by this Court. *Mitek*, 139 F.4th at 1351-52.

This Court's decision in *Bill of Lading* makes clear the "relevant inquiry" is "whether the accused products can be used for purposes *other than* infringement." 681 F.3d at 1338. There, the patent owner alleged that device makers contributed to direct infringement of their trucking customers by selling devices capable of wirelessly transmitting bills-of-lading. *Id.* at 1335, 1337-38. The appellant patent owner alleged that "as customized" for appellee's trucking customers, the accused process had no substantial noninfringing uses. *Id.* at 1337-41. This Court found that the allegation was "tailored too narrowly" and said "nothing more than if you use this device to perform the patented method, the device will infringe and has no noninfringing uses." *Id.* at 1338 (citation modified). This Court found that "[t]he fact that a product may be unavailable for simultaneous non-infringing uses while being used to infringe[ ]is not determinative." *Id.*

Likewise, in *Mitek*, this Court reiterated that the sale of a product capable of infringing and substantially noninfringing uses does not contribute to infringement. 139 F.4th at 1351-52. There, this Court found that sales of a product where "end-users [could] customize and use [the product] in many ways, including noninfringing ways" could not create a basis for a contributory infringement claim. *Id.* at 1351. This Court highlighted testimony that end users have "*the ability* to . . . cease use of

the infringing technology" by using the accused product differently as evidence that sales of the product did not contribute to infringement. *Id.* (emphasis added).

The district court misapplied this law multiple times over. ***First***, the district court found refined coal had no substantial noninfringing use because the accused coal sold by CERT RC had "no other realistic outcome" other than infringement. Appx318. The "realistic outcome" of specific sales of the accused product is not the proper inquiry. *See Mitek*, 139 F.4th at 1351-52. Rather, it is whether the accused product *in general* has substantial noninfringing uses. *See id.* at 1351 ("MiSnap has several substantial non-infringing uses."). Because end users had "the ability" to "customize and use" the accused product in noninfringing ways, its sale did not contribute to infringement. *See id*. So too here, power plants had the ability to—and actually did—burn coal in a noninfringing way—for example, without ACI.

***Second***, despite this Court's clear instruction in *Bill of Lading* and *Mitek*, the district court found that "whether *other* refined coal—e.g., coal that was bought/sold/treated by other non-Defendant[s] . . . had a substantial non-infringing use is simply beside the point." Appx318. But by considering only refined coal "as customized" for a certain set of users and only as used on their premises, the district court's inquiry was "tailored too narrowly." *See Bill of Lading*, 681 F.3d at 1337-38. A focus on only accused users at their accused locations cannot answer whether the refined coal "can be used for purposes *other than* infringement." *See id*.

***Third***, the district court erroneously found that the substantial noninfringing use inquiry depends on whether the product's seller "could well have thought—in light of the particular factual circumstances of the case—that the accused product it sold might be substantially used in a non-infringing way." Appx317. But, under this Court's precedent, a product's substantial noninfringing uses are not limited to those uses present in "the particular factual circumstances of the case." *See Bill of Lading*, 681 F.3d at 1337-39 (finding that pleading that a process "as customized by the relevant appellee []for their trucking customers" did not plausibly allege no substantial noninfringing uses). The district court reversibly erred by not considering whether refined coal was "capable" of substantial noninfringing uses. *See Mitek*, 139 F.4th at 1352.

The Supreme Court's recent decision in *Cox* further confirms the district court's error. There, drawing a "historic kinship" between patent law and copyright law, the Supreme Court found liability for contributory infringement under copyright law can only exist if the accused product "is not capable of substantial or commercially significant noninfringing uses." *Cox*, 146 S. Ct. at 967 (internal quotation omitted). The Supreme Court's focus on the *capability* of a product reinforces that the district court erred by not considering the "relevant inquiry" established in *Bill of Lading*. Here, a "commercially significant" use of refined coal is burning that refined coal in Section 45 certification testing. That is indisputably a

non-infringing use, as it cannot involve ACI. Appx4384-4386. And it is indisputably "commercially significant," as underscored by ME2C (wrongly) accusing this conduct of infringement in its original complaint. Appx4440-4442.

To the extent the district court relied on *Hodosh v. Block Drug Co.*, 833 F.2d 1575 (Fed. Cir. 1987), to deny JMOL, the district court's reasoning is erroneous. Appx317. The district court found that *Hodosh* supports its assertion that the substantial noninfringing use inquiry assesses what an accused infringer "'know[s]' as to whether the material it 'actually sold' realistically has a 'substantial noninfringing use,'" analyzed "in light of the particular factual circumstances of the case." *Id*. But the district court's reliance on *Hodosh* missed the point. *See Bill of Lading*, 681 F.3d at 1338 n.10 (explaining that *Hodosh* is "not helpful" when determining whether a specific product has no substantial noninfringing use because the *Hodosh* court "did not determine whether the product at issue . . . had substantial non-infringing uses"). As this Court pointed out in *Lucent Techs*, "[i]n focusing on 'what was actually sold,' the *Hodosh* court rejected the argument that an otherwise infringing product may automatically escape liability merely because it contains a *noninfringing* staple ingredient." *Lucent Techs.*, 580 F.3d at 1321 (emphasis original). Here, the district court disregarded uses of refined coal itself, not of any one component of refined coal.

The district court further erred in its interpretation of *Nalco*. Appx318-319 (citing *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018)). In reviewing dismissal of a complaint, this Court in *Nalco* considered the allegation that "selling and offering to sell MerSorb and S-Sorb to operators of coalfired power plants and/or the [r]efined [c]oal LLCs" contributed to infringement. *Nalco*, 883 F.3d at 1356. The Court approved of an allegation that the accused products had no substantial noninfringing uses "as sold and delivered." *See id.* at 1357. That brief discussion, which credited an allegation at the pleading stage, cannot support the district court's limitation of the substantial noninfringing use inquiry to only the specific uses by the accused power plants. *See id.*; Appx318-319. Such an interpretation is incompatible with *Bill of Lading* and *Mitek,* which considered whether a product is "equally capable of" infringing and substantial noninfringing uses. *Mitek*, 139 F.4th at 1352; *Bill of Lading,* 681 F.3d at 1338.

The pleadings in *Nalco*, alleging that MerSorb and S-Sorb generally have no substantial noninfringing uses, are a far cry from the record here. The pleading in *Nalco* alleges that MerSorb and S-Sorb "are specifically formulated" for use in an infringing manner at coal-fired power plants. *See Nalco* 883 F.3d at 1357. The *Nalco* pleading then alleges that "[w]hen a coal-fired power plant" (or refined coal LLC) "receives MerSorb and S–Sorb it purchased, the coal-fired power plant or [r]efined [c]oal LLC has no other use for MerSorb and S–Sorb except" infringement. *Id.* The

pleading in *Nalco* does not limit *which* users of MerSorb and S-Sorb a court should consider, but instead alleges that *all* power plants, the market for which the accused products were "specifically formulated," have no substantial noninfringing uses for the products.

The district court thus erred by finding in its denial of JMOL that *Nalco* supports looking only at the uses of refined coal by the power plants "in question," that is, those accused of direct infringement. Appx319. Here, unlike the facts pled in *Nalco*, there are several power plants that substantially used refined coal in a *noninfringing* manner during the damages period. Appx4333-4334, Appx4367-4369, Appx4463-4464. Further, certification testing is irrefutably noninfringing. Appx4440-4442. In *Nalco*, the accused products were alleged to be capable of no substantial uses other than infringement, but the undisputed evidence here shows that refined coal *is* capable of uses other than infringement. The district court thus misapplied this Court's precedent by finding that only ME2C's chosen users of refined coal are relevant to the substantial noninfringing use inquiry.

#### b. The Substantial Noninfringing Use Inquiry Is Not Limited to the Capabilities of an Accused Product at One Specific Time Period.

In its denial of JMOL, the district court held that uses of "other" refined coal sold "in years prior to or after the damages period" are "simply beside the point" of the substantial noninfringing use inquiry. Appx318. That is incorrect. As this Court

has instructed, the proper inquiry is whether refined coal is "equally capable of" infringing and substantially noninfringing uses. *Mitek*, 139 F.4th at 1352. The district court's erroneous standard excludes evidence necessary to answer the "relevant inquiry" of whether a product can be used for purposes "*other than*" infringement. *See Bill of Lading*, 681 F.3d at 1338.

The district court again cited to *Nalco* to support its ruling that a finding of substantial noninfringing use can be based on evidence limited to a plaintiff's chosen damages window. *See* Appx319 (citing *Nalco*, 883 F.3d at 1357). According to the district court, *Nalco* considered "what the defendants would have known about the potential non-infringing uses of those additives *at the time when the plants in question received the additives that they purchased*." Appx319 (emphasis original). But that is a misinterpretation of *Nalco.* The district court once again relied on the allegation *Nalco* approved of at the pleading stage, which read in part that "[w]hen a coal-fired power plant or a [r]efined [c]oal LLC receives MerSorb and S-Sorb [the accused products] it purchased, [the buyer] has no other use for MerSorb and S-Sorb except" infringement. Appx319 (citing *Nalco*, 883 F.3d at 1357). But *Nalco*'s pleading alleged that uses of MerSorb and S-Sorb by *any* power plant (as opposed to only a limited set of uses during the damages period)—have no uses for the products other than infringement. *See Nalco*, 883 F.3d at 1357. The district court's standard is thus flawed.

### 2. The Evidence Was Insufficient to Show That Refined Coal Has No Substantial Noninfringing Uses.

There is no substantial evidence in the record for a reasonable jury to find that refined coal has no substantial noninfringing uses. ME2C needed to show that when considering *all* uses of refined coal, not only certain uses by specific power plants during a limited time period, refined coal has no noninfringing uses. But the uncontroverted evidence shows the opposite.

ME2C did not dispute that certification testing is not infringing. Appx4384-4386, Appx4440-4442. Further, ME2C does not dispute that three power plants—Chesterfield Power Station, Mount Storm Power Station and Intermountain Power Plant—used "a substantial amount" of refined coal in a noninfringing manner. Appx4333-4334 (stating these plants "never used" ACI); Appx4367-4369 (showing these plants bought refined coal between 2011 and 2021); Appx4463-4464 (showing these plants purchased approximately 14 million tons of refined coal); Appx4438 (showing that Intermountain Power Plant used refined coal treated with the same amount of MerSorb and S-Sorb as the accused power plants); *see* Appx315. These three power plants never used ACI alongside refined coal. Appx4367-4369, *see* Appx315. This evidence shows refined coal is "equally capable of . . . both infringing and substantial noninfringing uses." *Mitek*, 139 F.4th at 1352. The district court prejudicially erred when it found this evidence to be "beside the point" in its denial of JMOL. Appx318.

ME2C also failed to meet its burden to show that, when considering *all* uses of refined coal, including those from outside the damages period of July 2019 to the December 2021, refined coal has no substantial noninfringing uses. Appx312. The uncontroverted evidence shows that *each* CERT RC appellant sold refined coal to a power plant (which was a defendant below) during a period when that plant did *not* use ACI. Appx4341-4353 (showing each appellant made sales to a plant not then using ACI); *see* Appx4073 (ME2C's expert acknowledging they "didn't do any research . . . to determine when any of the subject power plants installed [ACI] systems"); *see* Appx315. That was possible because refined coal was designed to qualify for Section 45 tax credits, which do not require the use of ACI. Appx4065-4066, Appx4471-4472. Use of the refined coal in noninfringing ways at the *same* power plants ME2C accused of infringement shows that refined coal is "equally capable of . . . both infringing and substantial noninfringing uses." *Mitek*, 139 F.4th at 1352. The district court again prejudicially erred when it found this evidence to be "beside the point." Appx318.

**3. There Was No Evidence at Trial, Let Alone Substantial Evidence, That Refined Coal Was Especially Made or Adapted for Infringement.**

ME2C also failed to meet its requirement to show that refined coal was "especially made or especially adapted for" infringement of a patent. *Lucent Techs.*, 580 F.3d at 1320. In fact, refined coal was specifically designed to qualify for

Section 45 tax credits, not to infringe. Appx4471-4472 (stating CERT's coal was especially made to meet "the technical requirements of the Section 45 tax credit"). The EERC determined amount of MerSorb and S-Sorb needed for Section 45 qualification before the start of the damages period, and then checked if later-produced refined coal qualified in tests that *could not involve* ACI. Appx4418-4419 (showing that EERC reports "include MerSorb and S-Sorb rate[s] . . . that would qualify fuel made at the facility . . . for the Section 45 tax credit"); Appx4434-4436 (showing the amounts of MerSorb and S-Sorb in refined coal remained the same after the start of the damages period); Appx4384-4386 (use of ACI during a Section 45 test "would disqualify the test"); Appx4470-4472 (stating that ACI "plays absolutely no role in the way" CERT formulates its coal and that CERT has "never used [ACI] to qualify" for the credit). Indeed, ME2C's own infringement expert testified at trial that certification tests for the Section 45 tax credit "do[] not require the use of [ACI]." Appx309, Appx4065-4066. The evidence the district court relied on showed that ACI was used to comply with MATS, not that it was necessary, or even relevant, to Section 45 tax credits. Appx296 (the district court finding "the evidence at trial demonstrated that [] CERT knew that these power plants had ACI systems on site in order to comply with MATS regulations regarding mercury emissions").

On this record, ME2C cannot show that refined coal was "especially made or especially adapted for" use in an infringing manner. *See Lucent Techs.*, 580 F.3d at 1320 (considering whether a tool was "especially made" for infringement in its initial development, as opposed to later reproduction); *see also Microsoft*, 755 F.3d at 905-06 (finding no contributory liability based on sale of a software product though it was "capable of being used in an infringing manner").

### B. The Improper Jury Instructions Given by the District Court Require a New Trial.

At trial, the district court improperly instructed the jury on the law of substantial noninfringing use. The district court instructed, over CERT's objection Appx4546, that the jury should consider whether CERT "knew that the refined coal supplied to that power plant [which directly infringed the asserted patents], *as sold and delivered during the damages period*, is not a staple article or commodity of commerce capable of substantial non-infringing use." Appx3073, Appx4689 (emphasis added). The district court then reiterated to the jury that the only refined coal relevant to the substantial noninfringing use inquiry "is the refined coal that [CERT RC] supplied during the damages periods to a power plant that is alleged to have directly infringed the patents-in-suit in this case." Appx4690-4691. The district court specifically directed the jury to "not consider refined coal" sold prior to the start of the damages period or to entities other than the accused plants. Appx4691. But this instruction was erroneous because it prohibited the jury from considering

whether refined coal is "equally capable of" both infringing and substantial noninfringing uses. *Mitek*, 139 F.4th at 1352; *Bill of Lading*, 681 F.3d at 1338; *supra* Section II.A.1.

This was prejudicial because, as discussed above, *supra* Section II.A.2, multiple power plants used refined coal in a noninfringing manner. Appx4333-4334, Appx4367-4369, Appx4463-4464, *see* Appx315. And each appellant provided refined coal before the damages period to a power plant that was not using ACI at the time of the sale. Appx4341-4353, *see* Appx315. Further, certification testing is not infringing. The district court's instruction prejudiced CERT by preventing the jury from considering all of the uses of refined coal. Thus, a new trial on contributory infringement is warranted. *See Grazier,* 328 F.3d at 126; *Power Integrations*, 843 F.3d at 1330-32.

## III. THE DAMAGES JUDGMENT SHOULD BE REVERSED OR VACATED.

The district court abused its discretion in denying a new trial on damages because ME2C's damages theory is based on expert opinions that are unreliable under Rule 702 and *Daubert*. After excluding this improper evidence, the jury's damages verdict has no support.

ME2C's damages theory rests on the faulty opinion of its damages expert, Mr. Green. At trial, Mr. Green and ME2C called for a royalty rate of 65 cents to $1 per

ton of coal. Appx4113. The jury adopted the high end of this range and awarded damages of approximately $1 per ton. Appx3099.

The range Mr. Green offered at trial was a multiple higher than the range offered in his expert report. Appx1788(¶195). The only support for nearly doubling the royalty rate to the $1 per ton figure offered at trial came from a fourth agreement, the Alistar Settlement Agreement. Appx4121-4122. ME2C reached this agreement with Alistar, one of CERT's co-defendants, on the eve of trial. Appx3408-3410. While the Alistar Agreement expressly references "a rate of $1 per ton of accused coal sold during the applicable damages period," the total amount Alistar agreed to pay to ME2C under that agreement was only $107,776. Appx9645, Appx4119.

Mr. Green's damages opinion is flawed for multiple independent reasons: his opinions are based on licenses that are not technically or economically comparable to the hypothetical negotiation here, and he did not apportion the value of the patented technology in those licenses from other financial benefits such as the value of the tax credits. The jury's verdict lacks proper support and a new trial is required.

### A. The District Court Erred in Denying CERT's Motion for a New Trial on Damages.

The Expert Report Agreements are not applicable to a hypothetical negotiation here because they are either for patents other than the Asserted Patents or litigation settlements.

#### 1. Mr. Green's Reliance on the Expert Report Agreements Was Flawed Because ME2C Did Not Offer Sufficient Evidence of Technical or Economic Comparability.

"[A] determination of reliability under Rule 702 is an essential prerequisite" to any expert testimony reaching the ears of a jury. *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339-40 (Fed. Cir. 2025) (en banc). Mr. Green's royalty rate never should have reached the ears of the jury.

***First***, Mr. Green's opinion failed to show that the patents licensed in the Expert Report Agreements are technologically comparable to the Asserted Patents. The technical comparability requirement "often precludes use of other licenses that involve (only or even partly) technology other than the patented technology at issue." *VLSI Tech. LLC v. Intel Corp*., 87 F.4th 1332, 1346 (Fed. Cir. 2023). This Court has held that "alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). For example, in *Lucent Techs*., this court vacated a jury's damages award and ordered a new trial on damages because the licenses were for patents merely in the general field of the allegedly infringed patent. 580 F.3d at 1331-32; *see also Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973-74 (Fed. Cir. 2022) (same).

The Asserted Patents here are directed to mercury control in power plants. *See* Appx365, Appx434. It is undisputed that while the patents licensed in the Expert

Report Agreements cover mercury control, they also cover nitrogen oxide control, sulfur oxide control, refined coal manufacturing and preparation, and other technologies. *See* Appx1784(¶176), Appx7844(§ 4(b)(i)), Appx7956. Patent holders are only entitled to the "incremental benefit" traceable back to their patent claims. *Ericsson*, 773 F.3d at 1233. Mr. Green noted only in his report that these three sets of patents were "similar" and "comparable" to the Asserted Patents because they are in the same general field—exactly the "loose or vague comparability" which this Court held insufficient in *LaserDynamics*. 694 F.3d at 79; *see* Appx1787(¶190), Appx1790(¶199).

The district court excused Mr. Green's vague justification of comparability by reading his trial testimony in light of Mr. O'Keefe's opinion. Appx198-199. But the district court also acknowledged that the patents licensed in the Expert Report Agreements included a variety of other technologies beyond the claims of the Asserted Patents. *Id*. Those technologies are all irrelevant to this hypothetical negotiation. *See Ericsson*, 773 F.3d at 1226. Mr. O'Keefe himself admitted that these patents are "not [technically] comparable . . . they achieve the same result." Appx4059-4060. Mr. Green's testimony should have been excluded for simply asserting "loose or vague comparability" and failing to account for these differences. *LaserDynamics*, 694 F.3d at 79; *see Lucent Techs.*, 580 F.3d at 1332; *Apple*, 25 F.4th at 973; Appx1787(¶190); Appx1790(¶199).

***Second***, in light of the context and structure of the Expert Report Agreements, they lack economic comparability. Mr. Green admitted that the Chem-Mod Agreements were part of a "common structure" of corporate entities that were formed for the express purpose of earning and claiming Section 45 tax credits. *See* Appx1279-1280, Appx1292-1293. But the *Georgia-Pacific* hypothetical negotiation is an "arm's-length" transaction between a licensor and licensee who are "competitors in the same line of business"—not parties with common ownership and working towards the same goal. *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1373 (Fed. Cir. 2008) (citation omitted). And it is undisputed that the Chem-Mod Agreements include a variety of engineering, financial, and business ancillary services to achieve that goal—services which the licensee paid for and which Mr. Green never explained. *See* Appx1775-1776(¶131-¶134); *LaserDynamics*, 694 F.3d at 79.

The ADA-ES agreement is similarly deficient as an exclusive license granted *to a company the licensor formed to commercialize the technology licensed*, with financial terms unknown to Mr. Green. *See* Appx1784(¶175). Mr. Green never showed why the district court should "accept as conclusive the royalty arrangement" between "[non-]competitors." *Minks*, 546 F.3d at 1373 (citation modified).

And the Nalco Settlement Agreement is a litigation settlement and inapt to a hypothetical negotiation without some compelling factual circumstances showing

otherwise. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078-79 (Fed. Cir. 1983) (litigation settlements "should not be considered evidence of an established royalty" (internal quotation omitted)). Reliance on settlement agreements is suspect because "the hypothetical reasonable royalty calculation occurs before litigation . . . since license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (citing *Hanson*, 718 F.2d at 1079) (internal quotations omitted). Mr. Green understood this and opined that the settlement was not equivalent to the royalty damages that would have been awarded in a hypothetical negotiation there. Appx1765(¶79), Appx1777-1778(¶141-¶145). Yet he provided no justification as to why the circumstances of this agreement are similar to the hypothetical negotiation here.

Because the Expert Report Agreements fail to provide a basis for Mr. Green's opinion, the district court abused its discretion by denying CERT's motion to exclude Mr. Green's testimony under Rule 702 and *Daubert*.

#### 2. Mr. Green's Reliance on the Alistar Settlement Agreement Is Similarly Flawed.

A reasonable royalty represents what "a 'willing licensor' and a 'wiling licensee'" would have agreed to at a hypothetical negotiation "just before infringement began." *Carnegie Mellon Univ. v. Marvell Tech Grp.*, 807 F.3d 1283,

1303-04 (Fed. Cir. 2015). Mr. Green's reliance on the Alistar Settlement Agreement does not align with these fundamental principles.

This Court has questioned the usefulness of settlement agreements in determining a reasonable royalty within the *Georgia-Pacific* framework. *See LaserDynamics*, 694 F.3d at 77; *ResQNet*, 594 F.3d at 872; *Hanson*, 718 F.2d at 1078. The Alistar Settlement Agreement was entered on the eve of trial, and Mr. Green failed to explain why it nevertheless should be used for the hypothetical negotiation. *See LaserDynamics*, 694 F.3d at 77.

The scale of the Alistar Settlement Agreement is also at odds with the hypothetical license between the parties here. In *Lucent Techs.*, this Court discarded a license as not economically comparable because its scale was far too small to be applicable to the hypothetical negotiation without a compelling explanation. *See* 580 F.3d at 1330. This Court questioned the prudence of extrapolating a damages award three to four times greater than the license fees in evidence. *See id.* at 1332. Here, ME2C attempts to extrapolate a $1 per ton royalty paid for 107,776 tons to an award for more than *55 million tons* of coal. Appx4144. As in *Lucent Techs.*, Mr. Green provided no explanation as to why the rate in the Alistar Settlement Agreement should be extrapolated to create an award two orders of magnitude more than the license fee. *See id.*

The Alistar Settlement Agreement was also entered into more than four years after the hypothetical negotiation date set in this case. Pushing the date forward skews the analysis by including the changing technological and financial landscape for the licensed technology and the possible investment that the parties have expended in litigation. *See Wordtech*, 609 F.3d at 1320-21 (rejecting several plaintiff-offered licenses because they were negotiated after threatening litigation); *LaserDynamics*, 694 F.3d at 78. Indeed, this Court has rejected settlement agreements entered into three, four and five years after the hypothetical negotiation date. *Id.*; *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276-77 (Fed. Cir. 1999). The Alistar Settlement Agreement is so dissimilar to the hypothetical license in time and circumstance that it requires a compelling explanation to be usable—which Mr. Green did not provide. *See ResQNet*, 594 F.3d at 873.

#### 3. Mr. Green Failed to Properly Apportion the Value of the Patented Technology.

A patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). If a license offered as a comparison includes other elements, the economic value of a license must be apportioned between its components to isolate the value of the patented technology. *See ResQNet.com*, 594 F.3d at 873; *Apple*, 25 F.4th at 971-74. Here, Mr.

Green did not properly apportion the value of the alleged invention claimed by the Asserted Patents.

Mr. Green admitted in his expert report that "[t]he Section 45 tax credits . . . serve as the *economic basis* for the alleged infringement by the RC Defendants." Appx1861(¶16) (emphasis added). Mr. Green made clear that his opinion was derived from "the tax credits less the cost to get those tax credits." Appx1307-1308.

Worse yet, Mr. Green continued by claiming that he apportioned the value of the patented technology *out* of his royalty opinion: "[T]he environmental benefits are *not part of the economics* that were being derived by the RC LLCs from their production of the refined coal and inducing infringement by the power companies." *Id*. (emphasis added). Mr. Green testified that he "limited [his] analysis to what was the benefit measured on the books and records of the refined coal LLCs." *Id*.

At trial, Mr. Green reversed himself. He claimed at trial that he did not consider tax credits in his opinion, Appx4212, which cannot be squared with the detail in his report and the lack of detail of how he supposedly measured the incremental benefit of the claimed invention when he took the stand. The district court took his self-serving testimony at face value, Appx206, but it is clear that Mr. Green inverted the proper apportionment analysis. Rather than isolating the value of the technology covered by the Asserted Patents and using that as the basis for his

opinion, he isolated the value of the technology and *excluded* it from his opinion—which leaves only tax credits as a possible basis.

Mr. Green explained that the hypothetical negotiation would be carried out for the "specific purpose" of allowing the licensee to earn tax credits. Appx1923(¶251). This is irrelevant. The hypothetical negotiation is a legal fiction held in a vacuum, with the assigned royalties reflecting only the value of the invention. *See, e.g., Ericsson*, 773 F.3d at 1226. But it is undisputed that the Asserted Patents do not claim anything related to the tax credits. They do not claim a method for applying for tax credits. *See* Appx396-397, Appx472-473. They do not claim nitrogen oxide reduction, a requirement to earn tax credits. *See id.*; 26 U.S.C. § 45(c)(7)(B).

And even if the Asserted Patents were necessary to earn those tax credits—similar to a standard-essential patent—the value of those credits would still derive from the *legal* requirements of the tax code, not from the *technological* value provided by the Asserted Patents. *See Ericsson*, 773 F.3d at 1233 (stating that standard-essential patent royalties must reflect "technological [value], not the value of its widespread adoption due to standardization"). "Other value in economic products or practices" must be "separat[ed] out and exclud[ed]." *VLSI*, 87 F.4th at 1345. Mr. Green should have apportioned the value of the Section 45 tax credits out of his calculations, but he did not. *See* Appx1304-1307.

Further, even if the tax credits can be considered as part of the value of the Asserted Patents' technology, Mr. Green still failed to properly apportion that value in the agreements he offered. For example, he asserted that the full value of the Chem-Mod Agreements was for "comparable" mercury reduction technology—but those licenses went significantly beyond the "incremental benefit" provided by the Asserted Patents by including other technology and consulting services. *See Ericsson*, 773 F.3d at 1233; Appx1285-1288, Appx1289-1290, Appx1304-1307.

Mr. Green simply suggested that the licenses he offered were "self-apportioning." Appx1786(¶185). But such licenses must be "sufficiently comparable" by embodying only the value of the asserted patent. *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020). Here, the Expert Report Agreements did not involve the Asserted Patents; the technology in those agreements diverge significantly from the Asserted Patents; and all four agreements were negotiated under wildly different economic circumstances than the hypothetical negotiation here. *See supra* Section III.A.1.

This Court has held that "only theories comporting with settled principles of apportionment" should be offered to the jury. *Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). Rule 702 assigns trial courts a "gatekeeping" role in excluding testimony which is not a product of "reliable principles and methods" and does not reflect a "reliable application of [the expert's] principles and

methods to the facts of the case." *Willis Elec. Co. v. Polygroup Ltd.*, 166 F.4th 1363, 1373 (Fed. Cir. 2026) (citing Fed. R. Evid. 702).

In light of Mr. Green's failure to apportion to properly isolate the license value attributable to the Asserted Patents, the trial court erred by admitting his testimony under Rule 702. *United States v. Gonzalez*, 905 F.3d 165, 195 (3d Cir. 2018).

### B. After Properly Excluding Improper Testimony and Inapt Agreements, the Jury's Verdict Is Not Supported by Substantial Evidence.

After properly excluding Mr. Green's testimony and the agreements upon which it relied, the record contains no evidence supporting the jury's award of $1 per ton**.** The district court's decision to deny a new trial was an abuse of discretion and should be reversed. *Gonzalez*, 905 F.3d at 195.

The royalty rate of $1 per ton of coal—which formed the basis of the damage award—was based on the Alistar Settlement Agreement. Appx4121-4122. This contradicts the great weight of the other license agreements in the record—including the other licenses that Mr. Green relied on. Appx1788(¶195).

When a verdict "cuts against" the record in this manner, it creates a "miscarriage of justice" and should be vacated on a motion for a new trial. *Leader Techs., Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1305 (Fed. Cir. 2012) (citing *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996) (en banc)). Under Third Circuit law, this Court is not bound to view the evidence in the light

most favorable to ME2C, but may exercise its own judgment in evaluating the basis for the jury's verdict. *Leader Techs.*, 678 F.3d at 1305 (citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 309 n. 18 (3d Cir. 2007)). Appellant respectfully asks this Court to reverse the judgment of the district court on its motion for a new trial and order a new trial on damages.

### C. If This Court Reverses or Vacates Any Portion of the Liability Judgment, the Entire Damages Judgment Should Be Vacated.

As explained above, this Court should reverse and vacate the entire judgment. Additionally, if this Court reverses or vacates infringement liability for any of the asserted patent claims, it should vacate the entire damages award and order a new trial. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1309-10 (Fed. Cir. 2007). As ME2C's requested verdict form asked, the jury returned a general verdict based on a finding of infringement of all four claims of the asserted patent "without breaking down the damages attributable to each patent" in its damages award. Appx3099; *see Verizon*, 503 F.3d at 1309-10. The "normal rule" in these circumstances is to hold a new trial on damages. *Id.*; *see VirnetX v. Apple Inc.*, 792 F. App'x 796, 812-13 (Fed. Cir. 2019).

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment, or vacate and remand for further proceedings on induced infringement, contributory infringement and damages.

Dated: August 25, 2026,
in New York, NY.

Respectfully submitted,
*/s/ Douglas R. Nemec*

Douglas R. Nemec
Leslie A. Demers
**Skadden, Arps, Slate, Meagher & Flom LLP**
One Manhattan West
New York, NY 10001
(212) 735-2419

Chengming Liu
**Skadden, Arps, Slate, Meagher & Flom LLP**
525 University Avenue
Palo Alto, CA 94301
(650) 470-4565

*Counsel for Defendants-Appellants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescense Energy Products LLC, Rutledge Products LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC*

# Addendum

# TABLE OF CONTENTS ADDENDUM


| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| DI798 | Final Judgement | 2025-12-29 | Appx1-Appx5 |
| DI627 | Memorandum Order regarding D.I. 571 Motion to Preclude Opinions of Plaintiffs' Damages Expert Philip Green | 2023-11-07 | Appx195-Appx206 |
| DI786 | Memorandum Opinion denying CERT's Motion re implied license to the asserted patents | 2025-06-10 | Appx228 - Appx280 |
| DI791 | Memorandum Opinion Denying CERT's Motion for Judgment as a Matter of Law | 2025-09-25 | Appx282-Appx325 |
| DI792 | Order Denying CERT's Motion for Judgment as a Matter of Law | 2025-09-25 | Appx326 |
| DI793 | Memorandum Opinion denying CERT's Motion for a New Trial | 2025-11-20 | Appx327-Appx362 |
| DI794 | Order Denying CERT's Motion for a New Trial | 2025-11-20 | Appx363 |
| PTX-001 | U.S. Patent No. 10,343,114 ME2C-RC-00074475-ME2C-RC-00074508 | | Appx364-Appx397 |
| PTX-003 | U.S. Patent No. 10,596,517 ME2C-RC-00074544-ME2C-RC-00074586 | | Appx433-Appx475 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES Inc., | ) | |
| | ) | C.A. No. 19-1334 (CJB) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ARTHUR J. GALLAGHER & CO., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# FINAL JUDGMENT

The Court having held a jury trial and the jury having rendered a unanimous verdict on March 1, 2024, (*see* D.I. 692), pursuant to Rule 58(b) of the Federal Rules of Civil Procedure, the Court hereby **ENTERS JUDGMENT** as follows:

1. Judgment is hereby entered in favor of Plaintiff Midwest Energy Emissions Corp. ("Plaintiff") and against Defendants CERT Operations RCB LLC, Senescence Energy Products LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Rutledge Products LLC, Cottbus Associates LLC, CERT Operations II LLC, Marquis Industrial Company LLC, CERT Operations IV LLC, Springhill Resources LLC, CERT Operations V LLC, and Buffington Partners LLC (collectively, "CERT") that CERT induced infringement of claims 25 and 26 of U.S. Patent No. 10,343,114 and claims 1 and 2 of U.S. Patent No. 10,596,517;

2. Judgment is hereby entered in favor of Plaintiff and against Defendants Senescence Energy Products LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Rutledge Products LLC, Cottbus Associates LLC, Marquis Industrial Company LLC, Springhill Resources LLC, and Buffington Partners LLC that these specific Defendants contributed to infringement of claims 25 and 26 of U.S. Patent No. 10,343,114 and claims 1 and 2 of U.S. Patent No. 10,596,517;

3. Judgment is hereby entered in favor of Plaintiff and against CERT that CERT willfully infringed claims 25 and 26 of U.S. Patent No. 10,343,114 and claims 1 and 2 of U.S. Patent No. 10,596,517;

4. Judgment is hereby entered in favor of Plaintiff and against CERT that all claims of U.S. Patent Nos. 10,343,114 and 10,596,517 are not invalid; and

5. Judgment is hereby entered in favor of Plaintiff and against CERT for damages in the amounts provided below, plus pre-judgment interest compounded quarterly at the prime rate (*see* D.I. 795 at 19):

| **Defendants** | **Jury Award** | **Pre-Judgment Interest (through 12/23/2025)** | **Total (through 12/23/2025)** |
|---|---|---|---|
| **Group 1**: CERT Operations RCB LLC, Senescence Energy Products LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC Rutledge Products LLC, and Cottbus Associates LLC, subject to the allocations described below, for the total amount of: | **Total Amount:** $35,341,918 | **Total Amount:** $13,197,914.22 | **Total Amount:** $48,539,832.22 |
| CERT Operations RCB LLC, for the amount of: | $35,341,918 | $13,197,914.22 | $48,539,832.22 |
| Senescence Energy Products LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of the jury award and prejudgment interest in the amount of: | $2,129,349 | $778,125.43 | $2,907,474.43 |
| Bascobert (A) Holdings LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of the jury award and prejudgment interest in the amount of: | $1,296,829 | $514,898.29 | $1,811,727.29 |
| Larkwood Energy LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion | $20,017,888 | $7,455,787.86 | $27,473,675.86 |

| | | | |
|---|---|---|---|
| of the jury award and prejudgment interest in the amount of: | | | |
| Rutledge Products LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of the jury award and prejudgment interest in the amount of: | $615,338 | $223,851.95 | $839,189.95 |
| Cottbus Associates LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of the jury award and prejudgment interest in the amount of: | $11,282,514 | $4,225,250.69 | $15,507,764.69 |
| **Group 2**: CERT Operations II LLC Jointly and Severally Liable with Marquis Industrial Company LLC, for the total amount of: | $11,119,113 | $4,175,270.39 | $15,294,383.39 |
| | | | |
| **Group 3**: CERT Operations IV LLC Jointly and Severally Liable with Springhill Resources LLC, for the total amount of: | $447,025 | $176,433.93 | $623,458.93 |
| | | | |
| **Group 4**: CERT Operations V LLC Jointly and Severally Liable with Buffington Partners LLC, for the total amount of: | $10,173,949 | $3,765,533.51 | $13,939,482.51 |
| | | | |

6. Additionally, judgment is hereby entered that, pursuant to 28 U.S.C. § 1961(a), Plaintiff is entitled to post-judgment interest from CERT applicable to all sums awarded herein, at the weekly average one-year constant maturity Treasury yield beginning on the date that this Judgment is entered and ending on the day upon which CERT satisfied the Court's Final Judgment (*see* D.I. 795 at 20). Post-judgment interest shall accrue in the daily amounts listed below:

| Defendants | Post-Judgment Interest – Daily Accrual |
|---|---|
| **Group 1**: CERT Operations RCB LLC, Senescence Energy Products LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC Rutledge Products LLC, and Cottbus Associates LLC, subject to the allocations described below, for the total amount of: | **Total Amount:** $4,667.80 |
| CERT Operations RCB LLC, for the amount of: | $4,667.80 |
| Senescence Energy Products LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of post-judgment interest daily accrual in the amount of: | $279.60 |
| Bascobert (A) Holdings LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of post-judgment interest daily accrual in the amount of: | $174.22 |
| Larkwood Energy LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of post-judgment interest daily accrual in the amount of: | $2,641.99 |
| Rutledge Products LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of post-judgment interest daily accrual in the amount of: | $80.70 |
| Cottbus Associates LLC, jointly and severally liable with CERT Operations RCB LLC, but only for an allocated portion of post-judgment interest daily accrual in the amount of: | $1,491.29 |
| **Group 2**: CERT Operations II LLC Jointly and Severally Liable with Marquis Industrial Company LLC, for the total amount of: | $1,470.77 |
| | |
| **Group 3**: CERT Operations IV LLC Jointly and Severally Liable with Springhill Resources LLC, for the total amount of: | $59.95 |
| | |

| | |
|---|---|
| **Group 4**: CERT Operations V LLC Jointly and Severally Liable with Buffington Partners LLC, for the total amount of: | $1,340.48 |
| | |

7. Pursuant to Federal Rule of Civil Procedure 54(d), Local Rule CV-54, and 28 U.S.C. § 1920, Plaintiff is the prevailing party in this case and shall recover its costs from CERT. Plaintiff is directed to file its bill of costs pursuant to D. Del. Local Rule 54.1(a) within 14 days after the time for appeal has expired or within 14 days after the issuance of the mandate of the appellate court.

8. Any request for attorneys' fees pursuant to 35 U.S.C. § 285 shall be filed no later than 21 days following issuance of a mandate after any appeal, or, if no party files an appeal, 21 days after the expiration of the time to file a notice of appeal.

9. All other requests for relief now pending and requested by either party but not specifically addressed herein are DENIED. The Clerk of Court is directed to CLOSE this case.

Dated: 12/29/2025

Christopher J. Burke
Magistrate Judge Christopher J. Burke

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

This is a patent action filed by Plaintiffs Midwest Energy Emissions Corp. ("Midwest Energy") and MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C") against 34 Defendants, in which Plaintiffs assert five patents-in-suit. The Court has set out a listing of all of the parties and asserted patents in its recent October 16, 2023 Memorandum Opinion ("October 16, 2023 MO"), (D.I. 586 at 2); it incorporates that discussion by reference here. Presently pending before the Court is Defendants' motion to exclude certain opinions of Plaintiffs' damages expert Philip Green ("Motion"). (D.I. 571) ME2C opposes the Motion. For the reasons set forth below, the Motion is DENIED.[1]

## I. BACKGROUND

ME2C commenced this action on July 17, 2019. (D.I. 1) Defendants filed the instant Motion on March 23, 2023. (D.I. 527; *see also* D.I. 571) The Motion was fully briefed as of April 18, 2023. (D.I. 555) Defendants filed a notice of subsequent authority on September 21, 2023. (D.I. 577) A trial is set to begin on November 13, 2023. (D.I. 507)

[1] The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 398)

The Court here writes primarily for the parties, and so any facts relevant to this Memorandum Opinion will be discussed in Section III below.

## II. STANDARD OF REVIEW

The Court has frequently set out the relevant standard of review for assessing a motion, like this one, filed pursuant to Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993). One such instance came in *Integra LifeScis. Corp. v. HyperBranch Med. Tech., Inc.*, Civil Action No. 15-819-LPS-CJB, 2018 WL 1785033, at *1-2 (D. Del. Apr. 4, 2018). The Court incorporates by reference those legal standards set out in *Integra*, and will follow them herein. To the extent that additional related legal principles regarding Rule 702 and *Daubert* are relevant, the Court will set those out in Section III.

## III. DISCUSSION

In this case, Plaintiffs seek a reasonable royalty for Defendants' alleged infringement of the asserted patents. (D.I. 547, ex. A at ¶ 13) "The reasonable royalty theory of damages . . . seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). A reasonable royalty "may be based upon . . . the supposed result of hypothetical negotiations between the plaintiff and defendant." *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995). A factfinder uses the hypothetical negotiation to "attempt to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) (internal quotation marks, citation and brackets omitted).

With their Motion, Defendants raise two issues with Mr. Green's opinions: (1) that in relying upon three real-world licensing agreements, Mr. Green did not account for technical and economic differences between those agreements and the hypothetical negotiation; and (2) Mr. Green failed to properly apportion the value of the patents that he assumed were comparable to the asserted patents with respect to these licensing agreements. (D.I. 528 at 45-50; D.I. 555 at 23-25) The Court will address these arguments in turn.

**A. Comparability of Real-world Licenses**

"In determining the reasonable royalty, an expert witness may rely on existing royalty agreements entered into at arms-length[,] as long as those agreements are sufficiently comparable to the hypothetical license at issue in suit." *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 494 (D. Del. 2019) (internal quotation marks and citations omitted). "[C]omparisons of past patent licenses to the infringement must account for the technological and economic differences between them." *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (internal quotation marks omitted). Asserting "a loose or vague comparability between different technologies or licenses" is not sufficient when relying on licenses to support a reasonable royalty. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). It is Plaintiffs' burden to show comparability of the licenses on which it relies. *ViaTech Techs., Inc. v. Adobe, Inc.*, Civil Action No. 20-358-RGA, 2023 WL 5975219, at *9 (D. Del. Sept. 14, 2023) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009)).

Defendants first argue that Mr. Green's opinions relying on three licenses (the "Nalco," "ADA-ES" and "Chem-Mod" licenses) are unreliable and must be excluded because they "lack the requisite technological and economic bases" for a comparison to the hypothetical negotiation.

(D.I. 528 at 46-48) With respect to technological comparability, Defendants contend that Mr. Green asserts only that the technologies underlying these licenses are "similar" and thus "comparable" because they are from the same general field, (*id.* at 46 (citing D.I. 547, ex. A at ¶¶ 190, 199; D.I. 533, ex. 26 at 157-61)), and Plaintiffs' technical expert "has not offered a sufficiently reliable predicate to compare [Plaintiffs'] patents to anyone else's[,]" (*id.* (citing D.I. 533, ex. 11 at 149, at ¶ 157)).

The Court will not exclude Mr. Green's testimony on this ground. Mr. Green relies on the opinions of Plaintiffs' technical expert, Mr. Philip O'Keefe, regarding the technological comparability between the patent licenses at issue and Plaintiffs' patents. (D.I. 547, ex. A at ¶¶ 5, 132, 137-39, 176) Mr. O'Keefe, in turn, explains that:

- The Nalco patent (the "'692 patent") has been licensed by Chem-Mod LLC ("Chem-Mod") and Arthur J. Gallagher & Co. ("Arthur J. Gallagher"), and the patent's claims require injecting halogen material into the flue gas, such that these licensees did not believe that they needed to license the patent because they do not inject material into the flue gas, (D.I. 546, ex. A at 146-47, at ¶¶ 151-52);

- The Chem-Mod patents (the "'083 patent" and the "'170 patent") are licensed by various Defendants; the '083 patent describes the use of several additives, including calcium bromide, to coal for the reduction of mercury emissions (as well as certain steps that Defendants did not perform or performed only biannually). MerSorb and S-Sorb contain some of these additives.[2] (*Id.* at 147-48, at ¶¶ 153-54) The '070 patent is not very relevant to Defendants' refined coal process because it describes, *inter alia*, combusting coal in the presence of nitrate salt, which is not a component included in MerSorb or S-Sorb. (*Id.* at 148, at ¶ 155); and

- The ADA-ES patent (the "'986 patent") describes the use of nitrogenous material to control NOx and halogen material to control mercury emissions from combustion chambers at

[2] MerSorb and S-Sorb are the additives that Defendants apply to the coal to make refined coal. (D.I. 546, ex. A at 43, at ¶ 82; *id.* at 148, at ¶ 155)

Case: 26-1403 Document: 31 Page: 93 Filed: 08/25/2026

coal-fired power plants, and this process is used to create and sell refined coal, (*id.* at ¶ 156).

- In sum, all of these patents "describe technology related to mercury capture for use with coal-fired combustion chambers" and are therefore "technically comparable" to Plaintiffs' patents "at least in the sense that they are drawn toward the same field of technology." (*Id.* at 149, at ¶ 157)

In the Court's view, Mr. O'Keefe has sufficiently explained the ways in which the licensed technology is—and is not—comparable to the asserted patents. While Defendants focused on the last paragraph of the relevant section of Mr. O'Keefe's report (paragraph 157), as demonstrated above, Mr. O'Keefe engaged in a more fulsome analysis than that. That is, he otherwise explained what the relevant patents cover (e.g., mercury control through the use of certain additives, some of which are also covered by the asserted patents) and noted certain other differences and similarities to the asserted patents.[3] (*See* D.I. 545 at 45); *see also, e.g.*, *SB IP Holdings, LLC v. Vivint, Inc.*, Civil Action No. 4:20-CV-00886, 2023 WL 6601415, at *4 (E.D. Tex. Oct. 10, 2023) (finding that an expert's reliance on a license should not be excluded for failure to show technological comparability, where the expert's opinion "was based on specific descriptions of the patents as well as elements and features shared by the patents") (internal quotation marks and citation omitted); *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 WL 4691047, at *7 (D. Del. Sept. 28, 2018) (rejecting defendant's argument that an expert alleged only a loose or vague comparability between certain licenses and the asserted patents, where he provided "reasonable and specific explanations" for selecting the agreements he did). Mr. O'Keefe's opinions establish at least a showing of "baseline

[3] Indeed, the Court notes that Defendants' own expert, Dr. Niksa, opines that the '692 patent is technologically comparable to the asserted patents, and in doing so, he focuses on the additives used and the patent's goal of reducing mercury (just as Mr. O'Keefe did). (D.I. 618, ex. B at ¶ 71)

comparability[;]" the "degree of comparability" can be further explored through cross-examination. *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020) (internal quotation marks and citation omitted).

As for economic comparability, Defendants argue that Mr. Green's analysis is deficient because:

- The Chem-Mod licenses were entered into as part of a closed common structure of companies designed to earn Section 45 tax credits and included "engineering, technical, financial, and business support[,]" yet Mr. Green offers no explanation for concluding that such circumstances should or could apply to the arms-length, patent-focused hypothetical negotiation, (D.I. 528 at 47 (citing D.I. 433, ex. 26 at 64-65, 96-97));

- The Nalco license constitutes a litigation settlement agreement and Mr. Green does not explain how such circumstances would be similar to those of the hypothetical negotiation, (*id.*); and

- The ADA-ES license was an exclusive license between a licensor and a company formed by the licensor to commercialize his inventions, and Mr. Green "offers no opinion that would let a jury bridge the gap between that type of arrangement and the hypothetical negotiation" between the parties here, (*id.* at 48).

Taking up the ADA-ES license first, as Plaintiffs note, (D.I. 545 at 46), Mr. Green acknowledges the fact that the ADA-ES license "differs from the licenses resulting from the hypothetical negotiation in that it is an exclusive license to a related party[,]" while the licenses between the parties here "would be non-exclusive and not with parties related to" Plaintiffs, (D.I. 547, ex. A at ¶ 178). Mr. Green could have done a better job of more expressly providing a clearer explanation as to "what extent this lack of a competitive relationship impacted the royalty calculation[.]" *Moskowitz Fam. LLC v. Globus Med., Inc.*, CIVIL ACTION No. 20-3271, 2023 WL 5487662, at *9 (E.D. Pa. Aug. 24, 2023); *Zimmer Surgical, Inc.*, 365 F. Supp. 3d at 496

Case: 26-1403 Document: 31 Page: 95 Filed: 08/25/2026

(concluding that an expert failed to show that a license was economically comparable to the asserted patents, where the license related to a settlement agreement and the expert "engage[d] in no analysis of the underlying litigation *and how it may have affected the royalty rate*") (emphasis added); *Intel Corp. v. Future Link Sys., LLC*, C.A. No. 14-377-LPS, 2017 WL 2482881, at *2 (D. Del. June 1, 2017) ("Mr. Chandler also identified indicia of economic comparability between the comparable license agreements and the hypothetical licenses involved here, *as well as any effect of alleged differences between them*") (emphasis added). However, Mr. Green does note that the documentary evidence indicates that the royalties from this license could amount to as much as $1 per ton, (D.I. 547, ex. A at ¶ 177), and yet he opines that the parties here would have "first considered that existing licensing indicates that royalties of between $0.60 and $0.65 per ton of refined coal have actually been paid for the use of similar technologies[,]" (*id.* at ¶ 199, 205 (chart not reflecting the ADA-ES agreement as a quantitative data point)). Thus, it appears that he *did* account for the differences in the competitive circumstances between the ADA-ES license and the hypothetical negotiation in his ultimate analysis. *Cf. Moskowitz Fam. LLC*, 2023 WL 5487662, at *9 (declining to exclude the expert's testimony on a lack-of-economic-comparability basis, where although the damages expert facially "did nothing to assess how much lower than 10% the reasonable royalty rate should be to account for the lack of a competitive relationship . . . such mathematical precision is not required[,]" and where the expert did "provide some explanation why and to what extent this lack of a competitive relationship impacted the royalty calculation"); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010) (where "Finjan noted multiple differences between the Finjan–Microsoft licensing scenario and a hypothetical negotiation with Defendants[,]" such as the fact

that "Finjan did not compete with Microsoft but does compete against Secure[,]" these "differences permitted the jury to properly discount the Microsoft license").

Turning next to the Nalco license, Mr. Green explains that, as a general matter, "depending on the facts surrounding a given licensing circumstance, the royalty amounts and terms included in settlement agreements may not be comparable to those that would be reached in the arms-length negotiation of the hypothetical negotiation construct." (D.I. 547, ex. A at ¶ 79) At the same time, however, settlement agreements and related licenses can provide reliable evidence regarding a reasonable royalty "where the royalty reflects the economic demand for the claimed technology as opposed to being largely driven by the coercive facts inherent in litigation." (*Id.* (internal quotation marks and citation omitted)) In the Court's view, Mr. Green provides enough details about the Nalco litigation to support the idea that the Nalco license was not largely driven by litigation-related coercion and instead reflects the demand for the claimed technology (such that his reliance on this license can be a part of his analysis). These details include the fact that: (1) the license was the product of a settlement of two lawsuits regarding the '692 patent; (2) the defendants did not believe that they needed to license the patent because they did not perform the claimed method; (3) the licenses note that if damages were applied to all uses of the Chem-Mod solution, including at plants that were non-parties to the suits, they could total hundreds of millions of dollars, but Chem-Mod and the defendants denied that any such damages should be awarded; and (4) the amounts reflected in the Nalco license "were the minimum royalties due because validity and infringement had not been determined" for the licensed patents. (*Id.* at ¶¶ 135-44, 199) Beyond that, any failure by Mr. Green to account for other variables can be explored on cross examination. *See e.g.*, *Shopify Inc. v. Express Mobile, Inc.*, Civil Action No. 19-439-RGA, 2021 WL 4288113, at *28 (D. Del. Sept. 21, 2021).

Finally, with respect to the Chem-Mod licenses, Plaintiffs retort that Mr. Green "noted that Chem-Mod entered into agreements for similar amounts with its corporate relatives (AJG entities) and with unrelated entities (CERT and DTE entities)." (D.I. 545 at 46 (citing D.I. 547, ex. A at ¶¶ 131-34, 168-73)) While it is not clear to the Court where in these paragraphs Mr. Green notes that certain of these agreements were with corporate relatives and others were not, it does appear that the royalty rates at issue were similar enough. Thus, Defendants' criticisms here too go to the weight of Mr. Green's analysis rather than to the admissibility.

**B. Apportionment**

Defendants make two arguments relevant to apportionment that the Court will address in turn.

First, Defendants argue that for the purportedly comparable licenses that he relied upon, Mr. Green was required to—but failed to—isolate the portion of each license fee attributable to the assertedly comparable patents. (D.I. 528 at 48) According to Defendants, Mr. Green did not offer any apportionment theory with respect to the Nalco and ADA-ES licenses, and he opined that no apportionment is necessary regarding the Chem-Mod licenses on the incorrect assumption that the entire payment was for "comparable" mercury emission reduction technology. (*Id.* at 49) According to Defendants, this analysis thus ignored additional benefits provided by the Chem-Mod licenses, including technology for NOx reduction (which the patents do not cover) and consulting and business services relating to Section 45 tax credits. (*Id.*)

Plaintiffs respond, (D.I. 545 at 47), by arguing that Mr. Green *did* take apportionment into account in rendering his opinion, in that he concluded that:

> "[T]here has been a substantial amount of licensing of technically comparable technologies. These licenses have provided for royalty rates of between \$.35 and \$.65 per ton of coal processed using technologies comparable to those claimed by the Asserted Patents.

> I understand that the [United States Court of Appeals for the] Federal Circuit has concluded that in circumstances in which comparable licenses exist[,] royalties that consider these agreements are essentially "self-apportioning" as they indicate the willingness of licensees to pay for the use of the technology and already consider the portion of profits that a licensee would be willing to pay for the rights to patented technology.

(D.I. 547, ex. A at ¶ 185) In deposition testimony, Mr. Green further explained that: (1) the licenses between Chem-Mod and DTE did not vary according to how many patents were at issue in the licenses because the licensees were paying for access to the technology, (D.I. 533, ex. 26 at 86, 91); (2) while the Chem-Mod patents enabled treating coal to reduce mercury and sulfur, the same royalty rates applied to the licenses even if sulfur reduction was not needed, (*id.* at 87, 89-90); (3) a licensee that did not need to reduce NOx would not get a reduced royalty rate, (*id.* at 90-91); and (4) royalties were due regardless of whether any other services were provided, (*id.* at 95-96).

The Federal Circuit has explained that "[w]hen a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020). "That is because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have 'built-in apportionment.'" *Id.* (citation omitted). "Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Id.* at 1041.

The Court finds that Mr. Green's explanation is sufficient here, as he has explained why, in his view, the licenses that he relies upon had built-in apportionment. The Court isn't saying that Mr. Green is *correct*; he may or may not be, and Defendants can surely explore their

disagreements with Mr. Green on that front during cross-examination. *See RSB Spine, LLC v. DePuy Synthes Sales, Inc.*, Civil Action No. 19-1515-RGA, 2022 WL 17084156, at *2 (D. Del. Nov. 18, 2022).

Finally, Defendants contend that Mr. Green's royalty rate opinion must be excluded because he fails to apportion out the value of the Section 45 tax credits that were earned by the licensees of Chem-Mod's, Nalco's and ADA-ES's technology (but instead opines that the Section 45 tax credits served as the economic basis for the alleged infringement). (D.I. 528 at 49 (citing D.I. 547, ex. A at ¶¶ 127-28, 149, 151; *id.*, ex. B at ¶¶ 16, 251, 256)) Defendants argue that this failure is "fundamentally flawed" because: (1) the asserted patents do not claim qualifying for Section 45 tax credits or reducing NOx, which is a requirement to earn such tax credits, such that the value of the credits cannot be attributed to the alleged infringement; and (2) even if practicing the patents is necessary to earn the credits, the value of the infringing product would be attributable to tax code compliance rather than to the value of the technical contribution of the asserted patents to the field of mercury reduction. (*Id.* at 49-50)

In response, Plaintiffs argue that Mr. Green's royalty rate opinion is a "flat per-unit amount" that is "assessed on a per-ton basis, and determined from a variety of inputs." (D.I. 545 at 48 (citing D.I. 547, ex. A at ¶¶ 189-205)) As for apportionment of tax credits, Plaintiffs assert that Mr. Green's royalty rate opinion "does not *include* any tax credit component to apportion *out*, and Defendants identify no evidence to show the *inclusion* of the value of the tax credits." (*Id.* at 48-49 (emphasis in original); *see also* Plaintiffs' Dispositive Motions Hearing Slides at Slide 85 ("Mr. Green Does Not Capture Any Tax Credit Value")) Plaintiffs contend that Mr. Green's damages opinion "identifies the economics of Defendants' infringement and separates

Case: 26-1403 Document: 31 Page: 120 Filed: 08/25/2026

the apportioned value for the use of the patented technology[.]" (D.I. 545 at 49 (citing D.I. 533, ex. 26 at 214-16))

On this record, where the parties' arguments were not very clear, at least to the Court, the Court can only take Plaintiffs at their word that Mr. Green's royalty rate range is not going "include a[] tax credit component" (and therefore does not "[f]ail to [a]pportion tax credits)." (*Id.* at 48-49) In light of this representation, Defendants' argument that Mr. Green's royalty rate opinions must be excluded for failure to apportion out Section 45 tax credits is not well-taken.

## IV. CONCLUSION

For the reasons set out above, the Court hereby ORDERS that Defendants' Motion is denied.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **November 9, 2023** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: November 7, 2023

Christopher J. Burke
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) | |
| Defendants. | ) | |

---

James M. Lennon and Peter Akawie Mazur, DEVLIN LAW FIRM, Wilmington, DE; Bradley W. Caldwell, Justin T. Nemunaitis, Warren J. McCarty, III, Daniel R. Pearson, Adrienne R. Dellinger, Aisha M. Haley, Richard A. Cochrane, CALDWELL CASSADY CURRY P.C., Dallas, TX; Attorneys for Plaintiffs Midwest Energy Emissions Corp. and MES Inc.

Kenneth L. Dorsney and Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE; Jeff Dyess, Paul Sykes, Benn Wilson and Ashley M. Robinson, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL; Jessica Zurlo, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., Attorneys for Defendants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Spring Hill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC and Rutledge Products, LLC.

---

**MEMORANDUM OPINION**

June 10, 2025
Wilmington, Delaware

Christopher J. Burke
**BURKE, United States Magistrate Judge**

**INTRODUCTION**

This patent infringement case relates to mercury control at coal-fired power plants ("power plants"). Plaintiffs Midwest Energy Emissions Corp. ("Midwest Energy") and MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C") allege infringement of claims 25 and 26 of United States Patent No. 10,343,114 (the "'114 patent") and claims 1 and 2 of United States Patent No. 10,596,517 (the "'517 patent" and collectively with the '114 patent, the "asserted patents")[1] against current-named Defendants Bascobert (A) Holdings, LLC; Buffington Partners, LLC; Cottbus Associates, LLC; Larkwood Energy, LLC; Marquis Industrial Company, LLC; Rutledge Products, LLC; Senescence Energy Products, LLC and Springhill Resources, LLC (the "CERT RC Defendants"); CERT Operations II LLC; CERT Operations IV LLC; CERT Operations V LLC; and CERT Operations RCB LLC (the "CERT Operations Companies Defendants" and collectively with the CERT RC Defendants, "CERT" or the "CERT Defendants"). (D.I. 659, ex. 2 at ¶¶ 1-6; *id.*, ex. 3 at ¶ 1) The asserted claims of the asserted patents recite methods for reducing mercury emissions from power plants with the use of bromine-enhanced coal (or "refined coal") and a sorbent such as activated carbon. (D.I. 775, PTX-001, PTX-003; *see also* D.I. 546, ex. A at ¶¶ 49, 70; D.I. 743 at ¶ 4)

[1] Plaintiffs previously also asserted United States Patent Nos. 8,168,147 (the "'147 patent"), 10,589,225 (the "'225 patent"), and 10,668,430 (the "'430 patent"), (D.I. 406 at ¶¶ 41, 42, 44), but only pursued their claims relating to the '114 patent and '517 patent at trial, (*see, e.g.*, D.I. 659, ex. 1 at ¶¶ 15-20).

The Court[2] held a 5-day jury trial beginning on February 26, 2024, (D.I. 781-85 (hereinafter, "JT Tr.")), regarding Plaintiffs' claims that the CERT RC Defendants contributed to infringement of the asserted claims of the asserted patents by selling refined coal to power plants, and that each of the CERT Defendants induced these power plants to add activated carbon to the refined coal in a manner that amounted to direct infringement[3] (and that this infringement was willful), (D.I. 659, ex. 2 at ¶¶ 5-6; D.I. 689 at 15; D.I. 743 at ¶ 4; JT Tr.[4] (D.I. 785) at 1206-08). At trial, the CERT Defendants denied that they indirectly infringed the asserted patents. (D.I. 669 at 2; JT Tr. (D.I. 785) at 1246) On March 1, 2024, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs. (D.I. 692) The Court entered non-final judgments on the verdict against the CERT Defendants. (D.I. 697-708) Thereafter, the parties submitted post-trial motions relating to the jury trial. (D.I. 716; D.I. 718; D.I. 720; D.I. 763)

The CERT Defendants had also asserted that Plaintiffs' infringement claims are barred because the CERT Defendants are entitled to an implied license to the asserted patents. (D.I. 515 at 112, at ¶ 16; D.I. 659, ex. 3 at 48 at ¶ 3(e)-(f)) The Court ruled that it would hold a bench trial on this defense following the jury trial. (D.I. 605) Along with its other post-trial motion briefing, CERT filed a motion to alter or amend the non-final judgments in the CERT

---

2 The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 398)

3 The CERT Operations Companies Defendants made refined coal that the CERT RC Defendants then sold to power plants. (D.I. 659, ex. 1 at ¶¶ 34-36; *see also* D.I. 532)

4 While the parties appear to cite to the rough versions of the jury trial transcript in their briefing, the Court herein cites to the final versions of the jury trial transcript that have been docketed.

Defendants' favor, pursuant to Federal Rule of Civil Procedure 59(e), should the Court find as a result of the bench trial that the CERT Defendants received an implied license (the "Motion"). (D.I. 717)

On May 30, 2024, the Court held the bench trial. (D.I. 779 (hereinafter, "BT Tr.")) The parties thereafter filed post-trial briefs regarding CERT's implied license defense, (D.I. 758; D.I. 760; D.I. 767), as well as proposed findings of fact and conclusions of law, (D.I. 759; D.I. 762). That briefing did not conclude until August 7, 2024. (D.I. 767)

As explained below, the Court determines that CERT has failed to prove by a preponderance of the evidence that it has an implied license to the asserted patents. Pursuant to Federal Rule of Civil Procedure 52(a), the Court hereby presents its findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. The Parties

1. Plaintiff Midwest Energy is a Delaware corporation. (D.I. 659, ex. 1 at ¶ 1)

2. The CEO of Midwest Energy is Rick MacPherson. (JT Tr. (D.I. 782) at 440) Mr. MacPherson founded ME2C in 2008. (*Id.*)

3. Plaintiff MES is a North Dakota corporation. (D.I. 659, ex. 1 at ¶ 2)

4. Defendants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC and Rutledge Products, LLC are Delaware limited liability companies. (*Id.* at ¶¶ 3-14)

5. The past president and Vice President of Operations for the CERT Operations Companies Defendants is Jeff Green. (BT Tr. at 50) Mr. Green served as the corporate representative for the CERT Defendants in this case. (JT Tr. (D.I. 783) at 839)

**B. The Relevant Patents**

6. The inventors of the asserted patents were researchers at the Energy & Environmental Research Center ("EERC"), a nonprofit research arm at the University of North Dakota; the inventors were studying the issue of mercury capture at the EERC. (D.I. 546, ex. A at 19, at ¶ 48; D.I. 759 at ¶ 7; JT Tr. (D.I. 781) at 241)

7. On May 1, 2012, the United States Patent and Trademark Office ("PTO") issued the '147 patent, entitled "Sorbents for the Oxidation and Removal of Mercury." (D.I. 775, PTX-005.0002; *see also* D.I. 598, ex. 1 at ¶ 37) The '147 patent claims priority to provisional application No. 60/605,640, which was filed on August 30, 2004 (as well as to a first non-provisional application that issued as United States Patent No. 7,435,286 (the "'286 patent")). (D.I. 775, PTX-005.0002)[5] The '147 patent names Edwin S. Olson, Michael J. Holmes and John H. Pavlish as inventors. (*Id.*; *see also* D.I. 598, ex. 1 at ¶ 38)

8. On July 9, 2019, the PTO issued the '114 patent, entitled "Sorbents for the Oxidation and Removal of Mercury." (D.I. 775, PTX-001.0002; *see also* D.I. 659, ex. 1 at ¶ 15) The '114 patent also claims priority to provisional application No. 60/605,640, (as well as a first non-provisional application that issued as the '286 patent). (D.I. 775, PTX-001.0003; D.I. 762 at

[5] The '286 patent issued on October 14, 2008 and, like the other relevant patents, is also entitled "Sorbents for the Oxidation and Removal of Mercury[.]" (*See* D.I. 776, PTX-049.0008) The EERC's reference number for the '286 patent was 05-001. (*Id.*; *see also* D.I. 775, PTX-039.0006)

¶ 2) The '114 patent names Edwin S. Olson, Michael J. Holmes and John H. Pavlish as inventors. (D.I. 775 at PTX-001.0002; *see also* D.I. 659, ex. 1 at ¶ 16)

9. On March 24, 2020, the PTO issued the '517 patent, entitled "Sorbents for the Oxidation and Removal of Mercury." (D.I. 775, PTX-003.0002; *see also* D.I. 659, ex. 1 at ¶ 18) The '517 patent too claims priority to provisional application No. 60/605,640 (as well as a first non-provisional application that issued as the '286 patent). (D.I. 775, PTX-003.0003; D.I. 762 at ¶ 3) The '517 patent also names Edwin S. Olson, Michael J. Holmes and John H. Pavlish as inventors. (D.I. 775, PTX-003.002; *see also* D.I. 659, ex. 1 at ¶ 19)

10. As noted above, the asserted claims of the asserted patents (i.e., claims 25 and 26 of the '114 patent and claims 1 and 2 of the '517 patent) recite methods for reducing mercury emissions from power plants with the use of refined coal and a sorbent such as activated carbon. (D.I. 775, PTX-0001, PTX-0003; *see also* D.I. 546, ex. A at 19, at ¶ 49 & at 32, at ¶ 70)

11. Inventor John H. Pavlish was employed at the EERC as a senior research advisor from 1993 until 2014, and he also served as the director of the EERC's Center for Air Toxic Metals from 2000 until 2014. (BT Tr. at 170-71) At some point while still employed at the EERC, Mr. Pavlish began consulting work for ME2C, and in 2014 he began to work full-time for ME2C as the Chief Technology Officer and Senior Vice President. (JT Tr. (D.I. 782) at 325-26)

**C. Regulations Regarding Mercury Reduction**

12. In 1990, Congress required the United States Environmental Protection Agency ("EPA") to prepare regulations addressing air pollutants, including mercury. (D.I. 659, ex. 1 at ¶¶ 21-22)

13. Then in 2004, Congress created a new tax credit to promote the production and

sale of refined coal ("Section 45 tax credits" or the "Section 45 tax credit program"). (*Id.* at ¶¶ 25-26) Pursuant to this law, a seller of refined coal could claim a tax credit for each ton of refined coal sold to a power plant that results in a 40% reduction in mercury emissions and a 20% reduction in NOx emissions. (*Id.* at ¶ 26; JT Tr. (D.I. 782) at 330, 431; JT Tr. (D.I. 783) at 776, 779)

14. In order to receive the Section 45 tax credits, a refined coal facility for producing refined coal had to be in operation (i.e., placed in service) at a power plant by December 31, 2011. (D.I. 659, ex. 1 at ¶ 32; BT Tr. at 55)

15. The Section 45 tax credit program ended on December 31, 2021. (D.I. 659, ex. 1 at ¶ 32; BT Tr. at 58; JT Tr. (D.I. 783) at 710)

16. In 2011, the EPA finalized national standards to reduce mercury (and other toxic air pollutants) from power plants, which are known as the Mercury and Air Toxics Standards ("MATS"). (D.I. 546, ex. A at 19, at ¶ 50; JT Tr. (D.I. 782) at 329) MATS required power plants to reduce mercury emissions by 90%. (JT Tr. (D.I. 782) at 431; JT Tr. (D.I. 783) at 613-14, 694, 710) Most power plants were required to comply with this rule by 2015, unless granted a one-year extension to 2016. (JT Tr. (D.I. 782) at 330; JT Tr. (D.I. 783) at 651-52, 660-61)

17. In order to comply with MATS, a number of power plants installed and used activated carbon systems as part of their strategy to reduce mercury by 90%. (JT Tr. (D.I. 782) at 462; JT Tr. (D.I. 783) at 613-14, 644, 699; *see also* D.I. 659, ex. 1 at ¶¶ 44-46)

**D. The Defendants' Relationships and Activities**

18. The CERT Operations Companies Defendants operated refined coal facilities (owned by the CERT RC Defendants) located at certain power plants (including Big Cajun II, Rush Island, WA Parish, Coleto Creek, Limestone, Labadie, Laramie River, Powerton and

Antelope Valley). (D.I. 659, ex. 1 at ¶¶ 56-64) The CERT Operations Companies Defendants made refined coal at these refined coal facilities. (*Id.* at ¶ 34) The refined coal at issue in this case was made by applying MerSorb and S-Sorb to coal. (*Id.* at ¶ 38) MerSorb is a 52% solution of calcium bromide and S-Sorb is cement kiln dust. (BT Tr. at 136) These chemicals were supplied by ChemMod (the "ChemMod technology"). (JT Tr. (D.I. 783) at 742; JT Tr. (D.I. 784) at 890; BT Tr. at 67)

19. It was understood in the mercury capture industry that the ChemMod technology did not include activated carbon. (BT Tr. at 106)

20. The CERT RC Defendants sold the refined coal made by the CERT Operations Companies Defendants to the power plants. (D.I. 659, ex. 1 at ¶¶ 35-36, 47-55)

21. Powerton first used activated carbon injection in one or more of its coal-fired units in 2009 or earlier. (*Id.* at ¶ 43) The remaining power plants at issue first used activated carbon injection in one or more of their coal-fired units by 2015 or 2016. (*Id.* at ¶¶ 44-46)[6]

22. CERT did not become aware of any of ME2C's patents until it was served with the original Complaint in this case in July 2019. (D.I. 279 at 16-19; D.I. 759 at ¶ 106; D.I. 762 at ¶ 22)

**E. Refined Coal Certification Testing**

23. The Section 45 tax credit program required each facility that produced refined coal to document and certify that the refined coal produced and burned achieved a qualified emission reduction (for CERT, a 20% reduction in NOx and 40% reduction in mercury), as

[6] CERT also supplied refined coal to some power plants that never used activated carbon. (JT Tr. (D.I. 784) at 953-54; BT Tr. at 208)

compared to the raw coal feedstock ("Section 45 certification testing" or "Section 45 certification test(s)"). (BT Tr. at 56)

24. The results of a Section 45 certification test were valid for six months. (JT Tr. (D.I. 784) at 1001) Accordingly, companies producing refined coal were required to have certification testing done at least every six months. (*Id.*; BT Tr. at 64)

25. One way that the Internal Revenue Service ("IRS") allowed Section 45 certification testing to be performed was via pilot scale testing at a facility that met testing requirements set forth by the IRS. (BT Tr. at 56-57; D.I. 775, DTX-1980 at 406)[7]

26. The EERC had pilot scale testing facilities that met the requirements set forth by the IRS. (BT Tr. at 57-58; JT Tr. (D.I. 784) at 1001-02)

27. The EERC was involved in developing Section 45 certification tests protocols and reporting requirements. (BT Tr. at 52-53)

**F. The License Agreement Between EERC and Plaintiffs**

28. On January 15, 2009, ME2C (through its predecessor company RLP Energy, Inc.) and the EERC entered into an agreement titled "EXCLUSIVE PATENT AND KNOW-HOW LICENSE AGREEMENT INCLUDING TRANSFER OF OWNERSHIP" (the "Agreement"). (JT Tr. (D.I. 782) at 448-49; D.I. 776, PTX-048)

29. The Agreement is governed by North Dakota law. (D.I. 776, PTX-048.0022 at § 15.2)

30. The Agreement defines the intellectual property rights that the EERC licensed to ME2C. (D.I. 759 at ¶ 16; D.I. 762 at ¶ 8)

[7] The other way was full scale testing at the power plants; that type of testing is not at issue here. (BT Tr. at 56-57)

31. The "Recitals" section of the Agreement provides that the EERC is the owner of "certain INTELLECTUAL PROPERTY (as later defined herein) relating to [the EERC's] Intellectual Property No. 05-001, "Sorbents and Flue Gas Additives for the Oxidation and Removal and Mercury[.]" (D.I. 776, PTX-048.0003)

32. Section 2 of the Agreement, entitled "Grant of Rights," includes the following license grant in Section 2.1:

> 2.1 License Grants. Subject to the terms of this Agreement, LICENSOR [the EERC] hereby grants to COMPANY [ME2C] and its ASSOCIATE for the TERM, an exclusive license for the INTELLECTUAL PROPERTY, to develop, make, have made, use, sell, offer to sell, lease, and import INTELLECTUAL PROPERTY in the FIELD in the TERRITORY and to develop and perform the INTELLECTUAL PROPERTY in the FIELD in the TERRITORY.

(*Id.*, PTX-048.0006 at § 2.1)

33. Section 1 of the Agreement includes the following definitions of certain terms used directly or indirectly in Section 2.1:

> 1.5 "FIELD" shall mean any coal-fired combustion systems.
>
> 1.6 "IMPROVEMENTS" shall mean any patented modification of a device, method, or product described in the PATENT RIGHTS, provided such a modification, if unlicensed, would infringe one or more claims of the issued PATENT RIGHTS. IMPROVEMENTS shall further mean any improvement to the PATENT RIGHTS or TECHNICAL INFORMATION, whether patentable or not, which are conceived and, at least in part, reduced to practice in the course of work under the EERC projects identified and entered into under the EERC SERVICE AGREEMENT.
>
> 1.7 "INTELLECTUAL PROPERTY" shall mean all PATENT RIGHTS (as later defined herein), all TECHNICAL INFORMATION (as later defined herein), and all IMPROVEMENTS. . . .

> 1.10 "PATENT RIGHTS" shall mean all patents and patent applications, all divisions, substitutes, continuations, continuations-in-part, reissues, reexaminations, and extensions thereof, together with any foreign counterpart thereof and patents issuing thereon derived from or claiming the priority of the U.S. or other provisional patent applications filed or to be filed in relation to the invention(s) *listed in Appendix A*.
>
> 1.11 "SUBLICENSEE" shall mean any non-ASSOCIATE sublicensee of the rights granted to the COMPANY under Section 2.1.
>
> 1.12 "TECHNICAL INFORMATION" shall mean all CONFIDENTIAL INFORMATION that is unpublished research and development information, unpatented inventions, know-how, trade secrets, technical data, software, financial data, agreements, and marketing information related to suppliers, contractors, and customers and in the possession of the LICENSOR [EERC] at the EFFECTIVE DATE of this Agreement that are reasonably necessary to produce LICENSED PRODUCTS and that the LICENSOR [EERC] has the right to provide to the COMPANY [ME2C]. . . .
>
> 1.14 "TERRITORY" shall mean worldwide.

(*Id.*, PTX-048.0004-0006 at §§ 1.5, 1.6, 1.7, 1.10 (emphasis added), 1.11, 1.12, 1.14)

34. During the jury trial, ME2C offered the Agreement into evidence (and it was thus admitted) without "Appendix A." (*Id.*, PTX-048; JT Tr. (D.I. 782) at 448-49)

35. It is not disputed that "Appendix A" listed at least the '286 patent ("and any invention claimed therein"). (D.I. 761, ex. 1 at ¶ 3; D.I. 767 at 2; D.I. 776, PTX-049.0005, .0008)

36. Because the asserted patents claim priority to a non-provisional application that issued as the '286 patent, the asserted patents fall under the broad definition of "PATENT RIGHTS" in the Agreement, as patents that issued derived from or claiming the priority of the

"U.S. . . . patent applications filed or to be filed in relation to [the '286 patent]." (D.I. 776, PTX-048.0005 at § 1.10)

37. The Agreement includes the following provisions relating to ME2C's right to sublicense its rights under the Agreement:

> 2.4 Sublicenses. COMPANY [ME2C] shall have the right to grant sublicenses of its rights under Section 2.1. COMPANY [ME2C] shall incorporate terms and conditions into its sublicense agreements sufficient to enable COMPANY [ME2C] to comply with this Agreement. COMPANY [ME2C] shall promptly furnish LICENSOR [EERC] with a fully signed photocopy of any sublicense agreement. Upon termination of this Agreement for any reason, any SUBLICENSEE not then in default shall have the right to seek a license from LICENSOR [EERC]. LICENSOR [EERC] agrees to negotiate such licenses in good faith under reasonable terms and conditions. . . .
>
> 7.5 Right to Sublicense. COMPANY [ME2C] shall have the sole right to sublicense any alleged infringer in the FIELD in the TERRITORY for future use of the PATENT RIGHTS in accordance with the terms and conditions of this Agreement relating to sublicenses.

(D.I. 776, PTX-048.0006, .0013 at §§ 2.4, 7.5)

38. The Agreement also includes the following provision within Section 2:

> 2.6 Acknowledgement of Patent Ownership. Neither this Agreement, nor the use by the COMPANY [ME2C] of the LICENSED PRODUCT or LICENSED PROCESS, shall in any way give or be deemed to give the COMPANY [ME2C] any interest in the LICENSED PRODUCT or LICENSED PROCESS, except for the right to use the LICENSED PRODUCT or LICENSED PROCESS in connection with the exploitation of the COMPANY'S [ME2C's] rights under this Agreement in the FIELD in the TERRITORY. . . .

(*Id.*, PTX-048.0006-7 at § 2.6)

39. The key terms of Section 2.6 are defined as follows:

1.8 "<u>LICENSED PROCESS</u>" shall mean any process that, absent the license granted hereunder, would infringe one or more claims of the PATENT RIGHTS or which uses TECHNICAL INFORMATION, or which uses a LICENSED PRODUCT.

1.9 "<u>LICENSED PRODUCT</u>" shall mean any service, product, or part thereof that:

A) Absent the license granted hereunder, would infringe one or more claims of the PATENT RIGHTS; or

B) Is manufactured by using a LICENSED PROCESS or that, when used, practices a LICENSED PROCESS; or that, when used, practices a LICENSED PROCESS; or

C) Uses TECHNICAL INFORMATION.

(*Id.*, PTX-048.0005 at §§ 1.8, 1.9)

40. Section 7.1 of the Agreement provides that "[e]ach [p]arty agrees to provide written notice to the other [p]arty promptly after becoming aware of any infringement of the PATENT RIGHTS." (*Id.*, PTX-048.0012 at § 7.1)

41. Section 9.1(B) (in the "REPRESENTATIONS OR WARRANTIES" section of the Agreement) provides the EERC's representation and warranty to ME2C that as of the effective date of the Agreement:

(i) to LICENSOR'S knowledge, it has not received any notice of a claim by a third party for infringement of such third party's intellectual property relating to the use and practice of the LICENSED PRODUCT, LICENSED PROCESS, or PATENT RIGHTS;

(ii) it has no knowledge of any actual infringement by any third party in the TERRITORY of the PATENT RIGHTS;

(iii) at the Effective Date, LICENSOR is the sole owner of the PATENT RIGHTS, the LICENSED PRODUCT, and the LICENSED PROCESS and has not licensed, assigned,

> transferred, pledged, or otherwise encumbered the rights granted to COMPANY under Section 2.1[.]

(*Id.*, PTX-048.0015 at § 9.1(B))

**G. The Closing Agreement Between EERC and ME2C**

42. A Closing Agreement (the "Closing Agreement") executed between EERC and ME2C in 2017 shows that the Agreement was amended several times. (D.I. 776, PTX-054.0001)

43. Pursuant to the Closing Agreement, the Agreement was terminated and one or more Plaintiffs acquired the EERC's patents. (*Id.*, PTX 054.0001, 054.0003)

**H. The Relationship Between EERC and CERT**

44. ChemMod began working with the EERC in around 2004, with ChemMod testing the ChemMod technology at the EERC facilities. (BT Tr. at 51, 127-29, 175)

45. Somewhere around 2007, Mr. Pavlish made the Intellectual Property Director of the EERC aware of his belief that ChemMod's use of bromine on coal fell within the scope of the EERC's intellectual property rights. (*Id.* at 180-82)

46. In 2009, ChemMod contacted CERT to see if CERT was interested in getting into the refined coal business using ChemMod's technology. (*Id.* at 51) During that discussion, ChemMod steered CERT to the EERC with regard to the Section 45 certification testing that would be required for CERT to qualify refined coal for Section 45 tax credits. (*Id.*)

47. Subsequent to ChemMod's discussion with CERT regarding the refined coal business, CERT began interacting with the EERC in late 2009, after the EERC and ME2C had executed the Agreement. (*Id.* at 51, 103-04)

48. From 2011 through the end of the Section 45 tax credit program in 2021, the

CERT Operations Companies Defendants contracted with the EERC to perform Section 45 certification testing via pilot scale testing at the EERC facilities for all refined coal sold to the power plants by the CERT RC Defendants. (D.I. 659, ex. 1 at ¶¶ 47-55; BT Tr. at 51, 58)

49. For the Section 45 certification testing, the CERT Operations Companies Defendants would send the EERC a sample of feedstock coal. The EERC would also prepare another sample of the same feedstock coal mixed with known amounts of S-Sorb and MerSorb and would test the samples in its laboratory. If the results provided at least a 40% reduction in mercury and a 20% reduction in NOx, the coal would be certified. (JT Tr. (D.I. 784) at 1002-03)

50. In reporting the test results to CERT, the EERC included the following disclaimer:

> LEGAL NOTICE This research report was prepared by the Energy & Environmental Research Center (EERC), an agency of the University of North Dakota, as an account of work sponsored by [Defendant name]. Because of the research nature of the work performed, neither the EERC nor any of its employees makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed or represents that its use would not infringe privately owned rights.

(D.I. 774, DTX-1691 at CERT-0040454; BT Tr. at 115-16)

51. CERT looked for a back-up facility to the EERC for Section 45 certification testing, but could not find another laboratory to perform the testing that had the same or similar knowledge and capabilities as did the EERC. (BT Tr. at 57-58)

52. The EERC performed a total of 204 Section 45 certification tests for CERT from 2011 to 2021. (*Id*. at 75) CERT paid EERC approximately $8.8 million for this Section 45 certification testing. (*Id.* at 78, 94)

53. Other licensees of the ChemMod technology also used the EERC to perform

Section 45 certification testing. (*Id.* at 52, 58) For all ChemMod licensees, the EERC performed approximately 700 Section 45 certification tests. (*Id.* at 136)

54. The EERC also helped CERT respond to power plants' technical questions regarding the additives that would end up in the plants' boilers, and provided technical support for operational problems that CERT encountered (such as corrosion in the plants' air preheater baskets). (*Id.* at 53-54, 59-60)

55. When the EERC certified refined coal for CERT, it knew what power plants that refined coal would ultimately be sent to. (*Id*. at 64, 68-69; D.I. 775, DTX-1983)

56. Mr. Green, who was the person at CERT responsible for all communications with the EERC, testified that CERT did not tell the EERC "that several CERT connected power plants were going beyond the Chem[]Mod technology and also adding activated carbon" to the coal for mercury capture. (BT Tr. at 107; *see also id.* at 102, 123-24)

57. During the jury trial, Mr. Green initially took the position that CERT did not learn that its refined coal was being used in a process with activated carbon at the power plants until the same day that CERT learned that it was being sued in this case. (*Id*. at 86) However, Mr. Green acknowledged that during the jury trial, it had come out that CERT "knew generally [that] some of the power plants were using activated carbon at some point from 2014 and on." (*Id.* at 85)

58. During the jury trial, the EERC's corporate representative, Tom Erickson, testified that the EERC was not aware that ChemMod's licensees were selling refined coal to power plants that also used activated carbon. (JT Tr. (D.I. 784) at 1126) At the time of his testimony, Mr. Erickson was the Chief Operations Officer and Vice President for Intellectual Property at EERC; prior that, he was the Director for Exploratory Research, Intellectual Property

and Technology Commercialization, and prior to that, the Chief Executive Officer of EERC. (*Id.* at 1121-22)

59. During this time period (i.e., from 2009 through 2021), no one from EERC told CERT that the EERC had any patents or patent applications in the field of mercury control technology. (BT Tr. at 55, 78-79)

60. Mr. Green testified that if the EERC had told CERT that it had patents in the mercury control field in the 2010 to 2016 time-frame, CERT could have moved the refined coal program to power plants that were not using activated carbon. (*Id* at 79-80) CERT had moved approximately 7 facilities over the years, and it operated at some power plants that did not use activated carbon. (*Id.* at 80; JT Tr. (D.I. 784) at 953-54)

61. The EERC never told CERT that CERT had its permission to sell refined coal to power plants using activated carbon. (BT Tr. at 84, 112)

62. After CERT learned of ME2C's patents from this lawsuit in 2019, CERT continued to engage in the same conduct accused of infringing until the Section 45 tax credit program ended in 2021, because CERT believed that it did not infringe. (*Id.* at 121-22)

**I. The Relationship Between ME2C and the EERC**

63. Mr. Pavlish (while still at the EERC) handled ME2C's competitive product testing beginning in 2009, and ME2C was testing at the Joppa power plant (later accused of infringement in this case) by 2011.[8] (*Id.* at 160-161, 204; D.I. 406 at ¶¶ 115, 119, 128-37) Mr. Pavlish testified that "it became pretty obvious and evident" that Joppa was using activated carbon. (BT Tr. at 184-85)

[8] The Joppa power plant did not receive its refined coal from a CERT Defendant. (D.I. 598, ex. 1 at ¶ 103)

64. In April 2012, Mr. Pavlish e-mailed ME2C a spreadsheet regarding competing technologies that was part of the EERC's "ongoing efforts . . . to continue to track who's doing [what], what technologies are out there, what's being applied." (*Id.* at 188-89; D.I. 773, DTX-0051-0052)

65. In a May 22, 2012 e-mail (the "Powerton e-mail"), ME2C and the EERC discussed the fact that a product was tested by ADA at the Powerton power plant, with Mr. Pavlish responding that ME2C "should take a serious look at how to get into this market" and "[b]oth them and ChemMod rely mainly on adding bromine to the coal to achieve mercury reductions." (D.I. 773, DTX-0104; *see also* JT Tr. (D.I. 782) at 408-11)

66. In October 2012, ME2C submitted a breakdown of pricing to Joppa for replacing its current mercury capture program "as well as projecting the dose rate with the ChemMod[] Refined Coal program that is in the process of being installed." (D.I. 773, DTX-0077; JT Tr. (D.I. 782) at 507-08)

67. In July 2013, an e-mail among ME2C employees and Mr. Pavlish discussed that a potential power plant customer was going to be running a "Refined Coal demonstration" in September and would be adding powered activated carbon to the "backend for sorbent" which would allow it to qualify for MATS. (D.I. 773, DTX-0105; *see also* JT Tr. (D.I. 782) at 412) The e-mail noted that this "is the same thing that happened at Joppa" and that "[t]he EERC (not JP's department) is complicit in this as well—they are testing for Chem[]Mod[] and others to prove 'compliance.'" (D.I. 773, DTX-0105) Mr. Pavlish responded that ME2C "might as well pack up and go home." (*Id.*, DTX-0106)

68. On September 18, 2013, an ME2C employee stated in an e-mail to Mr. Pavlish and Mr. Erickson that "simple/cheap efforts" to thwart the Section 45 tax certification program

were "causing serious damage to the effort we're making to commercialize and profit from our tech." (*Id.*, DTX-0112 at 2) Mr. Erickson replied by asking if there was any interest in teaming up with an existing company to offer a complete mercury solution and noted that if so, "ChemMod would be a good company." (*Id.*) Mr. Pavlish responded to ME2C that many of the power plants would need "additional control to achieve the MATS limit" and would likely employ the use of activated carbon in "combination with [the Section 45 tax credit]. . . . Either ChemMod or ADA will offer this as a solution, or the [power plant] will simply buy the [activated carbon] separately. So we have heard, there are a number of plants already doing this." (*Id.* at 1)

69. In a December 2014 internal ME2C e-mail, ME2C described a visit to a power plant to try to convince the plant to use ME2C's products; ME2C told the plant that it "run[s] in parallel with [refined coal] at two customer sites." (*Id.*, DTX-0056 at 1)

70. In a May 2015 e-mail exchange, an ME2C employee stated that its "program may be a great fit" for power plants that used activated carbon, (*id.*, DTX-0181 at 3), and ME2C discussed that ChemMod probably got the rate of bromine needed to be added to its coal changed because the power plant "adds [activated carbon] to hit the MATS target[,]" (*id.* at 1). Mr. Pavlish further noted that you "probably have better sources to find out the real scoop" and that "the whole thing[ is] a bit sneaky." (*Id.*)

71. In August 2015, ME2C's Vice President of Sales asked Mr. Pavlish how ME2C "work[s] with Refined Coal programs" and Mr. Pavlish provided a list of advantages. (*Id.*, DTX-0088)

72. ME2C did not provide notice to the EERC that it believed that its patent rights were being infringed until a conversation shortly before this lawsuit was filed. (BT Tr. at 167-69; JT Tr. (D.I. 782) at 510-12)

**J. Plaintiffs' Claims**

73. Plaintiffs claim in this lawsuit that the CERT RC Defendants contributed to infringement of the asserted claims of the asserted patents by selling refined coal to power plants, and that each of the CERT Defendants induced these power plants to add activated carbon to the refined coal in a manner that amounted to direct infringement (and that this infringement was willful). (D.I. 659, ex. 2 at ¶¶ 5-6; D.I. 689 at 15; D.I. 743 at ¶ 4; JT Tr. (D.I. 785) at 1206-08)

74. The parties tried Plaintiffs' claims of indirect and willful infringement of the asserted patents against the CERT Defendants in a jury trial before this Court from February 26, 2024 through March 1, 2024. (D.I. 759 at ¶ 12; D.I. 762 at ¶ 5) On March 1, 2024, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs. (D.I. 692) The Court has entered non-final judgments on the verdict against the CERT Defendants. (D.I. 697-708)

**K. CERT's Implied License Defense**

75. CERT now argues that Plaintiffs' claims are barred in their entirety, in that it is entitled to an implied license by equitable estoppel to the asserted patents due to the EERC's conduct, and due to the doctrine of equitable estoppel in light of the EERC's misleading silence. (D.I. 758 at 14, 20; D.I. 767 at 7 n.5, 10) CERT's theory is that the EERC conducted Section 45 certification testing for CERT for years while remaining silent about the patented technology, and that in light of this conduct and/or silence, the EERC granted CERT an implied license to the

Case: 26-1403 Document: 31 Page: 121 Filed: 08/25/2026

asserted patents, or that Plaintiffs are equitably estopped from asserting these patents against CERT. (D.I. 758 at 1; *see also* D.I. 732 at 3)

76. ME2C never gave CERT permission to practice the asserted patents. (BT Tr. at 122)

77. CERT does not contend that ME2C conveyed an implied license to CERT to practice the asserted patents. (*Id.* at 92)

78. ME2C contends that CERT has not met its burden of proving that it received an implied license to the asserted patents (nor that it is otherwise entitled to relief under the doctrine of equitable estoppel). (D.I. 760 at 15-16, 20)

79. The Court held a bench trial on May 30, 2024 regarding CERT's implied license defense. (D.I. 779) The parties thereafter submitted post-trial briefing and proposed findings of fact and conclusions of law regarding the defense, which concluded on August 7, 2024. (D.I. 758; D.I. 759; D.I. 760; D.I. 762; D.I. 767)

## LEGAL STANDARD

"A patent grants its owner the right to exclude others from making, using, or selling the patented invention." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995). However, the right to exclude may be waived, totally or in part, "by granting a license, which may be express or implied." *Id.*; *see also Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997) ("In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention."). With respect to implied licenses, the Supreme Court of the United States has explained that:

> No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort.

*De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927); *see also Carborundum Co.*, 72 F.3d at 878 (noting that an implied license is an affirmative defense to patent infringement).

There are various pathways that can lead to implied licenses—they may arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais) or by legal estoppel. *Wang*, 103 F.3d at 1580; *see also Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1374 (Fed. Cir. 2001), *opinion corrected*, 275 F.3d 1344 (Fed. Cir. 2001). That said, the United States Court of Appeals for the Federal Circuit has noted that "judicially implied licenses are rare under any doctrine[.]" *Wang*, 103 F.3d at 1581.

To establish an implied license by equitable estoppel, at issue here, the defendant must put forward proof that: "(1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to [infringe] to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim." *Winbond*, 262 F.3d at 1374 (*citing Wang*, 103 F.3d at 1581; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992)).

Whether an implied license exists is a question of law. *Wang*, 103 F.3d at 1580; *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986). The defendant bears the burden of proving its defense of implied license by a preponderance of the evidence.

*Sprint Commc'ns Co., L.P. v. Mediacom Commc'ns Corp.*, Civil Action No. 17-1736-RGA, 2021 WL 982737, at *1 (D. Del. Mar. 16, 2021).

The Federal Circuit has also explained that the doctrine of equitable estoppel serves as a guideline for the estoppel analysis in implied license cases, but that the two doctrines are not conterminous. *Wang*, 103 F.3d at 1581. The "primary difference" between the estoppel analysis in an implied license case and the analysis in an equitable estoppel case is that the former "looks for an affirmative grant of consent or permission to make, use, or sell: i.e., a license." *Id.* Meanwhile, equitable estoppel looks for "misleading conduct suggesting that the patentee will not enforce patent rights." *Id.* (internal quotation marks and citation omitted).[9]

A defendant seeking to bar a patentee's suit pursuant to the doctrine of equitable estoppel must prove, by a preponderance of the evidence, that:

> (1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016) (internal citation omitted); *see also A.C. Aukerman Co.*, 960 F.2d at 1045-46 (noting that the defense of equitable estoppel must be proven by a preponderance of the evidence, absent special circumstances), *abrogated on other grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.,*

---

[9] The Court herein includes the legal standards regarding the doctrine of equitable estoppel, in addition to those for an implied license by equitable estoppel, since CERT seems to say that it is asserting both the defense of implied license by equitable estoppel *and* the defense of equitable estoppel. (D.I. 767 at 7 n.5; *see also* D.I. 758 at 14 (asserting that the "record here supports implied license by conduct" and "by equitable estoppel from misleading silence"); D.I. 739, ex. 3 at ¶¶ 6-7; CERT's Closing Statement Slide at 3)

*LLC*, 580 U.S. 328 (2017).[10] "The effect of equitable estoppel is a license to use the invention that extends throughout the life of the patent." *High Point SARL*, 817 F.3d at 1331 (internal quotation marks and citation omitted).

**DISCUSSION**

CERT argues that it is entitled to an implied license to the inventions at issue (or, relatedly, that Plaintiffs are equitably estopped from asserting claims against them as to the asserted patents)—and that this means that CERT was licensed or authorized to engage in the accused conduct here (thus barring ME2C's infringement claims in their entirety). (D.I. 758 at 14, 20) Again, CERT's theory has to do with the EERC's actions or inaction when it was engaging in Section 45 certification testing of the refined coal for CERT. CERT's position is that EERC's participation in this certification testing, all while it stayed silent about its mercury control technology patents, granted CERT some form of an implied license to the asserted patents. (*Id.* at 1-2; BT Tr. at 9) Meanwhile, according to CERT, the EERC kept ME2C in the loop as to its refined coal program (including that power plants were increasingly burning refined coal with activated carbon in order to comply with MATS)—with ME2C tacitly approving of the EERC's conduct by remaining silent about its patent rights for years. (D.I. 758 at 1-2)

For its part, ME2C responds that CERT has failed to meet its burden of proof for several reasons. First, ME2C argues that with the Agreement, the EERC conveyed an exclusive license to the asserted patents to ME2C, which precludes the EERC from even having the ability to grant

---

[10] There is another doctrine referenced above—the doctrine of *legal* estoppel—that encompasses a "narrower" category of conduct by which a patentee has licensed a right, received consideration, and then attempted to derogate from the right granted. *Wang*, 103 F.3d at 1581. CERT did not press any theory regarding the doctrine of legal estoppel in its briefing, and the Court considers it to not be at issue as to the instant Motion. (D.I. 760 at 11; BT Tr. at 49)

any implied license to CERT. (D.I. 760 at 1-8; BT Tr. at 23-24, 26) Second, ME2C argues that to prove an implied license, the alleged infringer must have knowledge of the relevant patents, and here CERT was unaware of the patented technology during the relevant time period. (D.I. 760 at 8-11; BT Tr. at 29-36) Third, ME2C contends that CERT's implied license defense requires CERT to identify an affirmative grant of permission from the EERC to CERT to engage in infringing conduct, and to show that the EERC was aware that CERT was engaging in infringing conduct, and that CERT relied on the grant of permission—and that CERT has failed to make out these requirements. (D.I. 760 at 12-19; BT Tr. at 36-39) Finally, ME2C asserts that even if the EERC had the authority to grant an implied license to CERT to some patents, any such license would not apply to the asserted patents, which issued well after the conduct said to give rise to the implied license. (D.I. 760 at 20)

Below, the Court will first explain why it agrees with ME2C's first argument—i.e., that the Agreement did convey an exclusive license to ME2C, which in turn precluded the EERC from granting an implied license in any form (i.e., by conduct or by misleading silence). Then, it will turn to the elements of CERT's defense, and will explain why even if the Agreement did allow the EERC the ability to grant an implied license, CERT nevertheless has failed to prove that the EERC actually engaged in the requisite conduct and/or misleading silence sufficient to convey an implied license to CERT.

**A. The EERC conveyed an exclusive license to ME2C that precluded the EERC from being able to grant an implied license to CERT.**

The parties dispute whether the Agreement conveyed an exclusive license to ME2C for the patented technologies at issue in this case. (*See, e.g.*, D.I. 758 at 3; D.I. 760 at 2) ME2C argues that it did, which means that the EERC lacked the authority to later impliedly license

CERT. (D.I. 760 at 1-8) CERT argues that the Agreement provided only limited rights to ME2C, reserving for the EERC broader rights (including the ability to convey an implied license). (D.I. 758 at 3-6; D.I. 767 at 1-4)

Contract interpretation is a matter of law. *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1569 (Fed. Cir. 1993); *Northstar Ctr., LLC v. Lukenbill Fam. P'ship, LLLP*, 17 N.W.3d 1, 8 (N.D. 2025).[11] The plain and unambiguous meaning of a contract controls. *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed. Cir. 1991); *see also Burk v. State by & through Bd. of Univ. & Sch. Lands*, 890 N.W.2d 535, 539 (N.D. 2017) ("The parties' intention must be ascertained from the writing alone if possible.") (internal citation omitted). If a contract is unambiguous, extrinsic evidence is not admissible to contradict the contract's language. *Burk*, 890 N.W.2d at 539. But if a contract is ambiguous, the Court can consider extrinsic evidence to evaluate the intent of the parties. *Id.* A contract is ambiguous "when rational arguments can be made in support of contrary positions as to the meaning of the language in question." *Id.* (internal citation omitted).

Here, the plain language of the Agreement unambiguously supports ME2C's position. Importantly, two provisions of the Agreement make clear that the EERC granted ME2C the exclusive right to sublicense others for use of the patent rights. (*See* D.I. 760 at 2-3) Section 7.5, located in the "Infringement" section of the Agreement, says just this—that *ME2C* "shall have

[11] "A license agreement is a contract governed by ordinary principles of state contract law." *Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989). The parties agree that North Dakota law applies to the parties' dispute regarding whether the Agreement conveyed an exclusive license to ME2C. (*See* D.I. 758 at 6; D.I. 760 at 2) The law of the Federal Circuit, meanwhile, governs issues involved in the substance of enforcement of a patent right, such as the effect of a patent license grant. *See, e.g.*, *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 856 (Fed. Cir. 1999); *Cardiovascular Sys., Inc. v. Cardio Flow, Inc.*, 498 F. Supp. 3d 1080, 1090 (D. Minn. 2020).

the *sole right* to sublicense any alleged infringer in the FIELD in the TERRITORY for future use of the PATENT RIGHTS in accordance with the terms and conditions of th[e] Agreement relating to sublicenses." (D.I. 776, PTX-048.0013 at § 7.5 (emphasis added)) The "terms and conditions" of the Agreement relating to sublicenses are then set out in Section 2.4 (in the "Grant of Rights" section of the Agreement), which reiterates that ME2C "shall have the right to grant sublicences of its rights under Section 2.1." (*Id.*, PTX-048.0006 at § 2.4) And Section 2.1 of the Agreement, in turn, expressly grants ME2C ("[s]ubject to the terms of this Agreement") "an exclusive license for the INTELLECTUAL PROPERTY, to develop, make, have made, use, sell, offer to sell, lease, and import INTELLECTUAL PROPERTY in the FIELD in the TERRITORY and to develop and perform the INTELLECTUAL PROPERTY in the FIELD in the TERRITORY." (*Id.* at § 2.1)[12] So when you read these provisions, the Agreement's language is very clear. ME2C was granted the *exclusive* right to make, use and sell the intellectual property at issue in the Agreement, including the *exclusive or sole* right to grant sublicenses of such patent rights. (D.I. 760 at 2-4); *see also, e.g.*, *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (concluding that a license agreement's language providing that "'AMF hereby grants to AB an exclusive . . . worldwide license . . . to make, use, lease, offer to lease, sell, offer to sell and otherwise commercially exploit products and perform services' under the patents-in-suit" clearly granted AB an exclusive license); *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007) ("[T]he grant of an exclusive license to

[12] Section 2.7 of the Agreement also gibes with this understanding. It lays out the EERC's "Retained Rights," and in doing so, it only provides that the EERC retained the right to practice the "INTELLECTUAL PROPERTY for research and development purposes[.]" (D.I. 776, PTX-048.0007 at § 2.7(A))

make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention.").

So how does CERT attempt to get around this clear language? It makes three primary arguments, which the Court will address below. But none are availing.

First, CERT makes a kind of record-based argument, which has a few steps to it. There CERT asserts that: (1) the "PATENT RIGHTS" licensed to ME2C pursuant to the Agreement are limited to those patents listed in Appendix A of the Agreement; but (2) ME2C didn't offer Appendix A into evidence alongside the Agreement during either trial; and since (3) the Agreement was amended many times over the years; this means (4) that ME2C has failed to demonstrate what specific inventions it was granted the exclusive rights to under the Agreement—and whether those included the asserted patents. (D.I. 758 at 4; D.I. 767 at 1-2)[13]

In the Court's view, however, the record *does* clearly demonstrate that the Agreement covers the asserted patents. To start, during the jury trial, Mr. MacPherson (Midwest Energy's CEO and founder) identified the Agreement as "the original license between my company and the EERC for the technologies." (JT Tr. (D.I. 782) at 448; *see also id.* at 478 (Mr. MacPherson agreeing that pursuant to the Agreement, ME2C "license[d] the EERC's mercury control portfolio"))

Now on its own, perhaps this testimony wouldn't be enough to conclusively establish that the Agreement covered the asserted patents—but there is more. The "Recitals" section of the Agreement provides that the EERC is the owner of "certain INTELLECTUAL PROPERTY (as later defined herein) relating to [the EERC's] Intellectual Property No. 05-001, 'Sorbents and

---

[13] CERT did not advance this argument during the bench trial; instead, it was raised for the first time in its post-trial briefing. (*See, e.g.*, BT Tr. at 18-19; D.I. 760 at 2 n.1)

Flue Gas Additives for the Oxidation and Removal and Mercury[.]'" (D.I. 776, PTX-048.0003) "INTELLECTUAL PROPERTY" is thereafter defined to include "PATENT RIGHTS[,]" with "PATENT RIGHTS" being broadly defined to mean "all patents and patent applications, all divisions, substitutions, continuations, continuations-in-part, reissues, reexaminations, and extensions thereof, together with any foreign counterpart thereof and patents issuing thereon derived from or claiming the priority of the U.S. or other provisional patent applications filed or to be filed *in relation to invention(s) listed in Appendix A*." (*Id.*, PTX-048.0004-5 at §§ 1.7, 1.10 (emphasis added)) It does not appear to be disputed that the original Appendix A included at least the '286 patent. (*See* D.I. 767 at 2; *see also* D.I. 761, ex. 1 at ¶ 3; D.I. 776, PTX-049.0005)[14] Indeed, the Assignment of the '114 patent from the EERC to ME2C also demonstrates that the EERC's reference number for the '286 patent is 05-001—i.e., the number referenced in the "Recitals" section of the Agreement (as just described above). (D.I. 775, PTX-039.0006; D.I. 776, PTX-048.0003; *see also* D.I. 776, PTX-049.0008) Nor does CERT dispute that the asserted patents claim priority to a first non-provisional application that issued as the '286 patent. (D.I. 775, PTX-001.0003; *id.*, PTX-005.002; *see also* D.I. 762 at ¶¶ 2-3)

---

14 With its post-trial answering brief regarding CERT's implied license defense, ME2C submitted a declaration from Mr. MacPherson (the "MacPherson Declaration") in which he identifies the document that purportedly was Appendix A to the Agreement. (D.I. 761, ex. 1) The MacPherson Declaration also cites to certain exhibits marked as PTX-048 to PTX-054. (*Id.*) CERT objects to the "admission" of PTX-049-PTX-053 as violating the Pretrial Order, which provides that the exhibit list shall not be supplemented without leave and unlisted exhibits will not be admitted without good cause. (D.I. 767 at 2 n.1 (citing D.I. 739 at ¶ 38)) While these documents may not be included on the trial exhibit list, (D.I. 750), they were included as exhibits in the Joint Appendix to the parties' post-trial briefs regarding CERT's implied license defense, (D.I. 776). And at least as to PTX-049, CERT itself cites to the document in its briefing. (D.I. 767 at 2) For these reasons, the Court will consider and cite to PTX-049 in making its decision here.

When you put all of this evidence together, it shows that: (1) the '286 patent was both listed in the Recitals section of the Agreement (albeit by its reference number) and in Appendix A; and (2) the asserted patents claim priority to a non-provisional application that issued as the '286 patent. Therefore, there can be no dispute that the asserted patents fall under the broad definition of "PATENT RIGHTS" in the Agreement, since they are patents that issued "derived from or claiming the priority of the U.S. . . . patent applications filed or to be filed in relation to [the '286 patent]." (D.I. 776, PTX-048.0005)

CERT attempts to argue otherwise by asserting that "PATENT RIGHTS" as defined in the Agreement are expressly limited to "the invention(s) listed in <u>Appendix A</u>[,]" and that "the putative Appendix A only lists 'any invention claimed' in the '286 patent[.]" (D.I. 767 at 2) CERT also points out that the Agreement defines the term "IMPROVEMENTS" to mean "'any patented modification of a device, method or product *described* in the PATENT RIGHTS, *provided* such a modification, if unlicensed, would *infringe* one or more *claims* of the *issued* PATENT RIGHTS[.]'" (*Id.* at 2-3 (citing D.I. 776, PTX-048.0004) (emphasis added by CERT)) It draws from this that the "PATENT RIGHTS" under the Agreement "were expressly limited to 'inventions claimed' in the identified '286 patent" (and not, additionally, to inventions claimed in the asserted patents). (*Id*. at 3)

The Court does not understand CERT's argument here. The problem with the argument is that it seems to ignore the fact that in the Agreement, "PATENT RIGHTS" is *not* defined just as the "invention(s) *listed in* <u>Appendix A</u>[.]" Instead, the term is defined much more broadly to include any patents *related to the inventions listed in* Appendix A. (D.I. 776, PTX-048.0005 at § 1.10) Moreover, Appendix A lists the '286 patent "*and* any invention claimed therein"—it doesn't simply say "any invention claimed in the '286 patent." (D.I. 776, PTX-049.0005, .0008

(emphasis added)) Thus, in the Court's view, the record does not demonstrate that the "PATENT RIGHTS" (to which ME2C was granted the exclusive right to sublicense in the Agreement) were expressly limited only to what is set out in the claims of the '286 patent alone. And so the Court rejects CERT's first counter-argument.

Second, CERT argues that even if the asserted patents are covered by the "PATENT RIGHTS" set out in the Agreement, the EERC still *retained rights* in the intellectual property at issue from which an implied license could flow. (D.I. 758 at 3-6; D.I. 767 at 1-4) Its argument here hinges on Section 2.6 of the Agreement (the "Section 2.6 argument"), which is titled "Acknowledgement of Patent Ownership" and provides that:

> *Neither this Agreement*, nor the use by the COMPANY [ME2C] of the LICENSED PRODUCT or LICENSED PROCESS, *shall in any way give or be deemed to give* the COMPANY [ME2C] ***any interest*** in the LICENSED PRODUCT or LICENSED PROCESS, *except for the right to use* the LICENSED PRODUCT or LICENSED PROCESS in connection with the exploitation of the COMPANY'S [ME2C's] rights under this Agreement in the FIELD in the TERRITORY. . . .

(D.I. 758 at 4-5 (citing D.I. 776, PTX-048.0006-.0007) (emphasis added by CERT); BT Tr. at 18, 210-11) CERT asserts that Section 2.6 provides that "nothing in the Agreement gave ME2C anything more than a right to use 'Licensed Products' and 'Licensed Processes'" which encompass products and processes relating to refined coal. (D.I. 758 at 5; BT Tr. at 18) In other words, CERT is arguing that: (1) since any exclusive license granted to ME2C in Section 2.1 was "[s]ubject to the terms of th[e] Agreement[;]"; and (2) one such term is Section 2.6, which provides that "nothing in the Agreement gave ME2C anything more than a right to use 'Licensed Products' and "Licensed Processes'"; that means that (3) the EERC retained substantial rights in

the "LICENSED PRODUCT'' and "LICENSED PROCESS"—including the right to grant an implied license to CERT. (D.I. 758 at 4-5)

In further support of this argument, CERT also points to the "REPRESENTATIONS OR WARRANTIES" section of the Agreement. (*Id.* at 5-6) Section 9.1(B) provides the EERC's representation and warranty to ME2C that, as of the effective date of the Agreement:

> (i) to LICENSOR'S knowledge, it has not received any notice of a claim by a third party for infringement of such third party's intellectual property relating to the use and practice of the LICENSED PRODUCT, LICENSED PROCESS, or PATENT RIGHTS;
>
> (ii) it has no knowledge of any actual infringement by any third party in the TERRITORY of the PATENT RIGHTS;
>
> (iii) at the Effective Date, LICENSOR is the sole owner of the PATENT RIGHTS, the LICENSED PRODUCT, and the LICENSED PROCESS and has not licensed, assigned, transferred, pledged, or otherwise encumbered the rights granted to COMPANY under Section 2.1[.]

(D.I. 776, PTX-048.0015 at § 9.1(B)) CERT notes that Section 9.1(B) distinguishes between "PATENT RIGHTS" on the one hand and "LICENSED PRODUCT" and "LICENSED PROCESS" on the other. (D.I. 758 at 5-6) It argues that this section indicates that while the EERC was warranting ownership of all three, Section 9.1(B)(iii)'s language "does not represent that [the EERC] had not licensed or granted rights to other parties in the 'Licensed Product' or 'Licensed Process.'" (*Id.*; *see also* D.I. 767 at 4)

ME2C has a couple of rejoinders to CERT's Section 2.6 argument. To that end, ME2C argues as follows:

- First, even if CERT is correct that Section 2.6 together with Section 2.1 means that *those* portions of the Agreement only grant ME2C a right to use licensed products, "[S]ections 2.4 and 7.5 grant ME2C the exclusive right to sublicense the

patents and any other of its rights under the [A]greement, including the right to use licensed products." (D.I. 760 at 3-4)

- Alternatively, CERT is wrong about the meaning of Section 2.6, in that it does not narrow or limit the rights granted to ME2C in other sections (like Sections 2.1, 2.4 and 7.5), including ME2C's exclusive right to sublicense. (*Id.* at 4) Instead, according to ME2C, Section 2.6 "merely clarifies that, at the time of the [A]greement, the EERC remained the assignee of the underlying intellectual property and that ME2C's use of a LICENSED PRODUCT or LICENSED PROCESS—terms that are defined to cover ME2C conduct that would infringe but for this [A]greement—cannot expand the scope of ME2C's rights beyond the terms of the [A]greement." (*Id.*) In other words, ME2C posits that Section 2.6 is conveying that, for example, ME2C's sales of products within the field of use as defined in the Agreement "does not imply that products can be used *outside the field of use*." (*Id.* (emphasis added))

- With regard to CERT's assertion that in the "REPRESENTATIONS OR WARRANTIES" section of the Agreement, the EERC did not represent that it had not already licensed rights to other parties as to the "LICENSED PRODUCT" or "LICENSED PROCESS"—ME2C retorts that CERT fails to explain how the language in Section 9.1 "would allow the EERC to retain licensing rights despite the other express provisions in the [A]greement." (*Id.*) Furthermore, ME2C asserts that the Agreement's warranty in Section 9.1(B)(iii) that it had not licensed the patent rights supports the view that, pursuant to the Agreement, *ME2C* would now have the exclusive right to do so. (*Id.*); and

- As further support for the idea that the EERC intended to grant ME2C the exclusive right to sublicense the asserted patents under the Agreement, ME2C points to the fact that Section 2.7 of the Agreement lays out the EERC's "Retained Rights"—and that this short section only provides that the EERC retained the right to practice the "INTELLECTUAL PROPERTY for research and development purposes[.]" (*Id.* at 5 (citing D.I. 776, PTX-048.0007 at § 2.7(A)))

The Court agrees with ME2C that, even when one considers all of these additional portions of the Agreement, it remains very clear that the EERC gave ME2C the exclusive right to

Case: 25-1403 Document: 36 Page: 134 Filed: 08/25/2025

grant a sublicense to third parties for future use of the "PATENT RIGHTS." As an initial matter, it is worth stepping back and again reiterating that the Agreement repeatedly, explicitly and directly *says just that*. Again, Section 7.5 flatly states that ME2C has the "sole right to sublicense" the asserted patents and Section 2.4 provides that ME2C shall have the right to grant sublicenses of its rights under Section 2.1, which are "exclusive" rights. (D.I. 776, PTX-048.0006 at §§ 2.1, 2.4; *id.*, PTX-048.0013 at § 7.5) When it comes to analyzing contracts, words matter. Beyond this, the Agreement's definition of "SUBLICENSEE" (i.e., "any non-ASSOCIATE sublicensee of the rights granted to the COMPANY [i.e., ME2C] under Section 2.1") reiterates that *ME2C* (and nobody else) is the entity who is being granted the right to "sublicense[]" the intellectual property rights referenced in Section 2.1. (*Id.*, PTX-048.0005 at § 1.11) And the Agreement never otherwise expressly states that the EERC would—in direct contravention of these above-referenced provisions—*retain for itself* the right to grant licenses to the intellectual property at issue. Indeed, as has been repeatedly noted above, the Agreement's "Retained Rights" provision indicates the opposite—i.e., that EERC did *not* retain such a right, since that right was not there listed as one of the rights it "[r]etained[.]"[15] (*Id.*, PTX-048.0007 at § 2.9)

As for Section 2.6—the provision that CERT hangs its hat on here—in the Court's view, it simply cannot and does not nullify all of the other provisions of the Agreement that say that ME2C has the exclusive right to grant sublicenses to the intellectual property at issue. (*See* D.I. 760 at 3-4; BT Tr. at 23-25, 213-14, 216) Section 2.6 provides that ME2C's use of the licensed

[15] Because the Agreement is unambiguous in providing the exclusive right to sublicense to ME2C, both parties agree that CERT's extrinsic evidence regarding the issue is not admissible. (D.I. 758 at 6; D.I. 760 at 5)

product or process does not give ME2C "any interest" therein "except for the right to use the LICENSED PRODUCT or LICENSED PROCESS *in connection with the exploitation of [ME2C's] rights under this Agreement in the FIELD in the TERRITORY*[.]" (D.I. 776, PTX-048.0006-.0007 at § 2.6 (emphasis added)) Therein, Section 2.6 seems simply to be making a particular point about the limits of ME2C's rights to use the "LICENSED PRODUCT" or "LICENSED PROCESS." It is explaining that the Agreement only grants ME2C rights of use "in the FIELD in the TERRITORY"—and it is further noting that ME2C does *not* have such rights outside of "the FIELD in the TERRITORY." It simply doesn't make sense that—after having explicitly stated in multiple ways and in multiple sections of the Agreement that ME2C has the exclusive right to sublicense the asserted patents (and that EERC does not have such a right)—Section 2.6 would somehow negate that grant of rights, especially because Section 2.6 never says anything specific about sublicensing at all.

The Court's interpretation of these provisions of the Agreement, and its meaning, are fatal to CERT's theory here. Again, that theory is that the EERC is the entity that granted an implied license to CERT, which in turn permitted CERT to practice the patented technology. But as the Court has explained above, the Agreement granted *ME2C* an exclusive license to the intellectual property—i.e., one that included the *sole* right to sublicense other potential infringers for future use of the patent rights. *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998) ("To qualify as an exclusive license, an agreement must clearly manifest the patentee's promise to refrain from granting to anyone else a license in the area of exclusivity."); *Morrow*, 499 F.3d at 1340 ("[T]he grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention."). Therefore, the EERC simply did not have the authority to convey *any* licenses to the patented technology to

third parties—including an implied license like the one at issue here. *See Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1336 (Fed. Cir. 2006) (stating that "because the seed distributors had no authority to confer a right to use Monsanto's biotechnology, they could not confer any sort of license to use the seeds" and acknowledging the proposition that "a seller cannot confer broader rights via an implied license than it has been granted by the patent holder") (citation omitted); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 484 (1964); *cf. Taylor Holland LLC v. MVMT Watches, Inc.*, Case No. 2:15–cv–03578–SVW–JC, 2016 WL 6892097, at *6 (C.D. Cal. Aug. 11, 2016) (noting, in a copyright infringement matter, that "no implied license may permit what a written license prohibits"); *Hargis v. Pacifica Senior Living Mgmt. LLC*, Case No. 2:22-cv-06989-MCS-PD, 2023 WL 6373869, at *9-10 (C.D. Cal. Aug. 2, 2023) (stating the same). Rather, pursuant to the contract between the EERC and ME2C, only ME2C had that authority. *Morrow*, 499 F.3d at 1341 ("The grant of this exclusive license and the right to sublicense [from GUCLT to Vaupel] *constituted a transfer of the exclusionary rights to the patent* to Vaupel.") (emphasis added). So CERT's second counter-argument is also not successful.

Third, CERT argues that regardless of what the Agreement says about ME2C's exclusive rights to the patented technology, the Court could nevertheless conclude (based on principles of equity) that EERC conveyed an implied license here. CERT's position is that: (1) ME2C "st[ood] by silently for over six years" while the EERC worked with entities like CERT and enabled CERT's infringement of the asserted patents; and (2) this "six-year silence communicated consent and authorization to the EERC to certify refined coal for use with [activated carbon.]" (D.I. 758 at 11-12; D.I. 767 at 4-5) In support, CERT says that the EERC and ME2C "together held all rights as patentee, and just as the licensee's conduct in *De Forest*

[*Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236 (1927)] or the patentee's predecessor's conduct in *High Point* [*SARL v. Sprint Nextel Corp.*, 817 F.3d 1325 (Fed. Cir. 2016)] was imputed to the patentee plaintiff to create an implied license against its claim, equity should impute the EERC's conduct here to ME2C." (D.I. 758 at 11-12)

As explained above, however, the EERC and ME2C did not "together" hold the right to grant sublicenses to the intellectual property covered by the Agreement. Rather, ME2C alone held that right. In the cases upon which the EERC relies, a party that had the right to license the patent rights is the party that engaged in the conduct that created the implied license at issue (or that gave rise to equitable estoppel). (*See* D.I. 760 at 7)[16] In its answering brief, ME2C pointed

---

[16] In *De Forest*, the principal of the plaintiff ("De Forest Radio Telephone & Telegraph Company" or "De Forest") assigned to De Forest certain patents covering vacuum tubes or audions used in radio communication. 273 U.S. at 237-38. De Forest then granted certain rights in the patents to the Western Electric Company, which were later conveyed to American Telephone & Telegraph Company ("AT&T"). *Id.* at 238. De Forest maintained certain expressly reserved rights, and it was undisputed that De Forest and AT&T each had the right to license to the United States the manufacture and use of the audions. *Id.* at 238, 240. The United States was at war, and it informed AT&T that it wanted large numbers of the audions made promptly for it by General Electric Company ("GE") and other companies. *Id.* at 239. AT&T replied that it would not do anything to interfere with the manufacture of the audions, but it also represented that it was not waiving patent rights and that all claims under patents rights would be reserved and later investigated, adjusted and settled. *Id.* AT&T then assisted the United States in promptly obtaining the audions for use in the war by furnishing information, drawings and blueprints to GE, and allowing GE representatives to study its manufacturing process for the audions. *Id.* After the United States made and used the audions, AT&T executed a release to the United States and the manufacturers of all claims regarding the making and use of the audions. *Id.* at 239-40. De Forest then later sued the United States for alleged unlawful use of the patented audions. *Id.* at 237. The *De Forest* Court held that the conduct of AT&T (which, again, *had the right to license* the ability to make and use the audions to the United States)—in fully consenting to the United States' making and using of the patented invention, and in aiding the United States in such making and using—had granted the United States a license, which constituted a complete defense against De Forest's infringement lawsuit. *Id.* at 240-42.

In *High Point SARL*, AT&T's Bell Labs ("AT&T") developed the patented inventions in 1993 and 1994; in 1996, AT&T assigned the asserted patents to one of its corporate affiliates,

out that "CERT cites no authority that it could receive an implied license based on actions the EERC took when it *did not* hold the patent rights." (*Id.* at 8 (emphasis in original)) In reply, CERT identifies no such authority. (D.I. 767 at 4-5)[17] And so CERT's third counter-argument fails as well.[18]

---

Lucent Technologies ("Lucent") who then spun off part of its business, including the asserted patents, to Avaya, Inc. ("Avaya") in 2000. 817 F.3d at 1326. In 2008, Avaya sold the asserted patents to High Point SARL ("High Point"), who sued Sprint Nextel Corporation and its affiliates ("Sprint") for patent infringement in December of that same year. *Id.* at 1326-28. The Federal Circuit found that High Point's predecessors (i.e., AT&T, Lucent and Avaya) had engaged in conduct that amounted to equitable estoppel during the timeframe in which those predecessors held rights in the asserted patents. *Id.* at 1329-31. The Court explained that the predecessors had failed to challenge Sprint when Sprint's activities fell outside of the scope of licenses between those parties. *Id.* at 1331. This effectively granted Sprint a license to use the invention that extended through the life of the patent—meaning that the predecessors' conduct was imputed to its successor-in-interest (i.e., High Point). *Id.* But again here, it was not disputed that the entities that had engaged in the misleading behavior that resulted in equitable estoppel (AT&T, Lucent and Avaya) *had the authority to license the patents* at the time they engaged in that activity.

[17] In reply, CERT did cite to *Anderson v. Eiler*, 50 F. 775 (3d Cir. 1892) as purportedly "binding" authority requiring that "ME2C's misleading silence estops it from denying that it consented to the use of refined coal with ACI or that the EERC was authorized to do so under the" Agreement. (D.I. 767 at 5) There again though, in *Anderson*, the individual who created a design for the mantels at issue—the patentee—was the one who granted the implied license in question; he did so by selling (through an agent) sample mantels to a mantel manufacturer with knowledge that the "only object in purchasing was to copy and use [the patentee's] design, and did it without objecting to the use contemplated." 50 F. at 775.

CERT also cites to N.D. Cent Code § 31-11-06, as a "*cf.*" in support of its position here. (D.I. 767 at 5; *see also* D.I. 758 at 12) That statute codifies the doctrine of equitable estoppel under North Dakota law. *Hayden v. Medctr. One, Inc.*, 828 N.W.2d 775, 784 (N.D. 2013). CERT's brief citation to this statute, without any further explanation as to how the statute is well applied to the particular facts at play here, fails to establish the doctrine of equitable estoppel should apply in this case.

[18] To the extent that CERT is also arguing that *ME2C* (not EERC), by *its own in*action somehow itself communicated *its own assent* to what EERC was doing and thus somehow *gave its own permission* for CERT to infringe, (D.I. 758 at 12), it is not clear how that would amount to affirmative consent *to CERT* to infringe, as would be required for an implied license by equitable estoppel, (*see* D.I. 760 at 8).

For all of these reasons, the Court finds that pursuant to the Agreement, ME2C held the exclusive right to license others with respect to the intellectual property. Therefore, the EERC could not grant to CERT an implied license of any type in the intellectual property at issue.

**B. CERT has not otherwise proven the elements of implied license by equitable estoppel.**

Above, the Court has explained why, pursuant to the Agreement, the EERC could not have granted an implied license in the asserted patents to CERT. But even if that conclusion were incorrect, and even assuming that (notwithstanding the Agreement), the EERC *could* have done so, ME2C argues that CERT has additionally failed to sufficiently prove that the EERC *actually did* make such a license grant.

To set up this argument, the Court begins by again restating CERT's argument for an implied license. CERT's position is that although the EERC was "aware of the potential infringement issues" before it began interacting with CERT, it then "actively engaged, participated in, supported, and profited from CERT's refined coal business for over a decade while remaining silent about its patents and patent applications." (D.I. 758 at 16; *see also* D.I. 767 at 8 (noting that "CERT quite reasonably inferred that the EERC happily consented to their business relationship" from the EERC's "essential, ongoing, and profitable role with CERT and all ChemMod licensees")) According to CERT, the EERC was also "aware that refined coal was in fact being used with [activated carbon] by 2011, and that its use would be and actually was increasing as MATS was rolling out in the following years." (D.I. 758 at 17) CERT argues that although the EERC knew what power plants CERT sold its refined coal to, the EERC never told CERT not to sell refined coal to any power plants that were using activated carbon; thus, CERT's position is that the EERC was fully consenting to CERT's infringement of the asserted

patents—and in fact was *aiding* CERT in doing so (thus conveying to CERT a license). (*Id.*; *see also* D.I. 767 at 9) For example, CERT says that the EERC "knew as early as 2011 that the Powerton plant was using refined coal with [activated carbon]—and a CERT trial defendant made Powerton's refined coal." (D.I. 767 at 9; *see also* D.I. 758 at 8; BT Tr. at 83 (Mr. Green suggesting that the EERC conveyed that CERT had its permission to act as it did with the "certification reports [that] allowed [CERT] to produce refined coal to qualify for the tax credit"), 91))

The Court will first assess CERT's argument regarding an implied license by equitable estoppel. Again, to prove that such a license conveyed, CERT must establish that: "(1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to make, use or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim." *Winbond*, 262 F.3d at 1374. In *Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363 (Fed. Cir. 2001), the Federal Circuit made clear that a finding of implied license "requires a nexus between the patentee's purported waiver and the infringing action." *Id.* (providing that the first element—the giving of an affirmative grant of consent or permission—"requires the patentee to communicate that 'the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is *currently* engaged'") (emphasis in original) (quoting *A.C. Aukerman Co.*, 960 F.2d at 1042).

In the Court's view, CERT has failed to establish at least two of the above-referenced requirements: (1) that the EERC, through its statements or conduct, "gave an affirmative grant of consent or permission to" infringe; and (2) that there is a "nexus" between EERC's purported

waiver and the infringing action. *Winbond*, 262 F.3d at 1374.[19] CERT was required to demonstrate that the EERC's statements or conduct affirmatively conveyed to CERT that it was okay for CERT to do something that amounted to *infringement of the patents.*[20] *See Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559 (Fed. Cir. 1983) ("As the Supreme Court recognized, '[a]ny language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent [*i.e.*, patented invention] . . . constitutes a license . . . .'") (emphasis and citations omitted)). And it has not done so.

The problem with CERT's argument is that the use of the refined coal at issue—i.e., the coal on which the EERC performed its certification testing—*did not alone* infringe the patents. Rather, in order to infringe, *activated carbon had to be added* to that refined coal—a step that happened *at the power plants*. And so CERT had to prove that the EERC affirmatively granted CERT permission (through the EERC's statements or conduct) to infringe—i.e., to sell the refined coal that the EERC had certified *to power plants that then added activated carbon to the*

---

[19] While ME2C makes additional arguments about CERT's lack of knowledge of the asserted patents, detrimental reliance, and the scope of any implied license, (D.I. 760 at 8-11, 17-20), the Court need not consider those in light of its decision set out herein.

[20] Of course, the two asserted patents here issued to ME2C (not the EERC), and did not issue until 2019 and 2020, respectively. So at the time of most of the conduct being discussed in this subsection, the asserted patents did not even exist. In another portion of their briefing, Plaintiffs argue that CERT "cites no case where [an implied license] defense covers patents issued after the conduct giving rise to an implied license." (D.I. 760 at 20)

The Court need not reach that issue, however. Herein it will assume *arguendo* that it could be possible for the EERC to have given CERT permission to infringe the asserted patents if it gave CERT permission to infringe *related patents/applications* years earlier. (*See* D.I. 758 at 20; BT Tr. at 15, 252-53) But again, for the reasons set out herein, CERT has *not* sufficiently proven that the EERC even gave *that* type of permission to CERT.

*coal*—at the time that CERT was engaging in the infringing conduct. (D.I. 760 at 11-14) Yet the evidence does not come close to establishing this, for the reasons set out below.

For one thing, the test reports that the EERC submitted to CERT following Section 45 certification testing contained an express disclaimer of any grant of patent rights:

> LEGAL NOTICE This research report was prepared by the Energy & Environmental Research Center (EERC), an agency of the University of North Dakota, as an account of work sponsored by [Defendant name]. Because of the research nature of the work performed, neither the EERC nor any of its employees makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed or represents that its use would not infringe privately owned rights.

(*See, e.g.*, D.I. 774, DTX-1691 at CERT-0040454; BT Tr. at 115-16) CERT tries to brush away this disclaimer as failing to "negate an inference of consent[.]" (D.I. 767 at 8 n.6) It does so by pointing out that in *De Forest* (described above, *see supra* n.16), AT&T had represented to the United States that it would not interfere with the manufacture of the patented audions, but had also said that it was not waiving and was reserving all claims under any patents or patent rights—and yet the *De Forest* Court still found that AT&T had granted an implied license. (*Id.* (citing *De Forest*, 273 U.S. at 239)) That is true, as far as it goes. But what CERT overlooks is that in *De Forest*, AT&T *also* subsequently executed a release to the United States and to all manufacturers working for the United States "of all claims for compensation of the making and use of the audions," including compensation for patent infringement. 273 U.S. at 239-40. There was no such release here.[21] As a result, *De Forest* is not a good comparator for CERT. And so

[21] Nor does CERT point to anything else in the test reports conveying that CERT had the right to infringe. (BT Tr. at 43; D.I. 760 at 16)

relatedly, here (as opposed to the situation in *De Forest*) it seems like the EERC's disclaimer can and should have some real force in the implied license analysis.

The Court turns next to the other evidence establishing that the EERC did not give CERT an affirmative grant of permission to infringe.

One key category of evidence relates to what EERC did *not say*. There, it is undisputed that the EERC never told CERT that CERT had its permission to sell refined coal to power plants that used activated carbon. (BT Tr. at 84, 112; *see also* D.I. 760 at 12; D.I. 767 at 8)

Another relates to what the EERC did *not know*. On that front, while the record indicates that the EERC seemed to track the mercury control technology that entities were utilizing as a general matter, and that the EERC knew what plants CERT was selling refined coal to, (BT Tr. at 64, 68-69, 186-87; D.I. 775 at DTX-1983),[22] it also demonstrates that nevertheless, the EERC was not aware that CERT was engaging in infringing conduct. More specifically, the trial record shows that CERT and the EERC never discussed any patent applications or patents relating to mercury capture, (BT Tr. at 115), nor communicated in any way regarding activated carbon, (*id.* at 84, 113). During the bench trial, Mr. Green acknowledged that CERT did not tell the EERC "that several CERT connected power plants were going beyond the Chem[]Mod technology and also adding activated carbon" to the coal for mercury capture. (*Id.* at 107; *see also id.* at 102 (Mr. Green testifying that even when MATS went into effect in 2015-2016, CERT did not tell the EERC that some of CERT's power plant customers would be implementing activated carbon injection)) And the EERC's representative at the jury trial, Tom Erickson, testified that the

[22] The EERC's Section 45 certification test reports identified what power plant the refined coal being qualified would go to. (BT Tr. at 68-69)

EERC was not aware that ChemMod's licensees were selling refined coal to power plants that also used activated carbon. (JT Tr. (D.I. 784) at 1126)[23] Indeed, CERT's own position at the jury trial was that, in the relevant timeframe, *CERT itself* was not even aware (until it was sued in this case) that any of its power plant partners were using activated carbon in a process involving CERT's refined coal. (BT Tr. at 85-86; *see also* JT Tr. (D.I. 783) at 865-66 (Mr. Green testifying during the jury trial that "I don't have knowledge of what's going on with the emissions control at [the] power plants"))[24] Under these facts, the Court "simply cannot find that

[23] During the bench trial, Mr. Green claimed that Mr. Erickson was "out of touch" in this regard; Mr. Green asserted that despite what Mr. Erickson had testified to, Mr. Green believed that the EERC *did* know "that some power plants or a lot of power plants were using activated carbon and some of those we were supplying refined coal to." (BT Tr. at 109) Yet during closing arguments at the jury trial—in defense of the contributory infringement claim against it—CERT's counsel referred to Mr. Erickson's testimony as the "slam-dunk testimony of a knowledgeable independent witness[.]" (JT Tr. (D.I. 785) at 1236-37; BT Tr. at 243-44 (ME2C's counsel pointing out that CERT "ran a [jury] trial theme that [it] didn't know about activated carbon . . . kind of pounded the table in closing that [Mr. Erickson] is a neutral expert and he thinks it's unreasonable to combine activated carbon and bromine and now they're saying nevertheless we got a license because surely they would have known we were [selling to power plants that used] activated carbon")) In sum, the Court ascribes no weight to Mr. Green's speculative belief that the EERC knew that CERT was working with power plants that used activated carbon—especially because: (1) there is no record evidence to support that belief; and (2) Mr. Green's statement contradicts CERT's own position during the jury trial—where CERT urged the jury to conclude that the EERC's witness had testified credibly when he stated that he *did not know* this fact.

[24] As Plaintiffs demonstrated during the jury trial, CERT's position in this regard turned out not to be credible. Instead, the evidence at the jury trial demonstrated unequivocally that CERT did in fact know that at least some of the power plants it worked with were using activated carbon in a process with CERT's refined coal. Indeed, by the time of the bench trial, Mr. Green acknowledged that this is what the jury trial record showed. There he stated that "in the trial" it had come out that CERT "knew generally [that] some of the power plants were using activated carbon at some point from 2014 and on." (BT Tr. at 85)

All of that said, the question relevant to the instant Motion relates to what *the EERC* knew and conveyed, not what CERT knew. And for the reasons set out above, there is no evidence indicating that the EERC knew about the relevant power plants' use of activated carbon in the timeframe at issue.

[the EERC's] behavior amounted to an affirmative *grant of consent* [to infringe] as required for an implied license defense." *Lautzenhiser Techs., LLC v. Sunrise Med. HHG, Inc.*, 752 F. Supp. 2d 988, 1013-14 (S.D. Ind. 2010) ("[T]he Court simply cannot find that LT's behavior amounted to an affirmative *grant of consent* as required for an implied license defense[,]" where the former patentee's website had advertised its head control device's compatibility with the PG controllers accused of infringement, but "[t]rumpeting compatibility . . . does not give Defendants *carte blanche* to use patents with impunity[.]") (emphasis in original); *see also Oracle Am., Inc. v. Google Inc.*, No. C 10–03561 WHA, 2012 WL 1965778, *1 (N.D. Cal. May 31, 2012) (explaining that the patentee's CEO's blog post and similar statements by the patentee's executives, which had congratulated defendant Google on the release of Android, "do not fall under the narrow circumstances" in which an implied license may be found, as "[e]ven if Google understood Oracle and/or Sun's conduct to condone use of the Java API packages, the 'course of conduct' must be assessed for an affirmative grant of such consent" and none was present).[25]

For its part, CERT points to some additional evidence (beyond the EERC's Section 45 certification testing) that it contends shows that the EERC enabled the entire refined coal industry to develop a large market in the accused products while remaining silent about its

[25] Indeed, even when CERT learned of this lawsuit, CERT continued to engage in the same conduct accused of infringing until the Section 45 tax credit program ended in 2021; CERT did so because it believed that it *did not infringe*—not because it thought that the EERC had given it an affirmative grant of consent to engage in infringement. (BT Tr. at 121-22; D.I. 760 at 19) This is another fact that does not gibe with CERT's current position—i.e., that it continued its conduct because the EERC had affirmatively communicated to it that it had an implied license to do so. *Cf. Duval Sulphur & Potash Co. v. Potash Co. of Am.*, 244 F.2d 698, 701 (10th Cir. 1957) (finding no implied license where "Duval[] never considered itself to be a user of the Patent, did not want that process and never bargained for it. . . . [t]o create an implied agreement one must have a meeting of the minds as in any contract, the variance from an express agreement being only the character of the evidence used to establish it").

patents. (D.I. 758 at 8-10, 16-19; D.I. 767 at 8-9) In the end, this evidence, which the Court summarizes below, does not persuade the Court that the EERC granted CERT an implied license to infringe the patents:

- The EERC helped CERT respond to power plants' technical questions regarding the additives that would end up in the plants' boilers, and the EERC also provided technical support for operational problems that CERT encountered at power plants including WA Parish, Big Cajun II and Rush Island (such as corrosion in the plants' air preheater baskets). (BT Tr. at 53-54, 59-60)

- CERT points out that Mr. Pavlish (while still at the EERC) handled ME2C's competitive product testing beginning in 2009, and that ME2C was testing at the Joppa power plant (later accused of infringement in this case) by 2011. (D.I. 758 at 7-8 (citing BT Tr. at 159-61; D.I. 406 at ¶¶ 119, 128-37); BT Tr. at 204) Mr. Pavlish testified that "it became pretty obvious and evident" that Joppa was using activated carbon as of at least the 2014/2015 timeframe and perhaps earlier. (BT Tr. at 184-85)

- Mr. Pavlish e-mailed ME2C a spreadsheet regarding competing technologies in April 2012 that was part of the EERC's "ongoing efforts . . . to continue to track who's doing [what], what technologies are out there, what's being applied." (*Id.* at 188-89; D.I. 773, DTX-0051-0052)

- In the Powerton e-mail, ME2C and the EERC discussed the fact that a product was tested at Powerton power plant, with Mr. Pavlish responding that ME2C "should take a serious look at how to get into this market" and "[b]oth them and ChemMod rely mainly on adding bromine to the coal to achieve mercury reductions." (D.I. 773, DTX-0104; *see also* JT Tr. (D.I. 782) at 408-11)

- In October 2012, ME2C submitted a breakdown of pricing to Joppa for replacing its current mercury capture program "as well as projecting the dose rate with the ChemMods Refined Coal program that is in the process of being installed." (D.I. 773, DTX-0077; JT Tr. (D.I. 782) at 507-08)

- In July 2013, an ME2C e-mail among ME2C employees and Mr. Pavlish discussed that a potential power plant customer was going to be running a "Refined Coal demonstration" in September and would be adding powered activated carbon to the "backend for sorbent" which would allow them to qualify for MATS. (D.I. 773, DTX-0105; *see also* JT Tr. (D.I. 782) at 412) The e-mail noted that this "is the same thing that happened at Joppa" and that "[t]he EERC (not JP's department) is complicit in this as well—they are doing the testing for Chem[]Mods and others to prove 'compliance.'" (D.I. 773, DTX-0105) Mr. Pavlish responded that ME2C "might as well pack up and go home." (*Id.* at DTX-0106)

- On September 18, 2013, an ME2C employee stated in an e-mail to Mr. Pavlish and Mr. Erickson that "simple/cheap efforts" to thwart the Section 45 tax certification program were "causing serious damage to the effort [they're] making to commercialize and profit from [their] tech." (*Id.* at DTX-0112 at 2) Mr. Erickson replied by asking if there was any interest in teaming up with an existing company to offer a complete mercury solution and noted that if so, "ChemMod would be a good company." (*Id.*) Mr. Pavlish responded to ME2C that many of the power plants would need "additional control to achieve the MATS limit" and would likely employ the use of activated carbon in "combination with [the Section 45 tax credit]. . . . Either ChemMod or ADA will offer this as a solution, or the [power plant] will simply buy the [activated carbon] separately. So we have heard, there are a number of plants already doing this." (*Id.* at 1)

- In a December 2014 internal ME2C e-mail, ME2C described a visit to a power plant to try to convince the plant to use ME2C's products; ME2C told the plant that it "run[s] in parallel with [refined coal] at two customer sites." (*Id.* at DTX-0056)

- In May 2015, ME2C stated that its "program may be a great fit" for power plants that used activated carbon, (*id.* at DTX-0181 at 3), and ME2C discussed that ChemMod probably got the rate of bromine needed to be added to its coal changed because the power plant "adds [activated carbon] to hit the MATS target." (*Id.* at 1) (Mr. Pavlish further noted that you "probably have better sources to find out the real scoop" and that "the whole things a bit sneaky." (*Id.*))

- In August 2015, ME2C's Vice President of Sales asked Mr. Pavlish how ME2C "work[s] with Refined Coal programs" and Mr. Pavlish provided a list of advantages. (*Id.* at DTX-0088)

- ME2C did not provide notice to the EERC that it believed that its patent rights were being infringed until a conversation shortly before this lawsuit was filed. (BT Tr. at 167-69; JT Tr. (D.I. 782) at 510-12)

The problem for CERT is that the smattering of e-mails and documents that it points to, taken together with the EERC's Section 45 certification testing, fails to show that the EERC gave CERT an affirmative grant of permission through its conduct to infringe the patents by selling the certified refined coal to power plants that used activated carbon. To be sure, the above evidence does establish that ME2C knew that *certain power plants* (such as Joppa, which is not a power plant operated by the CERT Defendants) were using activated carbon. (D.I. 659, ex. 1 at ¶¶ 56-64) It also shows that the EERC understood that *certain power plants* used activated carbon (with Mr. Pavlish speculating that some may do so in the future to obtain the additional reduction in mercury required by MATS) and that the EERC discussed this with ME2C. But what this evidence does not show is that the EERC gave CERT permission to sell refined coal to power plants using activated carbon. Indeed, it does not refute the evidence described above establishing that the EERC was not aware that that CERT was engaging in infringing conduct.

In trying to sidestep this conclusion, CERT zeros in on the Powerton e-mail, particularly because CERT made Powerton's refined coal. (D.I. 758 at 8 (citing D.I. 773, DTX-0104; D.I. 598, ex. 1 at ¶¶ 84, 101); *see also* D.I. 767 at 9)[26] But what the Powerton e-mail conveys is that

[26] ME2C says that the Powerton plant was operated and supplied by Defendants that have already settled with ME2C, not by CERT. (D.I. 760 at 14 n.4) But the record seems to establish that "Defendant CERT Operations II, LLC, through its employees, operated the refined coal facility located at the Powerton plant[.]" (D.I. 598, ex. 1 at ¶ 101)

in May 2012, "ADA" "tested" a vague "product" at Powerton during the prior week, with Mr. Pavlish of the EERC responding that ADA and ChemMod "rely mainly on adding bromine to the coal to achieve mercury reductions." (D.I. 773 at DTX-0104) This evidence doesn't do the job of establishing that the EERC was aware that Powerton was using a process that included activated carbon. And it certainly does not demonstrate that the EERC communicated to CERT that it was okay for CERT to sell its refined coal to power plants using activated carbon (e.g., without worrying about patent infringement). *See, e.g.*, *Control Laser Corp. v. Smith*, 705 F. Supp. 3d 1006, 1014 (N.D. Cal. 2023) ("Defendant fails to satisfy the first element [of the defense of implied license by equitable estoppel] because it identifies no communicative conduct by Plaintiff indicating that Defendant's activities in selling and distributing the Baublys systems would not be disturbed."); *see also Lautzenhiser Techs.*, 752 F.Supp.2d at 1013-14; *Oracle Am., Inc.*, 2012 WL 1965778, at *1.[27]

---

[27] In the cases that CERT relies upon, it was clear that the patentee was aiding the alleged infringer in what was clearly understood to be infringing activity. (D.I. 758 at 14-16) In *De Forest*, for example, the patents at issue covered audions, and the patentee (AT&T): (1) provided information, drawings and blueprints to the entity that was going to be manufacturing the audions (GE); and (2) allowed GE employees to witness AT&T's audion manufacturing process. 273 U.S. at 237, 239, 241. In *Wang*, the asserted patents covered SIMMs, and the patentee coaxed the alleged infringer into the SIMM market, repeatedly requested that the alleged infringer manufacture SIMMs, provided the alleged infringer with designs, suggestions and samples for SIMMs and eventually purchased SIMMs from the alleged infringer. 103 F.3d at 1573-75, 1582. And in *High Point SARL*, the patentee's predecessors had license agreements with the alleged infringer (Sprint) relating to its planned network based on a new technology relating to cell phones, and had actively engaged with Sprint in establishing that network. 817 F.3d at 1327, 1330-31. Those license agreements then lapsed, and it was clear that the predecessors were on notice that Sprint was subsequently engaging in unlicensed activity in expanding the Sprint network. *Id.*

Here, in contrast, the EERC conducted Section 45 certification testing on CERT's refined coal. But the asserted patents require that, for infringement to occur, activated carbon must be added to that coal—and the EERC's testing did not involve any activated carbon, and nor did the EERC ever discuss activated carbon with CERT. So unlike the circumstances in cases like *De*

### C. CERT has not otherwise proven the elements of the defense of equitable estoppel.

The Court also notes that to the extent that CERT alternatively relies on the defense of equitable estoppel here—and in turn argues that the EERC's *misleading silence* somehow bars Plaintiffs' infringement suit—CERT's position fares no better. (D.I. 758 at 14) CERT's equitable estoppel argument is based on the same evidence just discussed above as to the defense of implied license by equitable estoppel. (*Id.* at 14-19) And the evidence fails to establish all of the elements of equitable estoppel are satisfied.

To that end, the Federal Circuit has noted that the first element of the equitable estoppel defense is that "the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer[.]" *High Point SARL*, 817 F.3d at 1330. The Federal Circuit has gone on to explain that "[m]isleading conduct occurs when the alleged infringer is aware of the patentee or its patents, and *knows or can reasonably infer that the patentee has known of the allegedly infringing activities for some time*." *Id.* (emphasis added).[28] Moreover, the Federal Circuit has noted that another element of the defense of equitable estoppel is that the alleged infringer *relies* on the patentee's misleading silence. *Id.*; *see also Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V. v. Sirius XM Radio Inc.*, 2023-2267, 2025 WL 1617966, at *4-5 (Fed. Cir. June 9, 2025).

---

*Forest* and *Wang* and *High Point SARL*, here one cannot say that the EERC encouraged or suggested that it was okay for CERT to *infringe* the patents at issue.

[28] This only makes sense, as it would seem impossible to argue that a patentee became estopped from asserting infringement due to its own misleading conduct or silence—if the patentee never even knew that infringing conduct was occurring in the first place when it engaged in that conduct or silence.

CERT's evidence cannot show that these elements are met. Here, as discussed above: (1) CERT and the EERC did not discuss activated carbon; (2) CERT did not tell the EERC that it sold its refined coal to power plants that used activated carbon; (3) the EERC's test reports disclaimed any grant of patent rights, and; (4) indeed, *CERT itself* claimed that it was not even really aware of the activated carbon use at particular power plants that it supplied (until it was sued in this case). Moreover, when CERT did learn that it was being accused of infringement, it did not then move its operations to power plants that did not use activated carbon; instead, it simply continued doing what it was doing, because it believed that it did not infringe—*not* because it thought it had an implied license. (D.I. 760 at 19) CERT therefore has not demonstrated that the EERC engaged in misleading conduct or silence under circumstances sufficient to implicate the defense of equitable estoppel, nor that CERT relied upon qualifying misleading conduct or silence, when it sold refined coal to plants using activated carbon. *Cf. Fraunhofer-Gesellschaft*, 2025 WL 1617966, at *4-5 (concluding that a grant of summary judgment premised upon an equitable estoppel defense was improper, where the defendant could not sufficiently establish that it had relied upon the plaintiff's misleading conduct or silence, in that there was record evidence suggesting that the defendant pursued the accused system not due to plaintiff's silence but because the system had greater market penetration and was the easier business choice); *Kove IO, Inc. v. Amazon Web Servs., Inc.*, Case No. 18 C 8175, 2024 WL 450028, at *28 (N.D. Ill. Feb. 6, 2024) (denying the defendant's summary judgment motion on its equitable estoppel defense, because the reliance element looks to whether the alleged infringer relied upon the patentee's "conduct in deciding to develop the accused products in their current forms rather than pursue these non-infringing alternatives" and "[t]here is no evidence in the record to support the conclusion that AWS took into account Kove's silence in connection with

taking some action") (internal quotation marks and citation omitted); *J.R. Simplot Co. v. McCain Foods USA, Inc.*, 713 F. Supp. 3d 904, 951, 954 (D. Idaho 2024) (denying a defendants' motion for summary judgment on equitable estoppel, where the defendants' position was that the patentee ("McCain") was estopped because he "did not do *anything* to dissuade [defendants] from improving PEF technology, building PEF Systems, and selling PEF devices. In fact, McCain encouraged these actions. But McCain also did not do anything to indicate it would not enforce and defend its patent—if and when doing so became necessary.") (emphasis in original); *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 14-CV-6544(KAM)(GRB), 2018 WL 1525686, at *24–26 (E.D.N.Y. Mar. 27, 2018) (concluding that while "the record contains some circumstantial evidence that might be helpful to an equitable estoppel claim"—where, *inter alia*, the defendant contended that plaintiffs misled it by testifying in another patent case that plaintiff followed a "live and let live" policy with respect to intellectual property and testifying that one of defendant's product infringes its patents, but that it had never filed suit—no equitable estoppel could be found, as the defendant did not present evidence that, based on that testimony, it reasonably inferred that plaintiffs did not intend to enforce its patent against defendant).

## CONCLUSION

For the foregoing reasons, the Court finds that CERT's Motion should be DENIED. An appropriate Order will issue.

Because this Memorandum Opinion may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Opinion. Any such redacted version shall be submitted no later than **June 17, 2025** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to

judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Opinion.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) | |
| Defendants. | ) | |

James M. Lennon and Peter Akawie Mazur, DEVLIN LAW FIRM LLC, Wilmington, DE; Bradley W. Caldwell, Justin T. Nemunaitis, Warren J. McCarty, III, Daniel R. Pearson, Adrienne R. Dellinger, Aisha M. Haley, Richard A. Cochrane, CALDWELL CASSADY CURRY P.C., Dallas, TX; Attorneys for Plaintiff Midwest Energy Emissions Corp.

Kenneth L. Dorsney and Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE; Jeff Dyess, Paul Sykes and Benn Wilson, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL; Jessica Zurlo, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., Attorneys for Defendants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC and Rutledge Products, LLC.

**MEMORANDUM OPINION**

September 25, 2025
Wilmington, Delaware

Christopher J. Burke
**BURKE, United States Magistrate Judge**

The Court[1] presided over a five-day jury trial in this patent infringement case from February 26, 2024 through March 1, 2024. (D.I. 781-85 (hereinafter, "Tr.")) At trial, Plaintiff Midwest Energy Emissions Corp. ("Midwest Energy") and then-Plaintiff MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C")[2] alleged that Defendants Bascobert (A) Holdings, LLC; Buffington Partners, LLC; Cottbus Associates, LLC; Larkwood Energy, LLC; Marquis Industrial Company, LLC; Rutledge Products, LLC; Senescence Energy Products, LLC and Springhill Resources, LLC (the "CERT RC Defendants"); CERT Operations II LLC; CERT Operations IV LLC; CERT Operations V LLC; and CERT Operations RCB LLC (the "CERT Operations Companies Defendants" and collectively with the CERT RC Defendants, "CERT" or the "CERT Defendants") indirectly and willfully infringed claims 25 and 26 of United States Patent No. 10,343,114 (the "'114 patent") and claims 1 and 2 of United States Patent No. 10,596,517 (the "'517 patent" and collectively with the '114 patent, the "asserted patents"). (D.I. 659, ex. 2 at ¶¶ 1-6; *id.*, ex. 3 at ¶ 1) At the end of trial, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs. (D.I. 692) Pending before the Court is CERT's Motion for Judgment as a Matter of Law ("JMOL") of No Induced Infringement, No Contributory Infringement, and No Willful Infringement as to Plaintiffs'

---

[1] The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 398)

[2] As the parties are aware, subsequent to trial, the Court granted CERT's motion to dismiss Plaintiff MES pursuant to Federal Rule of Civil Procedure 12(b)(1). (D.I. 788; D.I. 789) Because MES participated in the case up through and including the filing of the briefing on the instant Motion, and simply to avoid confusion, the Court will herein refer to "Plaintiffs" or to "Plaintiffs' position" on the relevant issues, even though there is currently only one Plaintiff (i.e., Midwest Energy) in the case.

Claims for Infringement of the '114 and '517 patents (the "Motion"). (D.I. 718) For the reasons set forth below, the Court DENIES the Motion.

## I. BACKGROUND

This patent infringement case relates to mercury control at coal-fired power plants ("power plants"). The asserted claims of the asserted patents recite methods for reducing mercury emissions from power plants with the use of bromine-enhanced coal (or "refined coal") and a sorbent such as activated carbon. (D.I. 751, PTX-001, PTX-003; *see also* D.I. 546, ex. A at ¶¶ 49, 70; D.I. 743 at ¶ 4) All four asserted claims include, *inter alia*, the following steps: (1) the use of bromine-enhanced coal; (2) injecting an activated carbon sorbent ("ACI") into the combusted coal, i.e., into the mercury-containing gas (the "ACI step"); and (3) "separating the mercury/sorbent composition from the mercury-containing gas" or "collecting mercury in the mercury-containing gas" with the sorbent (the "separating or collecting mercury step"). (D.I. 751, PTX-001.0034; *id.*, PTX-003.0040) It is not in dispute that: (1) CERT was responsible for adding bromine to the coal at issue, (*see, e.g.*, Tr. (D.I. 781) at 196);[3] (2) each of the power plants to which CERT sold refined coal in the relevant period went on to inject ACI into the combusted coal, (*see, e.g.*, Tr. (D.I. 782) at 574); and (3) those power plants then also used devices called baghouses or electrostatic precipitators ("ESPs") to perform the separating or collecting mercury step, (*see, e.g.*, *id.* at 571-73).

[3] While the parties appear to cite to the rough versions of the jury trial transcript in their briefing, the Court herein cites to the final versions of the jury trial transcript that have been docketed.

Plaintiffs filed this lawsuit on July 17, 2019. (D.I. 1)[4] Plaintiffs allege that each of the CERT RC Defendants contributed to infringement of the asserted claims of the asserted patents by selling refined coal to specific power plants, and that each of the CERT Defendants[5] induced these power plants to add activated carbon to the refined coal in a manner that amounted to direct infringement[6] (and that this infringement was willful). (D.I. 659, ex. 2 at ¶¶ 1-6; D.I. 743 at ¶ 4; Tr. (D.I. 785) at 1206-08) The Court hereby incorporates by reference its findings of fact relating to this case set out in its June 10, 2025 Memorandum Opinion. (D.I. 786 at 4-21)

This case as pleaded was a sprawling one. Partly as a result of this, the case's procedural history is very lengthy. Below, the Court will summarize certain case events that are particularly relevant to the instant Motion.

CERT filed a motion to dismiss the original Complaint, which the Court recommended be granted without prejudice on June 18, 2020 (the "June 2020 R&R"). (D.I. 110 at 13-22) With respect to induced infringement, the Court concluded that the Complaint's allegations were insufficient as to the allegation that CERT had knowledge that the power plants (i.e., the alleged direct infringers) utilized activated carbon. (*Id.* at 14) Similarly, with respect to contributory

---

[4] Plaintiffs' original complaint asserted the '114 patent, which issued on July 9, 2019, as well as United States Patent No. 8,168,147. (D.I. 1 at ¶¶ 50-51; D.I. 751, PTX-001.0002) Plaintiffs' First Amended Complaint added claims of infringement regarding the '517 patent, which issued on March 24, 2020, as well as United States Patent Nos. 10,589,225 and 10,668,430. (D.I. 130 at ¶¶ 51-53; D.I. 751, PTX-003.0002) At trial, Plaintiffs only pursued their claims relating to the '114 patent and '517 patent. (*See, e.g.*, D.I. 659, ex. 1 at ¶¶ 15-20)

[5] When Plaintiffs filed this case, they had also named many additional Defendants. But by the time of trial, only the CERT Defendants remained in the case.

[6] The CERT Operations Companies Defendants made refined coal that the CERT RC Defendants then sold to the respective power plants at issue. (D.I. 659, ex. 1 at ¶¶ 34-36; *see also* D.I. 532 at ¶ 3)

infringement, the Court found that the Complaint failed to adequately plead that CERT knew that the coal could not reasonably be used for purposes other than to be injected with activated carbon (since the Complaint did not sufficiently plead that CERT knew or intended that the coal would be injected with activated carbon). (*Id.* at 19-20)[7] United States District Judge Richard G. Andrews, who was then presiding over the case, later adopted the June 2020 R&R. (D.I. 127)

Plaintiffs then filed their First Amended Complaint ("FAC") on July 15, 2020, (D.I. 130), which CERT moved to dismiss, (D.I. 175; *see also* D.I. 272). On July 31, 2020, the Court granted CERT's motion for a stay "until the Court determines that Plaintiffs have stated a viable claim for relief" against CERT. (D.I. 166) Plaintiffs subsequently requested leave to file a second amended complaint ("SAC") to replace certain of the John Doe Defendants then named in the FAC and to add additional allegations in response to pending motions to dismiss the FAC. (D.I. 214; D.I. 218)

On May 20, 2021, the Court issued a Report and Recommendation (the "May 2021 R&R") in which it concluded that Plaintiffs had now plausibly pleaded certain induced and contributory infringement claims against CERT. More specifically, with respect to induced infringement, the proposed SAC now plausibly alleged that CERT knew and intended that the power plants utilize activated carbon, in light of its allegations that: (1) CERT engaged in Section 45 certification testing[8] that made it aware of power plants' activated carbon usage; and

---

[7] The Court also determined that Plaintiffs' allegations failed to plausibly establish that CERT knew of the asserted patents before the suit was filed. (D.I. 110 at 16-17)

[8] Plaintiffs alleged that "Section 45 tax credits" were tax credits related to the production of refined coal, which were established by Congress in a 2004 law. (D.I. 279 at 20-21) Pursuant to the law, a refined coal producer could receive an inflation-adjusted tax credit for each ton of refined coal it sold to a power plant that results in a significant reduction in harmful emissions when the coal was burned. (*Id.* at 21) It was also alleged that in order to demonstrate

(2) CERT intended for power plants to continue to operate their activated carbon injection systems when CERT provided them with refined coal, so that CERT could continue to receive benefits from obtaining Section 45 tax credits. (D.I. 279 at 20-26)[9] As for contributory infringement, the Court concluded that the proper inquiry is whether the accused refined coal "as sold and delivered" to power plants lacks substantial non-infringing use; it found that the proposed SAC plausibly pleaded that when the refined coal at issue was dropped off at the power plant, it had no substantial non-infringing use. (*Id.* at 26-29)[10] Judge Andrews subsequently adopted these portions of the May 2021 R&R. (D.I. 319 at 6-8, 11) On the same date that it issued the May 2021 R&R, the Court also lifted the stay of the case as to CERT. (D.I. 280)

On October 7, 2021, Plaintiffs filed a Third Amended Complaint. (D.I. 326) This pleading replaced some John Doe Defendants with newly identified entities, removed references to prior named Defendants that had been subsequently dismissed, and removed references to since-dismissed claims. (*See* D.I. 320)

---

that the refined coal it produced met the reduced emissions requirements, CERT engaged in "Section 45 certification testing," including by performing such testing at particular power plants it worked with. (*Id*. at 23)

[9] With regard to CERT's knowledge that the power plants at issue utilized activated carbon, the FAC and SAC also alleged that even if CERT did not learn of a power plant's use of activated carbon in connection with the Section 45 certification testing process, they would "learn of the plant's use of activated carbon by working with the plant[ when] determin[ing] logistics for installing refined coal equipment, storing and supplying chemicals, and operating and maintaining equipment[, whereby CERT] . . . . would be able to witness activated carbon injection equipment and on-site activated carbon" and would also learn of "the plant's use of sorbent containing activated carbon through routine conversation and communications with individuals at the coal-fired power plant that are necessary to ensure coordination and smooth operation of the plant[.]" (D.I. 130 at ¶¶ 90-91; D.I. 281 at ¶¶ 89-90)

[10] The Court again determined in the May 2021 R&R that the SAC's allegations failed to plausibly establish that CERT knew of the asserted patents before the suit was filed. (D.I. 279 at 16-20)

Next, Plaintiffs filed a motion requesting leave to file a Fourth Amended Complaint ("4AC") to, *inter alia*, add certain recently-identified Defendants and remove certain allegations indicating that Defendants had learned of activated carbon use from certification testing (with Plaintiffs noting that such allegations had "merely provided one of multiple means of inferring Defendants' knowledge"). (D.I. 372; *see also* D.I. 375) While Defendants argued that Plaintiffs' proposed 4AC failed to sufficiently plead the intent element of induced infringement, (D.I. 376 at 4-5), the Court granted Plaintiffs leave to file the 4AC, concluding that the allegations plausibly alleged Defendants' intent for the power plants to directly infringe, (D.I. 404).

On May 3, 2022, Plaintiffs filed the operative 4AC. (D.I. 406) Defendants subsequently moved to dismiss the induced infringement claims in the 4AC, (D.I. 418); the Court denied Defendants' motion in a January 12, 2023 Memorandum Order ("January 2023 MO"), (D.I. 513). The case then proceeded through the remainder of fact and expert discovery.

At the summary judgment stage, CERT filed motions for summary judgment with respect to, *inter alia*, Plaintiffs' claims of induced and contributory infringement. (D.I. 568; D.I. 569) On November 3, 2023, the Court issued a Memorandum Opinion denying CERT's motion for summary judgment of no contributory infringement. (D.I. 611) On November 8, 2023, the Court issued a Memorandum Opinion denying CERT's motion for summary judgment of no induced infringement. (D.I. 631) And on February 16, 2024, the Court issued an Oral Order denying CERT's motion for reargument of the Court's denial of its motion for summary judgment of no induced infringement. (D.I. 672)

The Court then presided over the above-referenced jury trial from February 26, 2024 to March 1, 2024. (D.I. 781-85) At trial, the CERT Defendants denied that they indirectly

infringed the asserted patents. (D.I. 669 at 2; Tr. (D.I. 785) at 1246) At the conclusion of trial, as was noted above, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs. (D.I. 692)

The Court next entered non-final judgments on the verdict against the CERT Defendants. (D.I. 697-708) Thereafter, the parties submitted a substantial number of post-trial motions relating to the jury trial, including the instant Motion. (D.I. 716; D.I. 718; D.I. 720; D.I. 763)[11] Briefing on the instant Motion concluded on May 17, 2024. (D.I. 736)

## II. LEGAL STANDARD

A court may grant JMOL before a case is submitted to a jury if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [moving] party on that issue[.]" Fed. R. Civ. P. 50(a)(1). If the court denies the motion, following the entry of judgment, a party may file a renewed motion for JMOL. Fed. R. Civ. P. 50(b).

Pursuant to Federal Rule of Civil Procedure 50(b), JMOL following a jury trial should be granted only if, "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993); *see also Wirtgen Am., Inc. v. Caterpillar, Inc.*, Case No. 1:17-cv-00770-JDW, 2024

---

[11] In addition, CERT had also asserted that Plaintiffs' infringement claims are barred because CERT is entitled to an implied license to the asserted patents. (D.I. 515 at 112, at ¶ 16; D.I. 659, ex. 3 at 48 at ¶ 3(e)-(f)) On May 30, 2024, the Court held a bench trial regarding the implied license defense. (D.I. 779) The Court thereafter issued a Memorandum Opinion and Order concluding that CERT had failed to prove, by a preponderance of the evidence, that it has an implied license to the asserted patents. (D.I. 786; D.I. 787)

WL 4216057, at *5 (D. Del. Sept. 17, 2024).[12] Motions for JMOL are to be granted only "sparingly[.]" *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (noting that such motions should be granted where "the record is critically deficient of the minimum quantum of evidence in support of the verdict") (internal quotation marks and citation omitted).

In resolving such a motion, a court "may not weigh the evidence, determine the credibility of witnesses, or substitute [its] version of the facts for the jury's version." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 314 (3d Cir. 2016) (internal quotation marks and citation omitted); *see also Wirtgen Am., Inc.*, 2024 WL 4216057, at *5. "Because the jury returned a verdict in favor of the plaintiff, [the Court] must examine the record in a light most favorable to the plaintiff, giving [it] the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (internal quotation marks and citation omitted).

## III. DISCUSSION

With its Motion, CERT argues that the jury's verdict for Plaintiffs is unsupported by legally sufficient evidence, and that the Court should therefore enter JMOL that CERT is not liable for induced infringement, contributory infringement or willful infringement of any asserted claim. (D.I. 719 at 1, 20; D.I. 736 at 10) Plaintiffs oppose the Motion, asserting that the Court should uphold the jury's verdict on all issues. (D.I. 728 at 1, 20) Below, the Court will address the Motion as it relates to each type of claim, in turn.[13]

---

[12] The law of the regional circuit governs the standards for deciding motions for judgment as a matter of law. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019); *10X Genomics, Inc. v. Bruker Spatial Biology, Inc.*, Case No. 21 C 653, 2024 WL 5201115, at *7 (D. Del. Dec. 23, 2024).

### A. Induced Infringement

The Court first addresses CERT's arguments that JMOL of no induced infringement should be granted. Section 271(b) states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009).

CERT argues that it is entitled to JMOL of no inducement of infringement because there is no evidence: (1) that it took affirmative acts to encourage infringement; (2) that it did so with the requisite intent; nor (3) that it caused any power plant to perform two steps of the asserted claims (the ACI step and the separating or collecting mercury step). (D.I. 719 at 2) Below, the Court will explain why each of CERT's arguments is not persuasive.

---

[13] In order to prove both induced and contributory infringement, the plaintiff must demonstrate that the defendant had knowledge of the asserted patents and that the acts at issue constituted patent infringement. *See Portus Sing. Pte Ltd v. Schneider Elec. USA, Inc.*, Civil Action No. 23-977-JLH-CJB, 2025 WL 437055, at *9 (D. Del. Feb. 7, 2025). In addition to its arguments that the Court will discuss below, CERT also makes another (brief) argument that: (1) Plaintiffs point only to their original Complaint to demonstrate the basis for CERT's knowledge of the asserted patents and of patent infringement, in order to support their indirect infringement claims; (2) but several courts have ruled that a complaint cannot alone establish a defendant's knowledge, because the purpose of a complaint is to obtain relief from an existing claim, rather than to create a claim; and (3) therefore Plaintiffs have not proved the knowledge element of both indirect infringement claims, such that CERT is entitled to judgment as a matter of law. (D.I. 719 at 17 (citing *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 250 (D. Del. 2021)); *see also* D.I. 736 at 8)

The Court does not agree. It has "already decided this issue. In doing so, it has determined that a complaint can supply knowledge of a patent for certain types of post-complaint claims." (D.I. 590 at 7 (citing cases)); *see also, e.g.*, *Staton Techiya, LLC v. Harman Int'l Indus., Inc.*, 734 F. Supp. 3d 354, 368 (D. Del. 2024) (citing cases); *Tonal Sys., Inc. v. iFIT Inc.*, C.A. No. 20-1197-LPS-CJB CONSOLIDATED, 2022 WL 951549, at *2 (D. Del. Mar. 30, 2022) (citing cases). And so JMOL is not warranted with respect to this issue.

### 1. Affirmative Act to Encourage Infringement

The United States Court of Appeals for the Federal Circuit has explained that a patentee must plead and prove that the accused inducer "took an affirmative act to encourage [direct] infringement[,]" *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014); *see also Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760 (2011) ("The addition of the adverb 'actively' suggests that the inducement must involve the taking of affirmative steps to bring about the desired result[.]"), and that the inducer's act in turn "led to direct infringement[,]" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1331 (Fed. Cir. 2016) (internal quotation marks omitted). With regard to the affirmative act requirement, the Federal Circuit has noted that while the concept of inducement "has connotations of active steps knowingly taken . . . the term is [otherwise] as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent[.]" *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1378-79 (Fed. Cir. 2001) (emphasis omitted). Indeed, to "induce" can mean, *inter alia*, "[t]o lead on; to influence; to prevail on; to move by persuasion or influence." *Glob.-Tech Appliances, Inc.*, 563 U.S. at 760 (internal quotation marks omitted).

As to this requirement, CERT contends that there is no evidence that it took the requisite affirmative act to induce direct infringement by the power plants. More specifically, CERT argues that it never instructed any power plant to perform the ACI step or the separating or collecting mercury step. Instead, according to CERT, the evidence shows that: (1) power plants performed the ACI step based on instructions from the government[14] and (2) at times during his

[14] Federal regulations passed by the United States Environmental Protection Agency ("EPA") known as the Mercury and Air Toxics Standards ("MATS") required power plants to reduce mercury emissions by 90%. (Tr. (D.I. 782) at 329, 431; Tr. (D.I. 783) at 613-14, 694, 710) Most power plants were required to comply with this rule by 2015, unless granted a one-

testimony, Plaintiffs' infringement expert stated that CERT did nothing to encourage power plants to use ESPs or baghouses (to perform the separating or collecting mercury step). (D.I. 719 at 5-6 (citing, *e.g.*, Tr. (D.I. 783) at 613-14, 699-700 (Plaintiffs' infringement expert agreeing that the only reason he is aware of that power plants used ACI is because they had to comply with MATS); 665-66 (Plaintiffs' expert agreeing that there's nothing CERT did to talk power plants into using ESPs or baghouses));[15] *see also* D.I. 736 at 1-2) CERT's position is that it simply sold refined coal to power plants without instructing them to perform the remaining steps of the patented method—and that, as a matter of law, its mere act of selling the refined coal (even with knowledge that it will be put to an infringing use) cannot constitute an act of encouraging or inducing infringement. (D.I. 719 at 2-6, 9; *see also* D.I. 736 at 1-3) Plaintiffs, for their part, retort that substantial evidence supports the jury's conclusion that CERT committed affirmative acts that caused the power plants to directly infringe the asserted claims—including by providing refined coal to the relevant power plants. (D.I. 728 at 2-6)

This is not the first time in this case that the Court has considered an argument like this. In the January 2023 MO, the Court noted that Defendants had moved to dismiss the 4AC for failing to plausibly allege that they took active steps to encourage the power plants to directly infringe. (D.I. 513 at ¶ 3) In denying Defendants' motion to dismiss, the Court explained that

---

year extension to 2016. (Tr. (D.I. 782) at 330; Tr. (D.I. 783) at 651-52, 660-61) In order to comply with MATS, a number of power plants installed and used activated carbon systems as part of their strategy to reduce mercury emissions by 90%. (Tr. (D.I. 782) at 462; Tr. (D.I. 783) at 613-14, 644, 699) CERT's argument is that if anybody took an affirmative act that induced direct infringement here by the power plants, it was the EPA, not CERT.

[15] The Court notes that during Plaintiffs' expert's redirect testimony, he stated that CERT's actions in providing the coal did cause the power plants to perform each and every step of the asserted claims. (Tr. (D.I. 783) at 715)

CERT's provision of coal itself is an affirmative act, and one that was not alleged to have been performed in a vacuum. (*Id.* at ¶ 7) In other words, Plaintiffs' theory of infringement was not just that CERT sold refined coal to some power plants with knowledge that those plants might possibly infringe at some point in the future. Instead, the 4AC alleged that:

> [W]hen Defendants provide this coal, they and the power plants all know that: (a) the power plants have an activated carbon injection system on site for mercury control, which requires an upfront cost and ongoing costs for operation; these systems have been installed in order to allow the plants to comply with state and federal regulations regarding mercury emissions; (b) were the plants to stop operating their activated carbon injection systems, they could face fines that would destroy the economic incentives for dealing with a refined coal provider, or be shut down; (c) were the plants to unilaterally reduce their activated carbon injection rate, or were Defendants to reduce the amount of bromine added to the refined coal that they provide to the plants, this could hinder the plants' ability to comply with state and federal mercury regulations; (d) one of the benefits of using refined coal at a power plant with an activated carbon injection system is that the bromine enhances the performance of the activated carbon, which results in a reduced need for emission controls (i.e., it reduces the quantity of activated carbon that is required to be used) and preserves the plant's ability to sell fly ash; and (e) partly in light of the above, the refined coal that Defendants produce has no substantial non-infringing use at these power plants (such that it cannot reasonably be used for purposes other than to be combusted at a plant where activated carbon will later be injected). . . . In light of these facts, a Defendant's affirmative act of providing the refined coal can reasonably be seen as a way of encouraging (or causing or aiding or influencing) the power plants to use activated carbon. It is a way of making it easier for those power plants to infringe (since the plants need the refined coal in the first place for infringement to happen). And it is a way of communicating to those power plants, in a non-word based manner, Defendants' intent and hope that infringement will thereafter occur.

(D.I. 513 at ¶ 8 (citing D.I. 406 at ¶¶ 80, 82-83, 85, 87-88, 96)) Importantly here, the evidence at trial bore out these allegations. (D.I. 728 at 2-4)

But before we even get to that evidence, it is important to first step back and emphasize that, as to CERT's provision of the coal itself, the facts here don't involve just a simple, typical sale of a product by a defendant to a far-flung group of third party customers—i.e., to third parties who purchase the product online or in a store, and who then might (or might not) later directly infringe when using that product.[16] In order to understand how CERT's provision of coal works, it is helpful to understand how the relevant coal-fired power plants generally operate here. Large piles of coal sit near the power plants, and power plant employees place coal from these piles onto conveyer belts; this coal would then pass through the respective CERT RC Defendant's refined coal facilities (more on that step below), and the refined coal that exited the refined coal facilities would continue on the conveyor belts to pulverizers that grind up the coal. (Tr. (D.I. 781) at 138, 230-31; Tr. (D.I. 782) at 550, 566; Tr. (D.I. 784) at 993) The ground up coal then goes into a combustor (or boiler) where it is burned; flue gas is generated from the burning process. (Tr. (D.I. 781) at 138, 230-31) Power plants inject activated carbon into the flue gas from outside of the boiler. (Tr. (D.I. 783) at 618, 628) The flue gas then flows through devices (including baghouses and/or ESPs) that remove impurities (including mercury) from the flue gas, and the gas is released into the atmosphere. (Tr. (D.I. 781) at 231; Tr. (D.I. 782) at 571-73; Tr. (D.I. 783) at 619) The burning process also creates steam that flows into a turbine that turns a generator to create electricity. (Tr. (D.I. 781) at 230-31) The generator then sends electricity to the power grid. (*Id.*)

---

[16] *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) ("[A] showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use[.]"); *Intel Corp. v. Future Link Sys., LLC*, Civil Action No. 14-377-LPS, 2015 WL 649294, at *8 (D. Del. Feb. 12, 2015) ("Simply selling products to customers who may be using the products in an infringing way does not, in and of itself, amount to induced infringement.").

As for CERT's role in this process, each of the CERT RC Defendants would take possession of coal while it was on the conveyer belt by purchasing it from the power plant at issue for a specific price; at that time, the CERT Operations Companies Defendants would make refined coal by "spray[ing] the [relevant] chemicals onto the coal as it was passing through [the CERT Defendants' refined coal facilities] on the way from the coal pile to the pulverizer." (Tr. (D.I. 782) at 550; *see also* Tr. (D.I. 784) at 993) The CERT RC Defendants would then sell the coal back to the power plant "*for less money than they paid for it*"—in other words, they would pay the power plants to take the refined coal, in order so that they could later obtain valuable Section 45 tax credits. (Tr. (D.I. 782) at 550-51 (emphasis added); *see also id.* at 437, 439 (CERT employee testifying that the refined coal companies would generally sell refined coal to the power plants for "less money" than they purchased the raw coal for, that the power plants "were provided with a financial incentive" to allow CERT to operate refined coal facilities there, and that this made economic sense for CERT at the time because the provision of the coal enabled them to reap the benefit of Section 45 tax credits))

Beyond that, the evidence at trial demonstrated that:

- CERT knew that these power plants had ACI systems on site in order to comply with MATS regulations regarding mercury emissions,[17] (*see, e.g.*, Tr. (D.I. 783) at 866; Tr. (D.I. 784) at 882-84, 1104), and that the plants would be shut down if they did not maintain compliance with MATS, (Tr. (D.I. 784) at 900-01);

- In 2012, CERT gave presentations to power plants conveying that the use of CERT's bromine solution would allow power plants to use less activated carbon (therefore saving money) and would allow the power plant to get more usable fly ash, which is created during the combustion process and which power

---

[17] *See supra* n.14.

plants sell to cement manufacturers. (Tr. (D.I. 783) at 639-40; Tr. (D.I. 784) at 920-21);

- In 2015, power plants requested that CERT help them optimize amounts of bromine and activated carbon to comply with MATS. (D.I. 755, PTX-693; *see also* D.I. 753, PTX-232; Tr. (D.I. 783) at 639);[18] and

- CERT knew that the refined coal that it produced had no substantial non-infringing uses at the relevant power plants—after bromine was sprayed on the coal, that coal had "no place to go except on the conveyer belt to the power plant to be pulverized and burned in the combustion chamber" with activated carbon injected therein. (Tr. (D.I. 783) at 627; *see also id.* at 866 (CERT's representative agreeing that CERT has known since the filing of this case that "the exhaust path after

---

[18] With respect to Plaintiffs' evidence regarding CERT's presentation regarding the fly ash benefits from using refined coal and CERT's help with rate optimization of bromine and ACI, CERT argues that this shows, at most, CERT's knowledge that refined coal may be used with ACI. (D.I. 719 at 7) CERT contends that such evidence cannot contribute to a finding that it induced infringement, since these acts occurred before (i.e., in or around 2012 or 2015) the point when the first of the asserted patents issued (i.e., in July 2019). (*Id.* at 7-8; D.I. 736 at 5 n.2; *see supra* n.4)

It is true that the Federal Circuit has reversed a jury's verdict of induced infringement where all of the acts of inducement occurred before the damages period began to run (and where there was no evidence of causation between the allegedly inducing acts occurring before the damages period and the direct infringement within the damages period). *See Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F. 4th 1109, 1119-21 (Fed. Cir. 2022). And so, were it standing alone, the above-referenced inducement evidence that pre-dates the issuance of the asserted patents could not itself amount to qualifying acts that induce infringement. However, in this case Plaintiffs seek damages regarding separate acts that *did* occur after the asserted patents issued and that *are* credibly said to have induced infringement (e.g., CERT's provision of coal to the directly infringing power plants at a loss). And as Plaintiffs explain, the above-referenced evidence that pre-dates the issuance of the patents is still relevant to demonstrate that "CERT and the power plants would have been aware of the benefits of using refined coal with activated carbon, and that those benefits would persist for each ton of infringing coal burned. . . . [Acts prior to the damages period] can still provide evidence of the knowledge of the inducer and direct infringer during the damages period." (D.I. 728 at 7-8); *see also, e.g.*, *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, Civil Action No. 14-878-LPS-CJB, 2016 WL 3946770, at *10-11 (D. Del. July 20, 2016) ("And surely it seems possible that what the party did and said *before* the patent issued might at least *bear on* what its mindset was in the crucial post-issuance time period (so long as that party did, in fact, perform an inducing act in that post-issuance time period)."), *report and recommendation adopted*, 2017 WL 1050574 (D. Del. Mar. 20, 2017).

the boiler at every one of the power plants involved in this case . . . includes injection of activated carbon"); Tr. (D.I. 784) at 882-84)[19]

In other words, the evidence showed that CERT was not merely (as CERT puts it) making a "sale of refined coal knowing it will be put [] to an infringing use[.]" (D.I. 719 at 5) Instead, in order to later obtain significant financial benefits in the form of Section 45 tax credits, CERT took action that resulted in the power plants *getting paid* to accept CERT's refined coal, as the coal was traveling through those plants' facilities on a conveyer belt—all with full

---

[19] Plaintiffs' infringement expert also relied on certain indemnity agreements—i.e., agreements in which CERT promised to indemnify power plants from claims of patent infringement—as evidence of induced infringement. (Tr. (D.I. 783) at 641-42; D.I. 752, PTX-202.0022) CERT argues that such agreements generally do not evidence an intent to induce infringement, and that Plaintiffs' expert failed to link any indemnity agreement (all of which were signed prior to issuance of the asserted patents) to an intent to cause infringement of the asserted patents. (D.I. 719 at 8) CERT cites in support to *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005). (*Id.*) But in that case, the court found that the indemnity provision at issue failed to establish the defendant's intent to induce infringement on the part of its customer where "the sale of the wafers from [the defendant to its customer] occurred *in Japan*" and it was therefore "more reasonable to conclude that the indemnity clause relates to claims of patent infringement under Japanese law." 420 F.3d at 1378-79.

Here, the Court concludes that the jury had sufficient evidence to support the conclusion that CERT took affirmative acts to encourage infringement, even without taking into account the evidence regarding these indemnity agreements. That said, it could have been reasonable for the jury to consider and factor in the existence of these agreements when assessing this element. The agreements were executed before the asserted patents issued, but they remained in place after those patents were in effect. And so it could have been reasonable for the jury to consider them as some evidence supporting the conclusion that induced infringement occurred here. *See Moskowitz Fam. LLC v. Globus Med., Inc.*, CIVIL ACTION No. 20-3271, 2022 WL 17876699, *17-18 (E.D. Pa. Dec. 22, 2022). That is, the "jury could reasonably infer that, because the power plants were already being paid to burn refined coal, these indemnity provisions were meant to 'overcome the deterrent effect that the patent laws have on would-be infringers.'" (D.I. 728 at 8 (quoting *MEMC Elec. Materials, Inc.*, 420 F.3d at 1378)); *see also, e.g.*, *Power Integrations, Inc.*, 843 F.3d at 1333-34 (explaining that the plaintiff introduced significant evidence that would allow a jury to find that the defendant took affirmative acts to induce third parties to import its products into the United States, including that defendant's "standard terms and conditions indemnified customers against claims for infringement of United States patents").

knowledge that this coal would certainly be injected with activated carbon thereafter (and that the power plants would subsequently use a baghouse or ESP to capture mercury). (Tr. (D.I. 783) at 715, 864, 866)[20] These acts—providing refined coal to the power plants while being physically located at those very plants, and paying the power plants to take that coal—amount to substantial evidence supporting the jury's finding that CERT took *affirmative action* with the intent to cause the power plants to directly infringe the asserted claims. *Cf. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 940 n.13 (2005) ("Inducement liability goes beyond that, and the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe. In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use.").

In support of its position that, as a matter of law, the sale of a material with knowledge that it will be put to an infringing use cannot stand as an affirmative act to encourage infringement, CERT relies on two Federal Circuit cases: *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014) and *HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680 (Fed. Cir. 2019). (D.I. 719 at 2-4; D.I. 736 at 2-3) The Court does not agree that these cases dictate JMOL in CERT's favor.

[20] CERT argues that its sale of refined coal to power plants at a loss does not constitute substantial evidence of an affirmative act of encouragement to infringe because there is no evidence that this was "tied to ACI in any way"—i.e., in that power plants in general can combust refined coal with and without ACI. (D.I. 719 at 7) But as explained above, here CERT's provision of refined coal to the directly infringing power plants is tied to ACI use because the directly infringing plants at issue *had to* combust the refined coal with the use of ACI in order to remain operational. (*See* D.I. 728 at 7 (citations omitted))

As to *HZNP*, the Court has previously explained why, in its view, "the facts of [that case] are just apples to oranges with regard to the facts here[:]"

> Of course, the statement of the law in *HZNP* is correct; an induced infringer cannot be found liable simply because it knows that the direct infringer will infringe; the inducer needs to do something to encourage that infringement. But in *HZNP*, the patented method required three distinct steps involving the use of an inventive drug formulation, and the accused infringer's label for the drug, which was alleged to induce infringement, only required the first step of the method and did not require the second or third step at all. 940 F.3d at 702. Here the factual scenario at play is just different, as it is alleged that the infringing methods require use of refined coal in conjunction with the use of activated carbon, and the alleged induced infringer's act of providing the refined coal (coal that allegedly has no other significant non-infringing use) will necessarily lead to the power plant's use of activated carbon to combust the coal [as well as to the use of ESPs or baghouses] (and thus direct infringement).

(D.I. 631 at 7 n.3)[21] The *HZNP* Court also noted that defendants' product there had substantial non-infringing uses, as evidenced by the fact that the defendants' label did not require the second or third steps of the method. 940 F.3d at 702.

In *Microsoft*, the patentee ("DataTern") had previously sued, *inter alia*, customers of Microsoft, alleging infringement of two patents (the '402 and '502 patents) based on the customers' use of Microsoft's software. 755 F.3d at 902. Microsoft then filed a declaratory judgment action against DataTern; DataTern moved to dismiss the action for lack of subject matter jurisdiction, and filed counterclaims for infringement. *Id*. The district court denied the motion to dismiss, and DataTern appealed that decision (as well as the district court's grant of

---

[21] While CERT characterizes *HZNP* as a case in which "a seller with a financial motive provides express instructions on how to infringe[,]" (D.I. 736 at 3), again, there the defendants' labels did not affirmatively require the patient to do anything but the first step of the method.

summary judgment of non-infringement). *Id.* On appeal, the Federal Circuit concluded that the district court had jurisdiction over Microsoft's challenge to the '502 patent, but not over its challenge to the '402 patent. *Id.* at 903. With respect to induced infringement by Microsoft, the Federal Circuit explained that Microsoft had established declaratory judgment jurisdiction for the '502 patent because DataTern's claim charts in its lawsuit against Microsoft's customers had cited to Microsoft-provided documentation for each limitation of the patent's claims. *Id.* at 905. As for the '402 patent, DataTern's claim charts relating to Microsoft's customers had cited exclusively to third-party documentation for several key claim limitations, and therefore nothing in the record suggested that Microsoft encouraged the acts accused of direct infringement. *Id.* ("[S]imply selling a product capable of being used in an infringing manner is not sufficient to create a substantial controversy regarding inducement."). And there was no evidence that Microsoft's product at issue was not suitable for substantial non-infringing uses. *Id.* at 906.

The facts here are not like those in *HZNP*, as CERT does not provide a label requiring customers to perform only one of three necessary steps for infringement (as to a product that can be used by those customers in non-infringing ways). Nor is this case like *Microsoft*, where the plaintiff accused customers of direct infringement based on its use of a product that had non-infringing uses—and where nothing in the record suggested that Microsoft encouraged the customers' use of the product in an infringing manner. Here, in contrast, the evidence demonstrates that CERT provided refined coal to power plants and paid power plants to take that coal, which helped foster CERT's ability to earn substantial Section 45 tax credits. And the evidence shows that CERT knew that there was no other outcome for the refined coal it was providing to these power plants—coal that, it again bears emphasizing, was traveling *on a conveyer belt to the boiler in the plants* at the time that the refined was made and sold—other

than to be combusted in a manner that directly infringed the asserted claims. Under these circumstances, CERT's provision of refined coal to power plants at a loss, with the knowledge that it was absolutely going to be used to infringe the asserted claims, was akin to a word-based communication to the power plants—i.e., one encouraging the plants to keep that refined coal on the conveyer belt and to use it for infringing purposes.[22] Therefore, there was substantial evidence to support the jury's conclusion that CERT took affirmative actions to encourage power plants to directly infringe the asserted patents. *Cf. Forest Lab'ys, Inc. v. Ivax Pharms., Inc.*, 501 F.3d 1263, 1272 (Fed. Cir. 2007) ("An inquiry into induced infringement focuses on the party accused of inducement as the prime mover in the chain of events leading to infringement. Here, we do not know if Cipla first approached Ivax or vice versa, but the plan to manufacture, import, market, and sell the EO products described in the ANDA was undoubtedly a cooperative venture, and Cipla was to manufacture and sell infringing EO products to Ivax for resale in the United States. Under the standards for inducement which we apply to 35 U.S.C. § 271(b), Cipla has therefore actively induced the acts of Ivax that will constitute direct infringement upon approval of the ANDA[.]"); *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979) ("[D]efendant sells a product that is obviously designed to function and be used in a specific manner, knows that it is so designed and intends it to be used in an infringing manner, and demonstrates that use to its distributors, presumably so that they may, in turn, do the same for their customers in promoting the sale of the product. The fact that defendant does not

---

[22] While there is no evidence here that words were spoken between CERT and the power plants as part of CERT's provision of the refined coal at issue, as the Court has previously explained (and as CERT has not disputed), the law "does not absolutely require that the active step element be satisfied by a showing that an alleged inducer utilized *written or spoken words* to encourage infringement" as there are "surely plenty of non-word-based acts by which an inducer can encourage (or cause or aid or influence) another's patent infringement." (D.I. 513 at ¶ 5)

actually instruct the ultimate users of the product in its use does not prevent our finding active inducement of infringement, since the intended manner or use of the product is readily apparent.").

JMOL is thus not warranted on this ground of CERT's Motion.

**2. Specific Intent to Induce Infringement**

The Court next addresses CERT's second argument regarding induced infringement. This is CERT's assertion that "there is no evidence of any instruction, requirement, description or other expression from CERT to any power plant from which a specific intent to induce infringement can be inferred or that CERT believed it had or intended to provide such encouragement or instruction." (D.I. 719 at 9 (citing *HZNP*, 940 F.3d at 702)) JMOL is not warranted on this basis either.

"[S]pecific intent may be inferred from circumstantial evidence where a defendant has both knowledge of the patent and specific intent to cause the acts constituting infringement." *Ricoh Co. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1342 (Fed. Cir. 2008). Previously, the Court rejected Defendants' position that Plaintiffs' then-proposed 4AC had failed to sufficiently allege the specific intent element. In doing so, the Court explained that the pleading "allege[s] that were the power plants to which Defendants supply coal to stop infringing (i.e., to stop using activated carbon), this could hinder the plants' economic viability (which in turn would harm Defendants' economic interests). . . . These allegations are sufficient to plausibly allege that Defendants specifically intended that the plants infringe (so that Defendants could continue to benefit from a financial relationship with those plants)." (D.I. 404)

Substantial evidence at trial proved that: (1) CERT Defendants earned millions of dollars in tax credits for refined coal combusted by the power plants; and (2) had power plants shut

down their operations when this lawsuit was filed, CERT's investors would have lost approximately $300-350 million in tax credits. (*See, e.g.*, Tr. (D.I. 784) at 938-40) As discussed above, the evidence also showed that CERT provided power plants with the refined coal at a loss, all with the knowledge that the power plants had to use activated carbon in order to remain in operation.

CERT does not dispute this evidence. Instead, CERT retorts that: (1) CERT's financial motives (e.g., its desire to earn tax credits from selling refined coal) cannot establish specific intent, because such a motive exists in every inducement case involving a sale of products; and (2) even if CERT had a financial motive to suggest that the power plants infringe, intent cannot be inferred in a situation like this one, since CERT did not provide the plants with *express instructions* regarding how to infringe. (D.I. 736 at 2-3)

These arguments are not persuasive. As for CERT's first argument, CERT cites to no caselaw in support of the position that financial motives relating to product sales cannot be a factor that helps establish specific intent. And the Court has, in the past, held to the contrary. *Cf. Galderma Lab'ys, L.P. v. Medinter US, LLC,* Civil Action No. 18-1892-CFC-CJB, 2020 WL 871507, at *5 (D. Del. Feb. 14, 2020) (concluding that a complaint sufficiently alleged that the defendant took specific acts to knowingly induce infringement, where the pleading stated facts suggesting, *inter alia*, that the defendant would substantially benefit financially from the direct infringement by another); *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, Civil Action No. 14-878-LPS-CJB, 2016 WL 3946770, at *17 (D. Del. July 20, 2016) (same), *report and recommendation adopted*, 2017 WL 1050574 (D. Del. Mar. 20, 2017). With respect to CERT's second argument, as the Court has previously explained, "the caselaw does not absolutely require that the active step element be satisfied by a showing that an alleged inducer utilized written or

spoken words to encourage infringement." (D.I. 513 at ¶ 5 (emphasis omitted); *see also supra* n.22)

Thus, CERT's arguments with regard to specific intent do not entitle it to JMOL.

### 3. Causation of the ACI Step and the Separating or Collecting Step

The induced infringer must "induce[]" another party to perform "every single step" in the patented method. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014). CERT's final argument regarding inducement is that there is no evidence that CERT actually *caused* any power plant to perform the asserted claims' ACI step and separating or collecting step. (D.I. 719 at 9-12; D.I. 736 at 3-5) Instead, CERT argues that the undisputed evidence shows that: (1) power plants used ACI and ESPs or baghouses "*wholly independent*" of the provision of the refined coal at issue here—i.e., they used such equipment before and after their use of refined coal, and they used ACI to comply with MATS; (2) thus, as a matter of law, CERT's action of providing refined coal to power plants is not the cause of the ACI and separating or collecting steps. (D.I. 719 at 9-11 (emphasis added); D.I. 736 at 3-5)

Again, the Court has previously addressed this issue of causation in this case, explaining that:

> [E]ven assuming "that at the time [it] first started receiving refined coal from a Defendant, each power plant at issue had made an independent decision that it was in [its] interest to use activated carbon when combusting the coal (in order to satisfy certain mercury emissions regulations, or for other reasons)[,] Defendants cite to no authority for the proposition that an entity that has decided that it may wish to take an action relevant to patent infringement cannot nevertheless be further encouraged (or influenced, or moved) to do so by another party. Even if one is predisposed to do something, one might still be further spurred on to do so by the act of another."

(D.I. 672 (quoting D.I. 631 at 5)) To that, CERT argues that there is no evidence that it caused any power plant to use ACI or an ESP or baghouse; CERT asserts that these plants would have used ACI and ESPs or baghouses even if they had not used CERT's refined coal. (D.I. 719 at 11) CERT also points out that patent infringement is a tort and, relying on *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), it states that it is "textbook tort law that an action is not regarded as a cause of an event if the particular event would have occurred without it." (D.I. 719 at 10 (quoting *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 347); *see also id.* at 11 n.7)

For their part, Plaintiffs reiterate that the evidence shows (as discussed above) that: (1) each CERT RC Defendant sold "a specific refined coal to a single power plant and that power plant had no non-infringing use for that refined coal[;]" (2) each power plant had to burn the refined coal that came in on its conveyor belt in order to have the fuel required to stay operational; and (3) in burning the coal, each power plant needed to perform the ACI and separating or collecting steps, or it would not comply with MATS and thus not be able to stay in operation (which would mean that CERT would not be able to collect tax credits). (D.I. 728 at 11) In other words, Plaintiffs argue that by providing refined coal to the power plants, and by paying power plants to burn that coal, CERT *caused* the plants to perform the ACI and separating or collecting steps. (*Id.*)

The Court agrees with Plaintiffs that such facts can demonstrate the requisite causation. And it agrees that, as set out above, there was substantial evidence in the record to allow the jury to find that such facts had been established.

The Court is not persuaded otherwise by CERT's reliance on *Nassar*—i.e., by CERT's argument that it could not be a legal cause because the power plants would have carried out the ACI and separating or collecting steps even if CERT did not supply them refined coal. (D.I. 719

at 10; D.I. 736 at 4) In "*Nassar*, the Supreme Court [of the United States] held that but-for causation is the correct standard for retaliation claims under Title VII of the Civil Rights Act." *Ormsby v. Sunbelt Rentals, Inc.*, 205 F. Supp. 3d 1204, 1212 (D. Or. 2016). But this is not a case involving a retaliation claim brought pursuant to Title VII. And there are other less demanding causation standards that can apply in the law, including tort law—one of which is proximate causation. *Id.* (explaining that employment discrimination law uses two standards of causation, the more stringent "but-for" standard described in *Nassar* and the less demanding "'motivating factor' standard [that] forbids 'adverse employment decisions motivated, *even in part*, by animus based on a plaintiff's disability or request for an accommodation'") (citation omitted); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004) ("Proximate cause is causation substantial enough and close enough to the harm to be recognized by law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm."). The Supreme Court has held that proximate cause, for example, "requires only *some direct relation* between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect" and that "[i]t is common for injuries to have multiple proximate causes." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419-20 (2011) (internal quotation marks, brackets and citation omitted, emphasis added).

Here, for the reasons explained above, the jury could reasonably have found that CERT's provision of refined coal to power plants and its payment to the power plants to keep that coal moving along on the conveyor belt to the combustion chamber—where the coal had no other use except for direct infringement—was *a cause* of the direct infringement.[23] *See, e.g.*, *Pantech*

[23] While CERT argues that "[t]his level of causation-in-fact . . . occurs in every case where the alleged inducer sells a component, device, or material used by the direct infringer to

*Corp. v. OnePlus Tech. (Shenzhen) Co.*, CASE NO. 5:22-CV-00069-RWS, 2024 WL 5510402, at *10 (E.D. Tex. Aug. 20, 2024) (concluding that the plaintiff had presented substantial evidence that a reasonable jury could rely upon to find that the defendant's involvement in the supply chain, by which it aided the sale of the infringing devices in the United States, amounted to the defendant actively directing and encouraging infringement by the direct infringers). CERT has cited to no case in the patent context suggesting that: (1) this type of evidence does not meet the relevant causation threshold; or (2) that some higher causation standard—e.g., "but-for" causation—is required here.

For these reasons, JMOL with respect to induced infringement is not warranted.

**B. Contributory infringement**

Next, CERT asserts that it is entitled to JMOL of no contributory infringement. To prove contributory infringement, a patentee must demonstrate that an alleged contributory infringer has sold, offered to sell or imported into the United States a material or apparatus for use in practicing a patented process "knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use[.]" 35 U.S.C. § 271(c); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009). CERT argues that the record lacks substantial evidence demonstrating that: (1) refined coal was especially made or adapted for use

infringe, without which the infringement could not occur[,]" (D.I. 736 at 4-5), the Court has already explained why this case is different from every such case (including that here, the inducers took steps resulting in *payments* being made to direct infringers so that they would accept the material used to infringe—material that had no other non-infringing uses). In other words, here, CERT's actions were a *particularly important*, and *particularly direct* cause of the alleged infringement—far more than in a typical circumstance where an alleged inducer simply sells a component to direct infringers, and that component later happens to be used to infringe.

in an infringement; (2) that CERT knew this to be true; and (3) refined coal lacks substantial non-infringing uses. (D.I. 719 at 12-17; D.I. 736 at 5-7) The Court considers each element in turn below.

### 1. Especially Made or Especially Adapted for Use

The Court turns first to CERT's argument about the "especially made or especially adapted for use" element. Here, CERT contends that the evidence shows that: (1) refined coal was made and adapted only to qualify for Section 45 tax credits (and that use of activated carbon is not necessarily required in order to obtain such tax credits); (2) accordingly, the amount of MerSorb and S-Sorb required to be added to the refined coal[24] was determined by testing performed by the Energy & Environmental Research Center ("EERC"), which was done without activated carbon; and (3) the formulation of refined coal sold by CERT was established before the asserted patents issued. (D.I. 719 at 13-14; *see also, e.g.*, Tr. (D.I. 783) at 685-86 (Plaintiffs' infringement expert testifying that "getting the Section 45 tax credits does not require the use of activated carbon"); Tr. (D.I. 784) at 1038-39, 1047-48 (CERT's representative testifying that the EERC determined the minimum rates of MerSorb and S-Sorb required to be added to the coal for it to qualify for Section 45 tax credits, and that these rates remained the same after the asserted patents issued)) Thus, according to CERT, "there is no evidence that any of the refined coal was made or adapted by CERT with the asserted patents in mind"—instead, the evidence proves that refined coal was able to be used both with and without ACI. (D.I. 719 at 14)

[24] The refined coal at issue in this case was made by applying MerSorb and S-Sorb to coal. (D.I. 659, ex. 1 at ¶ 38) MerSorb is a 52% solution of calcium bromide and S-Sorb is cement kiln dust. (D.I. 779 at 136) These chemicals were supplied by ChemMod (the "ChemMod technology"). (*Id.* at 67; Tr. (D.I. 783) at 742; Tr. (D.I. 784) at 890)

CERT's argument is a rehash of the argument it made at the summary judgment stage of the case. (*See* D.I. 611 at 12-13) At that time, the Court noted that with Plaintiffs pointing to evidence that "the accused refined coal, as delivered, has no other use than to be combusted at a specific power plant where ACI will be used[,]" there was a genuine issue of material fact as to whether the accused products were especially made or adapted for use in the infringement of the asserted patents. (*Id.*)

At trial, as explained above, the evidence demonstrated that the refined coal at issue was made at each directly infringing power plant by the CERT Operations Companies Defendants as the coal passed through the CERT RC Defendants' refined coal facilities on a conveyor belt. (*See supra* at 14-15) While the EERC sets the minimum rate of MerSorb and S-Sorb to be applied to coal, CERT adds "3 to 5 percent" to that number to ensure that the coal qualifies for Section 45 tax credits. (Tr. (D.I. 784) at 1038-39) After CERT made the refined coal, the only place for the coal to go was the combustion chamber at that power plant, where it would be burned and injected with activated carbon. (Tr. (D.I. 783) at 627, 866; *see also* Tr. (D.I. 784) at 882-84) And CERT expected that the refined coal that it made at a particular power plant would be burned at that same power plant. (Tr. (D.I. 783) at 863-64; Tr. (D.I. 784) at 880-82) This evidence is sufficient to permit a reasonable jury to conclude that the refined coal at issue here was especially made or adapted for use to be burned at directly infringing power plants. (*See* D.I. 728 at 13-14)

CERT attempts to avoid these facts by pointing out that refined coal with the same formulation was used (at other power plants, by other entities, or in other timeframes) with and without activated carbon, and that refined coal was not uniquely suited for use with activated carbon. If that is so, CERT asks, then how is it that refined coal can be said to be especially

made or especially adapted for use in infringing the asserted patents? (D.I. 719 at 12-14; D.I. 736 at 5-6) But for reasons the Court will further address below in greater detail, (*see infra* at 33-40), the contributory infringement inquiry does not look at refined coal in a vacuum. Rather, the statute "deals with the material actually sold by the accused and the uses made of it by its purchasers[;]" it requires "examination of the patented method only in determining whether *the material the accused actually sells constitutes a material part of the invention and is known by the accused to be especially made or adapted for use* in infringing the patent." *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987) (emphasis added); *see also ESCO Grp. LLC v. Deere & Co.*, Civil Action No. 20-1679-WCB, 2023 WL 4199413, at *9 (D. Del. June 22, 2023) ("[T]he . . . 'component' referred to in section 271(c) is the component that is sold by the accused infringer.").

And so here, we have to consider the refined coal that CERT made at the directly infringing power plants and then paid those plants to accept—that is, we must assess accused refined coal that was *sold and delivered* to those power plants.[25] *See* (D.I. 611 at 6-7 (citing cases)) As just explained, there is substantial evidence that this accused refined coal was especially made or adapted for use in an infringement. Indeed, pursuant to the facts presented at trial, once CERT's refined coal was made, there is no other use that it could possibly have been put to. *See Google Inc. v. Beneficial Innovations, Inc.*, Civil Action No. 2:11-cv-00229-JRG-RSP, 2014 WL 4215402, at *6 (E.D. Tex. Aug. 22, 2014) (rejecting the defendant's argument

---

[25] To the extent that CERT argues that the coal at issue could not have been especially made or especially adapted for infringement because the EERC established the formulation of chemicals applied to the coal before the asserted patents issued, "the contributory infringement statute 'does not require that the [component or material at issue] have been originally designed with the goal of infringing a patent.'" (D.I. 611 at 8 n.6 (quoting *Cipla Ltd. v. Sunovion Pharms. Inc.*, 174 F. Supp. 3d 869, 873 (D. Del. 2016)))

that to satisfy the "especially made" requirement of contributory infringement, the plaintiff must prove that the accused product was especially made to infringe each and every limitation of the asserted patents); *see also Cipla Ltd. v. Sunovion Pharms. Inc.*, 174 F. Supp. 3d 869, 873 (D. Del. 2016) (explaining that the requirement that a product is "especially made or especially adapted for use in a way that infringes" means that "the product in question must infringe the patent at issue if the product is used as intended").

**2. CERT's Knowledge**

CERT next argues that the record lacks substantial evidence that CERT *knew* that refined coal was especially made or adapted for an infringing use and did not have substantial non-infringing uses. (D.I. 719 at 14) According to CERT, the record shows that it had a reasonable belief during the damages period (i.e., July 2019 through the end of the refined coal program in 2021) that: (1) its refined coal was not especially made or especially adapted for use to infringe the asserted patents; and (2) the coal had substantial non-infringing uses. (*Id.* (citing *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 642 (2015)). And indeed, CERT's representative did offer testimony during trial meant to support CERT's position in this regard. (*See, e.g.*, Tr. (D.I. 784) at 1043-58 (CERT's representative testifying that the EERC's recommended rate of MerSorb and S-Sorb to be applied to the coal remained the same before and after the asserted patents issued); *id.* at 979, 981-84, 1077-90 (CERT's representative testifying that he believed that refined coal had substantial non-infringing uses, since two CERT Operations Companies originally sued in this case (CERT Operations, LLC and CERT Operations III) made refined coal at power plants that did not use activated carbon,[26] and because CERT sold a substantial amount

[26] CERT Operations, LLC and CERT Operations III were dropped as Defendants in May 2022. (D.I. 406 at 1; Tr. (D.I. 781) at 202)

of refined coal to plants that did not use activated carbon before the asserted patents issued); *id*. at 1090-92 (CERT's representative testifying that he did not understand CERT's refined coal to be especially made or especially adapted for use in infringing the asserted patents because CERT does not use activated carbon in the formulation of its refined coal))

But in the Court's view, the jury could reasonably have questioned the veracity of CERT's mistake of law defense. That is, the jury could have instead determined that CERT *did* know that the refined coal it sold to the directly infringing power plants was especially made or adapted for an infringing use and had no substantial non-infringing uses. (*See* D.I. 728 at 14-15)[27] CERT's representative testified that he "would understand that when we're considering what coal matters for whether it has a substantial non-infringing use, we're looking at the coal of the accused power plants in this damages period of this case[.]" (Tr. (D.I. 784) at 1105) He also testified that he has known since this lawsuit was filed that "the exhaust path after the boiler at every one of the power plants involved in this case . . . includes injection of activated carbon[.]" (Tr. (D.I. 783) at 866) And CERT did not offer any "evidence of specific legal opinions offered, the reasonableness of those opinions, or the reliance of CERT decision-makers on any such legal opinions." (D.I. 728 at 15); *cf. Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co., Ltd*, 403 F. Supp. 3d 571, 590-92 (E.D. Tex. 2019) (concluding that "[t]here is sufficient evidence in the record that a reasonable jury could discount Samsung's assertions of a good-faith belief of noninfringement and conclude that Samsung had knowledge of infringement[,]" where the defendant's representative purportedly "failed to explain what analysis was done by Samsung, when Samsung adopted that analysis and who was involved in the process of reaching the

[27] It is not disputed that during the damages period, the CERT RC Defendants sold coal only to power plants with ACI systems. (*See* D.I. 611 at 6-7)

noninfringing position, at the time of infringement"); *Google Inc.*, 2014 WL 4215402, at *11 & n.3 (explaining that while a good faith belief of non-infringement is relevant evidence to negate an accused inducer's intent to induce infringement, "nothing in the record suggest[ed] that Google's belief was formed in good faith" where, for example, "there is no evidence showing that Google ever obtained an opinion of counsel finding non-infringement").

Additionally, during CERT's opening statement, CERT's counsel informed the jury that "[w]hen this lawsuit was filed, we really didn't know which power plants in particular were using activated carbon and which weren't." (Tr. (D.I. 781) at 197) But later, during the trial testimony of CERT's representative, it was conclusively established that CERT *did* know that the directly infringing power plants at issue in this case were using activated carbon before this lawsuit was filed. (Tr. (D.I. 784) at 882-884, 1104) In the Court's view, when the jury realized that CERT had not told the truth about that issue from the beginning, that could have reasonably caused the jury to question the veracity of CERT's arguments about other elements of the claims—including CERT's claim that it had been mistaken in thinking that it did not contributorily infringe. (*See* D.I. 728 at 19-20)

### 3. No Substantial Non-Infringing Use

CERT's final argument with respect to contributory infringement relates to the requirement that the refined coal must not be suitable for substantial non-infringing use. As was explained above in Section III.B.1, the Court had previously concluded that, with respect to this and other elements, "the proper inquiry is whether the *accused* refined coal *as sold and delivered* [by CERT to its power plant customers] lacks substantial non-infringing use." (D.I. 611 at 7 (citations omitted); *see also* Tr. (D.I. 785) at 1295; D.I. 279 at 27; D.I. 319 at 7-8) CERT argues that the Court was wrong to do so. It says that the Court's conclusion in this regard is "too

narrow"—and argues that the proper standard considers whether refined coal made with calcium bromide, *in general*, has substantial non-infringing uses. (D.I. 719 at 14-16; *see also* D.I. 736 at 6-7) CERT states that when analyzed pursuant to that (purportedly proper) standard, the unrebutted evidence goes in its favor. That is, that the trial evidence showed that refined coal made with calcium bromide, *as a general matter*, has substantial non-infringing uses: e.g., refined coal sold by non-Defendants to power plants that did not also use activated carbon, or refined coal sold by CERT to power plants prior to the issuance of the asserted patents (used with and without activated carbon). (D.I. 719 at 16; *see also* Tr. (D.I. 784) at 960-72 (CERT's representative testifying that when CERT began supplying refined coal to the directly infringing power plants in the 2011 to 2014 timeframe, certain of them were not using activated carbon); Tr. (D.I. 784) at 952-54, 978-79, 987-89, 1080-81 (CERT's representative testifying that the original Complaint named CERT Operations LLC and CERT Operations III LLC as Defendants and that these entities: (1) operated refined coal facilities at power plants, such as Chesterfield Power Station or Mount Storm Intermountain, that never used activated carbon; and (2) supplied a substantial amount of refined coal to these plants); *id.* at 1044-58 (CERT's representative testifying that the EERC's recommended rate of MerSorb and S-Sorb did not change after the asserted patents issued))[28]

The Court stands by its prior conclusion. (D.I. 611 at 6-8 (citing case law in support)) It explains why below.

To start, the Court notes that CERT prominently relies here on the Federal Circuit's decision in *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323 (Fed.

---

[28] CERT's Motion does not challenge the jury's finding with respect to no substantial non-infringing use under the "as sold and delivered" standard. (*See* D.I. 728 at 15)

Cir. 2012). CERT claims that this case "rejected the Court's narrow focus[.]" (D.I. 719 at 15) In support of this argument, CERT notes that: (1) in *Bill of Lading*, the plaintiff argued that it had adequately pleaded the element in question because the complaints stated that "as customized by the relevant Appellee for their trucking customers, the process for scanning and wirelessly transmitting bills-of-lading from the truck cab to the back office for the preparation of loading manifests has no other substantial non-infringing use[;]" but (2) the Federal Circuit held that these "allegations are tailored too narrowly; they say nothing more than if you use this device to perform the patented method, the device will infringe and has no noninfringing uses"; and so (3) instead the proper inquiry focuses on "whether the accused products can be used for purposes *other than* infringement." *In re Bill of Lading*, 681 F.3d at 1337-38 (internal quotation marks and citation omitted) (*cited in* D.I. 719 at 15).

Nothing in *Bill of Lading* indicates that the Court's decision here was incorrect. In *Bill of Lading*, the various accused scanner products were sold by the accused infringers for use in the trucking industry. 681 F.3d at 1330. Certain materials regarding the accused products that were attached to the complaint contained descriptions of non-infringing uses—e.g., speeding billing and driver settlement, or scanning proof of delivery documents—to which the accused products could be put. *Id.* at 1338-39. The *Bill of Lading* Court emphasized that the accused products "do not need to be used to practice the patented method, and [the plaintiff's] own allegations make clear that they can be used for multiple other purposes." *Id.* *Bill of Lading* thus unsurprisingly and rightly indicates that the "substantial non-infringing use" inquiry focuses on the accused products—that is, the things that are made and sold by the accused infringer. (*See* D.I. 611 at 7-8 (citing cases)); *see also, e.g.*, *AquaTex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1379 n.** (Fed. Cir. 2005) ("The proper question is . . . whether the accused Techniche products are

'suitable for substantial noninfringing use[s].'"); *ESCO Grp. LLC*, 2023 WL 4199413, at *8-9 (rejecting the defendant's summary judgment argument that the locks recited in the asserted claims had substantial non-infringing uses because they could be used in non-infringing assemblies, in light of the fact that "the 'component' referred to in section 271(c) is the component that is sold by the accused infringer" and so "the key point is whether the locks sold by Deere have substantial non-infringing uses") (emphasis added); *Hoffmann-La Roche Inc. v. Promega Corp.*, No. C-93-1748-VRW, 1994 WL 761241, at *10 (N.D. Cal. June 13, 1994) (explaining that the substantial non-infringing use analysis is directed to the "thing sold" in the case) (internal quotation marks and citation omitted).

Contrary to CERT's argument, here the Court's conclusion is in line with the focus of the "substantial non-infringing use" inquiry. That inquiry is supposed to assess what the accused infringer "know[s]" as to whether the material it "actually sold" realistically has a "substantial noninfringing use[.]" 35 U.S.C. § 271(c); *Hodosh*, 833 F.2d at 1578. In other words, if the accused infringer could well have thought—in light of the particular factual circumstances of the case—that the accused product it sold might be substantially used in a non-infringing way (as opposed to an infringing way), then perhaps it can avoid Section 271(c) liability. Yet in this case, during the damages period at issue, CERT only made and sold refined coal at power plants that had ACI systems. (*See* D.I. 611 at 6-7; *see supra* n.27) It is not as if during this time, the CERT Defendants had one large factory from which they made and sold refined coal, and then they shipped that coal out to third party customers all over the country—whereafter, some customers used the coal in an infringing way (e.g., along with the use of ACI) and some didn't. So here, it matters what the accused products *actually are* and how they were *actually (made and) sold* by the *actual Defendants in this case*. As explained above, these CERT Defendants

worked on site at each particular power plant, where they bought the coal at issue, made it into refined coal by treating it, and/or sold it back to the power plants at a loss, all while the coal was "on a conveyor belt where it was destined to be burned and treated in an infringing manner." (D.I. 728 at 15; *see also* D.I. 727 at 5 ("It is simply not the case that the facts of this case establish definitively that there are many possible uses of the accused refined coal.")) Whether *other* refined coal—e.g., coal that was bought/sold/treated by other non-Defendant CERT entities or by entities in years prior to or after the damages period—had a substantial non-infringing use is simply beside the point. What is relevant is whether the *accused coal* had substantial non-infringing uses. And here, the actual accused coal *absolutely had to be used* to practice the patented method—again, there was no other realistic outcome for it.

That this is the right way to approach the "substantial non-infringing use" inquiry in this case is confirmed by the Federal Circuit's decision in *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018). In *Nalco*, the plaintiff ("Nalco") was the exclusive licensee of a patent that described a method for the removal of elemental mercury from the flue gas created by combustion in coal-fired power plants. 883 F.3d at 1342. The defendants were alleged to infringe the patent through the use and licensing of a "Chem-Mod solution[;]" that solution involved dual injection of MerSorb and S-Sorb on the coal feed belts of coal burning power generation stations, before the coal was fed into a combustion process. *Id*. at 1343-44.[29] At the pleading stage, the defendants asserted, *inter alia*, that Nalco's contributory infringement allegations were implausible, because Nalco had failed to allege that MerSorb and S-Sorb have

[29] Certain of the defendants in *Nalco* were once Defendants in this case, *see* 883 F.3d at 1342; (D.I. 1 at 1), and the MerSorb and S-Sorb components at issue in *Nalco* were used by Defendants to create the refined coal at issue in this case, (*see supra* n.24).

no substantial non-infringing use. *Id.* at 1357. But the Federal Circuit disagreed. In doing so, the Federal Circuit—citing to *Bill of Lading*—emphasized that "[f]or purposes of contributory infringement, the inquiry focuses on whether the accused products can be used for purposes *other than* infringement." *Id.* (citing *Bill of Lading*, 681 F.3d at 1338). And it then noted that Nalco had pled that:

> *As sold and delivered* to the Refined Coal LLCs or operators of coalfired power plants using the Chem-Mod[ ] Solution, the proprietary additives MerSorb and S-Sorb, which are specifically formulated to be used with the Chem-Mod[ ] Solution in coal-fired power plants, have no substantial noninfringing uses. *When a coal-fired power plant or a Refined Coal LLC receives MerSorb and S-Sorb it purchased, [the buyer] has no other use for MerSorb and S-Sorb except to use those additives in the Chem-Mod[] Solution*[.]

*Id.* (emphasis added). The Federal Circuit found that these allegations, along with a related allegation that the Chem-Mod Solution Mixture had no substantial non-infringing uses, were sufficient to state a claim for contributory infringement. *Id.* In other words, in a case involving incredibly close factual circumstances to this one, the Federal Circuit assessed the "substantial non-infringing use" question by focusing on: (1) the relevant additives "*as sold and delivered*" to the power plants in question; and (2) what the defendants would have known about the potential non-infringing uses of those additives *at the time when the plants in question received the additives that they purchased*. *Id.* In assessing this issue in the instant case, the Court has consistently drawn from the Federal Circuit's guidance in *Nalco*. And in doing so, it has focused on the actual accused products at issue—i.e., the accused coal "as sold and delivered" by CERT to the directly infringing power plants.[30]

---

[30] In its reply brief, CERT for the first time (such that Plaintiffs did not get to respond to it) posited a hypothetical, in order to demonstrate the "error" in limiting the non-

As a result, and for the reasons set out above, the Court concludes that there is substantial evidence that CERT's refined coal—as sold and delivered to the power plants at issue in this

---

infringing use inquiry to uses of the specific refined coal as made and sold by CERT to the specific accused power plants during the damages period. (D.I. 736 at 6-7) CERT's hypothetical involves a patented method for hardening plain brick mortar to make it more durable, in which a hardening agent is sprayed onto the exposed surface of wet mortar after it is laid; in some counties, local construction codes require this treatment. (*Id.* at 6) On jobsites utilizing the patented method, masonry contractors "sold and delivered" the mortar, and they would mix dry mortar with water and lay the mortar before it set; a painting contractor would then spray the hardening agent onto the surface of the mortar. (*Id.*) Once the mortar was mixed on a jobsite, it must be laid within an hour or it would set, so there was no other use for it. The patentee accused contractors at jobsites using the patented method of infringement, and accuses the masonry contractors of contributory infringement. In counties that do not require this treatment, the identical mortar is mixed and laid without the hardening agent—and thus does not infringe the patented method. (*Id.* at 6-7) CERT laments that under the Court's view of the substantial non-infringing use inquiry, however, only the mortar "as sold and delivered" to the *accused* jobsites can be considered, and there is no non-infringing uses for this mortar—even though it is a "ubiquitous staple article[,]" with "plain mortar [being] sold at every Home Depot in the country[.]" (*Id.* at 7)

The Court does not see why CERT's hypothetical demonstrates that "error" has occurred here. As an initial matter, the Court does not see what is the relevance to this hypothetical (and to the Court's decision) of the fact that "plain mortar [is] sold at every Home Depot in the country." If Home Depot was being accused of contributory infringement in this scenario, then such an accusation would seem not very likely to succeed—since Home Depot presumably sells plain mortar to innumerable customers (with large numbers of those customers presumably utilizing it in non-infringing ways) and presumably has very little idea of what use any particular customer is going to put the mortar to. The masonry contractors who are selling the mortar on the jobsites are the relevant comparators to the CERT entities here. As to them, it is not clear from CERT's hypothetical whether they only sold mortar to jobsites in counties with local construction codes requiring the patented treatment (i.e., directly infringing jobsites). Nor is it clear whether those contractors knew that the mixed mortar would always then have the hardening agent applied by painting contractors on the jobsites in question. If these masonry contractors only made sales to jobsites where the hardening agent was applied—and if it was clear that these contractors knew to a certainty that the hardening agent would be applied to the wet mortar at these sites after they sold the mortar and mixed it—then they might well be at risk of liability for contributory infringement. In the end, the Section 271(c) inquiry is about what the accused infringer knew when making a sale of the accused products at issue. 35 U.S.C. § 271(c). So a lot turns on what the accused products are, where and how the accused sales of those products are made, and what the accused infringer's mindset is at the time of those sales. And of course, here the Court is not dealing in hypotheticals—it is dealing with the actual evidence in this case, as set out at trial.

case—had no substantial non-infringing uses. *See Oak Indus., Inc. v. Zenith Elecs. Corp.*, 697 F. Supp. 988, 995 (N.D. Ill. 1988) (noting that "the fact variations which may invoke § 271(c) are [infinite] and that standards derived from a specific fact situation are necessarily suspect in other circumstances[,]" such that courts must therefore "ultimately, apply statutory language to a specific fact situation in light of the congressional purpose" which "accord[s] the patented owner a reasonable area of protection, and accord[s] others a reasonable latitude in pursuing the fruits of technological change").

### C. Willful infringement

"Willful infringement is a question of fact reviewed for substantial evidence following a jury trial." *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1353 (Fed. Cir. 2018). A determination of willful infringement requires a finding of "deliberate or intentional" infringement, and thus the plaintiff must show that "the accused infringer knew of the patent-in-suit, and knowingly or intentionally infringed the patent after acquiring that knowledge." *Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 440 (D. Del. 2023) (citations omitted); *see also Bayer HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021) ("Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness. Rather, willfulness requires deliberate or intentional infringement.").

CERT argues that the record does not support a finding of willful infringement because: (1) CERT was represented by counsel during the entire willfulness period, which begins here on June 29, 2020;[31] (2) during this time, CERT successfully moved to dismiss various amended

[31] The Court had previously dismissed Plaintiffs' claims of willful infringement pre-dating June 29, 2020 (i.e., the date when CERT received notice of the contents of Plaintiffs' FAC). (D.I. 279 at 41; D.I. 319 at 11)

complaints, with the Court staying the case for nearly a year as to CERT until the Court determined that Plaintiffs stated a viable claim for relief against it; (3) CERT served invalidity and non-infringement contentions, which suggests that it had a good faith belief that its behavior was not infringing; (4) Plaintiffs' prior complaints falsely alleged that CERT used activated carbon during the testing of refined coal, and "CERT could not have deliberately infringed based on conduct that CERT indisputably did not perform"; and (5) it was only in the 4AC filed in May 2022—after the conclusion of the refined coal program—that Plaintiffs adopted the infringement theory that was tried. (D.I. 719 at 18-19; *see also* D.I. 736 at 8-10)[32]

There is sufficient evidence on the record to support the jury's verdict of willful infringement. With respect to the fact that CERT was represented by counsel during the period of willfulness and that it served invalidity and non-infringement contentions in the case, "[w]hether [CERT's] conduct constituted willful infringement is an issue of fact for the jury, as is whether [CERT] subjectively held a good-faith belief in its non-infringement and invalidity defenses such that its conduct would not be deemed willful." *Hillman Grp., Inc. v. KeyMe, LLC*, CIVIL ACTION NOS. 2:19-CV-00209-JRG, 2:20-cv-00070-JRG, 2021 WL 1248180, at *2 (E.D. Tex. Mar. 30, 2021). As noted above, CERT did not offer any "evidence of specific legal opinions offered, the reasonableness of those opinions, or the reliance of CERT decision-makers on any such legal opinions." (D.I. 728 at 15) Moreover, with regard to CERT's invalidity and

[32] CERT also reiterates that as for contributory infringement, it had a good faith belief that it was making and selling refined coal that was not especially made or adapted for an infringing use and that had substantial non-infringing uses. (D.I. 719 at 19) With regard to induced infringement, CERT emphasizes that Plaintiffs identified no evidence that CERT instructed or encouraged power plants to use activated carbon. (*Id.* at 20) But the Court has already assessed (and rejected) these arguments in its above discussion of induced and contributory infringement. So it will not consider these arguments further here.

non-infringement contentions, CERT provides no evidence that the jury was ever even told of their existence. (*Id*. at 19) The jury was entitled to find that CERT did not hold a good faith belief in its defenses. Indeed, the Court notes that although CERT began the jury trial by informing the jury that it would prove that the patents were invalid, it did not end up pursuing its invalidity defense at trial. (Tr. (D.I. 781) at 218-21 (CERT's counsel asserting during its opening statement that it would show why the patents were invalid during the trial); Tr. (D.I. 785) at 1246 (CERT's counsel acknowledging during its closing statement that it ended up not pursuing its invalidity defense during the trial))

As for CERT's reliance on the fact that various amended complaints were dismissed, it is also true that:

> (1) When CERT received the original Complaint in July 2019, it learned of the '114 patent, and it learned that Plaintiffs were alleging, for example, that CERT operated refined coal facilities "that receive coal, add bromine and/or bromide such as $CaBr_2$ to the coal, and then provide that 'refined' coal to a coal-fired power plant that injects a sorbent material comprising activated carbon downstream of the combustion chamber" (and that CERT's conduct in this regard was intended to induce and/or contribute to the infringement of the power plants), (D.I. 1 at ¶¶ 152, 158; Tr. (D.I. 784) at 1104-05); and
>
> (2) CERT knew that the directly infringing power plants at issue in this case were using activated carbon before this lawsuit was filed, (Tr. (D.I. 783) at 866; Tr. (D.I. 784) at 882-84, 1104).

The jury could therefore have reasonably found that as of the timeframe at issue, "CERT did nothing to stop infringing even though it had all the evidence it needed to determine that the power plants were infringing[,]" (D.I. 728 at 18), and that the hundreds of millions of dollars that CERT earned in tax credits was motivation to continue infringing, (Tr. (D.I. 784) at 938-40 (CERT's representative being asked if "300 to $350 million in tax credits is a powerful motive to

keep selling refined coal after receiving the complaint" and responding that "[t]hat's a significant amount of money, yes")). *See, e.g.*, *Pantech Corp.*, 2024 WL 5510402, at *11 ("[A] reasonable jury could have found post-suit[] willfulness for the '954 patent given OnePlus's continued use of the standard essential technology even after it learned it was being accused of infringement.").[33]

Finally, CERT mischaracterizes the allegations in Plaintiffs' prior complaints by suggesting that the only conduct that was alleged therein to be infringing was CERT's use of activated carbon during certification testing of refined coal (an allegation later learned to be false). (*See* D.I. 728 at 19) But in these complaints, Plaintiffs *also* alleged that even if CERT did not learn of a power plant's use of activated carbon in connection with the testing process, it would "learn of the plant's use of activated carbon by working with the plant. . . . they would be able to witness activated carbon injection equipment and on-site activated carbon" and would also learn of "the plant's use of sorbent containing activated carbon through routine conversation and communications with individuals at the coal-fired power plant that are necessary to ensure coordination and smooth operation of the plant[.]" (D.I. 130 at ¶¶ 90-91; *see also* D.I. 281 at ¶¶

[33] The Court notes that the standard for finding willful infringement is different from that for finding enhanced damages. *Multimedia Techs. Pte. Ltd. v. LG Elecs. Inc.*, Case No. 2:22-cv-00494-JRG-RSP, 2025 WL 396766, at *2 (E.D. Tex. Jan. 27, 2025), *report and recommendation adopted*, 2025 WL 675446 (E.D. Tex. Mar. 3, 2025); *Med-El Elektromedizinische Gerate Ges.M.B.H. v. Advanced Bionics, LLC*, Case No. 1:18-cv-01530-JDW, 2024 WL 4371292, at *10 (D. Del. Oct. 2, 2024) (noting that the standard for awarding enhanced damages is "higher" than that necessary to establish willful infringement). While the conduct warranting enhanced damages is that which is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate[,]" *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (citation omitted), willful infringement, by contrast, is a question of fact merely requiring a finding of "deliberate or intentional infringement[,]" *id.* (citations omitted).

89-90) And, as discussed above, the evidence showed that CERT in fact did know that the directly infringing power plants used activated carbon at the time this lawsuit was filed.

For these reasons, CERT's arguments that the evidence is insufficient to support a finding of willfulness are not persuasive, and its Motion on this ground must be denied.

## IV. CONCLUSION

For the foregoing reasons, CERT's Motion is DENIED. An appropriate Order will issue.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) | |
| Defendants. | ) | |

**<u>ORDER</u>**

At Wilmington, Delaware this **25th day of September, 2025**:

For the reasons stated in the Memorandum Opinion issued this same date, IT IS HEREBY ORDERED that the CERT Defendants' Motion for Judgment as a Matter of Law of No Induced Infringement, No Contributory Infringement, and No Willful Infringement as to Plaintiffs' Claims for Infringement of the '114 and '517 patents, (D.I. 718), is DENIED.

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) | |
| Defendants. | ) | |

James M. Lennon and Peter Akawie Mazur, DEVLIN LAW FIRM LLC, Wilmington, DE; Bradley W. Caldwell, Warren J. McCarty, III, Justin T. Nemunaitis, Daniel R. Pearson, Adrienne R. Dellinger, Aisha M. Haley and Richard A. Cochrane, CALDWELL CASSADY CURRY P.C., Dallas, TX; Attorneys for Plaintiff Midwest Energy Emissions Corp.

Kenneth L. Dorsney and Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE; Jeff Dyess, Paul Sykes and Benn Wilson, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL; Jessica Zurlo, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., Attorneys for Defendants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC and Rutledge Products, LLC.

**MEMORANDUM OPINION**

November 20, 2025
Wilmington, Delaware

Christopher J. Burke
**BURKE, United States Magistrate Judge**

The Court[1] presided over a five-day jury trial in this patent infringement case from February 26, 2024 through March 1, 2024. (D.I. 779-85 (hereinafter, "Tr.")) At trial, Plaintiff Midwest Energy Emissions Corp. ("Midwest Energy") and then-Plaintiff MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C")[2] alleged that Defendants Bascobert (A) Holdings, LLC; Buffington Partners, LLC; Cottbus Associates, LLC; Larkwood Energy, LLC; Marquis Industrial Company, LLC; Rutledge Products, LLC; Senescence Energy Products, LLC and Springhill Resources, LLC (the "CERT RC Defendants"); CERT Operations II LLC; CERT Operations IV LLC; CERT Operations V LLC; and CERT Operations RCB LLC (the "CERT Operations Companies Defendants" and collectively with the CERT RC Defendants, "CERT" or the "CERT Defendants") indirectly and willfully infringed claims 25 and 26 of United States Patent No. 10,343,114 (the "'114 patent") and claims 1 and 2 of United States Patent No. 10,596,517 (the "'517 patent" and collectively with the '114 patent, the "asserted patents"). (D.I. 659, ex. 2 at ¶¶ 1-6; *id.*, ex. 3 at ¶ 1) At the end of trial, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs. (D.I. 692) Pending before the Court is CERT's Motion for a New Trial on the Issues of Induced Infringement, Contributory Infringement, Willful Infringement and Damages with Respect to Plaintiffs' Claims for

---

[1] The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 398)

[2] As the parties are aware, subsequent to trial, the Court granted CERT's motion to dismiss Plaintiff MES pursuant to Federal Rule of Civil Procedure 12(b)(1). (D.I. 788; D.I. 789) Because MES participated in the case up through and including the filing of the briefing on the instant Motion, and simply to avoid confusion, the Court will herein refer to "Plaintiffs" or to "Plaintiffs' position" on the relevant issues, even though there is currently only one Plaintiff (i.e., Midwest Energy) in the case.

Infringement of the Asserted Patents (the "Motion"). (D.I. 720) For the reasons set forth below, the Court DENIES the Motion.

## I. BACKGROUND

### A. Factual Background

This patent infringement case relates to mercury control at coal-fired power plants ("power plants"). The Court has set out the background of this case in its recent opinion regarding CERT's motion for judgment as a matter of law ("JMOL decision"), and it incorporates by reference the JMOL decision. (D.I. 791) The Court here writes primarily for the parties, and so any facts relevant to this Memorandum Opinion will be discussed in Section III below.

### B. Procedural Background

Following trial, the Court entered non-final judgments on the verdict against the CERT Defendants. (D.I. 697-708) Thereafter, the parties submitted numerous lengthy post-trial motions relating to the jury trial, including the instant Motion. (D.I. 716; D.I. 717; D.I. 718; D.I. 720; D.I. 763)[3] Briefing on the instant Motion concluded on May 17, 2024. (D.I. 737)

## II. LEGAL STANDARD

"[A]fter a jury trial," the Court may grant a new trial "to any party" on "all or some of the issues" for "any reason for which a new trial has heretofore been granted" in federal court actions at law. Fed. R. Civ. P. 59(a)(1)(A). Common reasons for granting a new trial include the

[3] CERT had also asserted that Plaintiffs' infringement claims are barred because CERT is entitled to an implied license to the asserted patents. (D.I. 515 at 112, at ¶ 16; D.I. 659, ex. 3 at 48 at ¶ 3(e)-(f)) On May 30, 2024, the Court held a bench trial regarding the implied license defense. (D.I. 779) The Court subsequently concluded that CERT failed to prove by a preponderance of the evidence that it has an implied license to the asserted patents. (D.I. 786)

Case: 26-1403 Document: 31 Page: 202 Filed: 02/25/2026

following circumstances: "(1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence exists that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent." *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775 (D. Del. 2015).

The decision of whether to grant a new trial is committed to the sound discretion of the district court. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, Civil Action No. 15-108-RGA, 2025 WL 959654, at *2 (D. Del. Mar. 31, 2025). Unlike the standard for judgment as a matter of law ("JMOL"), on a motion for a new trial, "the Court need not view the evidence in the light most favorable to the verdict winner." *Ateliers*, 85 F. Supp. 3d at 776. However, a new trial because the verdict is against the weight of evidence should only be granted where the record shows that the jury's verdict would result in a "miscarriage of justice[,]" the verdict "cries out to be overturned[,]" or where the verdict "shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).[4]

## III. DISCUSSION

With its Motion, CERT moves for a new trial on a vast number of different grounds, which can be generally grouped into six categories. First, CERT moves for a new trial on the jury's verdict for contributory infringement and induced infringement, respectfully, on the grounds that the jury instructions included prejudicial errors and that the verdict is against the clear weight of the evidence. (D.I. 721 at 1-8; D.I. 737 at 1-4) Second, CERT argues that a new

---

4 Regional circuit law governs the standard for ordering a new trial in a patent case. *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013).

trial is required on willful infringement because the jury's verdict is against the clear weight of the evidence. (D.I. 721 at 8-9; D.I. 737 at 4-5) Third, CERT argues that it is entitled to a new trial because the Court failed to provide a curative instruction regarding certain "Section 45" tax credits.[5] (D.I. 721 at 9-10; D.I. 737 at 5-6) Fourth, CERT contends that the trial record is based on multiple prejudicial evidentiary errors that require a new trial. (D.I. 721 at 10-17; D.I. 737 at 6-10) Fifth, CERT argues that a new trial on damages is warranted because the jury verdict is against the clear weight of the evidence. (D.I. 721 at 17-18) Sixth and finally, CERT moves for a new trial on infringement of claim 2 of the '517 patent, asserting that the jury's verdict is against the weight of the evidence. (*Id.* at 18-20; D.I. 737 at 10) Plaintiffs oppose the Motion, asserting that there is no basis for a new trial. (D.I. 727 at 1-20)

The Court will address each of CERT's arguments in turn below.

**A. Contributory Infringement**

With respect to contributory infringement, CERT contends that a new trial is warranted for two reasons. First, CERT argues that the jury instructions regarding contributory infringement contained prejudicial errors. (D.I. 721 at 1-3) Second, CERT argues that the jury's verdict is against the clear weight of the evidence. (*Id.* at 3-4) The Court takes up these two arguments below, in order.

**1. Jury Instructions Regarding Contributory Infringement**

CERT first argues that a new trial on contributory infringement is necessary because the Court erroneously instructed the jury that the plaintiff had to prove that "the defendant knew that the refined coal supplied to that power plant, *as sold and delivered during the damages period*, is

[5] The Court has previously described what Section 45 tax credits are, and how they relate to this case, in its JMOL decision, among other places. (D.I. 791 at 5 n.8)

not a staple article or commodity of commerce capable of substantial non-infringing use[.]" (*Id.* at 2 (emphasis added) (quoting D.I. 785 at 1295);[6] *see also* D.I. 737 at 1-2) According to CERT, the United States Court of Appeals for the Federal Circuit rejected a "narrowed" focus on accused products "as sold and delivered during the damages period" when evaluating substantial non-infringing uses—and the proper inquiry, instead, is whether the accused products can be used for purposes other than infringement. (D.I. 721 at 2-3) The Court's inclusion of the above-italicized language in the Court's instruction was prejudicial, according to CERT, because it caused the jury to ignore unrebutted evidence demonstrating that: (1) power plants other than the accused power plants used refined coal without activated carbon injection ("ACI"), both before and after the asserted patents issued; and (2) the accused power plants used refined coal without ACI prior to the issuance of the patents. (*Id.* at 3; D.I. 737 at 2) Had the jury considered this evidence, CERT says, it would have allowed them to return a verdict of no contributory infringement. (D.I. 721 at 3)[7]

---

[6] While the parties appear to cite to the rough versions of the jury trial transcript at nearly all times in their briefing, the Court herein cites to the final versions of the jury trial transcript that have been docketed.

[7] A litigant is not entitled to "a jury instruction of its choice, or precisely in the manner and words of its own preference." *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir. 1995). To obtain a new trial due to the content of jury instructions, the movant must prove that "the jury instructions read in their entirety were incorrect or incomplete as given." *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020) (internal quotation marks and citation omitted); *see also Fahie v. Virgin Islands*, 858 F.3d 162, 169 (3d Cir. 2017) ("The issue is whether, viewed in light of the evidence, the charge as a whole fairly and adequately submits the issues in the case to the jury.") (internal quotation marks and citation omitted). "Moreover, a jury verdict will [only] be set aside, based on erroneous jury instructions, if the movant can establish that those instructions were legally erroneous and that the errors had prejudicial effect." *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1278 (Fed. Cir. 2011) (internal quotation marks and citation omitted); *see also HQ Specialty Pharma Corp. v. Fresenius Kabi USA, L.L.C.*, C.A. No. 21-1714 (MN), 2025 WL 1825572, at *12 (D. Del. July 2, 2025). A party seeking to alter a judgment based on an

In its motion for JMOL, CERT argued that the Court was wrong to limit the substantial non-infringing use inquiry to whether the accused refined coal, as it was sold and delivered by Defendants to their power plant customers, could be used for purposes other than infringement. (D.I. 719 at 14-16; *see also* D.I. 721 at 2 (referring to CERT's opening brief in support of its motion for JMOL)) For the same reasons that the Court provided for not granting JMOL on that ground, the Court is not persuaded that the jury instruction at issue here was erroneous or prejudicial. (D.I. 791 at 33-40)

**2. Jury's Verdict as to Contributory Infringement**

CERT next contends that the jury's verdict as to contributory infringement is against the clear weight of the evidence, because the record shows that CERT believed and knew that refined coal was made and adapted *to qualify for Section 45 tax credits*—and not that it was made and adapted for an infringing use. (D.I. 721 at 3-4)[8] This is a rehash of CERT's argument in its motion for JMOL that the "record lacks substantial evidence that refined coal is 'especially made or especially adapted for use in an infringement' and that CERT knew that to be the case." (D.I. 719 at 12-14) For the reasons discussed in the JMOL decision, CERT's argument here is not persuasive. (D.I. 791 at 28-33); *see, e.g.*, *United States v. Gilead Scis., Inc.*, 722 F. Supp. 3d 458, 480 (D. Del. 2024) ("The Court has already found that substantial evidence supports the

---

erroneous jury instruction must establish that it made a proper and timely objection to such instruction, unless it can make a showing that the instruction contains plain error that affects substantial rights. *Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, C.A. No. 12-540-LPS, 2018 WL 1358814, at *4 (D. Del. Mar. 16, 2018); *see also* Fed. R. Civ. P. 51(d).

[8] CERT also argues that the jury's verdict is against the clear weight of evidence because "under the proper standard, refined coal has unrebutted substantial non-infringing uses[.]" (D.I. 721 at 3; *see also* D.I. 737 at 2) But for the reasons set out in the JMOL decision, the Court does not agree that it applied and/or instructed the jury with the incorrect standard for contributory infringement. (D.I. 791 at 33-40)

jury's verdict on invalidity. For the same reasons, the Court concludes that the jury's verdict was not against the weight of the evidence, even without viewing the evidence most favorably to Defendants."); *see also Aqua Connect, Inc. v. TeamViewer US, Inc.*, C.A. No. 18-1572-MN Consolidated, 2023 WL 6387791, at *14 (D. Del. Sept. 29, 2023).

**B. Induced Infringement**

With respect to induced infringement, CERT contends that a new trial is warranted because the jury instructions regarding induced infringement contained prejudicial errors. (D.I. 721 at 4-6) CERT then also argues that the jury's verdict as to this claim is against the clear weight of evidence. (*Id.* at 6-8) The Court addresses both arguments in turn below.

**1. Jury Instructions Regarding Induced Infringement**

CERT asserts that two aspects of the jury instructions on induced infringement require a new trial: (1) the failure to instruct the jury that CERT must actually encourage performance of each step of the asserted claims; and (2) the failure to instruct the jury that CERT's actions, as opposed to other factors, must have caused direct infringement. (*Id.* at 4-6) The Court does not agree.

**a. Requested Jury Instruction Regarding Encouragement**

As to the first issue, by way of background, at trial CERT had requested that for induced infringement, the jury be instructed that Plaintiffs must show that "the defendants encouraged the power plants to perform each and every step of the asserted claim." (D.I. 784 at 1155) But the Court's instruction already conveyed that Plaintiffs must prove that "the Defendant's actions actually caused the power plant to perform each and every step of the asserted claim"—and when discussing this issue with the Court during the trial, CERT agreed that *encouraging* the infringement is not a "separate requirement" from *causing* the infringement. (*Id.* at 1155-57; *see*

*also* D.I. 689 at § 4.3) Instead, CERT argued that its proposed addition should be included because "the feeling of encouragement has a *helpful gloss* to it[.]" (D.I. 784 at 1157 (emphasis added)) The Court declined to include CERT's requested instruction. (*Id.* at 1158) Now with its Motion, CERT argues that omitting the requested instruction was erroneous and prejudicial because: (1) the law is clear that to prove inducement, "the affirmative acts of alleged inducement must encourage the infringing acts" and (2) the instruction invited the jury to render a verdict of induced infringement "based solely on the sale of refined coal without the requisite evidence that any affirmative actions by CERT actually encouraged any power plant to perform each and every step of the asserted claims." (D.I. 721 at 5)

A new trial on these grounds is not warranted. The Court's instruction correctly states the law regarding induced infringement. *See, e.g.*, *Alpek Polyester, S.A. de C.V. v. Polymetrix AG*, 2021-1706, 2021 WL 5974163, at *8 (Fed. Cir. Dec. 16, 2021) ("To prove induced infringement, Alpek was required to show not only that Polymetrix intended to cause, but also that Polymetrix *did in fact cause*, IVP to infringe the patents-in-suit."); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1331 (Fed. Cir. 2016) ("[T]o prevail under a theory of indirect infringement, [plaintiff] must first prove that the defendants' actions led to direct infringement of the [patent-in-suit].") (quoting *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004)); *see also* (D.I. 784 at 1157 (CERT acknowledging that "encouragement is not a separate additional requirement for inducement" beyond the requirement that a defendant must cause the infringement)). Indeed, the Court's recitation of the elements of induced infringement largely tracked those in the Model Patent Jury Instructions of the American Intellectual Property Law Association ("AIPLA"), which is the authority that Defendants themselves utilized for their proposed induced infringement instruction. *See* AIPLA,

Model Patent Jury Instructions at § 3.8 (2019), *available at* https://www.aipla.org/docs/default-source/student-and-public-resources/publications/2019-11-13---aipla-model-patent-jury-instructions.pdf (listing as an element that the defendant "aided, instructed, or otherwise acted with the intent to cause acts by [alleged direct infringer] that would constitute direct infringement of the patent" without a separate "encouragement" requirement listed); (D.I. 659, ex. 22 at 31-32 & n.38); *see also HQ Specialty Pharma Corp. v. Fresenius Kabi USA, L.L.C.*, C.A. No. 21-1714 (MN), 2025 WL 1825572, at *12 (D. Del. July 2, 2025) (noting that it is unlikely that using a model jury instruction can constitute error) (citing cases).

In the end, then, CERT's desire for the Court to have adopted its proposed "helpful gloss" with regard to the instruction at issue is not a basis to order a new trial.

**b. Requested Jury Instruction Regarding Causation**

CERT also requested, over Plaintiffs' objection, that the induced infringement jury instruction convey that Plaintiffs must demonstrate that "the Defendant's actions, as opposed to other factors, actually caused the power plant to perform each and every step of the asserted claim[.]" (D.I. 659, ex. 22 at 36-37, 38-40 & n.44; D.I. 784 at 1159) The Court adopted the instruction but without the phrase "as opposed to other factors[.]" (D.I. 784 at 1159; D.I. 689 at § 4.3) CERT argues that declining to include this additional language was wrong and prejudicial because it permitted the jury to render a verdict in favor of Plaintiffs for induced infringement even though the record shows that other factors were the actual cause of the accused power plants' performance of certain steps of the asserted claims. (D.I. 721 at 6)

As the Court noted in rejecting CERT's position during trial—and as the Court further articulated in its JMOL decision—CERT has not persuaded it that there is a *sole* causation requirement for induced infringement. (*See* D.I. 727 at 8-9 & n.4; D.I. 784 at 1159; D.I. 791 at

24-27) The Court is therefore not convinced that failure to include "as opposed to other factors" in the jury instructions was error.

### 2. Jury's Verdict of Induced Infringement

CERT next contends that the jury's verdict of induced infringement is against the clear weight of the evidence, because there is "no evidence in the record that any CERT Defendant ever instructed a power plant to use ACI, conditioned the sale of refined coal on the use of ACI, or otherwise encouraged a power plant to begin using or continue to use ACI." (D.I. 721 at 7) Instead, according to CERT, the only evidence in the record is that CERT sold refined coal to power plants with knowledge that the power plants would also use ACI, which is insufficient as a matter of law to establish inducement. (*Id.*)

But as the Court explained in the JMOL decision, there *is* substantial evidence in the record supporting the jury's verdict of induced infringement. (D.I. 791 at 11-22) For the same reasons that the Court set out there for not granting JMOL, the Court will not grant CERT's motion for a new trial on this basis. *Gilead Scis., Inc.*, 722 F. Supp. 3d at 480; *Aqua Connect, Inc.*, 2023 WL 6387791, at *14.

## C. Willful Infringement

Next, CERT argues that if the Court determines that JMOL of no willful infringement is not warranted, then a new trial is required on willful infringement because the jury's verdict is against the clear weight of the evidence. (D.I. 721 at 8-9; D.I. 737 at 4-5) While a finding of willful infringement required the jury to find that CERT engaged in deliberate or intentional infringement, *see Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020), CERT argues that the record does not contain any evidence that it possessed the necessary "'bad state of mind'" for willfulness, (D.I. 721 at 8; *see also* D.I. 737 at 4-5). Here

again, CERT reiterates the same arguments that it made in its motion for JMOL regarding willful infringement. For the same reasons as discussed in the JMOL decision, a new trial on willfulness is not warranted. (D.I. 791 at 40-44)

**D. Request for Instruction Regarding Section 45 Tax Credits**

CERT next argues that it is entitled to a new trial because the Court's failure to provide a curative instruction regarding Section 45 tax credits was error. (D.I. 721 at 9-10; D.I. 737 at 5-6) On that front, CERT notes that Jeff Green (the past President and Vice President of Operations for the CERT Operations Companies Defendants, and the corporate representative for all of the CERT Defendants) testified—over CERT's objection—regarding the amount of money that the CERT entity that he owned made from Section 45 tax credits. (D.I. 783 at 839, 852-55, 857-60) CERT argues that the jury could have wrongly perceived this testimony regarding the economic value of selling refined coal as being relevant to the technological value of the asserted patents (i.e., relating to mercury reduction). (D.I. 721 at 9)[9] On this score, during trial CERT requested that the jury be instructed that the "damages award must not include the value of the tax credits" (the "tax credit instruction"). (D.I. 659, ex. 22 at 94-95; *see also* D.I. 784 at 1174-75) The Court, however, declined to include the tax credit instruction. (D.I. 784 at 1176-77) According to CERT, this left "the jury without guidance on a difficult economic distinction that pervaded the evidence throughout the trial[,]" which was highly prejudicial to CERT in that the jury's damages award "was orders of magnitude greater" than the amount of money that Plaintiffs licensed the asserted patents for in the absence of Section 45 tax credits. (D.I. 721 at 9-

[9] As the Court will explain further below, Mr. Green's testimony in this regard was relevant to issues such as his alleged bias and personal interest in the accused infringement, as well as to CERT's motivation/intent to indirectly infringe the asserted patents. (*See infra* at 30-31)

10; *see also* D.I. 737 at 5 ("CERT is entitled to a new trial because [of] the failure to instruct the jury to disregard testimony related to the value of Section 45 tax credits that was wholly irrelevant and prejudicial."))

This is not a basis to order a new trial either. As Plaintiffs point out, (D.I. 727 at 13), during the discussion of the tax credit instruction at the prayer conference (which took place after Jeff Green had testified), in ultimately declining to give the tax credit instruction, the Court noted that Plaintiffs' damages expert Mr. Philip Green[10] "wasn't talking about Section 45 tax credit value as a part of the calculus that he was making with regard to licensing[,]" (D.I. 784 at 1175). CERT's counsel there agreed that "tax credits [were] a very minimal at best part of" Philip Green's testimony. (*Id.* at 1177) Indeed, Philip Green testified that his damages opinion didn't have anything to do with Section 45 tax credits. (D.I. 783 at 831-32; *see also id.* at 805-06 (the Court sustaining Plaintiffs' objection when *CERT's counsel* was attempting to get Philip Green to discuss Section 45 tax credits)) Put another way, the Court determined that it did not make sense to specifically instruct the jury that they should apportion out the value of Section 45 tax credits from their damages analysis, when no one (including Plaintiffs' damages expert) had *even suggested* that such tax credits were relevant to the damages analysis in the first place.

In objecting to the Court's decision not to give this tax credit instruction during the prayer conference, CERT did not then (as it does now) argue that the instruction was necessary because of the testimony of *CERT representative Jeff Green*. (*See* D.I. 784 at 1175-77; D.I. 727 at 13) Federal Rule of Civil Procedure 51(c)(1) requires a party objecting to a jury instruction to

[10] Plaintiffs' damages expert (Philip Green) and the CERT Defendants' representative (Jeff Green) have the same last name. To avoid confusion, going forward the Court will try to make clear which Mr. Green it is talking about by using these witnesses' first name and last name.

"stat[e] distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1); *see also Palmer v. Hoffman*, 318 U.S. 109, 119 (1943) ("In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error."); *Lesende v. Borrero*, 752 F.3d 324, 335 (3d Cir. 2014) (explaining that such an objection "must be both cogent and specific to the alleged error"). CERT should have and could have explained *this* particular ground for the requested instruction during trial, but it failed to do so. Because CERT did not identify this specific ground during trial as a basis supporting the tax credit instruction at issue, CERT has waived this argument. *Cf. Alvarado v. City of Phila.*, 786 F. Supp. 3d 881, 897 (E.D. Pa. 2025) (finding that the defendants waived their argument that the failure to provide a particular jury instruction was error where, during trial, the defendants "did not address the distinct issues they had with this instruction").

However, even were the argument not waived, it would fail on the merits. The jury instructions conveyed that any damages award "must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused product, or other factors such as marketing or advertising, or a Defendant's size or market position" and that the appropriate royalty rate and royalty base would "reflect the value attributable to the patented invention alone." (D.I. 689 at § 5.3) With the jury therefore being appropriately instructed about its duty to apportion out value attributable to factors other than the patented invention—and with Plaintiffs' damages expert testifying that his opinion (and the licenses that it was based on) had nothing to do with the value of Section 45 tax credits—a new trial is not warranted because the Court declined to provide the tax credit instruction.

### E. CERT's Arguments Regarding Evidentiary Errors

CERT next contends that the trial record included multiple prejudicial evidentiary errors that require a new trial. (D.I. 721 at 10-17; D.I. 737 at 6-10) These purported errors relate to three general areas: (1) the testimony of Plaintiffs' technical expert Mr. Philip O'Keefe; (2) the testimony of Plaintiffs' damages expert Philip Green; and (3) the testimony of CERT representative Jeff Green about the money he received over the life of the refined coal program. (D.I. 721 at 10-17; D.I. 737 at 6-10) The Court takes these up one by one.

#### 1. Testimony of Plaintiffs' Technical Expert Mr. O'Keefe

CERT argues that a new trial is required due to the fact that Mr. O'Keefe provided certain testimony, which was unrelated to his qualifications and expertise as a mechanical engineer or otherwise improper. (D.I. 721 at 10-13; D.I. 737 at 6-7) CERT's objections here can be broken down into three broad categories, which the Court will address in turn below.

First, CERT challenges Mr. O'Keefe's testimony as to certain particular subject matter areas—areas that CERT also raised (to varying degrees of specificity) in its prior *Daubert* motion. With that motion, CERT had sought to exclude certain aspects of Mr. O'Keefe's expected trial testimony on similar grounds. (D.I. 721 at 11-12; D.I. 572; D.I. 528 at 34-45) The Court denied the motion in nearly all respects; it granted the motion only to the extent that it related to certain of Mr. O'Keefe's testimony about another's intent, motive or state of mind (the "*Daubert* decision"). (D.I. 613) During trial, the Court referred back to the substance of its *Daubert* decision as to these areas, noting that it had ruled therein that Mr. O'Keefe could testify

regarding evidence that sufficiently bears on the "operation of a coal-fired power plant[.]" (D.I. 783 at 608-10)[11]

CERT's third try to render Mr. O'Keefe unqualified to testify regarding these topics does not compel a different outcome. The Court denies CERT's Motion on this ground in significant part for the same reasons as it previously discussed in its lengthy ruling in the *Daubert* decision. As the Court noted then:

> As a general matter, these topics relate to systems and equipment, chemistry, and operations at coal-fired power plants, as well as compliance with applicable regulations at these plants. The Court agrees with Plaintiffs that Mr. O'Keefe's extensive background with power plant operations renders him qualified to apply his experience to the factual subject matters at issue, and that he is qualified to research systems that he did not personally use.

(D.I. 613 at 12); *see, e.g.*, *Ravgen, Inc. v. Lab'y Corp. of Am. Holdings*, Civil Action No. 6:20-cv-00969-ADA, 2025 WL 572753, at *2 (W.D. Tex. Feb. 12, 2025) ("A motion for a new trial should not be used as a vehicle to renew a *Daubert* challenge or relitigate matters the Court has already decided."); *Trs. of Columbia Univ. in City of N.Y. v. Gen Digit. Inc.*, Civil Action No. 3:13cv808, 2023 WL 8698906, at *2 (E.D. Va. Sept. 30, 2023) ("The bulk of Norton's Motion for a New Trial rehashes arguments previously made, often citing and incorporating its prior

---

[11] In their briefing on the Motion, Plaintiffs asserted that the Court could deny the Motion with respect to Mr. O'Keefe's testimony regarding mercury control systems and activated carbon injection systems, and as to Plaintiffs' damages expert Philip Green's testimony, on the ground that CERT did not lodge specific objections at trial regarding this testimony. (D.I. 727 at 15, 17-18 (citing cases)) However, even to the extent that CERT did not object at trial, CERT had filed *Daubert* motions on these grounds. Because CERT challenged this testimony at the *Daubert* stage and the Court ruled, the Court cannot agree with Plaintiffs that CERT has forfeited these arguments (except as to where, during trial, CERT expressly gave up its prior objections relating to Mr. O'Keefe's discussion of mercury emissions control systems and activated carbon injection systems, further discussed *infra*). (D.I. 737 at 6, 8); *see also* Fed. R. Evid. 103; *United States v. Brownlee*, 454 F.3d 131, 140 n.6 (3d Cir. 2006).

briefing on *Daubert* motions . . . . The Court has already considered and rejected those same arguments prior to and during trial, and Norton offers nothing further to suggest a different outcome post-trial. This alone supports a denial of the Motion for a New Trial."). That said, to the extent there is any further nuance to the issues CERT raises here and for sake of completeness, the Court will specifically address each subject matter area at issue below. In doing so, it will explain why the testimony at issue does not provide a basis to grant the Motion.

As to the portion of CERT's challenge regarding Mr. O'Keefe's testimony about "mercury emissions control" systems and "activated carbon injection systems," (D.I. 721 at 11), this evidence certainly relates to the "operation of a coal-fired power plant[.]" As the Court explained in the *Daubert* decision, Mr. O'Keefe: (1) had nearly 14 years of prior experience working at a coal-fired power plant, where he dealt with issues including emissions reduction and pollution control operations; and (2) continues to teach seminars regarding power plant operation. (D.I. 613 at 7-8 (citations omitted); D.I. 727 at 16) This amounted to sufficiently related experience to the matters at issue here to qualify Mr. O'Keefe as an expert. (D.I. 613 at 7-8; D.I. 727 at 16) And although Mr. O'Keefe did not work on *mercury reduction* techniques or the use of *ACI systems* during his prior power plant employment, experts are permitted to obtain some knowledge like this regarding the patented technology during their work on a case.[12] (D.I. 613 at 8-9 (citing cases); D.I. 727 at 16) Indeed, by the time of trial, CERT now *agreed* that Mr.

---

[12] On this score, as the Court noted in its *Daubert* decision, "Defendants' own expert Dr. Ni[ks]a appeared to testify that he learned everything he knew about the accused power plants (which utilized the accused technologies regarding mercury control) from Mr. O'Keefe's expert reports; Dr. Niksa described those reports as going into 'considerable detail [regarding] the application of calcium bromide and activated carbon in those power plants' and providing 'some information about which other air pollution control devices are used at those sites.'" (D.I. 613 at 9)

O'Keefe could properly testify about this type of evidence. There, CERT's counsel explained that if Mr. O'Keefe was "giving opinions on the direct infringement of a power plant, what do they put on the coal, how does the coal move through, how do they burn it, we're not going to cross him on those things. We're *not objecting* to him giving this testimony." (D.I. 782 at 557 (emphasis added); *see also id.* at 552) Therefore, even were there any merit to CERT's challenge as to this testimony, CERT waived it during trial. *See Pierce v. City of Phila.*, 811 F. App'x 142, 149 n.3 (3d Cir. 2020) (finding that plaintiff waived his assertion that the defendant's counsel made certain improper comments, where the defendant "withdrew these objections at trial").

CERT next challenges Mr. O'Keefe's testimony regarding "Section 45 Tax Credits[.]" (D.I. 721 at 11-12) At trial, when Plaintiffs' counsel began to ask Mr. O'Keefe about this subject matter, CERT's counsel lodged an objection. (D.I. 782 at 552-63) In discussing the objection with counsel, the Court noted that it would not permit Mr. O'Keefe to engage in any extended discussion about such tax credits, such as about the economics or tax-related policy behind the use of such credits—since that type of testimony would fall outside of the scope of his expertise. (*Id.* at 555, 561)[13] But the Court also noted that it was not in a position to rule that Mr. O'Keefe could make *no* mention of such tax credits *at all*, since CERT's receipt of such credits related to how and why it provided refined coal to the power plants at issue (and also to how and why CERT was alleged to have taken certain actions that caused the power plants to use

---

[13] Relatedly, when Mr. O'Keefe was later asked a question about the mechanics of how CERT partners received benefits from their investors relating to the building of the refined coal facilities, and CERT's counsel objected on the ground that this subject matter was "far afield from Mr. O'Keefe's technical expertise[,]" the Court sustained that objection and struck any answer the witness had provided. (D.I. 782 at 567)

the technology at issue in an infringing manner). (*Id*. at 561) After the Court resolved this objection, Plaintiffs' counsel (who noted that the jury had already heard about these tax credits from other witnesses), thereafter asked Mr. O'Keefe exactly two substantive questions about tax-credit-related subject matter—regarding what the tax credits were and when they went into effect. (*Id*. at 563-64, 638) Mr. O'Keefe answered those questions. (*Id.*) In light of the above, the Court cannot see how it was error to permit this (limited) testimony.[14] And even if it was, particularly in light of the fact that the jury had otherwise heard similar facts about such tax credits on many occasions without objection, (D.I. 782 at 329-30, 402, 437-39, 461, 473; D.I. 783 at 778-80), any such error would be harmless, *see Austin v. Cnty. of Northampton*, 630 F. App'x 163, 166 (3d Cir. 2015).

As for Mr. O'Keefe's testimony regarding "the requirements of MATS compliance,"[15] (D.I. 721 at 12), the testimony that CERT objects to here involved Mr. O'Keefe answering essentially two substantive questions, i.e.: (1) one answer that simply reminded the jury about what MATS standards are, (D.I. 782 at 563-64); and (2) one answer in which the witness stated that the power plants at issue burned refined coal with activated carbon to help meet these standards, (D.I. 783 at 644-45). (D.I. 721 at 12) It is true that Mr. O'Keefe did not have personal experience working with power plants regarding MATS compliance. (*Id.*) But this too

---

[14] Indeed, it seems possible that CERT may have given up on its objection to this aspect of Mr. O'Keefe's testimony, as in the relevant portion of its reply brief relating to Mr. O'Keefe's testimony, CERT no longer makes any explicit mention of Section 45 tax credits. (D.I. 737 at 6-8)

[15] The Court has previously described MATS and the requirements for MATS compliance, and how these concepts relate to this case, in its JMOL decision (among other places). (D.I. 791 at 11 n.14)

is subject matter that is closely related to the core of Mr. O'Keefe's testimony regarding power plants' use of refined coal (and how and why such coal is burned)—and is information that Mr. O'Keefe could understandably pick up through his work on this case. (D.I. 613 at 8-9) Moreover, the jury had previously heard similar testimony on this point from various other witnesses, without objection. (*See, e.g.*, D.I. 782 at 329-30, 462; D.I. 784 at 895, 897, 904, 908) And so again, even if the MATS-related testimony objected to here was somehow erroneously given, any error would be harmless.[16]

Lastly, CERT objects to Mr. O'Keefe's reference in his testimony to certain "coal supply agreements" between the power plants and certain Defendants (i.e. agreements wherein CERT entities, *inter alia*, agreed to provide refined coal to the power plants) and certain "indemnity agreements" (i.e., provisions in those coal supply agreements, whereby the CERT Defendants provided indemnity to power plants as to any later-arising claims of patent infringement against them). (D.I. 721 at 12) CERT's prior *Daubert* motion very briefly referenced the topic of indemnity provisions. (D.I. 528 at 43) The Court will address these two subjects now in turn.

With regard to the coal supply agreements, Mr. O'Keefe explained that he had familiarity and experience with such agreements during his prior employment at a power plant (in that he had run tests on coal samples in order to ensure that they complied with certain requirements in these types of coal supply contracts). (D.I. 783 at 652-53) Mr. O'Keefe was asked three

---

[16] In its *Daubert* decision, the Court also noted that to the extent that Mr. O'Keefe's prior, significant experience with pollution control at coal-fired power plants did not involve the reduction of *mercury emissions* from such plants, the use of *ACI*, or the implementation of *MATS regulations*, then a critique on that front might go to the weight the jury afforded to Mr. O'Keefe's testimony; the Court explained that CERT was free to cross-examine Mr. O'Keefe on these points. (D.I. 613 at 8, 10) At trial, CERT did just that. (D.I. 783 at 649-52, 656-58, 660-62)

questions about such agreements, to which he responded that: (1) he had reviewed the agreements as part of his work in the case; and (2) the agreements helped demonstrate that the relevant Defendants had in fact sold refined coal to certain plants (a fact that in turn, relates to an element of the contributory infringement inquiry). (*Id.* at 625-26) Mr. O'Keefe's background with coal-fired power plants and his familiarity with such contracts certainly rendered him qualified to provide this testimony.[17] *See Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, CIVIL ACTION NO. 2:22-CV-00125-JRG, 2023 WL 8260251, at *1-2 (E.D. Tex. Nov. 28, 2023) (rejecting the defendant's argument that the plaintiff's technical expert lacked qualifications to opine about a contract that the defendant required its customers to sign, where the expert "[wa]s certainly qualified to read the plain language of a contract").

As for Mr. O'Keefe's testimony regarding the indemnity agreements, he was asked a handful of questions about one such representative agreement. More specifically, Mr. O'Keefe was asked "[D]id the defendants provide or at least some of the defendants provide indemnity to the power plants[;]" after an objection from CERT's counsel that the Court overruled, Mr. O'Keefe responded "Yes, they did." (D.I. 783 at 641) Mr. O'Keefe was also shown an exemplary indemnity provision in a refined coal sales agreement, wherein he identified the relevant text at issue and explained who the parties to the agreement were. (*Id.* at 642) In addition, in discussing indemnity provisions generally, Plaintiffs' counsel asked Mr. O'Keefe "What does that mean?" to which Mr. O'Keefe responded:

> That means they were holding infringers of the patents-in-suit not responsible so they didn't have to deal with lawsuits or being sued or anything like that. So it gave them a license to infringe.

---

[17] Again, it may be that CERT has jettisoned its objection to this aspect of Mr. O'Keefe's testimony, since CERT makes no specific reference to "coal supply agreements" in the relevant portion of its reply brief relating to Mr. O'Keefe's testimony. (D.I. 737 at 6-7)

(*Id*. at 641)

The Court does not necessarily see anything objectionable to the questions and answers described above in which Mr. O'Keefe is simply confirming the existence of the indemnity agreements at issue. While Mr. O'Keefe did not have prior personal experience with negotiating indemnity provisions when he worked at a power plant, (*id.* at 653), he had reviewed such provisions in this case because they related to CERT's provision of refined coal to the power plants at issue, (*id*. at 609, 641). Simply noting that such provisions existed in the coal supply agreements, in and of itself, is not problematic. *See Entropic Commc'ns, LLC*, 2023 WL 8260251, at *1-2.

In contrast, with regard to the question and answer above wherein Mr. O'Keefe is asked what such provisions "mean," that exchange appears to cross the line into impermissible testimony about *the legal effect* of an indemnity provision—testimony that Mr. O'Keefe, who is not a lawyer and is also not the factfinder, was not qualified to give. *See id*. The problem for CERT there, however, is that it did not object again after this particular question was asked, nor after this answer was given. (D.I. 783 at 641) Had it done so, the Court would have sustained the objection. Indeed, in its *Daubert* motion, CERT had argued that a host of topics discussed in Mr. O'Keefe's expert report were improper; this included a brief assertion that possible future testimony about indemnity agreements would amount to Mr. O'Keefe providing inappropriate legal conclusions. (D.I. 528 at 43) In its *Daubert* decision, the Court did not specifically address this "legal conclusion" objection as it related to testimony regarding indemnity provisions. Instead, the Court noted that the following statement in Mr. O'Keefe's expert report was improper because it appeared to comment on another's state of mind: "[Receiving refined coal] with indemnity provisions in place. . . . would allow power plants to engage in infringing

conduct *with the expectation* that the power plant would face a diminished risk of infringement." (D.I. 613 at 14 (citation omitted) (emphasis added)) Otherwise, the Court explained that it was not practicable for it to engage in a line-by-line analysis of Mr. O'Keefe's expert report to identify any instance of possibly inappropriate trial testimony; instead, the Court urged CERT to "raise a contemporaneous objection to any such testimony" at trial if warranted. (*Id.* at 14 n.8) Yet when it came to the offending question and answer above, CERT did not do this. And so it has waived the ability to complain about testimony that it did not then object to. *See, e.g.*, *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'ns Sols., Inc.*, 684 F. Supp. 3d 316, 336 (E.D. Pa. 2023) ("Because Broadridge did not object to Mr. Miller's testimony regarding his general understanding of the contract and the meaning of 'commercially reasonable efforts,' the objection to Mr. Miller's testimony was waived."); *Express Mobile, Inc. v. GoDaddy.com, LLC*, 680 F. Supp. 3d 517, 529-30 (D. Del. 2023) (rejecting plaintiffs' argument that improper witness testimony required a new trial, where "the Court had clearly instructed Express Mobile during the pretrial conference that if it believed that Jarrett or Silva were asked . . . to render expert testimony during the trial, it would be incumbent upon Express Mobile to object at that time" but "Express Mobile still did not object to either witness's testimony as it was unfolding, as it was required to do").

Second, CERT complains that "Mr. O'Keefe was also permitted to give a narrative recasting of Plaintiffs' favored infringement evidence over CERT's objections." (D.I. 721 at 12 (citing cases)) This argument fails because all CERT cites in support of this position is 10 lines of the trial transcript, in which the Court was addressing an objection.[18] In the absence of CERT

[18] In the Court's *Daubert* decision, after Defendants had complained that Mr. O'Keefe's expert reports included long "fact-recasting narratives[,]" the Court noted that in

pointing to specific portions of Mr. O'Keefe's testimony that are purportedly objectionable in this regard, the Court cannot evaluate CERT's argument or grant it any relief.

Third, CERT argues in its opening brief that the Court erroneously permitted Mr. O'Keefe to testify "to the ultimate issue that CERT induced infringement, even though that necessarily includes an opinion on CERT's state of mind, *i.e.*, that CERT specifically intended to cause the power plants to infringe[.]" (*Id.* at 12-13) The objected-to testimony here involved Mr. O'Keefe's statements in which he: (1) stated that based on his review of the evidence, he believed that the respective CERT Defendants had engaged in induced (and contributory) infringement; and (2) listed some pieces of evidence that he had reviewed and found relevant to certain elements of the induced infringement inquiry. (D.I. 782 at 549; D.I. 783 at 637-45 (*cited in* D.I. 721 at 13)) In addressing this issue in its *Daubert* decision and during trial, the Court ruled, *inter alia*, that: (1) Mr. O'Keefe could not opine on CERT's intent, motive or state of mind, as such conclusions are within the province of the jury; (2) Plaintiffs should make clear in its questioning of Mr. O'Keefe that he is not and cannot be speaking to this issue of intent/state of mind; and (3) Mr. O'Keefe could otherwise testify about facts that might help demonstrate a party' state of mind, and he could otherwise provide his opinion that direct or indirect infringement has occurred as to the asserted claims (and why). (D.I. 613 at 12-14 (citing cases); D.I. 783 at 580-82 (*cited in* D.I. 721 at 13); *see also* D.I. 782 at 557-59; D.I. 783 at 592)

---

certain circumstances, it could be improper for an expert to engage in unnecessarily long summaries of the facts in evidence during trial. (D.I. 613 at 15 n.9 (citing cases)) But the Court explained that it would be premature to make any ruling as to Mr. O'Keefe's testimony on this basis, prior to observing that testimony at trial. (*Id.*) In the 10 lines of trial transcript referenced above by CERT, the Court was referring back to this portion of its *Daubert* decision—and noting that it would sustain an objection on this ground in the future if Mr. O'Keefe actually engaged in narrative recasting via his testimony (though the Court noted that it did not think "we've reached that point at this stage"). (D.I. 782 at 560-61)

In the Court's view, there was nothing inappropriate in drawing these lines, and Mr. O'Keefe's testimony here did not traipse over them. It is well-settled that expert testimony is admissible in patent cases to give an opinion on the ultimate question of infringement. *Snellman v. Ricoh Co.*, 862 F.2d 283, 287 (Fed. Cir. 1988); *Voxer, Inc. v. Meta Platforms, Inc.*, Case No. A-20-CV-00655-LY-SH, 2022 WL 3371634, at *3 (W.D. Tex. Aug. 16, 2022); *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, CIVIL ACTION NO. 2:16-CV-00134-JRG, 2017 WL 2844646, at *2 (E.D. Tex. May 19, 2017); *see also* Fed. R. Evid. 704(a). As such, it is not unusual in our Court for an expert to opine that "the defendant has committed direct infringement" or "the defendant has committed induced infringement" or "the defendant has committed contributory infringement," or words to that effect. That said, as the Court repeatedly noted in its *Daubert* decision and in responding to objections at trial, an expert may not specifically opine on a party's intent or state of mind (which is, to be sure, an element of induced and contributory infringement)—and it should be made clear to the jury that the expert has no opinion on *that* subject/element of the inquiry. (D.I. 613 at 13 (citing cases); *cf. GREE, Inc. v. Supercell Oy*, Case No. 2:19-cv-00070-JRG-RSP, 2020 WL 4288350, at *3 (E.D. Tex. July 27, 2020) ("To the extent that Dr. Akl, Mr. Friedman, or Dr. Zagal provides opinions regarding underlying facts that may show a party's state of mind, those opinions are proper. . . . However, it is improper for Dr. Akl to opine that 'Supercell actively and *intentionally* induced' infringement, and thereby opine as to the ultimate issue of *intent* reserved for the factfinder.") (emphasis added); *Smith & Nephew, Inc. v. Interlace Med., Inc.*, No. CIV.A. 10-10951-RWZ, 2012 WL 3560811, at *3 (D. Mass. Aug. 17, 2012) (denying a defendant's motion seeking to preclude the plaintiff's experts from offering an opinion on the ultimate issue of induced or contributory infringement, in light

of the plaintiff's assurances that the witnesses would provide only factual testimony from which the jury may or may not infer the defendant's state of mind).

Plaintiffs followed that guidance here. Mr. O'Keefe was not permitted to give testimony about CERT's intent or state of mind as it relates to the indirect infringement allegations, and he did not do so. Additionally, in his direct examination, Plaintiffs' counsel emphasized to the jury (via his questioning of Mr. O'Keefe) that he could not "ask [Mr. O'Keefe] what any Defendant knew or what was in someone else's state of mind" because that is "solely for the jury to decide"—and Mr. O'Keefe agreed that this was so. (D.I. 783 at 628-29) And the Court otherwise policed this line throughout the trial. In the few instances where Mr. O'Keefe was asked other types of questions that might have called for him to provide an answer touching on CERT's state of mind, the Court sustained CERT's objections to such questions—and the questions were either withdrawn or any answer was stricken. (D.I. 782 at 551; D.I. 783 at 630) Similarly, after Plaintiffs prepared draft slides that they were going to use with Mr. O'Keefe—slides that might have wrongly suggested that Mr. O'Keefe was going to give an opinion as to CERT's state of mind regarding the indirect infringement inquiries—the Court directed that the slides be edited to remove that content. (D.I. 782 at 575-76; D.I. 783 at 581-82, 592-94) In the end, Mr. O'Keefe did not provide testimony as to CERT's state of mind, and the Motion should not be granted on this ground.[19]

For all of the reasons discussed above, the Court concludes that Mr. O'Keefe's testimony is not a basis on which to grant CERT's Motion.

---

[19] Once again, here it is possible that CERT has abandoned this argument, because in its reply brief, when discussing Mr. O'Keefe's testimony, CERT makes no reference to it. (D.I. 737 at 6-7)

### 2. Testimony of Plaintiffs' Damages Expert Philip Green

CERT's next challenge is to the testimony of Plaintiffs' damages expert Philip Green. CERT asserts that Philip Green erroneously testified by using an unreliable methodology in two ways: (1) he derived a reasonable royalty from license agreements (the "Chem-Mod licenses") that were not sufficiently technologically or economically comparable, *see ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010); and (2) he did not properly apportion the value of the Chem-Mod licenses to the accused technology. (D.I. 721 at 13-15; D.I. 737 at 8) As CERT notes, it previously moved to exclude this testimony in a *Daubert* motion (the "Green *Daubert* motion"), (D.I. 571; D.I. 528 at 45-50 (*cited in* D.I. 721 at 13)), which the Court denied (the "Green *Daubert* opinion"), (D.I. 627).[20] This portion of CERT's Motion is another rehash of the arguments made in the Green *Daubert* motion. And the Court is not persuaded that its prior rulings were wrong.

To explain why, the Court begins by addressing CERT's position that the Chem-Mod licensed patents were not technologically comparable to the patents-in-suit. Philip Green found that there was technological comparability by relying on the testimony of Mr. O'Keefe, Plaintiffs' technical expert. (*See* D.I. 627 at 4-5) Now it is true that, as CERT notes, at one point on cross-examination, Mr. O'Keefe responded "[n]o, they're not" when asked if the Chem-Mod patents were "technically comparable" to the asserted patents. (D.I. 783 at 679-80; *see also* D.I. 721 at 14) But in that same discussion, Mr. O'Keefe quickly added that he believed that the Chem-Mod patents "achieve the same result" as do the patents-in-suit. (D.I. 783 at 679-80) And

[20] CERT moved for reconsideration, (D.I. 639), and the Court denied that motion as well, (D.I. 677). CERT's motion for reconsideration was focused on its assertion that Philip Green erroneously based his royalty opinions on the value of tax credits. (D.I. 639 at 6-7)

elsewhere, Mr. O'Keefe provided some explanation about what each Chem-Mod patent covered and why all such patents relate to "mercury removal from power plant emissions"—a fairly specific field of technology, and one that Mr. O'Keefe noted was in the "same field of technology" as the asserted patents. (*Id.* at 646-47, 716-17, 743; *cf.* D.I. 627 at 3-6 (citing cases)) And so despite his brief response to that one question on cross, Mr. O'Keefe otherwise did provide a sufficient basis for Philip Green to consider the Chem-Mod licenses to be technologically comparable to the patents-in-suit. *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020); *see also Willis Elec. Co. v. Polygroup Ltd.*, Case No. 15-cv-3443 (JNE/DTS), 2024 WL 3102257, at *11 (D. Minn. June 24, 2024) (noting that the "degree of comparability between license agreements . . . is a factual issue best resolved by the jury" and concluding that where "the patentee's expert provides some explanation of why she viewed certain licenses as [technologically] comparable, and the accused infringer has an opportunity to challenge that testimony through cross-examination and contrary evidence, the jury's damages award should not be disturbed simply because it rests in part on licenses that are not perfectly analogous").

CERT next argues that Philip Green did not sufficiently explain how the Chem-Mod licenses were economically comparable to the type of patent license that would come out of the hypothetical negotiation here. (D.I. 721 at 14-15) More specifically, CERT asserts that these licenses should not have been utilized because (unlike as to a hypothetical negotiation between Plaintiffs and CERT): (1) these Chem-Mod agreements involved a closed "common structure" of companies, and were a part of a larger plan to earn and obtain Section 45 tax credits; and (2) these agreements included other distinguishing features, such as the provision of certain engineering, technical, financial and business support. (*Id.* at 14) But in the Green *Daubert*

opinion, the Court explained why Philip Green had taken steps in his use of the licenses to account for the concerns that CERT raises here. (D.I. 627 at 6-9) And during trial, Philip Green provided testimony explaining why the economic structure of these agreements would have been similar to that of any license arising out of the hypothetical negotiation. (D.I. 783 at 746-47) CERT's briefing as to this argument, (D.I. 721 at 14), which does not cite to any portion of the trial transcript—and instead cites only to a part of the record at the summary judgment/*Daubert* stage—gives the Court no reason to revisit its prior *Daubert* decision on this score,[21] *see, e.g.*, *Trs. of Columbia Univ. in City of N.Y.*, 2023 WL 8698906, at *3.

Lastly, CERT argues that Philip Green did not sufficiently apportion the value of the Chem-Mod licenses to the patented technology, in that: (1) he assigned the entire Chem-Mod licenses to mercury emission reduction technology alone; when (2) those licenses provided additional benefits that have nothing to do with the patented technology, such as "technology for NOx reduction and consulting and business services relating to Section 45[.]" (D.I. 721 at 15; D.I. 783 at 746-47, 777-79) As with the prior argument above, CERT's position here is unchanged from the argument it made at the *Daubert* stage (and CERT cites only to the record at that stage—not to any relevant testimony from trial). (D.I. 721 at 15) Again, the Court sees no reason to depart from its contrary view set out in the Green *Daubert* opinion. (D.I. 627 at 9-11; *see also* D.I. 727 at 18 (citing D.I. 783 at 779)); *see, e.g.*, *Trs. of Columbia Univ. in City of N.Y.*, 2023 WL 8698906, at *3.

For these reasons, CERT's Motion is denied to the extent that it is premised on these alleged damages-related errors.

---

[21] In its reply brief, CERT does not raise the economic comparability issue, (D.I. 737 at 8); so again, it is unclear as to how hard CERT is really pressing that issue here.

### 3. Testimony of Jeff Green

Next, CERT argues that the Court erred in allowing its representative Jeff Green to testify (over CERT's objection) that the CERT entity that he owns has received approximately $50 million during the refined coal program. (D.I. 721 at 15-17 (citing D.I. 783 at 852-55, 857-60)) According to CERT, the testimony at issue was irrelevant, and its admission was prejudicial because: (1) it is improper to admit overall revenues associated with an infringing product without satisfying the entire market value rule (i.e., by showing that the patented features drive demand for the entire product), which Plaintiffs did not do here; and (2) it caused the jury to base its damages award on the lucrative nature of the Section 45 tax credit program. (*Id.* at 16-17)

The Court declines to order a new trial on this ground. While CERT speculates that the jury relied on this testimony in calculating the appropriate amount for its total damages award, CERT does not point to any portion of the record wherein Philip Green or Plaintiffs referred to this amount in relation to Plaintiffs' request for damages. (*See* D.I. 727 at 19) As Plaintiffs retort, the testimony at issue is not relevant to damages. But it *is* relevant instead to Jeff Green's[22] alleged bias and personal interest in the accused infringement, as well as to CERT's asserted motivation/intent to indirectly infringe the asserted patents. (*Id.*; D.I. 791 at 22-23 (the Court, in its JMOL decision, explaining why CERT's financial motives to infringe could be relevant to the intent to induce infringement) (citing cases); *see also* D.I. 624; D.I. 628); *cf. Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009)

---

[22] The Court is puzzled by CERT's argument that "neither Mr. [Jeff] Green nor the LLC of which he is the owner is a party to this case[,]" and that this helps to demonstrate that the testimony at issue was irrelevant. (D.I. 721 at 16) Jeff Green was the corporate representative for each of the CERT Defendants; he spoke for them in Court, and his intent was their intent for purposes of this trial. (D.I. 727 at 19) In that way, Jeff Green *was* the CERT Defendants.

(agreeing that the defendant's references to plaintiff's wealth had a "proper use[]" in proving the bias of plaintiff's witnesses).

**F. Jury's Verdict Regarding Damages**

CERT also argues that a new trial on damages is warranted because the jury verdict is against the clear weight of the evidence. (D.I. 721 at 17-18) The jury's award of over $57 million dollars was based on Plaintiffs' highest requested basis for damages—i.e., a calculation that utilized a rate of $1 per ton of refined coal. (*See* D.I. 783 at 769; D.I. 785 at 1218; D.I. 692 at 8) Philip Green's damages analysis in this regard made use of the Alistar license agreement (containing a running royalty of $1 per ton of coal) as well as the Chem-Mod licenses discussed above (containing running royalties of $0.50 to $0.65 per ton of coal). (D.I. 783 at 737-48) CERT contends that the Alistar license should not be accorded any weight because it is a "litigation settlement entered into by a fellow defendant on the eve of trial years after the date of the hypothetical negotiation including patents not at issue here[.]" (D.I. 721 at 17) As for the Chem-Mod licenses, CERT reiterates its arguments discussed and rejected above. (*Id.* at 17-18) CERT then argues that the jury should have awarded a royalty rate "of at most tenths and down to hundredths or thousandths of a penny per ton of coal" in light of certain licenses of record that CERT favors: i.e., lower-value licenses that Plaintiffs entered into with several utility operators that were former Defendants in the case. (*Id.* at 18)

This argument is also unavailing. Based on evidence in the record, the jury could reasonably have credited the Alistar license and Chem-Mod licenses over the other licenses—and thus agreed with Plaintiffs that the other licenses were less useful, since, *inter alia*, they were with power plants that were also simultaneously agreeing to purchase certain products from Plaintiffs. (*See, e.g.*, D.I. 782 at 393, 425-26, 472; D.I. 783 at 737-43; *see also* D.I. 727 at 14)

There is simply no basis to disturb the jury's damages award on this ground. *See Willis Elec. Co.*, 2024 WL 3102257, at *13 (explaining that the jury's decision to credit the plaintiff's expert's damages methodology over the defendant's expert's testimony and other contrary evidence "was within its proper fact-finding role and does not warrant overturning the verdict"); *see also Mass Engineered Design, Inc. v. Planar Sys., Inc.*, Case No. 3:16-cv-1510-SI, 2017 WL 11820360, at *12 (D. Or. Aug. 31, 2017) ("If the settlement agreements involve the same technology, involve settlements relating to the value of the patented technology, were reached after a determination of liability, or have other indicia of reliability, then proper jury instructions, admissible evidence, and argument are sufficient to enable the jury to arrive at a fair damages award, should the jury find infringement."); *Intell. Ventures I LLC v. Symantec Corp.*, C.A. No. 10-1067-LPS, 2016 WL 937220, at *4 (D. Del. Mar. 10, 2016) ("Mr. Wagner and Dr. McDaniel presented substantial evidence that the settlement agreements 'relate to the actual patents-in-suit' or are 'drawn to related technology,' . . . and thus are sufficiently comparable to be used as the basis for determining an appropriate royalty rate.").

**G. Direct Infringement of Claim 2 of the '517 Patent**

Finally, CERT moves for a new trial on infringement of claim 2 of the '517 patent. Here, CERT asserts that the jury's verdict is against the weight of the evidence. (D.I. 721 at 18-20; D.I. 737 at 10) Claim 2 of the '517 patent depends from claim 1, which requires, *inter alia*, "combusting coal in a combustion chamber . . . to form the mercury-containing gas[.]" (D.I. 751, PTX-003.0040) Claim 2 then recites "[t]he method of claim **1**, further comprising injecting an alkaline sorbent into the mercury-containing gas stream." (*Id.*)

CERT interprets claim 2 as requiring the alkaline sorbent to be injected into the mercury-containing gas *after* the coal has been combusted in the combustion chamber. (D.I. 721 at 19;

D.I. 737 at 10) According to CERT, Mr. O'Keefe's testimony established that claim 2 was not infringed, (D.I. 721 at 19), because:

- Mr. O'Keefe testified that S-Sorb is the "alkaline sorbent" required by claim 2. (D.I. 783 at 615-16);
- It is undisputed that S-Sorb is a powder that CERT applied to feedstock coal during the refining process, i.e., *before* the coal is combusted in the combustion chamber. (*Id.* at 615-16, 663-64; D.I. 784 at 992-93);
- Mr. O'Keefe testified that S-Sorb is not injected into the mercury-containing gas. (D.I. 783 at 663-64)

Thus, CERT argues that there is no evidence that S-Sorb was injected into the mercury containing gas after the coal has been combusted in the combustion chamber as required by claim 2; therefore, it argues that the jury's verdict of infringement is against the clear weight of the evidence and promotes a manifest injustice. (D.I. 721 at 19)[23] Additionally, CERT contends that a new trial is required regarding damages as well. This is purportedly because the damages award was based on a finding of infringement of all four asserted claims, including claim 2 of the '517 patent—and so the jury may have rested some part of its damages award on a finding of infringement of claim 2. (*Id.* at 19-20; D.I. 737 at 10)

Plaintiffs retort that the scope of claim 2 of the '517 patent permits adding the alkaline sorbent (i.e., S-Sorb) to the coal *before* it is combusted. (D.I. 727 at 20) Plaintiffs thus argue that Mr. O'Keefe's testimony regarding infringement was consistent with this understanding and provided sufficient evidence to support the jury's decision as to direct infringement of the claim. (*Id.*)

---

[23] "There can be no inducement or contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004).

As an initial matter, the Court notes that after years of litigation, it believes that this is the first it is hearing about CERT's non-infringement position regarding this particular portion of claim 2 of the '517 patent. Neither party sought to construe any of the words found in claim 2 at the *Markman* hearing, (*see* D.I. 392), nor anytime thereafter prior to the close of trial. At trial, although it appears that CERT's counsel asked Mr. O'Keefe a few questions about this claim language during cross-examination, (D.I. 783 at 663-64), so far as the Court can tell, CERT never raised this particular non-infringement argument to the jury during its closing argument, (*see, e.g.*, D.I. 785 at 1232-33). Thus, when it came to any words in the claims that were not construed by the Court (like the words in claim 2), the jury was simply instructed to apply the plain and ordinary meaning that such terms would have to a person of ordinary skill in the art. (D.I. 689 at § 3.3; D.I. 785 at 1288)

The problem with CERT's argument is that it rests on an asserted claim construction dispute—i.e., what is the meaning of "injecting an alkaline sorbent into the mercury-containing gas stream" in claim 2, and does it encompass a scenario wherein the sorbent is placed onto coal upstream of the combustion chamber? (*See* D.I. 737 at 10) But it is well-settled that "where the parties and the district court elect to provide the jury only with the claim language itself, and do not provide an interpretation of the language in the light of the specification and the prosecution history, it is too late at the [post-trial briefing] stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation." *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003); *see also, e.g.*, *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1311-12 (Fed. Cir. 2017) (rejecting the defendant's assertion that there was insufficient evidence for the jury to find that a particular limitation of the asserted claims was met, where the

jury was instructed to apply the plain and ordinary meaning of claim terms, because neither party asked for a construction of the term at issue and because if the defendant had desired a narrower definition, it could have and should have sought such a construction earlier in the case); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008) ("Qualcomm here has failed to offer its proposed construction of 'networks' at or prior to trial, and we reject such arguments raised for the first time after the jury verdict.").

As was noted above, CERT did not seek claim construction regarding claim 2 of the '517 patent before trial or during trial. This was so even though it was clear that Plaintiffs and Mr. O'Keefe: (1) were relying on S-Sorb being applied to coal before it enters the boiler as an act that would infringe claim 2; and (2) did not agree that in order to infringe the '517 patent, the sorbents had to be injected downstream of the boiler. (D.I. 783 at 615-16, 663-64) "When a claim phrase is not construed, we defer to the jury's view of the claim element unless that view is contrary to the only reasonable view of the claim element." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1341 (Fed. Cir. 2023). And although there could be some merit to CERT's belated claim construction position, at this point, the Court cannot conclude that it was absolutely unreasonable for the jury to find that "[b]ecause S-Sorb is applied to the coal before it is pulverized, and because the boiler undeniably includes mercury-containing gas, each of the directly infringing power plants inject an alkaline sorbent into a mercury[-]containing gas as required by" claim 2 of the '517 patent. (D.I. 727 at 20); *see also Moskowitz Fam. LLC v. Globus Med., Inc.*, CIVIL ACTION NO. 20-3271, 2024 WL 3792390, at *3-7 (E.D. Pa. Aug. 13, 2024) (denying plaintiff's JMOL motion or alternative motion for a new trial, where the plaintiff did not raise any claim construction issues regarding the "cooperating" claim limitation prior to or during trial, such that the term at issue was given its plain and ordinary meaning to a person of

skill in the art—and doing so on the ground that there was sufficient evidence from which a jury reasonably could find infringement based on that plain and ordinary meaning); *see also Comcast IP Holdings I LLC*, 850 F.3d at 1311-12.

CERT's Motion is therefore denied on this ground.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that CERT's Motion should be DENIED. An appropriate Order will issue.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) | |
| Defendants. | ) | |

**ORDER**

At Wilmington, Delaware this **20th day of November, 2025**:

For the reasons stated in the Memorandum Opinion issued this same date, IT IS HEREBY ORDERED that the CERT Defendants' Motion for a New Trial on the Issues of Induced Infringement, Contributory Infringement, Willful Infringement and Damages with Respect to Plaintiffs' Claims for Infringement of the Asserted Patents, (D.I. 720), is DENIED.

Christopher J. Burke
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

8210796

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

February 9, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *10,343,114*
ISSUE DATE: *July 9, 2019*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

John Burson
Certifying Officer

UNITED STATES PATENT AND TRADEMARK OFFICE
DEPARTMENT OF COMMERCE

Plaintiff's Exhibit
ME2C v. AJG
**PTX-001**
No. 1:19-cv-01334-CJB

US010343114B2

(12) **United States Patent**
**Olson et al.**

(10) **Patent No.: US 10,343,114 B2**
(45) **Date of Patent: *Jul. 9, 2019**

(54) **SORBENTS FOR THE OXIDATION AND REMOVAL OF MERCURY**

(71) Applicant: **Midwest Energy Emissions Corp**, Lewis Center, OH (US)

(72) Inventors: **Edwin S. Olson**, Grand Forks, ND (US); **Michael J. Holmes**, Thompson, ND (US); **John H. Pavlish**, East Grand Forks, MN (US)

(73) Assignee: **Midwest Energy Emissions Corp**, Lewis Center, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/978,760**

(22) Filed: **May 14, 2018**

(65) **Prior Publication Data**

US 2018/0257031 A1 Sep. 13, 2018

**Related U.S. Application Data**

(60) Continuation-in-part of application No. 15/295,594, filed on Oct. 17, 2016, which is a continuation of (Continued)

(51) **Int. Cl.**
***B01D 53/64*** (2006.01)
***B01J 20/34*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. ***B01D 53/64*** (2013.01); ***B01D 53/10*** (2013.01); ***B01D 53/346*** (2013.01); ***B01D 53/83*** (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,984,164 A 12/1934 Stock
2,317,857 A 4/1943 Soday
(Continued)

FOREIGN PATENT DOCUMENTS

CA 1099490 A 4/1981
CA 2150529 A1 12/1995
(Continued)

OTHER PUBLICATIONS

"U.S. Appl. No. 10/554,018 Response filed Nov. 1, 2010 to Final Office Action dated Apr. 27, 2010", 17 pgs.
(Continued)

*Primary Examiner* — Amber R Orlando
(74) *Attorney, Agent, or Firm* — Schwegman Lundberg & Woessner, P.A.

(57) **ABSTRACT**

A promoted carbon and/or non-carbon base sorbent are described that are highly effective for the removal of mercury from flue gas streams. The promoted sorbent comprises a carbon and/or non-carbon base sorbent that has reacted with and contains forms of halogen and halides. Optional components may be added to increase and/or preserve reactivity and mercury capacity. These may be added directly with the base sorbent, or in-flight within a gas stream (air, flue gas, etc.), to enhance base sorbent performance and/or mercury capture. Mercury removal efficiencies obtained exceed conventional methods. The promoted sorbent can be regenerated and reused. Base sorbent treatment and preparation methods are also described. New
(Continued)






ME2C-RC-00074476

PTX-001.0002

methods for in-flight preparation, introduction, and control of the active base sorbent into the mercury contaminated gas stream are described.

**30 Claims, 6 Drawing Sheets**

**Related U.S. Application Data**

application No. 14/102,896, filed on Dec. 11, 2013, now Pat. No. 9,468,886, which is a continuation of application No. 12/429,058, filed on Apr. 23, 2009, now Pat. No. 8,652,235, which is a continuation-in-part of application No. 12/201,595, filed on Aug. 29, 2008, which is a division of application No. 11/209,163, filed on Aug. 22, 2005, now Pat. No. 7,435,286.

(60) Provisional application No. 60/605,640, filed on Aug. 30, 2004.

(51) **Int. Cl.**

| | |
|---|---|
| ***B01J 20/22*** | (2006.01) |
| ***B01J 20/28*** | (2006.01) |
| ***B01J 20/20*** | (2006.01) |
| ***B01J 20/12*** | (2006.01) |
| ***B01J 20/10*** | (2006.01) |
| ***B01J 20/04*** | (2006.01) |
| ***B01J 20/02*** | (2006.01) |
| ***B01D 53/34*** | (2006.01) |
| ***B01D 53/83*** | (2006.01) |
| ***B01D 53/96*** | (2006.01) |
| ***B01D 53/10*** | (2006.01) |

(52) **U.S. Cl.**

CPC ............ ***B01D 53/96*** (2013.01); ***B01J 20/027*** (2013.01); ***B01J 20/0262*** (2013.01); ***B01J 20/04*** (2013.01); ***B01J 20/041*** (2013.01); ***B01J 20/043*** (2013.01); ***B01J 20/10*** (2013.01); ***B01J 20/106*** (2013.01); ***B01J 20/12*** (2013.01); ***B01J 20/20*** (2013.01); ***B01J 20/223*** (2013.01); ***B01J 20/28004*** (2013.01); ***B01J 20/3416*** (2013.01); *B01D 2251/108* (2013.01); *B01D 2253/102* (2013.01); *B01D 2257/602* (2013.01); *B01D 2258/0283* (2013.01); *B01D 2259/128* (2013.01); *B01J 2220/42* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 3,194,629 | A | 7/1965 | Dreibelbis et al. | |
| 3,341,185 | A | 9/1967 | Kennedy, Sr. | |
| 3,662,523 | A | 5/1972 | Revoir et al. | |
| 3,786,619 | A | 1/1974 | Melkersson | |
| 3,826,618 | A | 7/1974 | Capuano | |
| 3,849,267 | A | 11/1974 | Hilgen et al. | |
| 3,876,393 | A | 4/1975 | Kasai et al. | |
| 3,935,708 | A | 2/1976 | Harrewijne et al. | |
| 4,013,516 | A | 3/1977 | Greenfield et al. | |
| 4,094,777 | A | 6/1978 | Sugier et al. | |
| 4,101,631 | A | 7/1978 | Ambrosini et al. | |
| 4,196,173 | A | 4/1980 | DeJong et al. | |
| 4,338,896 | A | 7/1982 | Papasideris | |
| 4,342,192 | A | 8/1982 | Heyn et al. | |
| 4,500,327 | A | 2/1985 | Nishino et al. | |
| 4,530,765 | A | 7/1985 | Sabherwal | |
| 4,699,896 | A | 10/1987 | Sing et al. | |
| 4,708,853 | A | 11/1987 | Matviya et al. | |
| 4,772,455 | A | 9/1988 | Izumi et al. | |
| 4,786,483 | A | 11/1988 | Audeh | |
| 4,814,152 | A | 3/1989 | Yan | |
| 4,820,318 | A | 4/1989 | Chang et al. | |
| 4,889,698 | A | 12/1989 | Moller et al. | |
| 4,956,162 | A | 9/1990 | Smith et al. | |
| 5,245,120 | A | 9/1993 | Srinivasachar et al. | |
| 5,288,306 | A | 2/1994 | Aibe et al. | |
| 5,300,137 | A | 4/1994 | Weyand et al. | |
| 5,336,835 | A | 8/1994 | McNamara | |
| 5,346,674 | A | 9/1994 | Weinwurm et al. | |
| 5,409,522 | A | 4/1995 | Durham et al. | |
| 5,419,834 | A | 5/1995 | Straten | |
| 5,435,980 | A * | 7/1995 | Felsvang ................ | B01D 53/10 423/210 |
| 5,462,908 | A | 10/1995 | Liang et al. | |
| 5,480,619 | A | 1/1996 | Johnson et al. | |
| 5,500,306 | A | 3/1996 | Hsu et al. | |
| 5,505,766 | A | 4/1996 | Chang | |
| 5,569,436 | A * | 10/1996 | Lerner ................... | B01D 53/64 110/235 |
| 5,575,982 | A | 11/1996 | Reiss et al. | |
| 5,607,496 | A | 3/1997 | Brooks | |
| 5,672,323 | A | 9/1997 | Bhat et al. | |
| 5,695,726 | A | 12/1997 | Lerner | |
| 5,785,935 | A | 7/1998 | Fristad et al. | |
| 5,827,352 | A | 10/1998 | Altman et al. | |
| 5,891,324 | A | 4/1999 | Ohtsuka | |
| 6,001,762 | A | 12/1999 | Harmer et al. | |
| 6,013,593 | A | 1/2000 | Lee et al. | |
| 6,027,551 | A | 2/2000 | Hwang et al. | |
| 6,074,974 | A | 6/2000 | Lee et al. | |
| 6,080,281 | A | 6/2000 | Attia | |
| 6,103,205 | A | 8/2000 | Wojtowicz et al. | |
| 6,136,072 | A | 10/2000 | Sjostrom et al. | |
| 6,136,749 | A * | 10/2000 | Gadkaree ........... | B01D 53/8665 502/180 |
| 6,214,304 | B1 | 4/2001 | Rosenthal et al. | |
| 6,258,334 | B1 | 7/2001 | Gadkaree et al. | |
| 6,284,199 | B1 | 9/2001 | Downs et al. | |
| 6,342,462 | B1 | 1/2002 | Kulprathipanja | |
| 2,456,272 | A1 | 2/2002 | Pahlman et al. | |
| 6,372,187 | B1 * | 4/2002 | Madden .............. | B01D 53/508 110/345 |
| 6,375,909 | B1 | 4/2002 | Dangtran et al. | |
| 6,383,981 | B1 | 5/2002 | Blankenship et al. | |
| 6,471,936 | B1 | 10/2002 | Chen et al. | |
| 6,475,451 | B1 | 11/2002 | Leppin et al. | |
| 6,475,471 | B1 | 11/2002 | Wehrli | |
| 6,528,030 | B2 | 3/2003 | Madden et al. | |
| 6,558,454 | B1 * | 5/2003 | Chang .................... | B01D 53/10 110/342 |
| 6,576,585 | B2 | 6/2003 | Fischer et al. | |
| 6,579,507 | B2 | 6/2003 | Pahlman et al. | |
| 6,596,661 | B2 | 7/2003 | Neufert | |
| 6,610,263 | B2 | 8/2003 | Pahlman et al. | |
| 6,638,485 | B1 | 10/2003 | Iida et al. | |
| 6,719,828 | B1 * | 4/2004 | Lovell .................... | B01D 53/02 423/210 |
| 6,808,692 | B2 | 10/2004 | Oehr | |
| 6,818,043 | B1 * | 11/2004 | Chang .................... | B01D 53/64 423/213.2 |
| 6,848,374 | B2 * | 2/2005 | Srinivasachar ........ | B01D 53/10 110/165 R |
| 6,878,358 | B2 | 4/2005 | Vosteen et al. | |
| 6,942,840 | B1 | 9/2005 | Broderick | |
| 6,953,494 | B2 | 10/2005 | Nelson, Jr. et al. | |
| 6,960,329 | B2 | 11/2005 | Sellakumar | |
| 7,017,330 | B2 | 3/2006 | Bellows | |
| 7,081,434 | B2 | 7/2006 | Sinha | |
| 7,124,591 | B2 | 10/2006 | Baer et al. | |
| 7,211,707 | B2 | 5/2007 | Axtell et al. | |
| 7,247,279 | B2 | 7/2007 | Pahlman et al. | |
| 7,293,414 | B1 | 11/2007 | Huber | |
| 7,435,286 | B2 | 10/2008 | Olson et al. | |
| 7,442,239 | B2 | 10/2008 | Armstrong et al. | |
| 7,479,263 | B2 | 1/2009 | Chang et al. | |
| 7,514,052 | B2 * | 4/2009 | Lissianski ............. | B01D 53/56 423/210 |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,521,032 | B2 | 4/2009 | Honjo et al. | |
| 7,544,338 | B2 | 6/2009 | Honjo et al. | |
| 7,563,311 | B2 | 7/2009 | Graham | |
| 7,611,564 | B2 | 11/2009 | Mcchesney et al. | |
| 7,622,092 | B2 | 11/2009 | Honjo et al. | |
| 7,722,843 | B1 | 5/2010 | Srinivasachar | |
| 7,767,174 | B2 | 8/2010 | Lui et al. | |
| 7,780,765 | B2 * | 8/2010 | Srinivasachar | B01D 53/10 110/203 |
| 7,938,571 | B1 | 5/2011 | Irvine | |
| 7,942,566 | B1 | 5/2011 | Irvine | |
| 8,007,749 | B2 | 8/2011 | Chang et al. | |
| 8,080,088 | B1 | 12/2011 | Srinivasachar | |
| 8,168,147 | B2 | 5/2012 | Olson et al. | |
| 8,168,149 | B2 | 5/2012 | Gal et al. | |
| 8,173,566 | B2 | 5/2012 | Olson et al. | |
| 8,216,535 | B2 | 7/2012 | Pollack et al. | |
| 8,512,655 | B2 | 8/2013 | Olson et al. | |
| 8,652,235 | B2 | 2/2014 | Olson et al. | |
| 8,821,819 | B2 | 9/2014 | Olson et al. | |
| 9,011,805 | B2 | 4/2015 | Olson et al. | |
| 9,468,886 | B2 | 10/2016 | Olson et al. | |
| 9,662,629 | B2 | 5/2017 | Olson et al. | |
| 9,669,355 | B2 | 6/2017 | Olson et al. | |
| 9,757,689 | B2 | 9/2017 | Olson et al. | |
| 10,130,930 | B2 | 11/2018 | Olson | |
| 2001/0002387 | A1 | 5/2001 | Tsutsumi et al. | |
| 2001/0003116 | A1 | 6/2001 | Neufert | |
| 2002/0033097 | A1 | 3/2002 | El-shoubary et al. | |
| 2002/0043496 | A1 | 4/2002 | Boddu et al. | |
| 2002/0134242 | A1 | 9/2002 | Yang et al. | |
| 2002/0150516 | A1 | 10/2002 | Pahlman et al. | |
| 2003/0057293 | A1 | 3/2003 | Boecking | |
| 2003/0104937 | A1 | 6/2003 | Sinha | |
| 2003/0136509 | A1 | 7/2003 | Virtanen | |
| 2003/0206843 | A1 | 11/2003 | Nelson, Jr. | |
| 2003/0206846 | A1 | 11/2003 | Jangbarwala | |
| 2004/0003716 | A1 * | 1/2004 | Nelson, Jr. | B01D 53/02 95/134 |
| 2004/0013589 | A1 | 1/2004 | Vosteen et al. | |
| 2004/0076570 | A1 | 4/2004 | Jia | |
| 2004/0086439 | A1 * | 5/2004 | Vosteen | B01D 53/64 423/210 |
| 2004/0109800 | A1 | 6/2004 | Pahlman et al. | |
| 2005/0000197 | A1 | 1/2005 | Krantz | |
| 2005/0019240 | A1 | 1/2005 | Lu et al. | |
| 2005/0074380 | A1 | 4/2005 | Boren et al. | |
| 2005/0147549 | A1 | 7/2005 | Lissianski et al. | |
| 2005/0227146 | A1 | 10/2005 | Ghantous et al. | |
| 2006/0048646 | A1 * | 3/2006 | Olson | B01D 53/10 95/134 |
| 2006/0057044 | A1 | 3/2006 | Chang et al. | |
| 2006/0112823 | A1 | 6/2006 | Avina | |
| 2006/0191835 | A1 | 8/2006 | Petrik et al. | |
| 2006/0204418 | A1 | 9/2006 | Chao et al. | |
| 2007/0167309 | A1 | 7/2007 | Olson | |
| 2007/0168213 | A1 | 7/2007 | Comrie | |
| 2007/0180990 | A1 * | 8/2007 | Downs | B01D 53/10 95/134 |
| 2007/0234902 | A1 | 10/2007 | Fair et al. | |
| 2007/0295347 | A1 | 12/2007 | Paine, III et al. | |
| 2008/0090951 | A1 | 4/2008 | Mao et al. | |
| 2008/0107579 | A1 | 5/2008 | Downs et al. | |
| 2008/0134888 | A1 | 6/2008 | Chao et al. | |
| 2008/0182747 | A1 | 7/2008 | Sinha | |
| 2008/0207443 | A1 | 8/2008 | Gadkaree et al. | |
| 2008/0292512 | A1 | 11/2008 | Kang | |
| 2009/0031708 | A1 | 2/2009 | Schmidt | |
| 2009/0062119 | A1 | 3/2009 | Olson et al. | |
| 2009/0081092 | A1 | 3/2009 | Yang et al. | |
| 2009/0136401 | A1 | 5/2009 | Yang et al. | |
| 2009/0235848 | A1 | 9/2009 | Eiteneer et al. | |
| 2009/0297413 | A1 * | 12/2009 | Olson | B01D 53/10 423/215.5 |
| 2009/0320678 | A1 * | 12/2009 | Chang | B01D 46/002 95/92 |
| 2010/0024642 | A1 | 2/2010 | Fukumoto et al. | |
| 2010/0047146 | A1 | 2/2010 | Olson et al. | |
| 2011/0076210 | A1 | 3/2011 | Pollack et al. | |
| 2011/0168018 | A1 | 7/2011 | Mohamadalizadeh et al. | |
| 2012/0183458 | A1 | 7/2012 | Olson et al. | |
| 2012/0244355 | A1 | 9/2012 | Pollack et al. | |
| 2013/0280156 | A1 | 10/2013 | Olson et al. | |
| 2014/0056787 | A1 | 2/2014 | Olson et al. | |
| 2014/0224121 | A1 | 8/2014 | Mimna et al. | |
| 2014/0255279 | A1 | 9/2014 | Olson et al. | |
| 2014/0308188 | A1 | 10/2014 | Olson et al. | |
| 2015/0098878 | A1 * | 4/2015 | Olson | B01J 20/12 423/210 |
| 2015/0246315 | A1 | 9/2015 | Olson et al. | |
| 2017/0100692 | A1 * | 4/2017 | Olson | B01D 53/08 |
| 2017/0128908 | A1 | 5/2017 | Olson et al. | |
| 2017/0173524 | A1 | 6/2017 | Olson et al. | |
| 2017/0173557 | A1 | 6/2017 | Olson et al. | |
| 2017/0239644 | A1 * | 8/2017 | Olson | B01D 53/02 |
| 2018/0133646 | A1 * | 5/2018 | Pavlish | B01J 20/3416 |
| 2018/0229182 | A1 | 8/2018 | Olson et al. | |
| 2018/0257030 | A1 | 9/2018 | Olson et al. | |
| 2018/0257031 | A1 * | 9/2018 | Olson | B01J 20/3416 |
| 2018/0280870 | A1 | 10/2018 | Olson et al. | |
| 2019/0009247 | A1 | 1/2019 | Olson et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2327602 | A1 | 6/2001 |
| CA | 2400898 | A1 | 8/2001 |
| CA | 2584327 | A1 | 4/2006 |
| CA | 2757309 | A1 | 10/2010 |
| CA | 2757309 | C | 1/2017 |
| CN | 1048173 | A | 1/1991 |
| CN | 101048218 | A | 10/2007 |
| CN | 101053820 | A | 10/2007 |
| CN | 101293196 | A | 10/2008 |
| CN | 101816922 | A | 9/2010 |
| CN | 102413899 | A | 4/2012 |
| CN | 104519410 | A | 4/2015 |
| CN | 105188910 | A | 12/2015 |
| CN | 104619410 | B | 5/2016 |
| CN | 107661744 | A | 2/2018 |
| DE | 3426059 | A1 | 1/1986 |
| DE | 3816600 | A1 | 11/1989 |
| DE | 10233173 | A1 | 2/2004 |
| DE | 202012003747 | U1 | 11/2012 |
| EP | 0208490 | A1 | 1/1987 |
| EP | 1386655 | A1 | 2/2004 |
| EP | 1458474 | | 9/2004 |
| EP | 1570894 | A1 | 9/2005 |
| FR | 2529802 | | 1/1984 |
| GB | 2122916 | A | 1/1984 |
| JP | 4953590 | A | 5/1974 |
| JP | 4953593 | A | 5/1974 |
| JP | 4966592 | A | 6/1974 |
| JP | 4943197 | B4 | 11/1974 |
| JP | 506438 | B4 | 3/1975 |
| JP | 51003386 | A | 1/1976 |
| JP | 544868 | A | 1/1979 |
| JP | 50145324 | A | 3/1980 |
| JP | 09256812 | | 9/1997 |
| KR | 1020027006149 | | 7/2002 |
| SU | 732207 | A1 | 5/1980 |
| SU | 1163982 | A | 6/1985 |
| WO | WO-0162368 | A1 | 8/2001 |
| WO | WO-0228513 | A2 | 4/2002 |
| WO | WO-03072241 | A1 | 9/2003 |
| WO | WO-2004089501 | A2 | 10/2004 |
| WO | WO-2004094024 | A2 | 11/2004 |
| WO | WO-2006039007 | A2 | 4/2006 |
| WO | WO-2006039007 | A3 | 4/2006 |
| WO | WO-2006099611 | A1 | 9/2006 |
| WO | WO-2009018539 | A3 | 2/2009 |
| WO | WO-2010123609 | A1 | 10/2010 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO-2013162968 | A2 | 10/2013 |
| WO | WO-2013162968 | A3 | 10/2013 |
| WO | WO-2014137907 | A2 | 9/2014 |

OTHER PUBLICATIONS

"U.S. Appl. No. 10/554,018, Final Office Action dated Apr. 27, 2010", 8 pgs.
"U.S. Appl. No. 10/554,018, Non Final Office Action dated Oct. 6, 2009", 8 pgs.
"U.S. Appl. No. 10/554,018, Notice of Allowance dated Jan. 19, 2012", 7 pgs.
"U.S. Appl. No. 10/554,018, Response filed Feb. 8, 2010 to Non Final Office Action dated Oct. 6, 2009", 9 pgs.
"U.S. Appl. No. 10/554,018, Response filed Aug. 10, 2009 to Restriction Requirement dated Jun. 9, 2009", 1 pg.
"U.S. Appl. No. 10/554,018, Restriction Requirement dated Jun. 9, 2009", 5 pgs.
"U.S. Appl. No. 11/209,163, Advisory Action dated Apr. 21, 2008", 3 pgs.
"U.S. Appl. No. 11/209,163, Final Office Action dated Jan. 23, 2008", 20 pgs.
"U.S. Appl. No. 11/209,163, Non Final Office Action dated Aug. 13, 2007", 14 pgs.
"U.S. Appl. No. 11/209,163, Notice of Allowance dated Jul. 14, 2008", 7 pgs.
"U.S. Appl. No. 11/209,163, Preliminary Amendment filed Feb. 27, 2007", 9 pgs.
"U.S. Appl. No. 11/209,163, Response filed Mar. 24, 2008 to Final Office Action dated Jan. 23, 2008", 29 pgs.
"U.S. Appl. No. 11/209,163, Response filed Jul. 9, 2007 to Restriction Requirement dated Jun. 7, 2007", 2 pgs.
"U.S. Appl. No. 11/209,163, Response filed Nov. 13, 2007 to Non Final Office Action dated Aug. 13, 2007", 19 pgs.
"U.S. Appl. No. 11/209,163, Restriction Requirement dated Jun. 7, 2007", 6 pgs.
"U.S. Appl. No. 12/184,860, Examiner Interview Summary dated Apr. 5, 2011", 3 pgs.
"U.S. Appl. No. 12/184,860, Final Office Action dated May 11, 2011", 15 pgs.
"U.S. Appl. No. 12/184,860, Non Final Office Action dated Jan. 19, 2011", 14 pgs.
"U.S. Appl. No. 12/184,860, Response filed Apr. 7, 2011 to Non Final Office Action dated Jan. 19, 2011", 12 pgs.
"U.S. Appl. No. 12/184,860, Response filed Jul. 8, 2011 to Final Office Action dated May 11, 2011", 11 pgs.
"U.S. Appl. No. 12/201,595, Final Office Action dated Mar. 10, 2010", 13 pgs.
"U.S. Appl. No. 12/201,595, Non Final Office Action dated Apr. 16, 2009", 21 pgs.
"U.S. Appl. No. 12/201,595, Response filed Oct. 16, 2009 to Non Final Office Action dated Apr. 16, 2009", 18 pgs.
"U.S. Appl. No. 12/419,219, Final Office Action dated Oct. 14, 2010", 17 pgs.
"U.S. Appl. No. 12/419,219, Non Final Office Action dated Jan. 15, 2010", 13 pgs.
"U.S. Appl. No. 12/419,219, Non Final Office Action dated Feb. 23, 2011", 17 pgs.
"U.S. Appl. No. 12/419,219, Non Final Office Action dated Aug. 4, 2011", 16 pgs.
"U.S. Appl. No. 12/419,219, Notice of Allowance dated Jan. 10, 2012", 7 pgs.
"U.S. Appl. No. 12/419,219, Preliminary Amendment filed Apr. 6, 2009", 7 pgs.
"U.S. Appl. No. 12/419,219, Response filed Feb. 14, 2011 to Final Office Action dated Oct. 14, 2010", 19 pgs.
"U.S. Appl. No. 12/419,219, Response filed May 20, 2011 to Non Final Office Action dated Feb. 23, 2011", 14 pgs.
"U.S. Appl. No. 12/419,219, Response filed Jul. 15, 2010 to Non Final Office Action dated Jan. 15, 2010", 22 pgs.
"U.S. Appl. No. 12/419,219, Response filed Oct. 27, 2011 to Non Final Office Action dated Aug. 4, 2011", 12 pgs.
"U.S. Appl. No. 12/429,058, Advisory Action dated May 29, 2012", 3 pgs.
"U.S. Appl. No. 12/429,058, Ex Parte Quayle Action mailed Feb. 14, 2013", 7 pgs.
"U.S. Appl. No. 12/429,058, Examiner Interview Summary dated Dec. 28, 2012", 4 pgs.
"U.S. Appl. No. 12/429,058, Final Office Action dated Oct. 31, 2012", 21 pgs.
"U.S. Appl. No. 12/429,058, Final Office Action dated Dec. 20, 2011", 21 pgs.
"U.S. Appl. No. 12/429,058, Non Final Office Action dated Jun. 11, 2012", 18 pgs.
"U.S. Appl. No. 12/429,058, Non Final Office Action dated Jul. 19, 2011", 20 pgs.
"U.S. Appl. No. 12/429,058, Notice of Allowance dated Jan. 16, 2014", 5 pgs.
"U.S. Appl. No. 12/429,058, Notice of Allowance dated Sep. 11, 2013", 11 pgs.
"U.S. Appl. No. 12/429,058, Response filed Jan. 31, 2013 to Final Office Action dated Oct. 31, 2012", 19 pgs.
"U.S. Appl. No. 12/429,058, Response filed Mar. 7, 2013 to Ex Parte Quayle Action mailed Feb. 14, 2013", 7 pgs.
"U.S. Appl. No. 12/429,058, Response filed May 11, 2012 to Final Office Action dated Dec. 20, 2011", 11 pgs.
"U.S. Appl. No. 12/429,058, Response filed Sep. 11, 2012 to Non Final Office Action dated Jun. 11, 2012", 16 pgs.
"U.S. Appl. No. 12/429,058, Response filed Oct. 18, 2011 to Non Final Office Action dated Jul. 19, 2011", 17 pgs.
"U.S. Appl. No. 13/427,665, Non Final Office Action dated Jan. 4, 2013", 23 pgs.
"U.S. Appl. No. 13/427,665, Non Final Office Action dated Aug. 3, 2012", 12 pgs.
"U.S. Appl. No. 13/427,665, Notice of Allowance dated Apr. 16, 2013", 8 pgs.
"U.S. Appl. No. 13/427,665, Response filed Mar. 21, 2013 to Non Final Office Action dated Jan. 4, 2013", 20 pgs.
"U.S. Appl. No. 13/427,665, Response filed Oct. 10, 2012 to Non Final Office Action dated Aug. 3, 2012", 15 pgs.
"U.S. Appl. No. 13/427,685, Preliminary Amendment filed Mar. 22, 2012", 3 pgs.
"U.S. Appl. No. 13/453,274, Advisory Action dated Nov. 24, 2014", 3 pgs.
"U.S. Appl. No. 13/453,274, Final Office Action dated Oct. 16, 2014", 4 pgs.
"U.S. Appl. No. 13/453,274, Non Final Office Action dated May 30, 2014", 6 pgs.
"U.S. Appl. No. 13/453,274, Notice of Allowance dated Jan. 5, 2015", 5 pgs.
"U.S. Appl. No. 13/453,274, Response filed Sep. 2, 2014 to Non Final Office Action dated May 30, 2014", 13 pgs.
"U.S. Appl. No. 13/453,274, Response filed Nov. 6, 2014 to Final Office Action dated Oct. 16, 2014", 7 pgs.
"U.S. Appl. No. 13/453,274, Response filed Dec. 9, 2014 to Advisory Action dated Nov. 24, 2014", 6 pgs.
"U.S. Appl. No. 13/966,768, Non Final Office Action dated Dec. 6, 2013", 7 pgs.
"U.S. Appl. No. 13/966,768, Notice of Allowability dated Aug. 1, 2014", 6 pgs.
"U.S. Appl. No. 13/966,768, Notice of Allowance dated Apr. 18, 2014", 7 pgs.
"U.S. Appl. No. 13/966,768, Preliminary Amendment filed Aug. 14, 2013", 3 pgs.
"U.S. Appl. No. 13/966,768, Response filed Mar. 6, 2014 to Non Final Office Action dated Dec. 6, 2013", 6 pgs.
"U.S. Appl. No. 13/966,768, Supplemental Preliminary Amendment filed Aug. 15, 2013", 6 pgs.
"U.S. Appl. No. 14/102,896, Advisory Action dated Dec. 16, 2015", 3 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"U.S. Appl. No. 14/102,896, Final Office Action dated Aug. 26, 2015", 12 pgs.
"U.S. Appl. No. 14/102,896, Non Final Office Action dated Mar. 23, 2015", 13 pgs.
"U.S. Appl. No. 14/102,896, Notice of Allowance dated Jun. 10, 2016", 7 pgs.
"U.S. Appl. No. 14/102,896, Response filed Jan. 22, 2016 to Advisory Action dated Dec. 16, 2015", 11 pgs.
"U.S. Appl. No. 14/102,896, Response filed Jun. 22, 2015 to Non Final Office Action dated Mar. 23, 2015", 10 pgs.
"U.S. Appl. No. 14/102,896, Response filed Nov. 24, 2015 to Final Office Action dated Aug. 26, 2015", 5 pgs.
"U.S. Appl. No. 14/195,360, Corrected Notice of Allowance dated Feb. 27, 2017", 2 pgs.
"U.S. Appl. No. 14/195,360, Corrected Notice of Allowance dated Mar. 29, 2017", 2 pgs.
"U.S. Appl. No. 14/195,360, Final Office Action dated Mar. 18, 2016", 18 pgs.
"U.S. Appl. No. 14/195,360, Final Office Action dated Nov. 22, 2016", 7 pgs.
"U.S. Appl. No. 14/195,360, Non Final Office Action dated Jun. 20, 2016", 11 pgs.
"U.S. Appl. No. 14/195,360, Non Final Office Action dated Nov. 24, 2015", 19 pgs.
"U.S. Appl. No. 14/195,360, Notice of Allowance dated Feb. 7, 2017", 5 pgs.
"U.S. Appl. No. 14/195,360, Response filed Jan. 18, 2017 to Final Office Action dated Nov. 22, 2016", 7 pgs.
"U.S. Appl. No. 14/195,360, Response filed Feb. 22, 2016 to Non Final Office Action dated Nov. 24, 2015", 21 pgs.
"U.S. Appl. No. 14/195,360, Response filed May 17, 2016 to Final Office Action dated Mar. 18, 2016", 15 pgs.
"U.S. Appl. No. 14/318,270, Advisory Action dated Feb. 17, 2017", 4 pgs.
"U.S. Appl. No. 14/318,270, Corrected Notice of Allowance dated May 22, 2017", 2 pgs.
"U.S. Appl. No. 14/318,270, Final Office Action dated Nov. 25, 2016", 25 pgs.
"U.S. Appl. No. 14/318,270, Non Final Office Action dated Jun. 2, 2016", 24 pgs.
"U.S. Appl. No. 14/318,270, Notice of Allowance dated May 15, 2017", 8 pgs.
"U.S. Appl. No. 14/318,270, Response filed Jan. 25, 2017 to Final Office Action dated Nov. 25, 2016", 14 pgs.
"U.S. Appl. No. 14/318,270, Response filed Feb. 27, 2017 to Final Office Action dated Nov. 25, 2016", 15 pgs.
"U.S. Appl. No. 14/318,270, Response filed Mar. 2, 2016 to Restriction Requirement dated Jan. 14, 2016", 9 pgs.
"U.S. Appl. No. 14/318,270, Response filed Aug. 22, 2016 to Non Final Office Action dated Jun. 2, 2016", 14 pgs.
"U.S. Appl. No. 14/318,270, Restriction Requirement dated Jan. 14, 2016", 8 pgs.
"U.S. Appl. No. 14/564,860, Final Office Action dated Nov. 17, 2016", 4 pgs.
"U.S. Appl. No. 14/564,860, Non Final Office Action dated Jul. 12, 2016", 6 pgs.
"U.S. Appl. No. 14/564,860, Notice of Allowance dated Jan. 30, 2017", 6 pgs.
"U.S. Appl. No. 14/564,860, Preliminary Amendment filed Dec. 10, 2014", 8 pgs.
"U.S. Appl. No. 14/564,860, Preliminary Amendment filed Dec. 10, 2014", 6 pgs.
"U.S. Appl. No. 14/564,860, Response filed May 6, 2016 to Restriction Requirement dated Mar. 16, 2016", 9 pgs.
"U.S. Appl. No. 14/564,860, Response filed Oct. 3, 2016 to Non Final Office Action dated Jul. 12, 2016", 11 pgs.
"U.S. Appl. No. 14/564,860, Restriction Requirement dated Mar. 16, 2016", 5 pgs.
"U.S. Appl. No. 14/712,558, Advisory Action dated Feb. 12, 2018", 8 pgs.
"U.S. Appl. No. 14/712,558, Examiner Interview Summary dated Mar. 5, 2018", 3 pgs.
"U.S. Appl. No. 14/712,558, Final Office Action dated Dec. 6, 2017", 9 pgs.
"U.S. Appl. No. 14/712,558, Non Final Office Action dated Jul. 6, 2017", 7 pgs.
"U.S. Appl. No. 14/712,558, Response filed Jan. 23, 2018 to Final Office Action dated Dec. 6, 2017", 13 pgs.
"U.S. Appl. No. 14/712,558, Response filed Apr. 2, 2018 to Final Office Action dated Dec. 6, 2017", 7 pgs.
"U.S. Appl. No. 14/712,558, Response filed Oct. 6, 2017 to Non Final Office Action dated Jul. 6, 2017", 12 pgs.
"U.S. Appl. No. 14/712,558, Supplemental Amendment Filed May 15, 2018", 6 pgs.
"U.S. Appl. No. 14/712,558, Supplemental Preliminary Amendment filed May 15, 2015", 6 pgs.
"U.S. Appl. No. 15/295,594, Preliminary Amendment filed Jan. 26, 2017", 8 pgs.
"U.S. Appl. No. 15/295,594, Preliminary Amendment filed Jun. 13, 2017", 7 pgs.
"U.S. Appl. No. 15/382,114, Preliminary Amendment filed Apr. 4, 2017", 3 pgs.
"U.S. Appl. No. 15/449,112, Advisory Action dated Apr. 24, 2018", 3 pgs.
"U.S. Appl. No. 15/449,112, Final Office Action dated Feb. 15, 2018", 13 pgs.
"U.S. Appl. No. 15/449,112, Non Final Office Action dated Sep. 27, 2017", 17 pgs.
"U.S. Appl. No. 15/449,112, Response filed Jan. 16, 2018 to Non Final Office Action dated Sep. 27, 2017", 16 pgs.
"U.S. Appl. No. 15/449,112, Response filed Feb. 15, 2018 to Final Office Action dated Feb. 15, 2018", 13 pgs.
"U.S. Appl. No. 15/449,112, Response filed Apr. 6, 2018 to Final Office Action dated Feb. 15, 2018", 13 pgs.
"U.S. Appl. No. 15/452,527, Preliminary Amendment filed Mar. 8, 2017", 3 pgs.
"U.S. Appl. No. 15/589,359, Non Final Office Action dated Feb. 21, 2018", 15 pgs.
"U.S. Appl. No. 15/589,359, Preliminary Amendment filed Jan. 3, 2018", 6 pgs.
"Application Serial No. PCT/US04/12828, International Search Report dated Oct. 22, 2004", 2 pgs.
"Application Serial No. PCT/US2014/019916, International Preliminary Report on Patentability dated Sep. 17, 2015", 14 pgs.
"U.S. Appl. No. 14/195,360, Response filed Sep. 16, 2016 to Non Final Office Action dated Jun. 30, 2016", 12 pgs.
"Bromine and its Compounds", Jolles, Z. E., Editor, Academic Press, Inc., New York, NY, (1966), pp. 193 and 205.
"Canadian Application Serial No. 2,523,132, Office Action dated Jul. 18, 2011", 3 pgs.
"Canadian Application Serial No. 2,523,132, Response filed Jan. 16, 2012 to Office Action dated Jul. 18, 2011", 5 pgs.
"Canadian Application Serial No. 2,584,327, Office Action dated Mar. 3, 2009", 4 pgs.
"Canadian Application Serial No. 2,584,327, Office Action dated Dec. 7, 2009", 2 pgs.
"Canadian Application Serial No. 2,584,327, Response filed Mar. 19, 2010 to Office Action dated Dec. 7, 2009", 8 pgs.
"Canadian Application Serial No. 2,584,327, Response filed Sep. 2, 2009 to Office Action dated Mar. 3, 2009", 21 pgs.
"Canadian Application Serial No. 2,707,363, First Examiners Report", 2 pgs.
"Canadian Application Serial No. 2,757,309, Office Action dated Dec. 7, 2015", 3 pgs.
"Canadian Application Serial No. 2,757,309, Response filed Jun. 6, 2016 to Office Action dated Dec. 7, 2015", 13 pgs.
"Canadian Application Serial No. 2,757,309, Voluntary Amendment filed Jan. 30, 2015", 27 pgs.
"Canadian Application Serial No. 2,871,422, Response filed Feb. 26, 2016 to Office Action dated Sep. 9, 2015", 13 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"Canadian Application Serial No. 2,871,422, Office Action dated Apr. 2, 2015", 5 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Apr. 24, 2018", 4 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Aug. 31, 2017", 4 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Sep. 9, 2015", 3 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Dec. 22, 2016", 5 pgs.
"Canadian Application Serial No. 2,871,422, Response filed Feb. 26, 2018 to Office Action dated Aug. 31, 2017", w/ Amended Claims, 53 pgs.
"Canadian Application Serial No. 2,871,422, Response filed Jun. 21, 2017 to Office Action dated Dec. 22, 2016", 41 pgs.
"Canadian Application Serial No. 2,871,422, Response filed Aug. 28, 2015 to Canadian Office Action dated Apr. 2, 2015", 22 pgs.
"Chinese Application Serial No. 200480017704.4, Office Action dated Dec. 8, 2011", (w/ English Translation), 6 pgs.
"Chinese Application Serial No. 200480017704.4, Response filed Jan. 20, 2012 to Office Action dated Dec. 8, 2012", (w/ English Translation of Amended Claims), 10 pgs.
"Chinese Application Serial No. 200580037037.0, Chinese Office Action, dated Jun. 25, 2013 (and English translation)", no english translation, 46 pgs.
"Chinese Application Serial No. 201380033231.6, Office Action dated Sep. 21, 2015", w/ Partial English Translation, 6 pgs.
"Chinese Application Serial No. 201380033231.6, Response filed Jan. 14, 2016 to Office Action dated Sep. 21, 2015", w/English Claims, 7 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Jan. 16, 2018", (English Translation), 8 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Jul. 12, 2017", W/ English Translation, 8 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Jul. 25, 2016", (With English Translation), 4 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Dec. 23, 2016", W/ English Translation, 39 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Dec. 23, 2016", 24 pgs.
"Chinese Application Serial No. 201480025701.9, Response filed Mar. 27, 2018 to Office Action dated Jan. 16, 2018", w/ English Claims, 20 pgs.
"Chinese Application Serial No. 201480025701.9, Response filed Sep. 15, 2017 to Office Action dated Jul. 12, 2017", w/ English Translation, 21 pgs.
"DARCO® FGD—Powdered Activated Carbon", Norit Americas Inc. Datasheet No. 1100, (May 2009), 1 pg.
"Database WPI Week 197450", Thomson Scientific, London, GB; AN 1974-86199V XP002514926.
"European Application Serial No. 05814011.2, Response filed Sep. 9, 2011 to European Search Report dated Apr. 14, 2009 and Office Actioin dated Nov. 5, 2009", 20 pgs.
"European Application Serial No. 05814011.2, Communication Pursuant to Article 94(3) EPC dated Nov. 5, 2009", 4 pgs.
"European Application Serial No. 05814011.2, Decision to grant dated Jun. 8, 2012", 2 pgs.
"European Application Serial No. 05814011.2, Extended European Search Report dated Apr. 14, 2009", 13 pgs.
"European Application Serial No. 05814011.2, Office Action dated Jan. 25, 2008", 2 pgs.
"European Application Serial No. 05814011.2, Office Action dated Jan. 31, 2012", 4 pgs.
"European Application Serial No. 05814011.2, Office Action dated Apr. 27, 2012", 6 pgs.
"European Application Serial No. 05814011.2, Office Action dated Nov. 5, 2009", 2 pgs.
"European Application Serial No. 05814011.2, Partial European Search Report dated Apr. 14, 2009", 13 pgs.
"European Application Serial No. 05814011.2, Response filed Feb. 28, 2012 to Office Action dated Jan. 31, 2012", 30 pgs.
"European Application Serial No. 05814011.2, Response filed Apr. 18, 2008 to Office Action dated Jan. 25, 2008 and Third Party Observations submitted Dec. 4, 2007", 7 pgs.
"European Application Serial No. 05814011.2, Response filed May 11, 2010 to Communication Pursuant to Article 94(3) EPC dated Nov. 5, 2009", 11 pgs.
"European Application Serial No. 05814011.2, Response filed May 11, 2010 to Office Action dated Nov. 5, 2009", 11 pgs.
"European Application Serial No. 05814011.2, Response filed Sep. 9, 2011 to Extended European Search Report dated Apr. 14, 2009", 20 pgs.
"European Application Serial No. 05814011.2, Third Party Observations submitted Mar. 19, 2012", 7 pgs.
"European Application Serial No. 05814011.2, Third Party Observations submitted Dec. 4, 2007", 5 pgs.
"European Application Serial No. 10767465.7, Decision to grant dated Apr. 17, 2014", 2 pgs.
"European Application Serial No. 10767465.7, Extended European Search Report dated Dec. 6, 2012", 5 pgs.
"European Application Serial No. 10767465.7, Intention to Grant dated Mar. 17, 2014", 44 pgs.
"European Application Serial No. 10767465.7, Intention to Grant dated Sep. 30, 2013", 44 pgs.
"European Application Serial No. 10767465.7, Response filed Feb. 3, 2014 to Intention to Grant dated Sep. 30, 2013", 11 pgs.
"European Application Serial No. 10767465.7, Response filed Jun. 20, 2013 to Extended European Search Report dated Dec. 6, 2012", 18 pgs.
"European Application Serial No. 11189249.3, Communication Pursuant to Article 94(3) EPC dated Nov. 26, 2012", 4 pgs.
"European Application Serial No. 11189249.3, Decision to Refuse dated Dec. 19, 2013", 18 pgs.
"European Application Serial No. 11189249.3, Extended European Search Report dated Feb. 1, 2012", 7 pgs.
"European Application Serial No. 11189249.3, Office Action dated Nov. 4, 2013", 4 pgs.
"European Application Serial No. 11189249.3, Response filed Feb. 4, 2013 to Communication Pursuant to Article 94(3) EPC dated Nov. 26, 2012", 9 pgs.
"European Application Serial No. 11189249.3, Response filed Aug. 28, 2012 to Extended European Search Report dated Feb. 1, 2012", 9 pgs.
"European Application Serial No. 11189249.3, Summons to Attend Oral Proceedings mailed Apr. 15, 2013", 7 pgs.
"European Application Serial No. 11189252.7, Communication Pursuant to Article 94(3) EPC dated Jan. 9, 2013", 4 pgs.
"European Application Serial No. 11189252.7, Decision to grant dated May 2, 2014", 2 pgs.
"European Application Serial No. 11189252.7, Extended European Search Report dated Jan. 23, 2012", 6 pgs.
"European Application Serial No. 11189252.7, Extended European Search Report dated May 9, 2012", 12 pgs.
"European Application Serial No. 11189252.7, Office Action dated Oct. 30, 2013", 4 pgs.
"European Application Serial No. 11189252.7, Office Action dated Dec. 11, 2013", 6 pgs.
"European Application Serial No. 11189252.7, Response filed Feb. 11, 2013 to Communication Pursuant to Article 94(3) EPC dated Jan. 9, 2013", 5 pgs.
"European Application Serial No. 11189252.7, Response filed Oct. 10, 2013 to Office Action dated Apr. 15, 2013", 18 pgs.
"European Application Serial No. 11189252.7, Response filed Nov. 22, 2012 to Extended European Search Report dated May 9, 2012", 13 pgs.
"European Application Serial No. 11189252.7, Summons to Attend Oral Proceedings mailed Apr. 15, 2013", 6 pgs.
"European Application Serial No. 13719338.9, Notification Regarding Rule 164 and Article 94(3) EPC mailed Apr. 24, 2017", 8 pgs.
"European Application Serial No. 13719338.9, Office Action dated May 12, 2017", 6 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"European Application Serial No. 13719338.9, Office Action dated Dec. 19, 2014", 2 pgs.
"European Application Serial No. 13719338.9, Response filed Jun. 29, 2015 to Office Action dated Dec. 19, 2014", 19 pgs.
"European Application Serial No. 14711106.6, Communication Pursuant to Article 94(3) EPC dated Feb. 22, 2017", 6 pgs.
"European Application Serial No. 14711106.6, Response filed Aug. 17, 2017 to Communication Pursuant to Article 94(3) EPC dated Feb. 22, 2017", 10 pgs.
"International Application No. PCT/US2008/071986, International Search Report dated Jan. 30, 2009", 3 pgs.
"International Application Serial No. PCT/US2005/030018, International Preliminary Report on Patentability dated Dec. 27, 2006", 3 pgs.
"International Application Serial No. PCT/US2005/030018, International Search Report dated Jul. 25, 2006", 2 pgs.
"International Application Serial No. PCT/US2005/030018, Written Opinion dated Jul. 25, 2006", 3 pgs.
"International Application Serial No. PCT/US2010/022807, International Preliminary Report on Patentability dated Nov. 3, 2011", 6 pgs.
"International Application Serial No. PCT/US2010/022807, International Search Report dated Sep. 13, 2010", 3 pgs.
"International Application Serial No. PCT/US2010/022807, Written Opinion dated Sep. 13, 2010", 4 pgs.
"International Application Serial No. PCT/US2013/036964, International Preliminary Report on Patentability dated Jul. 17, 2014", 11 pgs.
"International Application Serial No. PCT/US2013/036964, International Search Report dated Nov. 29, 2013", 7 pgs.
"International Application Serial No. PCT/US2013/036964, Invitation to Pay Additional Fees and Partial Search Report dated Aug. 2, 2013", 7 pgs.
"International Application Serial No. PCT/US2013/036964, Written Opinion dated Apr. 15, 2014", 10 pgs.
"International Application Serial No. PCT/US2013/036964, Written Opinion dated Nov. 29, 2013", 13 pgs.
"International Application Serial No. PCT/US2014/019916, International Search Report dated Oct. 13, 2014", 6 pgs.
"International Application Serial No. PCT/US2014/019916, Invitation to Pay Additional Fees and Partial Search Report dated May 30, 2014", 6 pgs.
"International Application Serial No. PCT/US2014/019916, Written Opinion dated Oct. 13, 2014", 13 pgs.
"Powdered Activated Carbon", Cabot Corp, [Online] retrieved from the internet: <http://www.cabotcorp.com/solutions/products-plus/activated-carbon/powdered>, (Jan. 3, 2015), 3 pgs.
"Response filed Sep. 4, 2017 to Notification Regarding Rule 164 and Article 94(3) EPC dated Apr. 24, 2017", 7 pgs.
Arenillas, A, et al., "CO2 removal potential of carbons prepared by co-pyrolysis of sugar and nitrogen containing compounds", Journal of analytical and applied pyrolysis 74.1, (2005), 298-306.
Bakandritsos, A., et al., "Aqueous and Gaseous Adsorption from Montmorillonite-Carbon Composites and from Derived Carbons", Langmuir, 21, (2005), 2349-2355.
Bakandritsos, A., et al., "High Surface Area Montmorillonite—Carbon Composites and Derived Carbons", Chemistry of Materials, vol. 16, No. 8, (Mar. 16, 2004), 1551-1559.
Bimer, Jan, et al., "Modified active carbons from precursors enriched with nitrogen functions: sulfur removal capabilities", (1998), 519-525.
Chang, Shih-Ger, "Method for Oxidation of Mercury Vapor", U.S. Appl. No. 60/560,904, filed Apr. 9, 2004, (Apr. 9, 2004), 9 pgs.
Criswell, Gordon, et al., "Progress Report on Mercury Control Retrofit at the Colstrip Power Station", Paper #91, Mega Symposium, Baltimore, MD, (Aug. 2011), 1-23.
Darder, M., et al., "Caramel-clay nanocomposites", Journal of Materials Chemistry, 15, (2005), 3913-3918.
Diamantopoulou, LR G Skodras, et al., "Sorption of mercury by activated carbon in the presence of flue gas components", Fuel Processing Technology 91.2, (2010), 158-163.
Dong, J., et al., "Mercury Removal from Flue Gases by Novel Regenerable Magnetic Nanocomposite Sorbents", Environ. Sci. Technol., 43, (2009), 3266-3271.
Dunham, G. E., et al., "Mercury Capture by an Activated Carbon in a Fixed-Bed Bench-Scale System", Environmental Progress, 17(3), (1998), 203-208.
Eisazadeh, H,, "Removal of Mercury from Water Using Polypyrrole and its Composites", Chinese Journal of Polymer Science, 25(4), (2007), 393-397.
Felsvang, K., et al., "Mercury Reduction and Control Options", The U.S. EPA-DOE-EPRI Combined Power Plant Air Pollutant Control Symposium; The Mega Symposium and The A&WMA Specialty Conference and Mercury Emissions: Fate, Effects and Control; Chicago, IL, (Aug. 2001), 1-19.
Fernandez-Saavedra, R., et al., "Polymer-Clay Nanocomposites as Precursors of Nanostructured Carbon Materials for Electrochemical Devices: Templating Effect of Clays", Journal of Nanoscience and Nanotechnology, 8, (2008), 1741-1750.
Ghorbani, M., et al., "Application of polyaniline nanocomposite coated on rice husk ash for removal of Hg(II) from aqueous media", Synthetic Metals, (2001), 4 pgs.
Ghorishi, Behrooz, et al., "Sorption of Mercury Species by Activated Carbons and Calcium-Based Sorbents: Effect of Temperature, Mercury Concentration and Acid Gases", Waste Manage. Res., 16:6, (1998), 582-593.
Gomez-Aviles, A., et al., "Functionalized Carbon-Silicates from Caramel-Sepiolite Nanocomposites", Angew. Chem. Int. Ed., 46, (2007), 923-925.
Gomez-Aviles, A., et al., "Multifunctional materials based on graphene-like/sepiolite nanocomposites", Applied Clay Science, 47, (2010), 203-211.
Ha, et al., "Effect of unburnt carbon on the corrosion performance of fly ash cement mortar", Construction and Building Materials, (Sep. 1, 2005), 7 pgs.
Ikeue, K., et al., "Noble-metal-containing nanoporous carbon synthesized within the interlayer space of montmorillonite and its catalytic property", Applied Catalysis A: General, 351, (2008), 68-74.
Kawabuchi, Yuji, et al., "Chemical vapor deposition of heterocyclic compounds over active carbon fiber to control its porosity and surface function", Langmuir 13.8, (1997), 2314-2317.
Kyotani, T., et al., "Formation of highly orientated graphite from polyacrylonitrile by using a two-dimensional space between montmorillonite lamellae", Nature, 331, (1988), 331-333.
Lancia, A., et al., "Adsorption of Mercuric Chloride Vapours from Incinerator Flue Gases on Calcium Hydroxide Particles", Combust. Sci. & Tech., 93, (1993), 277-289.
Laumb, Jason D., et al., "X-ray photoelectron spectroscopy analysis of mercury sorbent surface chemistry", Fuel Processing Technology, 85, (2004), 577-585.
Li, Y., et al., "Removal of elemental mercury from simulated coal-combustion flue gas using a SiO2—TiO2 nanocomposite", Fuel Processing Technology, 89, (2008), 567-573.
M, Hocquel, "Quecksilber und seine Verbindungen bei der Abfallverbrennung", with English Abstract p. 3, (Dec. 31, 2000), 112 pgs.
Maroto-Valer, M. Mercedes, et al., "Development of Activated Carbons From Coal and Biomass Combustion and Gasification Chars", (2004), 2 pgs.
Mochida, I., et al., "Preparation of nitrogen containing pitches from quinoline and isoquinoline by AID of AlCl3", Carbon, 33(8), (1995), 1069-1077.
Nguyen-Thanh, D., et al., "High Porosity Carbonaceous Adsorbents Templated From Porous Clay Heterostructures", Prepr. Pap.-Am. Chem. Soc., Div. Fuel Chem., 51(1), (2006), 7-8.
Nguyen-Thanh, D., et al., "Metal-loaded carbonaceous adsorbents templated from porous clay heterostructures", Microporous and Mesoporous Materials, 92, (2006), 47-55.

(56) **References Cited**

OTHER PUBLICATIONS

Nickels, Dale L, et al., "Processing and reuse of activated carbon used to adsorb mercury from power plant flue gases", Final report, (2004).
Olson, David, et al., "The reduction of gas phase air toxics from combustion and incineration sources using the MET-Mitsui-BF activated coke process", Fule Processing Technology, (2000), 13 pgs.
Olson, David G., et al., "The Reduction of Gas Phase Air Toxics from Combustion and Incineration Sources using the MET-Mitsui-BF Activated Coke Process", Fuel Processing Technology, 65-66, (2000), 393-405.
Olson, E. S., et al., "Catalytic effects of carbon sorbents for mercury capture", Journal of Hazardous Materials, 74, (2000), 61-79.
Olson, Edwin S., et al., "Surface Compositions of Carbon Sorbents Exposed to Simulated Low-Rank Coal Flue Gases", J. Air & Water Waste Manage. Assoc., 55, (2005), 747-754.
Padak, Bihter, "Understanding mercury binding on activated carbon", Carbon 47.1 2, (2009), 2855-2864.
Przepiorski, J, et al., "High temperature ammonia treatment of activated carbon for enhancement of CO2 adsorption", Applied Surface Science 225.1, (2004), 235-242.
Rachel, Ribeirovieira Azzi Rios, et al., "Tailoring Activated Carbon by Surface Chemical Modification with O, S, and N Containing Molecules", Materials Research. 6 (2), (2003), 129-135.
Raymundo-Pinero, E, et al., "Structural characterization of N-containing activated carbon fibers prepared from a low softening point petroleum pitch and a melamine resin", Carbon 40.4, (2002), 597-608.
Smokey, et al., "Alternative to Activated Carbon for Mercury Control", Power Engineering, (Oct. 2012), 10 pgs.
Streng, Sabine, et al., "Toxics control by activated charcoal within the "System Dusseldorf" full scale experience", B. Fuel Processing Technology, (1994), 14 pgs.
Tsuji, K, et al., "The Activated Coke Process for Combinded SOx/NOx/Air Toxics Reduction", Air and Water Management Assoc., (Mar. 10, 1993), 27 pgs.
Vosteen, B, et al., "Chlor-und Bromgestutzte Hg-Sorption an Elektrofilter-Flugaschen eines kohlegefeuerten Schmelzkammerkessels und an Zementrohmehl", Matin-Luther-Universitat Halle-Wittenberg, (2003), 1-30.
Vosteen, B. W., et al., "", Flyer on Mercury Abatement given at the VDI—Wissensforum, Dusseldorf,Germany, (2003), 6 pgs.
Vosteen, B. W., "Bromine-enhanced Mercury Abatement from Combustion Flue Gases—Recent Industrial Applications and Laboratory Research", VGB PowerTech, vol. 86, Issue Mar. 2006, (2006), 70-75.
Vosteen, N., "Emissionsminderung von Quecksilber durch chlor—und bromgestutzte Hg-Oxidation in Rauchgas", (Sep. 2003), 1-23.
Wan, Q., et al., "Removal of gaseous elemental mercury over a CeO2—WO3/TiO2 nanocomposite in simulated coal-fired flue gas", Chemical Engineering Journal, 170, (2011), 512-517.
Wang, B., et al., "Performance of a diatomite-based sorbent in removing mercury from aqueous and oil matrices", J. Environ. Eng. Sci., 6, (2007), 469-476.
Zhang, Y., et al., "High efficient removal of mercury from aqueous solution by polyaniline/humic acid nanocomposite", Journal of Hazardous Materials, 175, (2010), 404-409.
Zhao, Yongxin, et al., "Effectsof Sulfur Dioxide and Nitric Oxide on Mercury Oxidation and Reducton under Homogeneous Conditions", J. Air & Waste Manage. Assoc., 56, (2006), 628-635.
Zheng, Yuanjing, et al., "Review of technologies for mercury removal from flue gas from cement production processes", Progress in Energy and Combustion Science, vol. 38, No. 5, (Apr. 26, 2012), 599-629.
Zhu, Jianzhong, et al., "Enhanced mercury ion adsorption by amine-modified activated carbon", Journal of hazardous materials 166, (2009), 866-872.
"U.S. Appl. No. 14/712,558, Non Final Office Action dated Jul. 2, 2018", 16 pgs.
"U.S. Appl. No. 14/712,558, Supplemental Amendment filed Jun. 13, 2018", 14 pgs.
"U.S. Appl. No. 15/974,343 Preliminary Amendment Filed May 15, 2018", 7 pgs.
"U.S. Appl. No. 15/295,594, Response filed Jul. 3, 2018 to Restriction Requirement dated May 22, 2018", 9 pgs.
"U.S. Appl. No. 15/295,594, Restriction Requirement dated May 22, 2018", 6 pgs.
"U.S. Appl. No. 15/295,594, Restriction Requirement dated Jun. 29, 2018", 5 pgs.
"U.S. Appl. No. 15/295,594, Supplemental Amendment Filed May 15, 2018", 10 pgs.
"U.S. Appl. No. 15/589,359, Final Office Action dated Jun. 4, 2018", 13 pgs.
"U.S. Appl. No. 15/589,359, Response filed May 18, 2018 to Non Final Office Action dated Feb. 21, 2018", 14 pgs.
"Supplementary European Search Report, dated Dec. 6, 2012", 2 pgs.
"U.S. Appl. No. 15/295,594, Response filed Jul. 24, 2018 to Restriction Requirement dated Jun. 29, 2018", 9 pgs.
"U.S. Appl. No. 15/449,112, Notice of Allowance dated Jul. 12, 2018", 8 pgs.
"U.S. Appl. No. 15/589,359, Response filed Jul. 26, 2018 to Non Final Office Action dated Jun. 4, 2018", 14 pgs.
"U.S. Appl. No. 15/974,343, Non Final Office Action dated Jul. 27, 2018", 12 pgs.
"U.S. Appl. No. 15/997,091, Non Final Office Action dated Jul. 27, 2018", 13 pgs.
"U.S. Appl. No. 15/997,091, Response filed Aug. 14, 2018 to Non Final Office Action dated Jul. 27, 2018", 10 pgs.
"European Application Serial No. 14711106.6, Office Action dated Jun. 5, 2018", 16 pgs.
"U.S. Appl. No. 15/974,343, Response filed Aug. 14, 2018 to Non Final Office Action dated Jul. 27, 2018", 11 pgs.
"U.S. Appl. No. 14/712,558, Response filed Aug. 14, 2018 to Non Final Office Action dated Jul. 2, 2018", 11 pgs.
"U.S. Appl. No. 15/382,114, Restriction Requirement dated Aug. 28, 2018", 9 pgs.
"U.S. Appl. No. 15/589,359, Final Office Action dated Sep. 12, 2018", 14 pgs.
"U.S. Appl. No. 15/382,114, Response filed Sep. 12, 2018 to Restriction Requirement dated Aug. 28, 2018", 8 pgs.
"U.S. Appl. No. 15/589,359, Response filed Sep. 14, 2018 to Final Office Action dated Sep. 12, 2018", 18 pgs.
"U.S. Appl. No. 14/712,558, Non Final Office Action dated Oct. 19, 2018", 26 pgs.
"U.S. Appl. No. 14/712,558, Non-Final Office Action dated Oct. 19, 2018", 35 pgs.
"U.S. Appl. No. 15/295,594, Non Final Office Action dated Oct. 23, 2018", 20 pgs.
"U.S. Appl. No. 15/589,359, Non Final Office Action dated Oct. 22, 2018", 12 pgs.
"U.S. Appl. No. 15/974,343, Non Final Office Action dated Oct. 29, 2018", 22 pgs.
"U.S. Appl. No. 15/997,091, Non Final Office Action dated Nov. 2, 2018", 27 pgs.
"European Application Serial No. 14711106.6, Response filed Oct. 15, 2018 to Office Action dated Jun. 5, 2018", w/ English Claims, 15 pgs.
Pietrzak, et al., "Preparation of nitrogen-enriched activated carbons from brown coal", Energy and Fuels 20.3, (2006), 1275-1280.
"U.S. Appl. No. 14/712,558, Amendment and Response filed Dec. 3, 2018 to Non Final Office Action dated Oct. 19, 2018", 28 pgs.
"U.S. Appl. No. 14/712,558, Final Office Action dated Jan. 11, 2019", 27 pgs.
"U.S. Appl. No. 15/382,114, Non Final Office Action dated Dec. 12, 2018", 46 pgs.
"U.S. Appl. No. 15/589,359, Amendment and Response filed Jan. 17, 2019 to Non Final Office Action dated Oct. 22, 2018", 14 pgs.
"U.S. Appl. No. 15/974,343, Amendment and Response filed Dec. 3, 2018 to Non Final Office Action dated Oct. 29, 2018", 37 pgs.
"U.S. Appl. No. 15/974,343, Final Office Action dated Jan. 14, 2019", 25 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"U.S. Appl. No. 15/997,091, Final Office Action dated Jan. 11, 2019", 20 pgs.
"U.S. Appl. No. 15/997,091, Response filed Dec. 3, 2018 Non Final Office Action dated Nov. 2, 2018", 40 pgs.
"Canadian Application Serial No. 2,904,039, Office Action dated Feb. 18, 2019", 6 pgs.
"U.S. Appl. No. 15/382,114, Response filed Mar. 12, 2019 to Non Final Office Action dated Dec. 12, 2018", 24 pgs.
"U.S. Appl. No. 15/589,359, Final Office Action dated Mar. 1, 2019", 10 pgs.
et al., "Coal Combustion Products (CCPs): Characteristics, Utilization and Beneficiation", Edited by Tom Robl, et al., Woodhead Publishing (Elsevier), (2017), 565 pgs.
"Control of Mercury Emissions from Coal Fired Electric Utility Boilers: An Update", US EPA Air Pollution Prevention and Control Division, National Risk Management Research Laboratory, Office of Research and Development, (Feb. 18, 2005), 59 pgs.
"Sorbent Enhancement Additives for Mercury Control", US DOE Office of Fossil Energy, National Energy Technology Laboratory, (Jun. 2008), 4 pgs.
Benson, Steven A., et al., "JV Task 73—Mercury Control Technologies for Electric Utilities Burning Subbituminous Coals—Draft Final Report", University of North Dakota Energy and Environmental Research Center, (Jun. 2005), 165 pgs.
Benson, Steven A., et al., "Pilot-and Full-Scale Demonstration of Advanced Mercury Control Technologies for Lignite-Fired Power Plants", University of North Dakota Energy and Environmental Research Center, (Feb. 2005), 97 pgs.
Berry, Mark, et al., "Mercury control evaluation of calcium bromide injection into a PRB-fired furnace with an SCR", Proc. of the Air Quality VI Conference, Arlington, VA, (2007), 9 pgs.
Brown, Thomas D., et al., "Mercury Measurement and Its Control: What We Know, Have Learned, and Need to Further Investigate", Journal of the Air and Waste Management Association, 49(6), (Jun. 1999), 98 pgs.
Feeley, Thomas J., et al., "A Review of DOE/NETL's Mercury Control Technology R and D Program for Coal-Fired Power Plants", DOE/NETL Hg R and D Program Review, (Apr. 2003), 32 pgs.
French, Charles L., et al., "Study of Hazardous Air Pollutant Emissions from Electric Utility Steam Generating Units—Final Report to Congress: vol. 1", US EPA Office of Air Quality Planning and Standards, (Feb. 1998), 502 pgs.
Ghorishi, Behrooz S., et al., "In-Flight Capture of Elemental Mercury by Chlorine-Impregnated Activated Carbon", Proc. of the 94th Annual Meeting of the Air and Waste Management Association, Orlando, FL, (Jun. 2001), 14 pgs.
Jones, Andrew P., et al., "DOE/NETL's Phase II Mercury Control Technology Field Testing Program: Preliminary Economic Analysis of Activated Carbon Injection", Environmental Science and Technology, 41(4), (2007), 7 pgs.
Keating, Martha H., et al., "Mercury Study Report to Congress vol. 1: Executive Summary", US EPA Office of Air Quality Planning and Standards, (Dec. 1997), 95 pgs.
Kilgroe, James D., et al., "Control of Mercury Emissions from Coal-Fired Electric Utility Boilers: Interim Report", US EPA Office of Research and Development, National Risk Management Laboratory, Air Pollution Prevention and Control Division, (Dec. 2001), 485 pgs.
Nelson, Sid Jr., et al., "How China Can Leapfrog the World in Mercury Emission Reductions", Proc. of the AWMA Intl. Specialty Conference on Leapfrogging Opportunities for Air Quality Improvement, (2010), 24 pgs.
Pavlish, John H., et al., "Status review of mercury control options for coal-fired power plants", Fuel Processing Technology, vol. 82, (2003), 77 pgs.
Yang, Yang, et al., "Effect of HBr formation on mercury oxidation via CaBr(2) addition to coal during combustion", RSC Advances, 6(64), 2016, 7 pgs.

* cited by examiner




FIG. 1



H
SO4 2-
Carbon Oxidation Site
H
Br
HBr
Carbon Basic
Zigzag Site
H
Hg— Br
NO2
HgBr2
Hg
Br


FIG. 2


100
Exhaust
206
205
35
42
160
150
140
161
151
141
207
162
152
Waste
Ash
25
110
120
130
201
131c
203
121c
202
121b
131b
111
121
131
204
170
115
116
208
15
180
117
209
171
118
119

FIG. 3


Br-Br
Me – O – Me – O – Me – O
O – Me – O – Me – O – Me
A
δ-
Br.....Br
δ+
Me – O – Me O – Me – O
O – Me – O – Me – O – Me
B
Hg
Hg
δ-
Br.....Br
δ+
Me – O – Me O – Me – O
O – Me – O – Me – O – Me
C
Br
Hg
Br
Me – O – Me O Me – O
O – Me – O – Me – O – Me
D

FIG. 4



301
401
501
502
302
503
303
504
304
505
402
403
404


FIG. 5A



301'
401'
501'
502'
302'
503'
304'
504'
303'
505'
402'
403'
404'


FIG. 5B

Case: 26-1403 Document: 31 Page: 251 Filed: 08/25/2026

ME2C-RC-00074490
PTX-001.0016






FIG. 6

# SORBENTS FOR THE OXIDATION AND REMOVAL OF MERCURY

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. patent application Ser. No. 15/295,594, filed Oct. 17, 2016, which is a continuation of U.S. patent application Ser. No. 14/102,896 filed on Dec. 11, 2013 (now U.S. Pat. No. 9,468,886), which is a continuation of U.S. patent application Ser. No. 12/429,058 filed on Apr. 23, 2009 (now U.S. Pat. No. 8,652,235), which is a continuation-in-part of U.S. patent application Ser. No. 12/201,595 filed on Aug. 29, 2008 (abandoned), which is a divisional of U.S. patent application Ser. No. 11/209,163 filed on Aug. 22, 2005 (now U.S. Pat. No. 7,435,286), which claims priority from provisional application Ser. No. 60/605,640 filed on Aug. 30, 2004. The disclosures of U.S. patent application Ser. Nos. 14/102,896; 12/429,058; 12/201,595; 11/209,163; and 60/605,640 are hereby incorporated herein by reference to the extent appropriate.

## BACKGROUND OF THE INVENTION

Technical Field of the Invention

The present invention relates to methods and materials for the removal of pollutants from flue gas or product gas from a gasification system. In particular, mercury is removed from gas streams generated during the burning or gasification of fossil fuels by highly reactive regenerable sorbents.

Background of the Invention

The combustion and gasification of fossil fuel such as coal generates flue gas that contains mercury and other trace elements that originate from the fuel. The release of the mercury (and other pollutants) to the environment must be controlled by use of sorbents, scrubbers, filters, precipitators, and other removal technologies. Mercury is initially present in the elemental form during combustion and gasification. In downstream process sections, such as in the ducts and stack of a combustion system, some of the elemental mercury is oxidized. The amount that is oxidized depends on the amount of acid gases present in the flue gas and other factors. Amounts of mercury vary with the fuel, but concentrations of mercury in the stream of flue gas from coal combustion are typically less than 5 parts per billion (ppb). Large coal combustion facilities such as electric utilities may emit a pound of mercury, or more, a day. Mercury removal applications include, without limitation, flue gas from coal (or other fossil fuel) combustion, waste incineration, product gas from gasification, as well as off-gases from mineral processing, metal refining, retorting, cement manufacturing, chloralkali plants, dental facilities, and crematories.

Mercury Sorbent Technologies

Several types of mercury control methods for flue gas have been investigated, including injection of fine sorbent particles into a flue gas duct and passing the flue gas through a sorbent bed. Fine-particle injection sorbents include activated carbon, metal oxide sorbent, sodium sulfide particles, and basic silicate or oxide sorbents. When particle injection is employed, the mercury captured on the sorbent particles is removed from the gas stream in a particulate control device such as a baghouse or electrostatic precipitator (ESP) and collected along with ash particulate. The sulfide and basic silicate and oxide particles are effective only for the oxidized mercury, and the metal oxide sorbents exhibit slower capture kinetics than the carbon particles. Additionally, injection of fine carbon particles into the flue gas stream has been only partially successful in removing mercury, especially elemental mercury, where effective removal of only about 60% is attained for some applications with a FF (fabric filter) to collect carbon and ash. Even lower removal rates have been observed when an ESP is used to collect the carbon because the contact time of the carbon with the gas is very short.

A major problem with existing carbon injection systems is that the sorbent is relatively unreactive toward mercury. Consequently, these sorbents must be used in large amounts, at high sorbent-to-mercury ratios, to effectively capture the mercury. These sorbents tend to be relatively expensive and cannot be easily separated from the ash for regeneration and reuse. The collection of carbon in the ash also creates solid waste disposal problems, and the spent sorbent may contaminate the collected ash, preventing its use in various applications.

One solution has been to add an oxidative sorbent comprising an aluminosilicate material impregnated with a very heavy dosage of one or more oxidative metal halides plus activated carbon. For example, refer to Varma et al. (20070140940). However, the amounts of metal salts required for Hg oxidation are generally relatively large and expensive. Also, several of the salts that can be used in such a process are highly toxic. Although the metal salts are present for oxidation in this process, activated carbon is essential for getting adsorption of the Hg. As such, there is no synergistic role for the aluminosilicates as they appear to be only a support for the oxidizing salts.

Another approach has been the injection of aluminosilicate particulate such as bentonite, which contains neither oxidizing salts nor halogen complexes with a Lewis base site, and thus lacks the more powerful oxidizing capability of the said complexes as described in this application. For example, see U.S. Pat. No. 7,413,719. Additionally, the injection of an aluminosilicate (kaolin or metakaolin) containing calcium hypochlorite which thermally decomposes to form halogen is also known. For example, see U.S. Patent Application No. 20030103882. Thus these and similar impregnated aluminosilicate technologies require time in flight at appropriate high temperatures to heat the impregnated salt(s) to generate an oxidation site. This clearly represents a kinetic barrier to activation in contrast to the extremely fast complexing reaction of the Lewis acid on the surface of the appropriate Lewis base sorbent described in the present patent. The kinetic barrier is only for heating up the calcium hypochlorite to decompose it to Cl atoms or molecules. Halogen (bimolecular or atomic) would complex with carbon or noncarbon at any lower temperature to form reactive oxidation sites. Also, halide would require a very high temp or strong acid to form reactive halogen or halogen complex.

Yet another approach is the injection of bentonite plus a metal sulfide and a metal salt, none of which is oxidizing to elemental mercury and would require a slow thermal activation step. For example, see U.S. Patent Application No. 20070119300.

The injection of halogen or halogen precursors in a hot zone, followed by contact with an alkaline material in a wet or dry scrubber is another approach known in the art. With such an approach, elemental mercury is claimed to be oxidized by the halogen to Hg(II) which is collected by the alkaline material in the scrubber. For example, see U.S. Pat. No. 6,808,692 (Oehr), U.S. Pat. No. 3,849,267 (Hilgen), U.S. Pat. No. 5,435,980 (Felsvang), U.S. Pat. No. 6,375,909

(Dangtran), U.S. Patent Application No. 20020114749 (Cole), U.S. Pat. No. 6,638,485 (Iida), U.S. Patent Application No. 20030185718 (Sellakumar), U.S. Patent Application No. 20030147793 (Breen), and U.S. Pat. No. 6,878,358 (Vosteen). However, even though it is known to inject halogen forms at some stage of the combustion process, such a process does not utilize a complexing method on a sorbent surface for conducting the oxidation and capture. Further, the alkaline material is rapidly surface-coated by the large concentrations of acid gases, lowering its capacity for adsorption of Hg(II). It is also recognized that the halogen forms initially introduced or generated are far more reactive to the large concentrations of $SO_2$ and moisture in the flue gas, and so gas-phase reactions of the halogens with Hg are hindered. In contrast, the present invention takes advantage of the Lewis acid complexes that rapidly form on the sorbent surface to effect the Hg oxidation, rather than rely on gas phase reactions for oxidation. Thus HCl, HBr, $SO_2Br$, and other gas-phase products all festoon the surface and promote the activity of the sorbent by forming complexes with the sorbent to form a promoted sorbent.

Accordingly, there remains a need for more economical and effective mercury removal technology. This invention provides for cost-effective removal of pollutants, including mercury, using sorbent enhancement additives and/or highly reactive sorbents, with contact times of seconds (or less), and that may be regenerated and reused.

## SUMMARY

The various embodiments of the present invention overcome the various aspects of the deficiencies of the prior art and provide new and economical methods for the removal of mercury from the gases produced in the utilization of fossil fuels.

A halogen/halide-promoted sorbent is described that is highly effective for the removal of mercury from flue gas streams. The sorbent comprises any activated carbon and/or non-carbon compound, such as porous or vesicular felsic or basaltic materials, clay-based compounds, alkaline compounds, calcium hydroxide compounds, sodium acetate compounds, and/or bicarbonate compounds, or a combination thereof. Optional secondary components and alkali may be added to further increase reactivity and mercury capacity. Mercury removal efficiencies obtained exceed or match conventional methods with added benefits such as reduced costs. Optionally, the promoted sorbent can be regenerated and reused. Sorbent treatment and/or preparation methods are also described. Methods for in-flight preparation, introduction, and control of the sorbent, promoter and promoted sorbent into the mercury contaminated gas stream are described.

When a promoted or a non-promoted base sorbent reacts with elemental or oxidized mercury, a mercury/sorbent chemical composition is formed and, in the case of elemental mercury reacting with the promoted base sorbent, the mercury is oxidized. As discussed in further detail in other portions of the specification, the base sorbent may be either a carbon or a non-carbon material or a combination thereof. Additionally, the mercury/sorbent chemical composition may be comprised of covalent bonds, ionic bonds and/or chemical complexes between the promoted or non-promoted base sorbent and the oxidized mercury. The Lewis basic groups on the non-promoted base sorbent, or the non-promoted portions of a promoted base sorbent, are available for reaction with the Lewis acid groups of already existing oxidized mercury in the mercury containing gas. Thus, mercury may be removed from the mercury containing gas stream through the formation of multiple and various mercury/sorbent chemical compositions even within the same process. For example, multiple sites on a sorbent particulate can form multiple and various mercury/sorbent chemical compositions in the case where only a portion of the sites on the base sorbent particulate are promoted.

In some embodiments, a carbon and/or non-carbon promoted sorbent and/or a combination thereof is provided comprising a sorbent structure that has reacted with a promoter selected from the group consisting of halides, halogens, and combinations thereof, such that the reaction product is effective for the removal of mercury from a gas stream. The carbon sorbent comprises reactive Lewis acid groups/sites; the non-carbon sorbent comprises reactive Lewis basic groups/sites.

In an embodiment, a promoted carbon and/or non-carbon sorbent is provided wherein the base sorbent is selected from the group consisting of carbon, activated carbon, porous or vesicular felsic and basaltic materials, clay-based compounds, alkaline compounds, calcium hydroxide compounds, sodium acetate compounds, and/or bicarbonate compounds, or a combination thereof, with an average particle size similar to that of fly ash produced from a thermal process (combustion or gasification) or greater than that of fly ash produced such that it is physically separable therefrom, and combinations thereof, and the promoter is selected from the group consisting of molecular halogens, Group V (CAS nomenclature is used throughout) halides, Group VI halides, hydrohalides, and combinations thereof. In an embodiment, the promoted sorbent (carbon, non-carbon, or their combination) may have a mass mean particle diameter such that it can be substantially separated by physical means from entrained ash in the gas stream from which mercury is to be removed. In an embodiment, the base sorbent (carbon, non-carbon, or their combination) may have a mass mean particle diameter greater than about 40 micrometers.

In another embodiment, the promoted sorbent comprises from about 1 to about 30 grams of promoter per 100 grams of base sorbent. Another embodiment further comprises an optional secondary component comprising a halogen or a hydrohalide such that the reactivity and mercury capacity of the promoted sorbent are enhanced.

In another embodiment, the concentration of the optional secondary component on the finished sorbent is within the range of from about 1 to about 15 wt % of the concentration of the promoter on the finished sorbent.

In another embodiment, an optional alkali component may preferably be added to provide a synergistic effect through combination of this alkali with the base sorbent.

In another embodiment, the optional secondary component is selected from the group consisting of Group V halides, Group VI halides, HI, HBr, HCl, and combinations thereof. In another embodiment, the promoter is substantially in vapor form when combined with the base sorbent. In another embodiment, the promoter is combined with an organic solvent prior to reaction with the base sorbent. In another embodiment, the promoter and optional secondary component are combined with the base sorbentsubstantially simultaneously. Another embodiment further comprises adding a mercury-stabilizing reagent selected from the group consisting of S, Se, $H_2S$, $SO_2$, $H_2Se$, $SeO_2$, $CS_2$, $P_2S_5$, and combinations thereof. Another embodiment further comprises adding an optional alkali component.

In an embodiment, a method is provided comprising providing a granular base sorbent and reacting the base

sorbent with a promoter selected from the group consisting of halogens, halides, and combinations thereof, such that the reaction product comprises a promoted sorbent effective for removal of mercury from a gas stream. In a further embodiment, the reaction product comprises from about 1 to about 30 grams of promoter per 100 grams of base sorbent. In another embodiment the reaction product has an average particle-size distribution greater than the average size of entrained ash particles in the gas stream from which mercury is to be removed, such that the reaction product can be substantially removed from the entrained ash particles by physical means. In another embodiment, the reaction product has a mass mean particle diameter greater than about 40 micrometers.

In another embodiment, the promoter is selected from the group consisting of molecular halogens, hydrohalides, Group V halides, Group VI halides, and combinations thereof. In another embodiment, the promoter is in the gas phase when contacting the base sorbent (carbon, non-carbon, or their combination). In another embodiment, the promoter is in an organic solvent when contacting the base sorbent (carbon, non-carbon, or their combination).

In another embodiment, the promoter is selected from the group consisting of $Br_2$, a Group V bromide, a Group VI bromide, and combinations thereof.

In another embodiment, the method further comprises reacting the granular non-carbon with an optional secondary component comprising a halogen or a hydrohalide such that the reactivity and mercury capacity of the promoted sorbent are enhanced. In another embodiment, the promoter and optional secondary component are contacted simultaneously with the non-carbon base sorbent. In another embodiment, the method further comprises adding a mercury-stabilizing reagent selected from the group consisting of S, Se, $H_2S$, $SO_2$, $H_2Se$, $SeO_2$, $CS_2$, $P_2S_5$, and combinations thereof. In an embodiment, a method is provided for control of mercury in a flue gas with substantially lower sorbent requirements. Through enhanced sorbent reactivity, mercury removal per gram of sorbent is increased, thereby decreasing the capital and operating costs by decreasing sorbent requirements.

In an embodiment, the promoted sorbent is introduced by direct injection into the flue gas stream. In another embodiment, the base sorbent is promoted within the flue gas stream

In an embodiment, a method is provided for reducing mercury in flue gas comprising providing a base sorbent, either by injection or in situ creation, into a mercury-containing flue gas stream, collecting greater than 70 wt % of the mercury in the flue gas on the promoted sorbent to produce a cleaned flue gas, and substantially recovering the promoted sorbent from the cleaned flue gas. In embodiments where less than 70 wt % mercury removal is desired, the required removal is attained using less base sorbent as would be required with standard base sorbent. In a further embodiment, the method further comprises monitoring the mercury content of the clean flue gas, regenerating the recovered promoted sorbent, and using the monitored mercury content of the cleaned flue gas to control the rate of base sorbent and promoter. In another embodiment the injected promoted sorbent is prepared in-flight by reacting a base sorbent (carbon, non-carbon, or their combination) and a promoter within a pneumatic transport line from which the reaction product is injected to the mercury-containing flue gas stream.

In another embodiment, the promoter is selected from the group consisting of molecular halogens, halides, and combinations thereof. In another embodiment, the promoter is reacted in the gas phase or as a vapor. In another embodiment, the promoter is added at from about 1 to about 30 grams per 100 grams of the base sorbent (carbon, non-carbon, or their combination).



In another embodiment, the injected promoted sorbent is prepared in-flight by reacting a base sorbent (carbon, non-carbon, or their combination), a promoter, and an optional secondary component to enhance the reactivity and capacity of the promoted sorbent within a pneumatic transport line from which the reaction product is injected to the mercury-containing flue gas stream.

In another embodiment, the optional secondary component is selected from the group consisting of iodine, hydrohalides, Group V halides, Group VI halides, and combinations thereof. In another embodiment, the optional secondary component is added at from about 1 to about 15 wt % of the promoter content. In another embodiment, the method further comprises adding to the promoted sorbent a mercury-stabilizing reagent selected from the group consisting of S, Se, $H_2S$, $SO_2$, $H_2Se$, $SeO_2$, $CS_2$, $P_2S_5$, and combinations thereof.

In an embodiment, the method further comprises coinjecting an optional alkaline material, including without limitation alkaline and alkaline-earth components, to improve the efficiency of mercury capture by capturing oxidized mercury and/or capturing gaseous components that might otherwise reduce promoted sorbent capacity. In another embodiment, the optional alkaline material may preferably comprise calcium oxide, sodium carbonate, and the like, as are known in the art.

In another embodiment, the method further comprises using the monitored mercury content of the cleaned flue gas to control the composition of the promoted sorbent. In another embodiment, the promoted sorbent is prepared in-flight by reacting a base sorbent (carbon, non-carbon, or their combination) and a promoter within the flue gas stream or in a transport line from which the reaction product is injected to the mercury-containing flue gas stream, wherein the promoter is selected from the group consisting of molecular halogens, halides, and combinations thereof, wherein the promoter is reacted in the gas phase or as a vapor, wherein the promoter is added at from about 1 to about 30 grams per 100 grams of the base sorbent (carbon, non-carbon, or their combination), wherein the rate at which the promoter is added and the rate of promoted sorbent injection are determined by a digital computer based, at least in part, on the monitored mercury content of the cleaned flue gas.

In an embodiment, a method for reducing the mercury content of a mercury and ash-containing gas stream is provided wherein particulate carbon and/or non-carbon promoted sorbent with a mass mean size greater than 40 μm is injected into the gas stream, mercury is removed from the gas by the promoted sorbent particles, the promoted sorbent particles are separated from the ash particles on the basis of size, and the promoted sorbent particles are reinjected to the gas stream. In another embodiment, the mercury-containing promoted sorbent particles are regenerated to remove some or substantially all of the mercury. In another embodiment, an alkaline component is coinjected into the gas stream. In another embodiment, the promoted sorbent may further comprise a promoter. The promoter may preferably comprise a halide, a halogen, or both.

In an embodiment, a method for reducing mercury in a mercury-containing gas to a desired level is disclosed. The method comprises reacting a carbon base sorbent with at least one promoter selected from the group consisting of molecular halogens, halides, and combinations thereof to

produce a promoted carbon sorbent; allowing said promoted carbon sorbent to interact with a mercury-containing gas to capture mercury in the mercury-containing gas on the promoted sorbent to produce a cleaned gas; and monitoring the mercury content of the cleaned gas. In some embodiments, the carbon base sorbent and the promoter are introduced into the mercury-containing gas at the same location or at separate locations. In some embodiments, the carbon base sorbent or promoter or combination thereof is introduced into the mercury-containing gas at one or more locations. In an embodiment, the rate at which the carbon base sorbent is introduced or the rate at which the promoter is introduced or combination thereof is adjusted according to the monitored mercury content of the cleaned gas so that the mercury content of the cleaned gas is maintained at substantially the desired level with minimal operating cost.

In a further embodiment, the method comprises reacting a non-carbon base sorbent with at least one promoter selected from the group consisting of molecular halogens, halides, and combinations thereof to produce a promoted non-carbon sorbent; allowing said promoted non-carbon sorbent to interact with a mercury-containing gas to capture mercury in the mercury-containing gas on the promoted sorbent to produce a cleaned gas; and monitoring the mercury content of the cleaned gas. In some embodiments, the non-carbon base sorbent and the promoter are introduced into the mercury-containing gas at the same location or at separate locations. In some embodiments, the non-carbon base sorbent or promoter or combination thereof is introduced into the mercury-containing gas at one or more locations. In an embodiment, the rate at which the non-carbon base sorbent is introduced or the rate at which the promoter is introduced or combination thereof is adjusted according to the monitored mercury content of the cleaned gas so that the mercury content of the cleaned gas is maintained at substantially the desired level with minimal operating cost.

In a further embodiment, a method for reducing mercury in a mercury-containing gas to a desired level is presented. The method comprises reacting a base sorbent with at least one promoter selected from the group consisting of molecular halogens, halides, and combinations thereof to produce a promoted sorbent, wherein said base sorbent is selected from the group consisting of a non-carbon material, a carbon material, and combination thereof; allowing said promoted sorbent to interact with a mercury-containing gas to capture mercury in the mercury-containing gas on the promoted sorbent to produce a cleaned gas; and monitoring the mercury content of the cleaned gas.

In some embodiments, the base sorbent and the promoter are introduced into the mercury-containing gas at the same location or at separate locations. In some embodiments, the base sorbent or promoter or combination thereof is introduced into the mercury-containing gas at one or more locations. In some embodiments, introducing the base sorbent and the promoter comprises injecting the base sorbent and the promoter into the mercury-containing gas. In some embodiments, the promoter is introduced into the mercury-containing gas upstream of the introduction of the base sorbent. In some embodiments, the promoter is introduced upstream of a boiler or a combustion chamber. In an embodiment, the rate at which the base sorbent is introduced or the rate at which the promoter is introduced or combination thereof is adjusted according to the monitored mercury content of the cleaned gas so that the mercury content of the cleaned gas is maintained at substantially the desired level with minimal operating cost.



In an embodiment, the base sorbent for the promoted sorbent is selected from the group consisting of carbon, activated carbon, porous felsic materials, vesicular felsic materials, porous basaltic materials, vesicular basaltic materials, clay-based compounds, alkaline compounds, calcium hydroxide compounds, sodium acetate compounds, bicarbonate compounds, and combinations thereof. In embodiments, the non-carbon material comprises Lewis basic groups and the carbon material comprises Lewis acid groups. In some cases, the non-carbon material comprises amorphous forms of tectosilicates comprising nanoscale cavities lined with Lewis basic oxygen associated with alkaline-earth metals. The alkaline-earth metals comprise Group I and Group II alkaline-earth metals. In some other cases, the non-carbon material comprises amorphous forms of phyllosilicates comprising nanoscale cavities lined with Lewis basic oxygen.

In an embodiment, the promoted sorbent comprises metastable complexes formed between the promoter of this disclosure and inorganic species on the non-carbon base sorbent. In some embodiments, the inorganic species is selected from the group consisting of sodium compounds, calcium compounds, magnesium compounds, aluminum compounds, iron compounds, and combinations thereof. In an embodiment, the promoted sorbent comprises metastable complexes formed between the promoter of this disclosure and metal-oxygen-metal structures on the non-carbon base sorbent. In some embodiments, the promoter after being complexed with the metal-oxygen-metal structures is in the form selected from the group consisting of a dihalogen group, a halogen atom, a hydrohalogen group, a Group V halide, a Group VI halide, and combinations thereof. In an embodiment, the promoted sorbent comprises activated Lewis basic groups or activated Lewis acid groups or combination thereof. In some embodiments, the interaction between promoted sorbent and said mercury-containing gas stream comprises mercury diffusing from the gas phase onto said promoted sorbent surface; and reacting with the activated Lewis basic groups or activated Lewis acid groups or combination thereof to cause chemisorption on the promoted sorbent surface.

In an embodiment, the method for reducing mercury in a mercury-containing gas to a desired level further comprises pretreating the base sorbent to increase the number of Lewis basic groups or Lewis acid groups or combination thereof. In some cases, the pretreating methods comprise chemical treatment, thermal treatment, vacuum treatment, and combinations thereof. In some embodiments, chemical treatment comprises acid treatment and alkaline treatment. In an embodiment, the method for reducing mercury in a mercury-containing gas to a desired level further comprises introducing an alkali component into the mercury-containing gas.

As will be described in more detail below, the present invention thus provides several advantages over previously known techniques, including significantly more effective and economical mercury sorbents for effluent gases, advantageously applicable to treating gas streams from combustion and gasification systems.

The foregoing has outlined rather broadly the features and technical advantages of the present invention in order that the detailed description of the invention that follows may be better understood. Additional features and advantages of the invention will be described hereinafter that form the subject of the claims of the invention. It should be appreciated by those skilled in the art that the conception and specific embodiments disclosed may be readily utilized as a basis for modifying or designing other structures for carrying out the

same purposes of the present invention. It should also be realized by those skilled in the art that such equivalent constructions do not depart from the spirit and scope of the invention as set forth in the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more detailed description of the preferred embodiments of the present invention, reference will now be made to the accompanying drawings.

FIG. **1** schematically illustrates methods for preparation of promoted carbon and/or non-carbon sorbents in accordance with the present invention.

FIG. **2** illustrates a proposed mechanistic model of the chemical reactions resulting in the oxidation and capture of mercury.

FIG. **3** schematically illustrates preparation of promoted carbon and/or non-carbon sorbents and processes for flue gas mercury reduction in flue gases and/or product gases from a gasification system in accordance with the present invention, including in-flight preparation of promoted carbon and/or non-carbon sorbent.

FIG. **4** illustrates a mechanism for promotion of metal oxide base sorbent via formation of a reactive halogen complex sorbent and subsequent capture of elemental mercury on the promoted sorbent.

FIG. **5**A schematically illustrates an exemplary process flow diagram for in-flight preparation of a promoted carbon and/or non-carbon sorbent.

FIG. **5**B schematically illustrates an exemplary process flow diagram for in-flight preparation of a promoted carbon and/or non-carbon sorbent.

FIG. **6** is a block diagram illustrating the use of the invention in a coal fueled facility.

## DETAILED DESCRIPTION

Herein will be described in detail specific preferred embodiments of the present invention, with the understanding that the present disclosure is to be considered an exemplification of the principles of the invention and is not intended to limit the invention to that illustrated and described herein. The present invention is susceptible to preferred embodiments of different forms or order and should not be interpreted to be limited to the specifically expressed methods or compositions contained herein. In particular, various preferred embodiments of the present invention provide a number of different configurations and applications of the inventive method, compositions, and their uses.

The present invention provides a cost-effective way to capture pollutants by utilizing exceptionally reactive halogen/halide-promoted sorbents using a bromide (or other halogen/halide) treatment of the promoted sorbent, that capture mercury via mercury-sorbent surface reactions, at very short contact times of seconds or less. The reactivity of the promoted sorbent toward the pollutants (i.e., mercury) is greatly enhanced, and the sorption capacity can be regenerated; i.e., the promoted sorbent may be regenerated, recycled and/or reused.

The treated base sorbents (carbon, non-carbon, or their combination), treatment techniques, and optional additives discussed herein have applicability to mercury control from the product or effluent gas or gases from gasification systems, syngas generators, and other mercury-containing gas streams, in addition to the flue gas from combustion systems. Thus it should be understood that the terms combustion system and flue gas as used throughout this description may apply equally to gasification systems and syngas or fuel gas, as will be understood by those skilled in the art.

Hereinafter the disclosure may at times discuss the use of carbon base sorbents in further details; however the use of non-carbon base sorbents and a combination of carbon and non-carbon base sorbents is also contemplated to at least the same degree as carbon base sorbents.

Referring now to FIG. **1**, there is shown a block flow diagram illustrating some preferred embodiments of the process of the present invention to prepare promoted sorbents useful for mercury capture in a mercury containing gas, such as a flue gas and/or product gas from gasification system streams. In a preferred embodiment illustrated by path **10**-**20**, block **10** illustrates providing a base sorbent while block **20** illustrates adding a halogen or halide promoter that reacts with the base sorbent to produce a product-promoted sorbent. In embodiments where the halogen or halide is added, for example, as a vapor, no further steps may be necessary. In embodiments where the halogen or halide is added in, for example, a solvent, it may be desirable to employ solvent removal as illustrated by block **20**A to produce a product-promoted sorbent suitable for injection.

Referring still to FIG. **1**, another preferred embodiment of the process of the present invention is illustrated by path **10**-**20**-**30**, comprising providing a base sorbent as shown by block **10**, adding a halogen or halide promoter that reacts with the base sorbent, illustrated at block **20**, and adding a secondary component illustrated at block **30** that reacts with the result of block **20** to produce a product-promoted sorbent. In embodiments where both the halogen or halide promoter and the secondary component are added, for example, as a vapor, no further steps may be necessary. In embodiments where the halogen or halide promoter and/or secondary component are added in, for example, a solvent, it may be desirable to employ solvent removal as illustrated by block **30**A to produce a product-promoted sorbent suitable for injection.

Referring still to FIG. **1**, another preferred embodiment of the process of the present invention is illustrated by path **10**-**40**, comprising providing a base sorbent as illustrated at block **10** and adding a halogen or halide promoter and a secondary component to the base sorbent together, with which they react to produce a product-promoted sorbent as illustrated by block **40**. As above, in embodiments where vapor additions are made to the base sorbent, no further steps may be desired. In embodiments where one or more components are added in solvent, a solvent removal step may be provided as illustrated by block **40**A to produce a product-promoted sorbent suitable for injection.

Referring still to FIG. **1**, another preferred embodiment of the process of the present invention is illustrated by path **10**-**50** in combination with path **20**-**50**. In this embodiment, a base sorbent as illustrated by block **10** is introduced to the mercury containing gas as illustrated by block **50** while a halogen or halide promoter as illustrated by block **20** is introduced to the mercury containing gas stream. Thus the base sorbent and promoter react at block **50** to produce a product-promoted sorbent. In a similar manner, a secondary component as illustrated by block **30** may be added to the halogen or halide promoter as illustrated by block **20** and introduced into the mercury containing gas as illustrated by block **50**. In embodiments where both the halogen or halide promoter and secondary component are added, for example, by vapor, no further steps may be taken. In embodiments where the halogen or halide and/or secondary component are

added in, for example, a solvent, it may be desirable to employ solvent removal as illustrated by block **20**A and/or block **30**A.

Referring still to FIG. **1**, also illustrated are preferred embodiments in which, as illustrated by block **50**, a mercury containing gas stream is treated with product-promoted carbon sorbent prepared as described above.

In some preferred embodiments, the carbon base sorbent provided may preferably be any of several types, as understood by those skilled in the art. For example, the carbon base sorbent may include powdered activated carbon, granular activated carbon, carbon black, unburned carbon, carbon fiber, carbon honeycomb or plate structure, aerogel carbon film, pyrolysis char, regenerated activated carbon from product-promoted carbon sorbent, or other types as known in the art.

In some preferred embodiments, the carbon base sorbent provided may preferably have a mass mean particle size greater than the fly ash in a mercury containing gas, such as a flue gas stream, to be treated.

In some preferred embodiments, the carbon base sorbent provided may preferably have a mass mean particle diameter preferably greater than 40 micrometers, more preferably greater than 60 micrometers, or a particle-size distribution greater than that of the fly ash or entrained ash in a flue gas stream, or other mercury containing gas, to be treated, such that the activated carbon and ash can be separated by physical means.

In some preferred embodiments, the halogen or halide promoter that is added to, and reacts with, the carbon base sorbent may preferably comprise, by way of illustration and not limitation, a molecular halogen in vapor or gaseous form, a molecular halogen in an organic solvent, a Group V or Group VI halide, such as $PBr_3$ or $SCl_2$, respectively, in vapor, liquid, or solution form (though not in an aqueous solvent).

Embodiments are also provided in which the organic solvent may preferably comprise a chlorinated hydrocarbon, such as dichloromethane, a hydrocarbon solvent, including for example, petroleum ether, ligroin, pentane, hexane, toluene, and benzene, carbon disulfide, a waste solvent, an ether, a recycled solvent, a supercritical solvent, such as supercritical $CO_2$, water (though not in the case of a Group V or Group VI halide), and others as will be apparent to those of skill in the art.

Referring now to FIG. **4**, a theory is illustrated developed from scientific evidence to explain the nature of the promoting compounds. For example, as illustrated in FIG. **4**, a molecular bromine molecule forms a complex with the surface of the base sorbent comprising a high surface area form of a metal oxide. Complexing with bromine can occur at surface and defect sites on the surface of the glassy amorphous tectosilicates by association with the Lewis basic oxygen lining the interstitial cavities and the alkali actions on the surface. Molecular hydrogen bromide or an electrophilic or Lewis acid bromine compound react to form a similar structure. The precedence for this promotion of a metal oxide surface complex with an acidic species is described in a paper by Stark and Klabunde (Klabunde, K. J. Chem. Mater. 1996, 8, 1913-1918) who showed addition of acids, HCl, $SO_3$, and NO, to a MgO surface to form a surface complex. In U.S. Pat. No. 6,517,423 to Koper et al. the described surface complexes were active for destroying biological agents and toxins. As shown in FIG. **4**, addition of halogens to a metal oxide surface (A) can form a complex that could be described as a bromide-oxybromide species (B), in which electrophilic reactivity is maintained, owing to the formation of positive charges on the surface. The electrophilic complex formed on the metal oxide base sorbent comprises an active site for oxidation of elemental mercury. Addition of mercury to the complex results in formation of a mercury oxygen bond and, simultaneously, a mercury bromine bond as shown in complex C in FIG. **4**. Thus the final structure is a stable oxidized Hg form (D) described as a metaloxymercuric bromide.

In summary, it has now been found that the formation of the new bromide complex with the metal oxide surface increases the surface reactivity toward mercury and other pollutants. Additionally, the resulting bromide compound is uniquely suited to facilitate oxidation of the mercury. The effectiveness of the oxidation apparently results from the promotion effect of the halide, exerted on the developing positive charge on the mercury during the oxidation, known in the chemical art as a specific catalytic effect. Thus as the mercury electrons are drawn toward the positive surface oxygen, the halide anion electrons are pushing in from the other side, stabilizing the positive charge developing on the mercury and lowering the energy requirement for the oxidation process. Bromide is especially reactive, owing to the highly polarizable electrons in the outer 4p orbitals of the ion. Thus adding HBr or $Br_2$ to the appropriate metal oxide forms a similar surface bromide complex, in which the positive oxygen oxidizes the mercury with the assistance of the bromide ion.

In embodiments, a non-carbon base sorbent with Lewis basic sites/groups comprising metal-oxygen-metal structures is activated by a promoter of this disclosure, forming a promoted sorbent. The promoter and the metal-oxygen-metal structures of the non-carbon base sorbent form metastable complexes, which are responsible for mercury capture via chemisorption. For example, metastable complexes may form between a halogen promoter and inorganic species on a non-carbon base sorbent, wherein inorganic species include sodium (Na), calcium (Ca), magnesium (Mg), aluminum (Al), iron (Fe) compounds, and combinations thereof. In some embodiments, the metastable complexes comprise a dihalogen group, such as Br—Cl, Br—Br, complexed with metal-oxygen-metal structures of the base sorbent. In some embodiments, the metastable complexes comprise a halogen atom, complexed with metal-oxygen-metal structures of the base sorbent. In some embodiments, the metastable complexes comprise a hydrohalogen group, complexed with metal-oxygen-metal structures of the base sorbent. In some embodiments, the metastable complexes comprise a Group V or Group VI halide, complexed with metal-oxygen-metal structures of the base sorbent. In some embodiments, the metal-oxygen-metal structures of the base sorbent are complexed with combinations of the functional groups disclosed herein. Without wishing to be limited by a theory, it is believed that mercury capture via chemisorption takes place through the action of mercury oxidation provided by these metastable complexes.

In embodiments, a carbon base sorbent with Lewis acid sites/groups comprising graphene sheets is activated by a promoter of this disclosure, forming a promoted sorbent. The promoter and the grapheme sheets of the carbon base sorbent form stable compounds, which are responsible for mercury capture via chemisorption. Without being limited by a theory, it is believed that mercury capture via chemisorption takes place through the action of mercury oxidation provided by these stable compounds. As one skilled in the art would appreciate, the versatility of chemistry associated with the base sorbent (carbon, non-carbon, or combination thereof) and the promoter of this disclosure

enables versatile applications of the promoted sorbent system for mercury capture. This is especially advantageous because mercury content in flue gases varies from facility to facility, from operation to operation, and from day to day.

Examples of non-carbon base sorbents are amorphous forms of tectosilicates that comprise nanoscale cavities lined with Lewis basic oxygen associated with Group I alkali metals and Group II alkaline-earth metals. Such tectosilicates can be found in naturally occurring minerals, including, but not limited to, perlite and pumacite. Examples of non-carbon base sorbents also include amorphous forms of phyllosilicates. It is appreciated that other minerals may be used and also treated chemically and thermally to increase the activity of the base sorbent materials, such as phyllosilicates in the amorphous forms.

In some embodiments, bentonites are used as non-carbon base sorbents, including sodium bentonite and calcium bentonite. The use of other types of bentonites is contemplated as is known to one skilled in the art. The application of bentonite base sorbents is by introducing them into the flue gas at a location of the mercury capture system wherein the temperature of that location is below 800° C.

In some embodiments, the base sorbents are treated chemically and/or thermally to increase their activity. For example, perlite as a base sorbent may go through vacuum treatment and then thermal treatment so as to reduce the moisture contained therein, increase its activity, and potentially alter its morphology. Other treatment processes include chemical treatment, such acid treatment and alkaline treatment. These treatment methods may be combined to achieve desired effects as known to one skilled in the art. One of the desired effects is to increase the number of available Lewis acid sites/groups in the carbon base sorbent and/or the number of available Lewis basic sites/groups in the non-carbon base sorbent for subsequent activation via reaction with a promoter disclosed herein.

Referring now to FIG. **3**, a schematic flow diagram is provided of mercury control system **100** comprising preparation of promoted base sorbents and flue gas mercury reduction in accordance with preferred embodiments of the present invention. In the exemplary embodiment shown, there is provided a base sorbent reservoir **110**, a halogen/halide promoter reservoir **120**, a secondary component reservoir **130**, and an alkali component reservoir **180**, each of which with corresponding flow control device(s) **201**, **202**, **203**, and **208**/**209**, respectively. In conjunction with the alkali component reservoir **180**, flow control devices **208** and **209** can be used independently, together, or not at all. Further, reservoirs **110**, **120**, **130** and **180** are optional and can be used in any combination, or not at all, whereby the otherwise stored components can be introduced into the system by other means either together or independently. Further, the alkali and secondary components may not be used at all within the system, if so desired.

As shown, reservoirs **110**, **120**, **130**, and **180** connect through their respective flow control devices and via associated piping, to transport line **115**. Alkali component reservoir **180** may also connect, through respective flow control devices and via associated piping, to transport line **118**. A source of air, nitrogen, or other transport gas(es) is provided by gas source **170** to transport line **115** for the purpose of entraining materials discharged from reservoirs **110**, **120**, **130**, and **180** and injecting such materials, via injection point **116**, into contaminated flue gas stream **15**. A source of air, nitrogen, or other transport gas(es) may be provided by gas source **171** to transport line **118** for the purpose of entraining materials discharged from reservoirs **180** and injecting such materials, via injection point **119**, into flue gas stream **15**. Gas sources **170** and **171** may be the same or different, as desired. Alternatively, transport gas(es) may be provided to both transport lines **115** and **118** by gas source **170** (connection from source **170** to line **118** not shown). Although gas sources **170** and **171** are shown in FIG. **3** as compressors or blowers, any source of transport energy known in the art may be acceptable, as will be appreciated by those of skill in the art.

For clarity, single injection points **116** or **119** are shown in FIG. **3**, although one skilled in the art will understand that multiple injection points and/or locations are within the scope of the present invention. In the embodiment shown, transport line **15** comprises multiple lines allowing for multiple injections and separate and/or combined injections of base sorbent **110** and promoter **120** and/or **130**. One mode of operation, by example, comprises providing base sorbent **110** in a common line which is promoted inline "in-flight" using promoter **120** and/or **130** and injected at point **116**. Another mode of operation, by example, comprises transport and injection of a base sorbent **110** in a separate line to a point downstream of the injection of promoter **120** and/or **130** in a line at point **116** which is upstream of injection of base sorbent **110**, resulting in in-flight preparation at a promoted sorbent within stream **15**.

In the exemplary embodiment shown, an optional optical density measuring device(s) **204** is connected to transport line **115** and/or **118** to provide signals representative of the optical density inside transport line **115** and/or **118** as a function of time.

Downstream from injection point **116** and **119** is provided particulate separator **140**. By way of illustration and not limitation, particulate separator **140** may comprise one or more fabric filters, one or more ESPs, or other particulate removal devices as are known in the art. It should be further noted that more than one particulate separator **140** may exist, sequentially or in parallel, and that injection point **116** and **119** may be at multiple locations upstream and/or downstream of **140** when parallel, sequential, or combinations thereof exist. Particulate separator **140** produces at least a predominantly gaseous ("clean") stream **142** and a stream **141** comprising separated solid materials. A sorbent/ash separator **150** separates stream **141** into a largely ash stream **152** and a largely sorbent stream **151**. Stream **151** may then preferably be passed to an optional sorbent regenerator **160**, which yields a regenerated sorbent stream **161** and a waste stream **162**.

An optional continuous emission monitor (hereinafter "CEM") **205** for mercury is provided in exhaust gas stream **35** to provide electrical signals representative of the mercury concentration in exhaust stream **35** as a function of time. The optional mercury CEM **205** and flow controllers **201**, **202**, **203**, **208**, and **209** are electrically connected via optional lines **207** (or wirelessly) to an optional digital computer (or controller) **206**, which receives and processes signals and preferably controls the preparation and injection of promoted carbon sorbent into contaminated flue gas stream **15**.

In operation, as example, promoted sorbent and/or an optional alkali component is injected into contaminated flue gas stream **15**. After contacting the injected material with the contaminated flue gas stream **15**, the injected material reduces the mercury concentration, transforming contaminated flue gas into reduced mercury flue gas, **25**. The injected material is removed from the flue gas **25** by separator **140**, disposed of or further separated by optional separator **150**, and disposed of or regenerated by an optional regenerator **160**, respectively. The reduced mercury clean

flue gas stream **142** is then monitored for mercury content by an optional CEM **205**, which provides corresponding signals to an optional computer/controller **206**. Logic and optimization signals from **206** then adjust flow controllers **201**, **202**, **203**, **208**, and **209** to maintain the mercury concentration in exhaust stream **35** within desired limits, according to control algorithms well known in the art. Flow controllers **201**, **202**, **203**, **208**, and **209** can also be adjusted manually or by some other automated means to maintain the mercury concentration in exhaust stream **35** within desired limits, according to control algorithms well known in the art.

Referring still to FIG. **3**, several embodiments are illustrated for preparation and injection of promoted sorbents and/or alkali components in accordance with the present invention. Stream **111** provides for introduction of base sorbent from reservoir **110**, as metered by flow controller **201** manually or under the direction of computer **206**. The halogen/halide may be combined and react with the base sorbent according to any of several provided methods. The halogen/halide may preferably be combined via line **121** directly into transport line **115**, within which it contacts and reacts with the base sorbent prior to injection point **116** or downstream at point **116**. This results in in-flight preparation of a promoted sorbent in accordance with the invention. Further, the halogen/halide may be combined via line **121***b* with the base sorbent prior to entering transport line **115**. Still further, the halogen/halide may be contacted and react with the base sorbent by introduction via line **121***c* into reservoir **110**. This option is preferably employed when, for example, reservoir **110** comprises an ebulliated or flueidized bed of base sorbent, through which halogen/halide flows in gaseous form or as a vapor. Of course, the halogen/halide may also preferably be contacted with the base sorbent in liquid form or in a solvent, as discussed previously, and solvent removal (not shown in FIG. **3**) may then be provided if necessary as mentioned with respect to embodiments discussed with reference to FIG. **1**.

Similarly, the optional secondary component may be contacted and react directly in transport line **115** via line **131**, or optionally as described above with respect to the halogen/halide, via lines **131***b* and **131***c*.

Similarly, the optional alkali component from **180** may either be added in transport line **115** directly, or may be injected separately by transport line **118**, combining downstream in flue gas **15** for synergistic effects with the base sorbent, promoted sorbent, or optional secondary components. Being able to vary on-site the amount of the optional alkali component relative to base sorbent, promoted sorbent, or optional secondary components is a key feature to overcome and optimize for site-specific operating and flue gas conditions.

In some preferred embodiments wherein contacting between components and reaction is performed in a liquid or solvent phase, stirring of such liquid and/or slurry mixtures may be provided. In other embodiments, the halogen/halide promoter and optional secondary component(s) may preferably be sprayed in solution form into or on the base sorbent. In some such embodiments, drying, filtering, centrifugation, settling, decantation, or other solvent removal methods as are known in the art may then be provided.

In embodiments wherein the halogen/halide promoter is in gaseous or vapor form, it may be diluted in air, nitrogen, or other gas as appropriate. The halide/halogen gas, for example, gaseous HBr or $Br_2$, may be passed through an ebulliated or flueidized bed of granular or fibrous base sorbent, with the promoted sorbent so produced removed from the top of the bed via gas entrainment for injection.

In some embodiments, the secondary component(s) may preferably comprise iodine or other halogens, hydrohalides, including without limitation HI, HBr, HCl, a Group V or Group VI element with a molecular halogen, such as $SCl_2$ and others. In some preferred embodiments, the promoted sorbent may comprise from about 1 to about 30 g of halogen/halide per 100 g of base sorbent. In some preferred embodiments, the promoted sorbent may comprise a secondary component in concentration of from about 1 to about 15 wt % of the concentration of the halogen/halide component.

In still other embodiments, the product-promoted sorbent may be applied to a substrate. In other embodiments, such prepared substrate(s) may be caused to contact a contaminated flue gas or gasification system product gas stream for mercury reduction purposes. Such substrates may be monolithic, rotating, or exposed to the gas stream in any number of ways known to those skilled in the art.

In some embodiments, a method is provided whereby a mercury stabilizing reagent is added to a promoted sorbent to produce a bifunctional sorbent. Such stabilizing reagent(s) may be sequentially added, either before or after the addition and reaction of the halogen/halide. In some preferred embodiments, the halogen/halide preferably comprises Br or HBr, and the mercury-stabilizing reagent may comprise S, Se, $H_2S$, $SO_2$, $H_2Se$, $SeO_2$, $CS_2$, $P_2S_5$, and combinations thereof.

Halogens in Mercury Capture

Methodologies for using halogens for the treatment of flue gas have been problematic, owing to their reactivity with other gases and metals, resulting in corrosion and health issues. A "halogen" is defined as a member of the very active elements comprising Group VIIA (CAS nomenclature is used throughout; Group VITA (CAS) corresponds to Group VIIB (IUPAC)) of the periodic table. In the molecular elemental form of the halogens, including $F_2$, $Cl_2$, $Br_2$, and $I_2$, the reaction with hot flue gas components leaves little to react with elemental mercury. The atomic elemental halogen form, which includes the flueorine, chlorine, bromine, and iodine atoms, is about a million times more reactive to mercury, but the concentration of the atomic forms is typically extremely low. In a large portion of electric utility coal combustion facilities, the concentrations are generally not sufficient to oxidize a significant amount of mercury.

The term "halide" as used herein is defined as a compound formed from the reaction of a halogen with another element or radical. In general, halide compounds are much less reactive than the molecular halogens, having a low chemical potential. Halides are considered reduced forms that do not, alone, oxidize other compounds. In the conventional view, therefore, a halide salt-treated sorbent will not effectively oxidize elemental mercury and capture elemental mercury.

Halogen-Promoted Sorbent Characteristics

The promoted sorbent described here has a very high initial reactivity for oxidizing mercury and therefore, can be used in very small amounts to achieve very high capture efficiencies, thus lowering operation costs and lessening waste disposal problems. In addition, further disposal reductions are obtainable by regenerating and reusing the promoted sorbents produced using the inventive technology. The time interval required for the mercury and the promoted sorbents of the present invention to successfully interact in a flue gas duct, with subsequent collection of the mercury on the promoted sorbent and ash, is very short—less than seconds. Clearly, such collection times require the promoted sorbent to have both high capacity and high reactivity toward mercury. The promoted sorbent can be utilized in a

very finely powdered form to minimize mass-transfer limitations. However, again, the reactivity should be very high to capture all of the mercury encountered by the fine particles. Additionally, use of these enhancement technologies allows capture to be effective for larger sorbent particles which also allows separation of the promoted sorbent from the ash to enable subsequent regeneration as well as ash utilization. One feature of this invention is the process to prepare a promoted sorbent containing a halide component formed on and/or within the base sorbent structure that provides a sorbent that is highly active on initial contact with the mercury-contaminated gas stream, which allows for very effective capture of the mercury.

The inventive sorbents chemically combine bromine species with Lewis acid/basic sites on the base sorbent. For example, x-ray photoelectron spectroscopy has established that the addition of bromine, chlorine, HBr, or HCl formed a chemical compound in the carbon structure. Thus the promoted sorbent produced from halogen and base sorbent does not represent a molecular halogen form, but rather a new chemically modified structure. This phenomenon may not occur with the less reactive iodine, where an $I_2$ molecular complex can exist on the carbon basal plane. In the case of bromine, modified cationic carbon has a high chemical potential for oxidation of mercury. Thus an entirely new model is presented for the reactivity of the bromine-treated carbon with mercury shown in FIG. **2**. The reactive carbon form can preferably be generated by the addition of bromine, hydrogen bromide, or combinations of bromine and other elements, as described herein. Halogen treatment resulted in higher-activity carbons because the halide anions (especially bromide and iodide) were effective in promoting oxidation by stabilizing the developing positive charge on the mercury in the transition state for oxidation. Based on this model, several innovative, inexpensive, activity-enhancing features have been developed.

Optional Second Component

It has been demonstrated that addition of an optional second component, in addition to the bromine, results in improved reactivity and capacity for the promoted sorbent, typically exceeding that of both the untreated base sorbent and the brominated carbon. The second compound comprises either a second halogen or a compound derived from a second halogen, such as HI. Thus in addition to having a reactive carbon form present, the second component generates a Lewis base with greater ability to stabilize the developing positive charge on the mercury. Thus the second component is an element with more polarized electrons (4p and 5p).

Optional Alkali Component

It has been demonstrated that addition of an optional alkali component with a base or promoted activated carbon results in improved mercury capture, typically exceeding that of both the untreated carbon and the promoted carbon. Test data indicate that flue gas contaminants, flue gas constituents ($SO_2$, NON, HCl, etc), operating temperature, mercury form, and mercury concentration may impact the effectiveness of the alkali addition. This suggests the need to be able to adjust and tailor the alkali-to-activated-carbon ratio on-site in order to overcome and optimize for a given set of site conditions.

The synergy that can be gained when coinjecting the two materials can be explained as follows. First, testing shows that binding sites on activated carbon (hereinafter "AC") can be consumed by chlorine species, sulfur species (i.e., sulfates), and other flue gas contaminants (arsenates, selenates, etc). The addition of optional alkali material will interact and react with these species/contaminants, thus minimizing their consumption of AC mercury binding sites. Second, testing also shows that standard AC will continue to oxidize mercury, even though the binding sites are fully consumed. This oxidized mercury can then react with alkali material and subsequently be captured by particulate control devices. Consequently, the addition of the optional alkali component acts to protect mercury-binding sites and capture oxidized mercury, thereby resulting in improved mercury reduction at lower cost. Alkali is generally much lower in cost (an order of magnitude less) than AC; thus more of it can be used, still resulting in overall lower costs.

In-Flight Sorbent Preparation

As stated previously, the halogen promoted sorbent can be readily produced in-flight. This is accomplished by, for example, contacting the vapors of any combination of halogens and, optionally, a second component, in-flight, with base sorbent particles. The particles may be dispersed in a stream of transport air (or other gas, such as the flue gas itself), which also conveys the halogen/halide-promoted sorbent particles to the flue gas duct, or other contaminated gas stream, from which mercury is to then be removed. There is no particular temperature requirement for this contact. This technology is obviously very simple to implement, and results in a great cost savings to facilities using this technology for mercury capture.

Referring to FIGS. **5A** and **5B**, process flow diagrams are shown as examples of the process for mercury removal from a mercury containing gas, such as a flue gas. In an embodiment shown at FIG. **5A**, gas inlet stream **501** passes through chamber **301** and enters air heater **302** as stream **502**; then it exits air heater **302** as stream **503** and passes through particulate control device **303** and enters scrubber **304** as stream **504**; finally it exits scrubber **304** as stream **505**. As shown, chamber **301** is a boiler, however, one skilled in the art will appreciate that chamber **301** can also be the combustion chamber of a coal fired boiler, a stand alone combustion chamber or any other chamber in which mercury containing gas is either generated or passed through. Injection streams **401**, **402**, **403** and **404**, in addition to stream **501**, are multiple locations wherein promoter, base sorbent, or a combination of promoter and base sorbent may be introduced.

FIG. **5B** shows an embodiment similar to that of FIG. A, but with the position of the scrubber and particulate control device switched. Specifically, gas inlet stream **501'** passes through chamber **301'** and enters air heater **302'** as stream **502'**; then it exits air heater **302'** as stream **503'** and passes through scrubber **304'** and enters particulate control device **303'** as stream **504'**; finally it exits particulate control device **303'** as stream **505'**. As shown, chamber **301** is a boiler, however, one skilled in the art will appreciate that chamber **301** can also be the combustion chamber of a coal fired boiler, a stand alone combustion chamber or any other chamber in which mercury containing gas is either generated or passed through. Injection stream locations **401'**, **402'**, **403'** and **404'**, in addition to stream **501'**, represent multiple locations wherein promoter, base sorbent, or a combination of promoter and base sorbent may be introduced.

At each of the aforementioned injection stream locations **401**, **401'**, **402**, **402'**, **403**, **403'**, **404** and **404'**, **501**, **501'** multiple injection points are contemplated so that promoter and base sorbent may be injected as a single injection stream or as separate injection streams, as further illustrated in the following exemplary embodiments.

In an embodiment, a promoter is introduced to chamber **301** at location **401**. A base sorbent (carbon, non-carbon, or

their combination) is introduced at location **402** upstream of air heater **302**. In a further embodiment, a promoter is introduced to at location **402** upstream of air heater **302**. A base sorbent (carbon, non-carbon, or their combination) is also introduced at location **402** either as a separate stream or as a mixed single stream with the promoter. In another embodiment, a promoter is introduced at locations **401** and **402**. A base sorbent (carbon, non-carbon, or their combination) is introduced at location **402** either as a separate stream or as a mixed single stream with the promoter.

With the aid of this disclosure, one of ordinary skill in the art will be able to configure the process in many different fashions for mercury removal using the promoted sorbent. All these configurations are considered equivalents of the disclosed process and therefore are within the scope of the claimed invention.

Advantages of On-Site Preparation

In-flight preparation of the halogen/halide-promoted sorbent on location produces certain advantages. For example, the treatment system can be combined with the base sorbent injection system at the end-use site. With this technique, the halogen/halide is introduced to the base sorbent air (or other gas, including to the flue gas or other mercury containing gas) mixture in a transport line (or flue gas duct part of the base sorbent storage and injection system). This provides the following benefits over current conventional concepts for treating sorbents off-site:

Capital equipment costs at a treatment facility are eliminated.

Costs to operate the treatment facility are eliminated.

There are no costs for transporting carbon and additive to a treatment facility.

The inventive process uses existing hardware and operation procedures.

The inventive technology ensures that the sorbent is always fresh and, thus, more reactive.

No new handling concerns are introduced.

There are no costs for removing carbon from treatment system.

The inventive process allows rapid on-site tailoring of additive-sorbent ratios in order to match the requirements of flue gas changes, such as may be needed when fuels are changed or loads are reduced, thus further optimizing the economics.

The inventive technology reduces the amount of spent sorbents that are disposed.

With the foregoing and other features in view, there is provided, in accordance with the present invention, embodiments including a process for preparing and regenerating halogen/halide-promoted sorbents, whose activity for mercury capture is enhanced by the addition of halogen (e.g., bromine) to the base sorbent structure.

Sorbent Injection Location

Some of the preferred embodiments contemplate the use of a halogen-promoted sorbent in a powdered form that has been injected into a flue gas stream before or after ash particulates have been removed. Other embodiments of the inventive composition of the halogen-promoted sorbent comprise a powdered modified AC prepared by adding $Br_2$ or HBr plus a second optional component. Other embodiments allow the addition of the optional alkali component in conjunction with a base AC and/or with the use of a halogen-based sorbent and any other combinations of the sorbent technologies provided in this patent. Other embodiments allow for in-flight preparation of promoted sorbents by using and combining the promoters and base sorbents. Alternatively, embodiments include methods wherein the base sorbent is on a moving contactor consisting of particles or fibers containing one or more of the compositions listed above.

Sorbent Regeneration

Any of the above embodiments of the halogen/halide-promoted carbon and/or non-carbon sorbent can be easily regenerated; the poisoning contaminants from the flue gas are preferably removed, and an inexpensive promoting agent added, to restore mercury sorption activity. This process of promoting the activity of the carbon and/or non-carbon itself contrasts with the earlier, more expensive, conventional methods of adding a reagent (such as peroxide, gold, triiodide, etc.) to a base sorbent. The halogen/halide-promoted carbon sorbent of the present invention, treated with bromine and/or optional components, is noncorrosive. Detailed examples of sorbent regeneration techniques are described in copending, commonly owned PCT Patent Application No. PCT/US04/12828, titled "PROCESS FOR REGENERATING A SPENT SORBENT," which is hereby incorporated by reference in its entirety.

Sorbent Injection Control Schemes

Another advantage of the present invention relates to the use of a feedback system to more efficiently utilize certain aspects of the invention. Where possible and desirable, the mercury control technology of the present invention may preferably utilize continuous measurement of mercury emissions as feedback to assist in control of the sorbent injection rate. Tighter control on the sorbent and optional component(s) levels can be achieved in this way, which will ensure mercury removal requirements are met with minimal material requirements, thus minimizing the associated costs. In an embodiment, the mercury emissions are continuously measured downstream of the injection location, preferably in the exhaust gas at the stack.

## EXAMPLES

To more clearly illustrate the present invention, an example is presented below. This example is intended to be illustrative, and no limitations to the present invention should be drawn or inferred from the example presented herein.

### Example 1

### Non-carbon-Promoted Sorbent Tests at Full-Scale Plants

Full-scale commercial tests were conducted at several coal-burning facilities equipped with ESPs wherein three types of pre-cursers were injected upstream of an ESP at 325° F. In all, more than thirty tests were performed with variations in base sorbent material, base sorbent material injection rates and promoter injection rates. Promoters were halogen-based materials. Base sorbents were clay-based materials such as perlite and pumacite, which are vesicular forms of tectosilicates comprising silicates and aluminate tetrahedra with alkali metals in the interstitual spaces. Each base sorbent was injected upstream from the ESP.

The flue gas flow rate for the test was approximately 23 million $dsft^3$/hr with a corresponding mercury flow rate of 0.0097 lbs Hg/hr. Initial mercury concentration in the flue gas prior to the introduction of the base sorbent or promoted sorbent was approximately 0.000417 lbs Hg/million $dsft^3$.

As shown in Table 1, each base sorbent was injected at three different test rates: about 100 lb/hr ("Low"), about 150 lb/hr ("Ave.") and about 200 lb/hr ("High"). At each test

rate, the mercury removal rate was measured both with and without the use of a promoter to show the relative benefit of introducing the promoter into the flue gas stream. For the tests where promoter was injected into the flue gas stream, promoter was injected at about 20 lb/hr for the "Low" tests, at about 25 lb/hr for the "Ave." tests and from about 30 to about 50 lb/hr for the "High" tests. The percent mercury removal for each test was calculated based on measurements taken from the inlet flue gas and the outlet flue gas. The results as shown in Table 1 clearly show a significant improvement in mercury capture when a promoter and base sorbent are injected, as compared to the injection of a base sorbent alone.

TABLE 1

Test Data for Non Carbon-Promoted Sorbents

| Base Sorbent | Base Sorbent Injection Rate (lb/hr) | | | Promoter Injection Rate (lb/hr) | | | Percent Removal of Mercury (%) | | |
|---|---|---|---|---|---|---|---|---|---|
| Material | Low | Ave. | High | Low | Ave. | High | Low | Ave. | High |
| Perlite | 100 | 150 | 200 | 0 | 0 | 0 | 37 | 40 | 43 |
| | 100 | 150 | 200 | 20 | 25 | 35 | 55 | 72 | 74 |
| Pumacite | 100 | 150 | 200 | 0 | 0 | 0 | 25 | 25 | 25 |
| | 100 | 150 | 200 | 20 | 25 | 50 | 52 | 60 | 65 |
| Clay- | 100 | 150 | 200 | 0 | 0 | 0 | 50 | 52 | 54 |
| Based Mix of Silica and Alumina | 100 | 150 | 200 | 20 | 25 | 30 | 58 | 65 | 74 |

## PROVISIONAL APPLICATION

A reactive sorbent material is described for capture of mercury in a vapor stream. The vapor stream includes flue gas from coal combustion or incineration, synthesis gas from gasification, as well as offgases from mineral processing, metal refining, retorting, cement manufacturing, chloralkali plants, dental facilities, and crematories. The sorbent is especially suited to, but not limited to, use in low-chlorine flue or exhaust gases where the mercury is mainly elemental. The sorbent comprises a bromide-modified carbon form containing a reactive compound produced by the reaction of bromine with the carbon. Other additional promoting substances can be added in smaller amounts to increase the reactivity with and sorption of elemental mercury. This combination results in a carbon bromide structure in the carbon lattice that can oxidize the mercury to a species that is strongly bonded to the carbon structure and, therefore, easily retained on the sorbent at higher temperatures in the presence of flue gas constituents. In some examples, the sorbent consists of a fine or coarse powdered material for injection into the gas stream or a granular or fibrous material for use in a fixed or moving bed. In some examples, the sorbent does not require in situ activation (an induction period) in a flue gas stream as do conventional activated carbon sorbents. Other additives of base chemistry (Ca, Na, and others) may be added to flue gas as a sorbent mixture, or co-injected to selectively sorb acid gases or other flue gas constituents to keep available reactive sites for mercury oxidation and subsequent capture. The sorbent can be regenerated by washing off contaminating components derived from flue gas that poison the spent sorbent. Novel methods for introduction of the sorbent dispersion into the mercury contaminated gas stream are described.

Following is an outline of examples of the invention. The invention may also take on various other examples or embodiments, as a person skilled in the art would understand.

1. A modified carbon sorbent was prepared by reacting the carbon with molecular bromine by applying a solution of molecular bromine in an organic solvent to the carbon, followed by removal of the modified carbon from the bulk of solvent and further removal of solvent from the pores by drying the carbon in air or nitrogen. The solution may also contain an additional promoting substance in small amounts. In one example, the amount of bromine taken up by the carbon ranges from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

1A. (Dependent)

Same as 1, carbon is powdered activated carbon.

Carbon is granular activated carbon.

Carbon is very fine carbon black.

Carbon is very fine carbon fiber.

Carbon is aerogel carbon film.

Carbon is char recovered from pyrolysis process.

Carbon is powdered activated carbon of size distribution larger than fly ash size distribution, so that it can be physically separated from the ash and regenerated for reuse.

Carbon is regenerated from previous usage cycle and recycled.

Other desired types of carbon may also be used.

1B. (Dependent)

Same as 1, Solvent is chlorinated hydrocarbon such as dichloromethane.

Same as 1, Solvent is hydrocarbon solvent such as petroleum ether or ligroin or pentane or hexane or toluene or benzene.

Same as 1, Solvent is water.

Same as 1, Solvent is carbon disulfide.

Same as 1, Solvent is a waste solvent.

Same as 1, Solvent is an ether.

Same as 1, Solvent is recycled from previous batch.

Same as 1, Solvent is supercritical solvent such as $CO_2$.

Other desired types of Solvents may also be used.

1C. (Dependent)

Same as 1, solution of bromine is applied by stirring the carbon in the bromine solution.

Same as 1, solution of bromine is applied by spraying a solution of molecular bromine in an organic solvent, followed by removal of solvent from the pores by drying the carbon in air or nitrogen.

The bromine may also be applied using other desired techniques.

1D. (Dependent)

Same as 1, removal of solvent is by filtration, centrifugation, settling, and decantation and drying in vacuum, air, or other gas.

Same as 1, when sprayed or minimal volume, removal of solvent is by drying in air, vacuum, or other gas.

The solvent may also be removed using other desired techniques.

1E. (Dependent)

Same as 1, additional substance is iodine, at 1%-10% of the bromine concentration added.

Same as 1, additional substance is hydrohalide (HI, HBr, HCl), etc, 1%-10% of bromine.

Same as 1, additional substance is a compound comprised of a Group V or VI element or combination of Group V or VI with Group VII element, such as $SCl_2$, 1-10 wt % of bromine.

A modified carbon sorbent was prepared by reacting the carbon with molecular bromine by contacting the carbon with a gas containing molecular bromine. In one example, the amount of bromine taken up by the carbon ranges from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

Contacting is by passing the $Br_2$ gas through a bed of the carbon.

Bed is ebullated or fluidized.

Bed is moving bed of granules or fibers.

Contacting is by admitting $Br_2$ gas to a duct through which the carbon is transported from a reservoir to the flue gas duct via an air-driven entrainment method, thus promoting the activity of the carbon in-flight.

Same additives as 1E, except these are added in the gas phase, and added in-flight as in 2 above.

A modified activated carbon sorbent was prepared by reacting the carbon with hydrogen bromide (HBr) by stirring the carbon in a solution of HBr in an organic solvent or in water, followed by removal of the modified carbon from the bulk of solvent and further removal of solvent from the pores by drying the carbon in air or nitrogen. In one example, the amount of bromine taken up by the carbon ranges from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

Same dependent clauses as in 1A with regard to carbon forms. Same solutions and treatment as 1B, 1C, 1D.

Same additives as 1E, added into the solution phase or later in the gas phase, and added in-flight as in 2 above.

An activated carbon sorbent was prepared by impregnating hydrogen bromide by passing a gas composition containing hydrogen bromide diluted with nitrogen or air through a fluidized bed or ebullated bed of the carbon. In one example, the amount of bromine taken up by the carbon ranges from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

Same dependent clauses as in 1A with regard to carbon forms.

Contacting options are similar to 2.

Sequential treatment of activated carbon with bromine or HBr, followed by another mercury stabilizing reagent to generate a highly reactive bifunctional sorbent, the reagent to include sulfur and selenium species, such as $H_2S$, $SO_2$, $H_2Se$, Se, $SeO_2$, $CS_2$, $P_2S_5$.

6. Sequential treatment of activated carbon with mercury stabilizing reagent, followed by bromine or HBr to generate a highly reactive bifunctional sorbent, the reagent to include sulfur and selenium species, such as $H_2S$, $SO_2$, $H_2Se$, Se, $SeO_2$, $CS_2$, $P_2S_5$.

Treatment of a carbon with a Group V or VI element combined with Group VII element, such as $PBr_3$ or $SCl_2$. In one example, the amount of Group V or VI halide is 1-30 wt % of the carbon. The compound is added in vapor phase or in solution (solvent is hydrocarbon, chlorinated hydrocarbon, or other solvent as described in 1B, but not water, since the compound is destroyed in water solution).

The process for preparing the bromine-containing activated carbon sorbent as described in Examples 1-6 and coupled with the injection of the bromine-containing fine-particle sorbent into the contaminated gas stream and subsequent removal of the fine particles of sorbent from the gas stream in a collection device, such as bag filtration of electrostatic precipitator (ESP).

The process of using additives (1-8) in conjunction with sorbents to capture acid gases and other flue gas constituents that block oxidation reactions or consume sorbent sites that would otherwise capture mercury. The additive is a compound comprised of Group I or II elements, such as Ca, Na, and others. These additives of base chemistry may be added to flue gas as a sorbent mixture or co-injected to selectively sorb acid gases or other gas constituents that compete for mercury reactive/sorption sites, thereby improving the effectiveness of activated carbon to capture mercury. In addition, the base additives can augment the treated activated carbon by helping to capture oxidized mercury forms in the flue gas, such as mercuric chloride, or that are produced on the carbon sorbent, such as mercuric bromide, but are released to the gas phase as the sorbent becomes saturated or capacity limited.

The process of preparing a larger-than-normal (>40 μm) sorbent particle size, promoting with the halogen treatment as described in 1-8, using the treated sorbent for capture of mercury by injecting in the flue gas, and finally separating and recovering the sorbent from the ash particles. The larger sorbent size thus will allow easy mechanical/physical separation so that sorbent can be regenerated, recycled, and reused, and the ash can be sold as a low-carbon cementatious byproduct for concrete. The separation can be effected by various methods, such as density (gravity), floatation, or sieving methods.

The process for preparing the bromine-containing activated carbon sorbent as described in Example 1-10, coupled with the direct injection of the slurry of the prepared fine-particle sorbent in the solvent or aqueous phase, so that the aerosol particles of the slurry achieve a high degree of dispersion in the gas stream and evaporation of the solvent in the hot gas occurs rapidly. The amount of slurry added is flow-controlled, and the concentration of particles in the slurry is monitored by optical density measurements prior to injection. Collection of particles is performed.

12. The process for preparing the bromine-containing activated carbon sorbent, as described in Examples 2 and 4, coupled where the fine-particle dispersion of brominated sorbent in the gas stream at the top of the ebullated bed is led to the flue gas or offgas duct where the said dispersion is contacted with mercury-contaminated flue gas or offgas stream. The amount of aerosol dispersion added is controlled by the gas flow to the ebullated bed, and the concentration of particles in the dispersion can be monitored by optical density measurements prior to injection. Collection of particles is performed by the existing particulate-collection equipment.

he process for preparing the bromine-containing activated carbon sorbent bed, coupled with contacting the bed with the mercury-contaminated flue gas or offgas.

The process for preparing the bromine-containing activated carbonBsorbent, as described in Examples 2 and 4, or untreated activated carbon, coated on a substrate or as activated carbon material. This material is placed in a moving system that geometrically allows for control of rate of exposure, sorption, and exchange of material in a continuous or semicontinuous manner.

In the sorbent and mercury removal process outlined in paragraphs above, the bromine reagents promote metal oxidation activity by creating cationic or radical character on the carbon edge structure that attracts mercury atoms and extracts electrons from said mercury atoms, resulting in oxidized mercury, which is more easily captured on a sorbent. A similar mechanism applies to oxidation and capture of reduced arsenic and other pollutant species.

The invention relates to the process for the removal of mercury and other pollutant species from gas streams generated during the burning of fossil fuels, such as in a coal-fired utility or synthesis gas from gasification facilities.

This removal process would utilize a sorbent and/or a combination of additives to remove pollutants from the gas stream, which are at the same time interacting with other gas components that result in poisoning or deactivating the sorbent and reducing its capacity or reaction rates with the targeted pollutant species. The present invention provides a cost-effective way to capture the pollutants by utilizing exceptionally active carbon sorbents and promoting mercury sorbent surface reactions, containing a bromide form of the carbon, that capture mercury with high kinetic chemisorption (oxidation) activity, so that capture can occur during contact times of seconds or less. The sorbent does not require in situ activation (induction period) in the gas stream to achieve high activity as do conventional activated carbon sorbents. The reactivity of the sorbent toward the pollutants and the sorption capacity can be regenerated, recycled, and reused.

Burning fossil fuels generates a flue gas that contains mercury (and other trace elements) that was in the coal, plus oxides of sulfur and nitrogen (acid gas emissions) and particulates whose release to the environment must be controlled by use of sorbents, scrubbers, filters, precipitators, and other removal technologies. While control of other elements and/or flue gas pollutants may apply, the discussion provided is focused on mercury. Initially, mercury is released in the elemental form during combustion/gasification, but downstream of the boiler, in the ducts and stack of the combustion system, part of the elemental mercury is oxidized. The amount oxidized depends on the amount of acid gases present in the flue gas and other factors. Amounts of mercury vary with the coal, but a typical concentration of mercury in the stream of combustion gas is about 5 parts per billion (ppb). A pound of mercury or more per day may be emitted in some utilities.

Discussion of Sorbent Technologies

Several types of mercury control methods for flue gas have been investigated, including injection of fine sorbent particles into a flue gas duct and passing the flue gas through a sorbent bed. Fine-particle injection sorbents include activated carbon, metal oxide sorbent, sodium sulfide particles (for example, see U.S. Pat. No. 6,214,304), and basic silicate or oxide sorbents (for example, see the Ghorishi reference (Ghorishi, B.; Gullet, B. K. Waste Manage Res. 1993, 16, 582). and Lancia references). When particle injection is employed, the mercury chemisorbed to the sorbent particle is removed from the gas stream in a bag house or ESP and collected along with ash particulates (for example, see U.S. Pat. Nos. 4,889,698, 4,956,162, 5,672,323, 5,827,352, 6,027,551, and 5,505,766). The sulfide and basic silicate and oxide particles are effective only for the oxidized mercury, and the metal oxide sorbents exhibit slower capture kinetics than the carbon particles. Additionally, injection of fine carbon particles into the flue gas stream has been only partially successful in removing mercury, especially elemental mercury, where effective removal of approximately 60% was attained with a baghouse to collect carbon and ash. Even lower removal rates have been observed when using an ESP to collect the carbon, since the contact time of the carbon with the gas is very short.

A major problem with existing carbon injection systems is that the sorbent is initially unreactive, and only after exposure to the flue gas for about 20 minutes does the seasoned sorbent become effective and provide capture of 60% of the mercury in the gas. Consequently, these sorbents must be used in large amounts (high sorbent-to-mercury ratios) to effectively capture the mercury. These sorbents can be relatively expensive and cannot be easily separated from the ash, regenerated and reused. The collection of carbon in the ash also creates solid waste disposal problems, and the spent sorbent may contaminate the collected ash for use in various applications.

Use of Halogens in Mercury Capture

Methodologies for using halogens for the treatment of flue gas have not previously been effective. Halogen is defined as a member of the very active elements comprising Group VII-A of the periodic table. In the molecular elemental halogen form, including $F_2$, $Cl_2$, $Br_2$, and $I_2$, the reaction with elemental mercury is not fast enough to result in the formation of oxidized mercury in a coal combustion flue gas with conventional ash control technology. The atomic elemental halogen form, which includes F atom, Cl atom, Br atom, and I atom, is about a million times more reactive to mercury, but the concentrations of these forms are extremely low, and also, therefore, cannot result in oxidation of mercury in a utility flue gas.

A halide is a compound formed from reaction of a halogen with another element or radical. In general, the halide compounds are normally very much less reactive than the molecular halogens, having expended their high chemical potential in forming the low energy halide. The halide is considered a reduced form and cannot therefore oxidize anything by itself. It is for this reason that it is not obvious that a halide-halogen treated activated carbon would be effective at oxidizing elemental mercury and provide effective capture of elemental mercury. In fact, for tests with salts, analytical data show the addition of bromine to an activated carbon or carbon black or soot does form a compound by reacting with the unsaturated groups on the carbon. By applying x-ray photoelectron spectroscopy, it has been determined that bromine or HBr added to carbon black forms chemical compounds within a carbon structure.

A body of theory has been developed from scientific evidence to explain the nature of the promotion effect of the bromine compounds. This principle is illustrated in FIG. **2**, which in step **1** shows the reaction of the hydrogen bromide with the unsaturated structure of the activated carbon. This may be a carbene species on the edge of the graphene sheets structures of the carbon. Molecular bromine or a bromine compound reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury.

We now teach that the formation of the new bromide compound with carbon increases the reactivity of the carbon forms toward mercury and other pollutants. The resulting bromide compound is uniquely suited to facilitate oxidation of the mercury. The effectiveness of the oxidation results from the promotion effect of the halide exerted on the developing positive charge on the mercury during the oxidation, known in the chemical art as a specific catalytic effect. Thus, as the mercury electrons are drawn toward the positive carbon, the halide anion electrons are pushing in from the other side, which stabilizes the positive charge developing on the mercury and lowers the energy requirement for the oxidation process. Bromide is especially reactive, owing to the highly polarizable electrons in the outer 4p orbitals of the ion. Thus, adding HBr or $Br_2$ to the carbon forms a similar carbon bromide, in which the positive carbon oxidizes the mercury with the assistance of the bromide ion.

Prior Art Publications

The earliest patents that relate to mercury capture on a sorbent are actually not for flue gas mercury control but for capture of mercury from air or other gas mixtures on a carbon or other sorbent. These patents were based on a model that recognized the affinity of halogens for mercury,

rather than the formation of a reactive carbon. These patents are discussed below according to the type of halogen used for impregnation.

One patent that teaches a halogen impregnation (Stock, U.S. Pat. No. 1,984,164, issued in 1934) describes the use of activated carbon or other solid impregnated with a halogen for removing Hg from air. The impregnation method is not specified. This seems to be the most general claim with respect to halogen impregnation. All the statements and claims appear to refer to halogen or iodine, but the patent does not appear to address bromides or other halides or bromide compounds or even specifically iodide or an iodine compound. The only example in the description is iodine impregnation. The patent also is restricted to air systems and did not pertain to flue gas systems with reactive acid gases. The description did not assume that the iodine formed a reactive carbon species.

Japanese Patent JP 49-43197 describes the treatment of Hg-contaminated electrolysis cell gas using a metal iodide salt on a support. A similar treatment using a resin impregnated with a metal iodide is described in JP 50-6438. These patents do not appear to represent a carbon bromide compound as specified in this patent application.

Another early patent (Hilgen, U.S. Pat. No. 3,849,267, issued in 1974) describes a method for Hg removal from a gas which claims mixing molecular chlorine ($Cl_2$) with the gas to be cleaned and passing it through a nonporous sorbent such as glass wool and NaCl (not carbon). This was evidently not an obvious extension of the Stock patent, since a halogen was introduced as part of the gas phase being cleaned.

A later patent (deJong, et al., U.S. Pat. No. 4,196,173, issued in 1980) describes a method for Hg removal in air which claims using a bed of activated carbon impregnated with halogen-only $Cl_2$ is specified in the other claims and examples, and it is prepared by flowing the $Cl_2$ stream through a carbon bed.

An improved sorbent for mercury in air was patented by Revoir and Jones (U.S. Pat. No. 3,662,523, issued in 1972), in which ICl and $ICl_3$ vapors were impregnated into the activated carbon. No explanation of the increased activity was provided. Since these compounds are interhalogen compounds, the patent did not infringe Stock.

U.S. Pat. No. 5,891,324 describes an activated carbon containing an acid (HCl, $H_2SO_4$, or $H_3PO_4$) for the removal of mercury contained in a liquid phase, such as would occur in a process steam in the oil industry. In this case, the model presented was that mercury is adsorbed from the liquid into the solid carbon phase at relatively low temperatures.

In U.S. Patent Application 2004/0003716, a method is described for removing mercury from a combustion gas. This method employs an exposure of a finely powdered activated carbon to a molecular bromine gas at an elevated temperature or to HBr to produce a sorbent with good mercury removal ability when injected into the flue gas duct. The model for the efficacy of the Nelson sorbent is not clearly stated, so it can be presumed that the reasoning for using bromine is the simple premise that some bromine form will help capture the mercury, as does iodine and chlorine. The methods for incorporation of the bromine in the Nelson application are not the same as with the present invention, and the Nelson method will not produce the identical carbon bromide species that are obtained in the art described in this application. The Nelson method lacks many of the features described in this application that impart exceptional activity to the sorbent in a convenient way, for example, the addition of smaller amount of a second more powerful promoting agent, the use of facile solvent systems, including aqueous bromine, and the use of in-flight bromine treatment. Additionally, the patent application does not mention regeneration, recycling, or reuse, or the use of moving contactors or larger particle size to facilitate sorbent-ash separation.

Embodiments of the Invention

A sorbent that is initially very reactive in oxidizing mercury can be used in very small amounts to achieve high capture efficiencies, thus lowering operation costs and lessening the disposal problem. In addition, further disposal reduction is made possible by recycling and reusing the sorbent that is produced using this technology. The time interval for the mercury and sorbent to interact in a flue gas duct and the subsequent collection of the mercury on the sorbent and ash may be very short—only seconds. This requires the sorbent to have high capacity and be very reactive toward mercury. A sorbent can be utilized in a very finely powdered form (e.g., 1-10 μm) to minimize mass transfer limitations. But, again, the reactivity should be very high to capture all of the mercury encountered by the fine particles. One feature of this invention is the process to prepare a sorbent containing a bromide compound formed on the carbon structure that provides a sorbent that is highly active on initial contact with the mercury contaminated gas stream, which allows for effective capture of the mercury.

One possible way to do this is to chemically combine molecular bromine from solution with activated carbon (edge sites). X-ray photoelectron spectroscopy established that the addition of bromine formed a chemical compound in the carbon structure. Thus, the sorbent does not represent a molecular bromine halogen form but a new chemically modified carbon structure. This may not occur with the less reactive iodine, where an $I_2$—molecular complex can exist on the carbon basal plane. In the bromine case, it is actually the carbon that oxidizes the mercury. Thus, an entirely new model is presented for the reactivity of the bromine-treated carbon with mercury. The reactive carbon form can be generated by the addition of bromine, hydrogen bromide, or combinations of bromine and other elements as described herein. Chlorine treatment resulted in lower-activity carbons because the chloride anion was less effective in promoting the oxidation by stabilizing the developing positive charge on the mercury in the transition state for oxidation. Based on this model, several innovative, inexpensive, activity-enhancing features have been developed.

It has been demonstrated that addition of an optional second component, in addition to the bromine, results in improved reactivity and capacity for the sorbent, exceeding that of both the untreated carbon and the brominated carbon. The second compound comprises either a second halogen or a compound from a second halogen, such as HBr. Thus, in addition to having a reactive carbon form present, the second component generates a Lewis base with greater ability to stabilize the developing positive charge on the mercury. Thus the second component is an element with more polarized electrons (4p and 5p).

Furthermore, we demonstrated that the sorbent can be readily treated with any combination of bromine and the second component in-flight using vapors of these components contacting the very fine carbon particles dispersed in air or other gas stream that conveys the particles to the flue gas duct. There is no particular temperature requirement for this contact. This technology is very simple to implement, so it will result in a great cost savings to the utility using this technology for mercury capture.

A unique, nonobvious technique for preparation of the treated carbon is through combining the treatment system

with the carbon injection system at the end-use site. With this technique, the halogen is introduced to the carbon-air mixture in the transport line (or other part of the sorbent storage and injection system). Benefits over current concepts to treat sorbents off-site include the following:

- Capital equipment costs at a treatment facility are eliminated.
- Costs to operate the treatment facility are eliminated.
- There are no costs for transporting carbon and additive to a treatment facility.
- This process uses existing hardware and operation procedures.
- This technology ensures that the sorbent is always fresh, and thus, more reactive.
- No new handling concerns are introduced.
- There are no costs for removing carbon from treatment system.
- This process allows rapid on-site tailoring of additive-sorbent ratios in order to match the requirements of flue gas changes, such as needed when changing fuels or reducing loads, thus further optimizing the economics.
- This technology reduces the amount of spent sorbents that are disposed.

With the foregoing and other features in view, there is provided, in accordance with the invention, a process for preparing and regenerating carbon sorbents whose activity for mercury capture is promoted by the addition of bromine to the carbon structure.

The invention applies to use of a sorbent in a powdered form that has been injected into a flue gas stream before or after ash particulates have been removed. Examples of the composition of the sorbent are a powdered modified activated carbon prepared by adding $Br_2$ or HBr plus a second optional component. Alternatively, the sorbent is on a moving contactor consisting of particles or fibers containing the compositions listed in the previous sentence. Either type can be regenerated; the poisoning contaminants from the flue gas are removed and an inexpensive promoting agent added to restore mercury sorption activity. This process of promoting the activity of the carbon itself contrasts with the earlier, more expensive art of adding a reagent (such as peroxide, gold, triiodide, etc.) to the sorbent. The activated carbon sorbent treated with bromine and/or the other components is noncorrosive.

Detailed examples of sorbent regeneration techniques are described in co-pending, commonly-owned PCT patent application No. PCT/US04/12828, titled "PROCESS FOR REGENERATING A SPENT SORBENT", which is incorporated by reference herein.

Although the invention is described herein as a sorbent material, it is nevertheless not intended to be limited to the details described, since various modifications and structural changes may be made therein without departing from the spirit of the invention and within the scope and range of equivalents of the claims.

The construction and method of operation of the invention, however, together with additional objects and advantages thereof will be best understood from the following description of specific exemplary embodiments.

FIG. **6** is a block diagram illustrating the use of the invention in a coal fueled facility. Of course, the invention can also be used in any other desired type of facility. FIG. **6** shows a boiler for burning pulverized coal. The facility utilizes various devices to clean the exhaust of the boiler. In this example, a baghouse or ESP is used to collect particulates in the exhaust. A scrubber and sorbent bed are also used to remove undesired constituents from the flue gas stream, before being fed to the stack. In the example shown, the sorbent is injected into the flue gas after the boiler. The additive can be injected where desired (e.g., before, after, or within the boiler).

Another advantage of the present invention relates to the use of a feedback system to more efficiently utilize the invention. Where possible, the mercury control technology of the present invention will utilize measurement of mercury emissions as feedback to assist in control of the sorbent injection rate. Tighter control on the sorbent levels in this way will ensure mercury removal requirements are met with the minimal sorbent requirements and therefore the associated costs will be minimized. In one example, the emissions are measured at the stack.

Carbon Sorbent

Reactions of halogens and acidic species with the basic binding sites on the activated carbon sorbent create sites for oxidizing mercury. Other metal ions, such as boron, tin, arsenic, galium, Sb, Pb, Bi, Cd, Ag, Cu, Zn, or other contaminants, will also react with the oxidation sites generated on the carbon.

According to our model, adding the bromine from the bromine reagent or a proton from a hydrogen halide acid to a basic carbene site on the carbon edge structure forms a carbocation that accept electrons from the neutral mercury atom forming the oxidized mercury species that is bound to the sorbent surface. The reactive site may also generate reactive bromine radicals or carbon radicals at the active sites on the carbon. Thus, the activated carbon serves to stabilize the bromine, yet provides a highly reactive bromine-containing reagent that can oxidize the mercury and promote its capture on the activated carbon. The sorbent that contains bromine is expected to be more reactive than the corresponding sorbent containing chlorine and much less expensive than the sorbent containing iodine.

A bench-scale procedure based on the above description was used to test the initial activities and capacities of several powdered carbon sorbents, including the bromine-containing activated carbons prepared from a commercially available sorbent and an aerogel carbon film sorbent, as well as the original precursor carbons for comparison. Bromine-treated carbons were prepared by impregnation of the powdered activated carbon precursors in a stirred solution of bromine in carbon tetrachloride or methylene chloride, or alternatively, in an aqueous solution of HBr, followed by drying in air at ambient temperature and drying in an oven at 100° C. in air or nitrogen. Bromine-treated carbons were also prepared by impregnating bromine from the gas phase by passing the gas through a rotating dry bed of the activated carbon precursor. Adding a second component to the solution was demonstrated to improve the capacity of the sorbent.

The carbons were initially tested in a heated bed, where a synthetic flue gas stream containing elemental mercury (11 $\mu g/m^3$) was passed through the bed. Concentrations of total and elemental Hg in the effluent gas were determined using a Sir Galahad mercury CEM. The powdered sorbent was supported on a quartz filter during the test, and the other sorbents were tested as a triple layer.

A comparison of the original commercial-grade powdered carbon sorbent with the sorbent after it has been treated with 0.1 N HBr, collecting the powder by centrifugation and drying, revealed that the mercury capture activity is increased from an initial capture efficiency of about 50% of the Hg in the inlet to 100% capture. A comparison of the sorbent after subsequent regeneration with HBr indicates that it not only captures mercury at the same level as before

(100% capture) but is enhanced such that its capacity is prolonged by several minutes. Similar results were obtained with the carbon film and carbon fiber sorbents by treatment with molecular bromine in solution or in dry beds as described above.

An activated carbon sorbent was prepared by treating the carbon by impregnating molecular bromine from a gas composition containing molecular bromine by flowing the gas through a liquid bromine reservoir in series with a fluidized bed of ebullated bed of the carbon. The amount of bromine taken up by the carbon ranges (in one example) from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

In one exemplary test conducted at a facility fired with lignite coal, the flue gas phase mercury (elemental) concentration was between 10 and 11 $\mu g/m^3$. The ash and injected carbons were collected in the baghouse at 350E to 375EF. Injection of commercial-grade activated carbon powder (untreated) at a rate of 1.0 lb/Macf resulted in mercury effluent concentrations of 3.8-4.2 $\mu g/m^3$ (representing 62%-58% removal of the mercury from the gas), and at 2.0 lb/Macf, gave 74%-71% removal. Injection of the bromine-treated carbon at 1.0 lb/Macf resulted in 73%-69% removal and at 2.0 lb/Macf gave 86%-84% removal. Thus, a significant increase in the mercury capture was exhibited during use of the bromine-treated carbon.

Addendum: Other References to Hg Sorption

Sorbent Beds with Particulate Removal

Carbon beds have also been utilized for mercury capture in flue gas. The German Patent 34 26 059 describes the use of a very thick carbon bed for treatment of flue gases containing polyhalogenated compounds. Although the system employed at Dusseldorf would also have the potential for Hg removal (for example, see the Streng reference), it is not very practical to use such a thick bed. Spent sorbent is burned and not regenerated. The carbons are not pretreated.

The GE-Mitsui-BF system (Tsuji, K.; Shiraishi, I.; Dague, R. F. Proceedings, Sixth International Symposium, Air & Water Management Assoc., New Orleans, La., Mar. 10-12, 1993) employs a recirculating carbon bed, where mercury is removed along with acid gases (as ammonium salts) and the carbon is regenerated at high temperatures where ammonium sulfate is decomposed to $SO_2$ and $N_2$ and mercury is converted to the elemental form, which desorbs from the sorbent. Attrition of the sorbent results in a significant sorbent cost. The carbons are not pretreated.

Sorbent Injection after Particulate Removal

A process of injecting manganese oxide sorbent particles is described in U.S. Patent Application 2002/0150516. Regeneration is claimed by removal of spent oxide particles from the reaction zone and rinsing with dilute aqueous acid.

Sorbent Beds after Particulate Removal

Of particular interest in designing a mercury control process is to use the sorbent downstream of a particulate control device so the sorbent is not highly diluted with the ash particles. The sorbent could then be more easily regenerated and recycled. The prior art teaches several examples of this type of configuration and sorbent processing.

U.S. Pat. No. 5,607,496 teaches the oxidation of mercury on a metal oxide sorbent bed and subsequent absorption to sorbent. The sorbent bed follows the particulate-removal equipment and, thus, the gas still contains the $SO_x$ and $NO_x$, which react with the metal oxide sorbent to form the metal sulfates, which poison the bed. High temperatures are proposed to regenerate the bed. However, Hg is only partially removed from the sorbent at temperatures up to 500° C. The sorbents do not work effectively after regeneration using this technique; the problem may be that manganese sulfate formed during the sorption cycle does not completely decompose back to an active manganese oxide form.

U.S. Pat. No. 6,383,981 describes a fixed $MnO_2$ or $Fe_2O_3$ bed for removal of Hg from a hydrocarbon stream. No regeneration method appears to be included.

A recent U.S. Patent application (2001/0003116) describes the regeneration of a plate or honeycomb material composed of transition metal oxides that was used for sorption of mercury in flue gas. The claimed process involves heating the sorbent in a reducing gas stream to remove poisons, followed by impregnation with a polyfunctional complex-forming reagent containing the catalyst active component to restore mercury capture capacity. The first of these steps can remove the mercury, but it is unclear whether it actually removes the sulfate poison. The second of these steps is rather expensive, because one is actually reconstituting the reagent on the sorbent

Porous beds containing a mercury oxidizing reagent on a solid support are described in several patents for removal of mercury from gas streams. These include peroxomonosulfate (for example, see U.S. Pat. No. 4,786,483), triiodide or other mixed halogens (for example, see U.S. Pat. Nos. 3,194,629; 3,662,523), or sulfur (for example, see U.S. Pat. Nos. 3,194,629, 4,101,631, 4,708,853, 6,258,334). The reagent material is destroyed either by reaction with the flue gas during sorption or by attempts to regenerate the sorbent; there is no way to regenerate these sorbents, except by reimpregnation of the expensive reagent.

Amalgamating noble metals (gold, silver) on a suitable support can be regenerated by microwave heating (for example, see U.S. Pat. No. 6,136,072), but they are expensive and not especially active for sorption in flue gas.

Hg Sorbents for Air or Natural Gas Treatment

Melkersson (U.S. Pat. No. 3,786,619) described a Hg sorbent comprising $SeO_2$ or $SeS_2$ for air treatment. This method did not appear to employ a carbon support or halide.

Yan (U.S. Pat. No. 4,814,152) described a Hg sorbent comprising elemental sulfur and a metal catalyst on a carbon support. This method did not appear to employ a halide.

Attia (U.S. Patent 65/080,281) described a sorbent for mercury and a variety of other contaminants comprising an inorganic aerogel composition. This method did not appear to employ a carbon support or halide.

FOLLOWING IS A LIST OF VARIOUS BACKGROUND REFERENCES

Lancia, A.; Musmarra, D.; Pepe, F.; Volpicelli, G. *Combust. Sci. & Technol.* 1993, 93, 277.

Streng, S.; Kassebohm, B. *Fuel Proc. Technol.* 1994, 39, 431.

U.S. Pat. No. 6,214,304 Rosenthal
U.S. Pat. No. 4,889,698 Moller
U.S. Pat. No. 4,956,162 Smith
U.S. Pat. No. 5,672,323 Bhat.
U.S. Pat. No. 5,827,352 Altman
U.S. Pat. No. 6,027,551 Hwang
U.S. Pat. No. 5,505,766 Chang
U.S. Pat. No. 5,607,496 Brooks
U.S. Pat. No. 6,383,981 Blankenship
U.S. Pat. No. 4,786,483 Audeh
U.S. Pat. No. 3,194,629 Dreibelbis, et al
U.S. Pat. No. 4,101,631 Ambrsini, et al
U.S. Pat. No. 3,662,523 Revoir
U.S. Pat. No. 4,708,853 Matviya
U.S. Pat. No. 6,258,334 Gadkaree

U.S. Pat. No. 6,136,072 Sjostrom
U.S. Patent Application 2002/0150516
U.S. Patent Application 2001/0003116 Neufert

While the preferred embodiments of the invention have been shown and described, modifications thereof can be made by one skilled in the art without departing from the spirit and teachings of the invention. The embodiments described herein are exemplary only and are not intended to be limiting. Many variations and modifications of the invention disclosed herein are possible and are within the scope of the invention. Accordingly, the scope of protection is not limited by the description set out above, but is only limited by the claims which follow, that scope including all equivalents of the subject matter of the claims.

The examples provided in the disclosure are presented for illustration and explanation purposes only and are not intended to limit the claims or embodiment of this invention. While the preferred embodiments of the invention have been shown and described, modifications thereof can be made by one skilled in the art without departing from the spirit and teachings of the invention. Process criteria, equipment, and the like for any given implementation of the invention will be readily ascertainable to one of skill in the art based upon the disclosure herein. The embodiments described herein are exemplary only and are not intended to be limiting. Many variations and modifications of the invention disclosed herein are possible and are within the scope of the invention. Use of the term "optionally" with respect to any element of the invention is intended to mean that the subject element is required, or alternatively, is not required. Both alternatives are intended to be within the scope of the invention.

The discussion of a reference in the Background is not an admission that it is prior art to the present invention, especially any reference that may have a publication date after the priority date of this application. The disclosures of all patents, patent applications, and publications cited herein are hereby incorporated herein by reference in their entirety, to the extent that they provide exemplary, procedural, or other details supplementary to those set forth herein.

Although the invention is described herein as a promoted sorbent material and associated processes for its preparation and use, it is nevertheless not intended to be limited to the details described, since various modifications and structural changes may be made therein without departing from the spirit of the invention and within the scope and range of equivalents of the claims.

What is claimed is:

**1**. A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein the mercury-containing gas comprises a halogen or halide promoter comprising HBr, $Br^-$, or a combination thereof, wherein

the coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber, or

the combustion chamber comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, or

a combination thereof;

injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber;

contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition;

separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas;



monitoring the mercury content of the cleaned gas; and

controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, the sorbent composition, or a combination thereof, so that the mercury content of the cleaned gas is maintained at or below a desired level.

**2**. The method of claim **1**, comprising removing greater than 70 wt % of the mercury in the mercury-containing gas.

**3**. The method of claim **1**, comprising removing greater than 70 wt % of the mercury in the mercury-containing gas on the sorbent.

**4**. The method of claim **1**, wherein the sorbent in the mercury-containing gas comprises about 1 g to about 30 g of the halogen or halide promoter per 100 g of the sorbent material.

**5**. The method of claim **1**, wherein the combustion chamber comprises the halogen or halide promoter.

**6**. The method of claim **1**, wherein the coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber.

**7**. The method of claim **1**, wherein the promoter is contacted with the sorbent in vapor form, gaseous form, liquid form, or in an organic solvent.

**8**. The method of claim **1**, further comprising injecting a secondary material into the mercury-containing gas downstream of the combustion chamber.

**9**. The method of claim **8**, wherein the secondary material comprises a halogen, a compound derived from a halogen, a hydrohalide, a compound comprising a Group V or Group VI element and a molecular halogen, or a combination thereof.

**10**. The method of claim **1**, wherein the sorbent material injected into the mercury-containing gas further comprises a non-carbon sorbent material.

**11**. The method of claim **10**, wherein the non-carbon sorbent material comprises at least one of a porous felsic material, a vesicular felsic material, a porous basaltic material, a vesicular basaltic material, a clay-based compound, an alkaline compound, a calcium hydroxide compound, a sodium acetate compound, and a bicarbonate compound.

**12**. The method of claim **1**, wherein the activated carbon comprises powdered activated carbon, granular activated carbon, or a combination thereof.

**13**. The method of claim **1**, wherein the sorbent material injected into the mercury-containing gas is substantially free of halogen and halide promotion.

**14**. The method of claim **1**, wherein the sorbent material injected into the mercury-containing gas is a promoted sorbent obtained by contacting a base sorbent with another halogen or halide promoter.

**15**. The method of claim **1**, wherein the combustion chamber comprises a boiler.

**16**. The method of claim **1**, wherein the mercury-containing gas is a flue gas.

**17**. The method of claim **1**, wherein the injection of the sorbent material into the mercury-containing gas occurs upstream of an air pre-heater.

**18**. The method of claim **1**, wherein the injection of the sorbent material into the mercury-containing gas occurs upstream of a particulate separator or a scrubber.

**19**. The method of claim **1**, wherein the coal comprises added halide sorbent enhancement additive.

**20**. The method of claim **1**, wherein the combustion chamber comprises added $Br_2$, HBr, $Br^-$, or a combination thereof.

**21**. The method of claim **1**, wherein the coal comprises added sorbent enhancement additive that comprises $Br^-$.

22. The method of claim 21, wherein the sorbent enhancement additive comprises a bromide compound.

23. A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein the mercury-containing gas comprises a halogen or halide promoter comprising HBr, $Br^-$, or a combination thereof, wherein

the coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber, or

the combustion chamber comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, or

a combination thereof;

injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber;

contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition; and

separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas.

24. A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein the mercury-containing gas comprises a halogen or halide promoter comprising HBr, $Br^-$, or a combination thereof, wherein

the coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber, or

the combustion chamber comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, or

a combination thereof;

injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber such that the activated carbon reacts with the halogen or halide promoter in the mercury-containing gas to form a promoted sorbent;

contacting mercury in the mercury-containing gas with the promoted sorbent, to form a mercury/sorbent composition;

separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas;

monitoring the mercury content of the cleaned gas; and

controlling, in response to the mercury content of the cleaned gas,

an injection rate of injecting the sorbent into the mercury-containing gas,

a rate of addition to the coal or the combustion chamber of the added $Br_2$, HBr, the bromide compound, or a combination thereof, or

a combination thereof,

so that the mercury content of the cleaned gas is maintained at or below a desired level.

25. A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein

the coal comprises added $Br_2$, HBr, a bromide compound, or a combination thereof, added to the coal upstream of the combustion chamber, or

the combustion chamber comprises added $Br_2$, HBr, a bromide compound, or a combination thereof, or

a combination thereof,

injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber;

contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition; and

separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas.

26. The method of claim 25, wherein the coal comprises the added $Br_2$, HBr, the bromide compound, or a combination thereof, added to the coal upstream of the combustion chamber.

27. The method of claim 25, wherein the combustion chamber comprises the added $Br_2$, HBr, the bromide compound, or a combination thereof.

28. The method of claim 25, further comprising

monitoring the mercury content of the cleaned gas; and

controlling, in response to the mercury content of the cleaned gas,

an injection rate of injecting the sorbent into the mercury-containing gas,

a rate of addition to the coal or the combustion chamber of the added $Br_2$, HBr, the bromide compound, or a combination thereof, or

a combination thereof,

so that the mercury content of the cleaned gas is maintained at or below a desired level.

29. The method of claim 25, wherein the mercury-containing gas comprises about 1 g to about 30 g of the element bromine per 100 g of the sorbent.

30. The method of claim 25, wherein the mercury/sorbent composition comprises the element bromine, the sorbent material, and mercury.

* * * * *

8206032

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

January 31, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *10,596,517*
ISSUE DATE: *March 24, 2020*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Sylvia Holley
Certifying Officer

Plaintiff's Exhibit
ME2C v. AJG
**PTX-003**
No. 1:19-cv-01334-CJB

US010596517B2

(12) **United States Patent**
**Olson et al.**

(10) **Patent No.: US 10,596,517 B2**
(45) **Date of Patent: *Mar. 24, 2020**

(54) **SORBENTS FOR THE OXIDATION AND REMOVAL OF MERCURY**

(71) Applicant: **Midwest Energy Emissions Corp.**, Corsicana, TX (US)

(72) Inventors: **Edwin S. Olson**, Grand Forks, ND (US); **Michael J. Holmes**, Thompson, ND (US); **John H. Pavlish**, East Grand Forks, MN (US)

(73) Assignee: **Midwest Energy Emissions Corp.**, Lewis Center, OH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/997,091**

(22) Filed: **Jun. 4, 2018**

(65) **Prior Publication Data**

US 2018/0280870 A1 Oct. 4, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/974,343, filed on May 8, 2018, which is a continuation of application
(Continued)

(51) **Int. Cl.**
***B01D 53/64*** (2006.01)
***B01D 53/10*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. ***B01D 53/64*** (2013.01); ***B01D 53/10*** (2013.01); ***B01J 20/20*** (2013.01); ***B01J 20/22*** (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,984,164 A 12/1934 Stock
2,317,857 A 4/1943 Soday
(Continued)

FOREIGN PATENT DOCUMENTS

CA 1099490 A 4/1981
CA 2150529 A1 12/1995
(Continued)

OTHER PUBLICATIONS

"U.S. Appl. No. 10/554,018 Response filed Nov. 1, 2010 to Final Office Action dated Apr. 27, 2010", 17 pgs.
(Continued)

*Primary Examiner* — Amber R Orlando
(74) *Attorney, Agent, or Firm* — Schwegman Lundberg & Woessner, P.A.

(57) **ABSTRACT**

A promoted activated carbon sorbent is described that is highly effective for the removal of mercury from flue gas streams. The sorbent comprises a new modified carbon form containing reactive forms of halogen and halides. Optional components may be added to increase reactivity and mercury capacity. These may be added directly with the sorbent, or to the flue gas to enhance sorbent performance and/or mercury capture. Mercury removal efficiencies obtained exceed conventional methods. The sorbent can be regenerated and reused. Sorbent treatment and preparation methods are also described. New methods for in-flight preparation, introduction, and control of the active sorbent into the mercury contaminated gas stream are described.

**30 Claims, 11 Drawing Sheets**






ME2C-RC-00074545

PTX-003.0002

**Related U.S. Application Data**

No. 15/951,970, filed on Apr. 12, 2018, which is a continuation of application No. 14/712,558, filed on May 14, 2015, which is a continuation of application No. 14/318,270, filed on Jun. 27, 2014, now Pat. No. 9,757,689, which is a continuation of application No. 13/966,768, filed on Aug. 14, 2013, now Pat. No. 8,821,819, which is a continuation of application No. 13/427,665, filed on Mar. 22, 2012, now Pat. No. 8,512,655, which is a continuation of application No. 12/419,219, filed on Apr. 6, 2009, now Pat. No. 8,168,147, which is a continuation of application No. 12/201,595, filed on Aug. 29, 2008, which is a continuation of application No. 11/209,163, filed on Aug. 22, 2005, now Pat. No. 7,435,286.

(60) Provisional application No. 60/605,640, filed on Aug. 30, 2004.

(51) **Int. Cl.**
***B01J 20/20*** (2006.01)
***B01J 20/22*** (2006.01)

(52) **U.S. Cl.**
CPC .. *B01D 2253/102* (2013.01); *B01D 2257/602* (2013.01); *Y10S 95/901* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


3,194,629 A 7/1965 Dreibelbis et al.
3,341,185 A 9/1967 Kennedy, Sr.
3,662,523 A 5/1972 Revoir et al.
3,786,619 A 1/1974 Melkersson
3,826,618 A 7/1974 Capuano
3,849,267 A 11/1974 Hilgen et al.
3,876,393 A 4/1975 Kasai et al.
3,935,708 A 2/1976 Harrewijne et al.
4,013,516 A * 3/1977 Greenfield .............. C10B 47/30 159/905
4,094,777 A 6/1978 Sugier et al.
4,101,631 A 7/1978 Ambrosini et al.
4,196,173 A 4/1980 DeJong et al.
4,338,896 A 7/1982 Papasideris
4,342,192 A 8/1982 Heyn et al.
4,500,327 A 2/1985 Nishino et al.
4,530,765 A 7/1985 Sabherwal
4,699,896 A * 10/1987 Sing ......................... B01J 21/18 264/29.2
4,708,853 A 11/1987 Matviya et al.
4,772,455 A 9/1988 Izumi et al.
4,786,483 A 11/1988 Audeh
4,814,152 A 3/1989 Yan
4,820,318 A 4/1989 Chang et al.
4,889,698 A 12/1989 Moller et al.
4,956,162 A 9/1990 Smith et al.
5,245,120 A 9/1993 Srinivasachar et al.
5,288,306 A 2/1994 Aibe et al.
5,300,137 A 4/1994 Weyand et al.
5,336,835 A 8/1994 McNamara
5,346,674 A 9/1994 Weinwurm et al.
5,409,522 A 4/1995 Durham et al.
5,419,834 A 5/1995 Straten
5,435,980 A * 7/1995 Felsvang ................ B01D 53/10 423/210
5,462,908 A 10/1995 Liang et al.
5,480,619 A 1/1996 Johnson et al.
5,500,306 A 3/1996 Hsu et al.
5,505,766 A 4/1996 Chang
5,556,447 A 9/1996 Srinivasachar et al.
5,569,436 A * 10/1996 Lerner ................... B01D 53/64 110/235
5,575,982 A 11/1996 Reiss et al.
5,607,496 A 3/1997 Brooks
5,672,323 A 9/1997 Bhat et al.
5,695,726 A 12/1997 Lerner
5,785,935 A 7/1998 Fristad et al.
5,827,352 A 10/1998 Altman et al.
5,891,324 A 4/1999 Ohtsuka
6,001,762 A 12/1999 Harmer et al.
6,013,593 A 1/2000 Lee et al.
6,027,551 A 2/2000 Hwang et al.
6,074,974 A 6/2000 Lee et al.
6,080,281 A 6/2000 Attia
6,103,205 A * 8/2000 Wojtowicz ............. B01D 53/04 423/210
6,136,072 A 10/2000 Sjostrom et al.
6,136,749 A * 10/2000 Gadkaree ........... B01D 53/8665 502/180
6,214,304 B1 4/2001 Rosenthal et al.
6,258,334 B1 7/2001 Gadkaree et al.
6,284,199 B1 9/2001 Downs et al.
6,342,462 B1 1/2002 Kulprathipanja
2,456,272 A1 2/2002 Pahlman et al.
6,372,187 B1 * 4/2002 Madden ............... B01D 53/508 110/345
6,375,909 B1 4/2002 Dangtran et al.
6,383,981 B1 5/2002 Blankenship et al.
6,471,936 B1 10/2002 Chen et al.
6,475,451 B1 11/2002 Leppin et al.
6,475,471 B1 11/2002 Wehrli
6,528,030 B2 3/2003 Madden et al.
6,558,454 B1 * 5/2003 Chang .................... B01D 53/10 110/342
6,576,585 B2 6/2003 Fischer et al.
6,579,507 B2 6/2003 Pahlman et al.
6,596,661 B2 7/2003 Neufert
6,610,263 B2 8/2003 Pahlman et al.
6,638,485 B1 10/2003 Iida et al.
6,719,828 B1 * 4/2004 Lovell .................... B01D 53/02 423/210
6,808,692 B2 10/2004 Oehr
6,818,043 B1 * 11/2004 Chang .................... B01D 53/64 423/213.2
6,848,374 B2 * 2/2005 Srinivasachar ........ B01D 53/10 110/165 R
6,942,840 B1 9/2005 Broderick
6,953,494 B2 10/2005 Nelson, Jr. et al.
6,960,329 B2 11/2005 Sellakumar
7,017,330 B2 3/2006 Bellows
7,081,434 B2 7/2006 Sinha
7,124,591 B2 10/2006 Baer et al.
7,211,707 B2 5/2007 Axtell et al.
7,247,279 B2 7/2007 Pahlman et al.
7,293,414 B1 11/2007 Huber
7,361,209 B1 4/2008 Durham et al.
7,435,286 B2 * 10/2008 Olson .................... B01D 53/10 95/142
7,442,239 B2 10/2008 Armstrong et al.
7,479,263 B2 1/2009 Chang et al.
7,514,052 B2 * 4/2009 Lissianski .............. B01D 53/56 423/210
7,521,032 B2 4/2009 Honjo et al.
7,544,338 B2 6/2009 Honjo et al.
7,563,311 B2 7/2009 Graham
7,611,564 B2 11/2009 Mcchesney et al.
7,622,092 B2 11/2009 Honjo et al.
7,722,843 B1 5/2010 Srinivasachar
7,767,174 B2 8/2010 Lui et al.
7,780,765 B2 * 8/2010 Srinivasachar ........ B01D 53/10 110/203
7,938,571 B1 5/2011 Irvine
7,942,566 B1 5/2011 Irvine
8,007,749 B2 8/2011 Chang et al.
8,080,088 B1 12/2011 Srinivasachar
8,168,149 B2 5/2012 Gal et al.
8,173,566 B2 5/2012 Olson et al.
8,216,535 B2 7/2012 Pollack et al.
8,821,819 B2 9/2014 Olson et al.
9,011,805 B2 4/2015 Olson et al.
9,662,629 B2 5/2017 Olson et al.

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 9,669,355 | B2 | 6/2017 | Olson et al. | |
| 10,130,930 | B2 | 11/2018 | Olson | |
| 10,343,114 | B2 | 7/2019 | Olson et al. | |
| 10,471,412 | B2 | 11/2019 | Olson et al. | |
| 2001/0002387 | A1 | 5/2001 | Tsutsumi et al. | |
| 2001/0003116 | A1 | 6/2001 | Neufert | |
| 2002/0033097 | A1 | 3/2002 | El-shoubary et al. | |
| 2002/0043496 | A1 | 4/2002 | Boddu et al. | |
| 2002/0114749 | A1 | 8/2002 | Cole | |
| 2002/0134242 | A1 | 9/2002 | Yang et al. | |
| 2002/0150516 | A1 | 10/2002 | Pahlman et al. | |
| 2003/0057293 | A1 | 3/2003 | Boecking | |
| 2003/0104937 | A1 | 6/2003 | Sinha | |
| 2003/0113239 | A1 | 6/2003 | Pahlman et al. | |
| 2003/0136509 | A1 | 7/2003 | Virtanen | |
| 2003/0161771 | A1 | 8/2003 | Oehr | |
| 2003/0206843 | A1 | 11/2003 | Sidney, Jr. | |
| 2003/0206846 | A1 | 11/2003 | Jangbarwala | |
| 2004/0003716 | A1* | 1/2004 | Nelson, Jr. | B01D 53/02 95/134 |
| 2004/0013589 | A1 | 1/2004 | Vosteen et al. | |
| 2004/0076570 | A1 | 4/2004 | Jia | |
| 2004/0086439 | A1* | 5/2004 | Vosteen | B01D 53/64 423/210 |
| 2004/0109800 | A1 | 6/2004 | Pahlman et al. | |
| 2004/0244657 | A1 | 12/2004 | Srinivasachar et al. | |
| 2005/0000197 | A1 | 1/2005 | Krantz | |
| 2005/0019240 | A1 | 1/2005 | Lu et al. | |
| 2005/0074380 | A1 | 4/2005 | Boren et al. | |
| 2005/0147549 | A1 | 7/2005 | Lissianski et al. | |
| 2005/0227146 | A1 | 10/2005 | Ghantous et al. | |
| 2005/0274307 | A1 | 12/2005 | Lissianski et al. | |
| 2006/0048646 | A1* | 3/2006 | Olson | B01D 53/10 95/134 |
| 2006/0057044 | A1 | 3/2006 | Chang et al. | |
| 2006/0112823 | A1 | 6/2006 | Avina | |
| 2006/0191835 | A1 | 8/2006 | Petrik et al. | |
| 2006/0204418 | A1 | 9/2006 | Chao et al. | |
| 2007/0167309 | A1 | 7/2007 | Olson | |
| 2007/0180990 | A1* | 8/2007 | Downs | B01D 53/10 95/134 |
| 2007/0234902 | A1 | 10/2007 | Fair et al. | |
| 2007/0259781 | A1 | 11/2007 | Sinha | |
| 2007/0295347 | A1 | 12/2007 | Paine, III et al. | |
| 2008/0090951 | A1 | 4/2008 | Mao et al. | |
| 2008/0107579 | A1 | 5/2008 | Downs et al. | |
| 2008/0134888 | A1 | 6/2008 | Chao et al. | |
| 2008/0182747 | A1 | 7/2008 | Sinha | |
| 2008/0207443 | A1 | 8/2008 | Gadkaree et al. | |
| 2008/0292512 | A1 | 11/2008 | Kang | |
| 2009/0031708 | A1 | 2/2009 | Schmidt | |
| 2009/0062119 | A1 | 3/2009 | Olson et al. | |
| 2009/0081092 | A1 | 3/2009 | Yang et al. | |
| 2009/0136401 | A1 | 5/2009 | Yang et al. | |
| 2009/0235848 | A1 | 9/2009 | Eiteneer et al. | |
| 2009/0297413 | A1* | 12/2009 | Olson | B01D 53/10 423/215.5 |
| 2009/0320678 | A1* | 12/2009 | Chang | B01D 46/002 95/92 |
| 2010/0024642 | A1 | 2/2010 | Fukumoto et al. | |
| 2010/0047146 | A1 | 2/2010 | Olson et al. | |
| 2011/0076210 | A1 | 3/2011 | Pollack et al. | |
| 2011/0168018 | A1 | 7/2011 | Mohamadalizadeh et al. | |
| 2012/0100053 | A1 | 4/2012 | Durham et al. | |
| 2012/0183458 | A1 | 7/2012 | Olson et al. | |
| 2013/0157845 | A1 | 6/2013 | Nalepa et al. | |
| 2013/0280156 | A1 | 10/2013 | Olson et al. | |
| 2014/0056787 | A1 | 2/2014 | Olson et al. | |
| 2014/0099244 | A1 | 4/2014 | Olson et al. | |
| 2014/0224121 | A1 | 8/2014 | Mimna et al. | |
| 2014/0255279 | A1 | 9/2014 | Olson et al. | |
| 2014/0308188 | A1 | 10/2014 | Olson et al. | |
| 2015/0098878 | A1* | 4/2015 | Olson | B01J 20/12 423/210 |
| 2015/0246315 | A1 | 9/2015 | Olson et al. | |
| 2017/0100692 | A1* | 4/2017 | Olson | B01D 53/08 |
| 2017/0128908 | A1 | 5/2017 | Olson et al. | |
| 2017/0173524 | A1 | 6/2017 | Olson et al. | |
| 2017/0173557 | A1 | 6/2017 | Olson et al. | |
| 2017/0239644 | A1* | 8/2017 | Olson | B01D 53/02 |
| 2018/0133646 | A1* | 5/2018 | Pavlish | B01J 20/3416 |
| 2018/0229182 | A1 | 8/2018 | Olson et al. | |
| 2018/0257030 | A1 | 9/2018 | Olson et al. | |
| 2018/0257031 | A1* | 9/2018 | Olson | B01J 20/3416 |
| 2019/0009247 | A1 | 1/2019 | Olson et al. | |
| 2019/0329179 | A1 | 10/2019 | Olson et al. | |
| 2019/0329215 | A1 | 10/2019 | Olson et al. | |
| 2019/0336913 | A1 | 11/2019 | Olson et al. | |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2327602 | A1 | 6/2001 |
| CA | 2400898 | A1 | 8/2001 |
| CA | 2584327 | A1 | 4/2006 |
| CA | 2757309 | A1 | 10/2010 |
| CA | 2757309 | C | 1/2017 |
| CN | 1048173 | A | 1/1991 |
| CN | 101048218 | A | 10/2007 |
| CN | 101053820 | A | 10/2007 |
| CN | 101293196 | A | 10/2008 |
| CN | 101816922 | A | 9/2010 |
| CN | 102413899 | A | 4/2012 |
| CN | 104519410 | A | 4/2015 |
| CN | 105188910 | A | 12/2015 |
| CN | 104619410 | B | 5/2016 |
| CN | 107661744 | A | 2/2018 |
| DE | 3426059 | A1 | 1/1986 |
| DE | 3816600 | A1 | 11/1989 |
| DE | 10233173 | A1 | 2/2004 |
| DE | 202012003747 | U1 | 11/2012 |
| EP | 0208490 | A1 | 1/1987 |
| EP | 1386655 | A1 | 2/2004 |
| EP | 1458474 | | 9/2004 |
| EP | 1570894 | A1 | 9/2005 |
| FR | 2529802 | | 1/1984 |
| GB | 2122916 | A | 1/1984 |
| JP | 4953590 | A | 5/1974 |
| JP | 4953593 | A | 5/1974 |
| JP | 4966592 | A | 6/1974 |
| JP | 4943197 | B4 | 11/1974 |
| JP | 506438 | B4 | 3/1975 |
| JP | 51003386 | A | 1/1976 |
| JP | 544868 | A | 1/1979 |
| JP | 50145324 | A | 3/1980 |
| JP | 09256812 | | 9/1997 |
| KR | 1020027006149 | | 7/2002 |
| SU | 732207 | A1 | 5/1980 |
| SU | 1163982 | A | 6/1985 |
| WO | WO-0162368 | A1 | 8/2001 |
| WO | WO-0228513 | A2 | 4/2002 |
| WO | WO-03072241 | A1 | 9/2003 |
| WO | WO-2004089501 | A2 | 10/2004 |
| WO | WO-2004094024 | A2 | 11/2004 |
| WO | WO-2006039007 | A2 | 4/2006 |
| WO | WO-2006039007 | A3 | 4/2006 |
| WO | WO-2006099611 | A1 | 9/2006 |
| WO | WO-2009018539 | A3 | 2/2009 |
| WO | WO-2010123609 | A1 | 10/2010 |
| WO | WO-2012030560 | A1 | 3/2012 |
| WO | WO-2013162968 | A2 | 10/2013 |
| WO | WO-2013162968 | A3 | 10/2013 |
| WO | WO-2014137907 | A2 | 9/2014 |

### OTHER PUBLICATIONS

"U.S. Appl. No. 10/554,018, Final Office Action dated Apr. 27, 2010", 8 pgs.

"U.S. Appl. No. 10/554,018, Non Final Office Action ated Oct. 6, 2009", 8 pgs.

"U.S. Appl. No. 10/554,018, Notice of Allowance dated Jan. 19, 2012", 7 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"U.S. Appl. No. 10/554,018, Response filed Feb. 8, 2010 to Non Final Office Action dated Oct. 6, 2009", 9 pgs.
"U.S. Appl. No. 10/554,018, Response filed Aug. 10, 2009 to Restriction Requirement dated Jun. 9, 2009", 1 pg.
"U.S. Appl. No. 10/554,018, Restriction Requirement dated Jun. 9, 2009", 5 pgs.
"U.S. Appl. No. 11/209,163, Advisory Action dated Apr. 21, 2008", 3 pgs.
"U.S. Appl. No. 11/209,163, Final Office Action dated Jan. 23, 2008", 20 pgs.
"U.S. Appl. No. 11/209,163, Non Final Office Action dated Aug. 13, 2007", 14 pgs.
"U.S. Appl. No. 11/209,163, Notice of Allowance dated Jul. 14, 2008", 7 pgs.
"U.S. Appl. No. 11/209,163, Preliminary Amendment filed Feb. 27, 2007", 9 pgs.
"U.S. Appl. No. 11/209,163, Response filed Mar. 24, 2008 to Final Office Action dated Jan. 23, 2008", 29 pgs.
"U.S. Appl. No. 11/209,163, Response filed Jul. 9, 2007 to Restriction Requirement dated Jun. 7, 2007", 2 pgs.
"U.S. Appl. No. 11/209,163, Response filed Nov. 13, 2007 to Non Final Office Action dated Aug. 13, 2007", 19 pgs.
"U.S. Appl. No. 11/209,163, Restriction Requirement dated Jun. 7, 2007", 6 pgs.
"U.S. Appl. No. 12/184,860, Examiner Interview Summary dated Apr. 5, 2011", 3 pgs.
"U.S. Appl. No. 12/184,860, Final Office Action dated May 11, 2011", 15 pgs.
"U.S. Appl. No. 12/184,860, Non Final Office Action dated Jan. 19, 2011", 14 pgs.
"U.S. Appl. No. 12/184,860, Response filed Apr. 7, 2011 to Non Final Office Action dated Jan. 19, 2011", 12 pgs.
"U.S. Appl. No. 12/184,860, Response filed Jul. 8, 2011 to Final Office Action dated May 11, 2011", 11 pgs.
"U.S. Appl. No. 12/201,595, Final Office Action dated Mar. 10, 2010", 13 pgs.
"U.S. Appl. No. 12/201,595, Non Final Office Action dated Apr. 16, 2009", 21 pgs.
"U.S. Appl. No. 12/201,595, Response filed Oct. 16, 2009 to Non Final Office Action dated Apr. 16, 2009", 18 pgs.
"U.S. Appl. No. 12/419,219, Final Office Action dated Oct. 14, 2010", 17 pgs.
"U.S. Appl. No. 12/419,219, Non Final Office Action dated Jan. 15, 2010", 13 pgs.
"U.S. Appl. No. 12/419,219, Non Final Office Action dated Feb. 23, 2011", 17 pgs.
"U.S. Appl. No. 12/419,219, Non Final Office Action dated Aug. 4, 2011", 16 pgs.
"U.S. Appl. No. 12/419,219, Notice of Allowance dated Jan. 10, 2012", 7 pgs.
"U.S. Appl. No. 12/419,219, Preliminary Amendment filed Apr. 6, 2009", 7 pgs.
"U.S. Appl. No. 12/419,219, Response filed Feb. 14, 2011 to Final Office Action dated Oct. 14, 2010", 19 pgs.
"U.S. Appl. No. 12/419,219, Response filed May 20, 2011 to Non Final Office Action dated Feb. 23, 2011", 14 pgs.
"U.S. Appl. No. 12/419,219, Response filed Jul. 15, 2010 to Non Final Office Action dated Jan. 15, 2010", 22 pgs.
"U.S. Appl. No. 12/419,219, Response filed Oct. 27, 2011 to Non Final Office Action dated Aug. 4, 2011", 12 pgs.
"U.S. Appl. No. 12/429,058, Advisory Action dated May 29, 2012", 3 pgs.
"U.S. Appl. No. 12/429,058, Ex Parte Quayle Action mailed Feb. 14, 2013", 7 pgs.
"U.S. Appl. No. 12/429,058, Examiner Interview Summary dated Dec. 28, 2012", 4 pgs.
"U.S. Appl. No. 12/429,058, Final Office Action dated Oct. 31, 2012", 21 pgs.
"U.S. Appl. No. 12/429,058, Final Office Action dated Dec. 20, 2011", 21 pgs.
"U.S. Appl. No. 12/429,058, Non Final Office Action dated Jun. 11, 2012", 18 pgs.
"U.S. Appl. No. 12/429,058, Non Final Office Action dated Jul. 19, 2011", 20 pgs.
"U.S. Appl. No. 12/429,058, Notice of Allowance dated Jan. 16, 2014", 5 pgs.
"U.S. Appl. No. 12/429,058, Notice of Allowance dated Sep. 11, 2013", 11 pgs.
"U.S. Appl. No. 12/429,058, Response filed Jan. 31, 2013 to Final Office Action dated Oct. 31, 2012", 19 pgs.
"U.S. Appl. No. 12/429,058, Response filed Mar. 7, 2013 to Ex Parte Quayle Action mailed Feb. 14, 2013", 7 pgs.
"U.S. Appl. No. 12/429,058, Response filed May 11, 2012 to Final Office Action dated Dec. 20, 2011", 11 pgs.
"U.S. Appl. No. 12/429,058, Response filed Sep. 11, 2012 to Non Final Office Action dated Jun. 11, 2012", 16 pgs.
"U.S. Appl. No. 12/429,058, Response filed Oct. 18, 2011 to Non Final Office Action dated Jul. 19, 2011", 17 pgs.
"U.S. Appl. No. 13/427,665, Non Final Office Action dated Jan. 4, 2013", 23 pgs.
"U.S. Appl. No. 13/427,665, Non Final Office Action dated Aug. 3, 2012", 12 pgs.
"U.S. Appl. No. 13/427,665, Notice of Allowance dated Apr. 16, 2013", 8 pgs.
"U.S. Appl. No. 13/427,665, Response filed Mar. 21, 2013 to Non Final Office Action dated Jan. 4, 2013", 20 pgs.
"U.S. Appl. No. 13/427,665, Response filed Oct. 10, 2012 to Non Final Office Action dated Aug. 3, 2012", 15 pgs.
"U.S. Appl. No. 13/427,685, Preliminary Amendment filed Mar. 22, 2012", 3 pgs.
"U.S. Appl. No. 13/453,274, Advisory Action dated Nov. 24, 2014", 3 pgs.
"U.S. Appl. No. 13/453,274, Final Office Action dated Oct. 16, 2014", 4 pgs.
"U.S. Appl. No. 13/453,274, Non Final Office Action dated May 30, 2014", 6 pgs.
"U.S. Appl. No. 13/453,274, Notice of Allowance dated Jan. 5, 2015", 5 pgs.
"U.S. Appl. No. 13/453,274, Response filed Sep. 2, 2014 to Non Final Office Action dated May 30, 2014", 13 pgs.
"U.S. Appl. No. 13/453,274, Response filed Nov. 6, 2014 to Final Office Action dated Oct. 16, 2014", 7 pgs.
"U.S. Appl. No. 13/453,274, Response filed Dec. 9, 2014 to Advisory Action dated Nov. 24, 2014", 6 pgs.
"U.S. Appl. No. 13/966,768, Non Final Office Action dated Dec. 6, 2013", 7 pgs.
"U.S. Appl. No. 13/966,768, Notice of Allowability dated Aug. 1, 2014", 6 pgs.
"U.S. Appl. No. 13/966,768, Notice of Allowance dated Apr. 18, 2014", 7 pgs.
"U.S. Appl. No. 13/966,768, Preliminary Amendment filed Aug. 14, 2013", 3 pgs.
"U.S. Appl. No. 13/966,768, Response filed Mar. 6, 2014 to Non Final Office Action dated Dec. 6, 2013", 6 pgs.
"U.S. Appl. No. 13/966,768, Supplemental Preliminary Amendment filed Aug. 15, 2013", 6 pgs.
"U.S. Appl. No. 14/102,896, Advisory Action dated Dec. 16, 2015", 3 pgs.
"U.S. Appl. No. 14/102,896, Final Office Action dated Aug. 26, 2015", 12 pgs.
"U.S. Appl. No. 14/102,896, Non Final Office Action dated Mar. 23, 2015", 13 pgs.
"U.S. Appl. No. 14/102,896, Notice of Allowance dated Jun. 10, 2016", 7 pgs.
"U.S. Appl. No. 14/102,896, Response filed Jan. 22, 2016 to Advisory Action dated Dec. 16, 2015", 11 pgs.
"U.S. Appl. No. 14/102,896, Response filed Jun. 22, 2015 to Non Final Office Action dated Mar. 23, 2015", 10 pgs.
"U.S. Appl. No. 14/102,896, Response filed Nov. 24, 2015 to Final Office Action dated Aug. 26, 2015", 5 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"U.S. Appl. No. 14/195,360, Corrected Notice of Allowance dated Feb. 27, 2017", 2 pgs.
"U.S. Appl. No. 14/195,360, Corrected Notice of Allowance dated Mar. 29, 2017", 2 pgs.
"U.S. Appl. No. 14/195,360, Final Office Action dated Mar. 18, 2016", 18 pgs.
"U.S. Appl. No. 14/195,360, Final Office Action dated Nov. 22, 2016", 7 pgs.
"U.S. Appl. No. 14/195,360, Non Final Office Action dated Jun. 20, 2016", 11 pgs.
"U.S. Appl. No. 14/195,360, Non Final Office Action dated Nov. 24, 2015", 19 pgs.
"U.S. Appl. No. 14/195,360, Notice of Allowance dated Feb. 7, 2017", 5 pgs.
"U.S. Appl. No. 14/195,360, Response filed Jan. 18, 2017 to Final Office Action dated Nov. 22, 2016", 7 pgs.
"U.S. Appl. No. 14/195,360, Response filed Feb. 22, 2016 to Non Final Office Action dated Nov. 24, 2015", 21 pgs.
"U.S. Appl. No. 14/195,360, Response filed May 17, 2016 to Final Office Action dated Mar. 18, 2016", 15 pgs.
"U.S. Appl. No. 14/318,270, Advisory Action dated Feb. 17, 2017", 4 pgs.
"U.S. Appl. No. 14/318,270, Corrected Notice of Allowance dated May 22, 2017", 2 pgs.
"U.S. Appl. No. 14/318,270, Final Office Action dated Nov. 25, 2016", 25 pgs.
"U.S. Appl. No. 14/318,270, Non Final Office Action dated Jun. 2, 2016", 24 pgs.
"U.S. Appl. No. 14/318,270, Notice of Allowance dated May 15, 2017", 8 pgs.
"U.S. Appl. No. 14/318,270, Response filed Jan. 25, 2017 to Final Office Action dated Nov. 25, 2016", 14 pgs.
"U.S. Appl. No. 14/318,270, Response filed Feb. 27, 2017 to Final Office Action dated Nov. 25, 2016", 15 pgs.
"U.S. Appl. No. 14/318,270, Response filed Mar. 2, 2016 to Restriction Requirement dated Jan. 14, 2016", 9 pgs.
"U.S. Appl. No. 14/318,270, Response filed Aug. 22, 2016 to Non Final Office Action dated Jun. 2, 2016", 14 pgs.
"U.S. Appl. No. 14/318,270, Restriction Requirement dated Jan. 14, 2016", 8 pgs.
"U.S. Appl. No. 14/564,860, Final Office Action dated Nov. 17, 2016", 4 pgs.
"U.S. Appl. No. 14/564,860, Non Final Office Action dated Jul. 12, 2016", 6 pgs.
"U.S. Appl. No. 14/564,860, Notice of Allowance dated Jan. 30, 2017", 6 pgs.
"U.S. Appl. No. 14/564,860, Preliminary Amendment filed Dec. 10, 2014", 8 pgs.
"U.S. Appl. No. 14/564,860, Preliminary Amendment filed Dec. 10, 2014", 6 pgs.
"U.S. Appl. No. 14/564,860, Response filed May 6, 2016 to Restriction Requirement dated Mar. 16, 2016", 9 pgs.
"U.S. Appl. No. 14/564,860, Response filed Oct. 3, 2016 to Non Final Office Action dated Jul. 12, 2016", 11 pgs.
"U.S. Appl. No. 14/564,860, Restriction Requirement dated Mar. 16, 2016", 5 pgs.
"U.S. Appl. No. 14/712,558, Advisory Action dated Feb. 12, 2018", 8 pgs.
"U.S. Appl. No. 14/712,558, Examiner Interview Summary dated Mar. 5, 2018", 3 pgs.
"U.S. Appl. No. 14/712,558, Final Office Action dated Dec. 6, 2017", 9 pgs.
"U.S. Appl. No. 14/712,558, Non Final Office Action dated Jul. 2, 2018", 16 pgs.
"U.S. Appl. No. 14/712,558, Non Final Office Action dated Jul. 6, 2017", 7 pgs.
"U.S. Appl. No. 14/712,558, Non Final Office Action dated Oct. 19, 2018", 26 pgs.
"U.S. Appl. No. 14/712,558, Non-Final Office Action dated Oct. 19, 2018", 35 pgs.
"U.S. Appl. No. 14/712,558, Response filed Jan. 23, 2018 to Final Office Action dated Dec. 6, 2017", 13 pgs.
"U.S. Appl. No. 14/712,558, Response filed Apr. 2, 2018 to Final Office Action dated Dec. 6, 2017", 7 pgs.
"U.S. Appl. No. 14/712,558, Response filed Aug. 14, 2018 to Non Final Office Action dated Jul. 2, 2018", 11 pgs.
"U.S. Appl. No. 14/712,558, Response filed Oct. 6, 2017 to Non Final Office Action dated Jul. 6, 2017", 12 pgs.
"U.S. Appl. No. 14/712,558, Supplemental Amendment filed Jun. 13, 2018", 14 pgs.
"U.S. Appl. No. 14/712,558, Supplemental Amendment Filed May 15, 2018", 6 pgs.
"U.S. Appl. No. 14/712,558, Supplemental Preliminary Amendment filed May 15, 2015", 6 pgs.
"U.S. Appl. No. 15//974,343 Preliminary Amendment Filed May 15, 2018", 7 pgs.
"U.S. Appl. No. 15//978,760, Preliminary Amendment Filed May 15, 2018", 7 pgs.
"U.S. Appl. No. 15/295,594, Non Final Office Action dated Oct. 23, 2018", 20 pgs.
"U.S. Appl. No. 15/295,594, Preliminary Amendment filed Jan. 26, 2017", 8 pgs.
"U.S. Appl. No. 15/295,594, Preliminary Amendment filed Jun. 13, 2017", 7 pgs.
"U.S. Appl. No. 15/295,594, Response filed Jul. 3, 2018 to Restriction Requirement dated May 22, 2018", 9 pgs.
"U.S. Appl. No. 15/295,594, Response filed Jul. 24, 2018 to Restriction Requirement dated Jun. 29, 2018", 9 pgs.
"U.S. Appl. No. 15/295,594, Restriction Requirement dated May 22, 2018", 6 pgs.
"U.S. Appl. No. 15/295,594, Restriction Requirement dated Jun. 29, 2018", 5 pgs.
"U.S. Appl. No. 15/295,594, Supplemental Amendment Filed May 15, 2018", 10 pgs.
"U.S. Appl. No. 15/382,114, Preliminary Amendment filed Apr. 4, 2017", 3 pgs.
"U.S. Appl. No. 15/382,114, Response filed Sep. 12, 2018 to Restriction Requirement dated Aug. 28, 2018", 8 pgs.
"U.S. Appl. No. 15/382,114, Restriction Requirement dated Aug. 28, 2018", 9 pgs.
"U.S. Appl. No. 15/449,112, Advisory Action dated Apr. 24, 2018", 3 pgs.
"U.S. Appl. No. 15/449,112, Final Office Action dated Feb. 15, 2018", 13 pgs.
"U.S. Appl. No. 15/449,112, Non Final Office Action dated Sep. 27, 2017", 17 pgs.
"U.S. Appl. No. 15/449,112, Notice of Allowance dated Jul. 12, 2018", 8 pgs.
"U.S. Appl. No. 15/449,112, Response filed Jan. 16, 2018 to Non Final Office Action dated Sep. 27, 2017", 16 pgs.
"U.S. Appl. No. 15/449,112, Response filed Feb. 15, 2018 to Final Office Action dated Feb. 15, 2018", 13 pgs.
"U.S. Appl. No. 15/449,112, Response filed Apr. 6, 2018 to Final Office Action dated Feb. 15, 2018", 13 pgs.
"U.S. Appl. No. 15/452,527, Preliminary Amendment filed Mar. 8, 2017", 3 pgs.
"U.S. Appl. No. 15/589,359, Final Office Action dated Jun. 4, 2018", 13 pgs.
"U.S. Appl. No. 15/589,359, Final Office Action dated Sep. 12, 2018", 14 pgs.
"U.S. Appl. No. 15/589,359, Non Final Office Action dated Feb. 21, 2018", 15 pgs.
"U.S. Appl. No. 15/589,359, Non Final Office Action dated Oct. 22, 2018", 12 pgs.
"U.S. Appl. No. 15/589,359, Preliminary Amendment filed Jan. 3, 2018", 6 pgs.
"U.S. Appl. No. 15/589,359, Response filed May 18, 2018 to Non Final Office Action dated Feb. 21, 2018", 14 pgs.
"U.S. Appl. No. 15/589,359, Response filed Jul. 26, 2018 to Non Final Office Action dated Jun. 4, 2018", 14 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"U.S. Appl. No. 15/589,359, Response filed Sep. 14, 2018 to Final Office Action dated Sep. 12, 2018", 18 pgs.
"U.S. Appl. No. 15/974,343, Non Final Office Action dated Jul. 27, 2018", 12 pgs.
"U.S. Appl. No. 15/974,343, Non Final Office Action dated Oct. 29, 2018", 22 pgs.
"U.S. Appl. No. 15/974,343, Response filed Aug. 14, 2018 to Non Final Office Action dated Jul. 27, 2018", 11 pgs.
"U.S. Appl. No. 15/978,760 , Response filed Jul. 13, 2018 to Non Final Office Action dated Jun. 29, 2018", 12 pgs.
"U.S. Appl. No. 15/978,760, Non Final Office Action dated Jun. 29, 2018", 9 pgs.
"U.S. Appl. No. 15/978,760, Non Final Office Action dated Oct. 10, 2018", 17 pgs.
"Application Serial No. PCT/US04/12828, International Search Report dated Oct. 22, 2004", 2 pgs.
"Application Serial No. PCT/US2014/019916, International Preliminary Report on Patentability dated Sep. 17, 2015", 14 pgs.
"U.S. Appl. No. 14/195,360, Response filed Sep. 16, 2016 to Non Final Office Action dated Jun. 30, 2016", 12 pgs.
"Bromine and its Compounds", Jolles, Z. E., Editor, Academic Press, Inc., New York, NY, (1966), pp. 193 and 205.
"Canadian Application Serial No. 2,523,132, Office Action dated Jul. 18, 2011", 3 pgs.
"Canadian Application Serial No. 2,523,132, Response filed Jan. 16, 2012 to Office Action dated Jul. 18, 2011", 5 pgs.
"Canadian Application Serial No. 2,584,327, Office Action dated Mar. 3, 2009", 4 pgs.
"Canadian Application Serial No. 2,584,327, Office Action dated Dec. 7, 2009", 2 pgs.
"Canadian Application Serial No. 2,584,327, Response filed Mar. 19, 2010 to Office Action dated Dec. 7, 2009", 8 pgs.
"Canadian Application Serial No. 2,584,327, Response filed Sep. 2, 2009 to Office Action dated Mar. 3, 2009", 21 pgs.
"Canadian Application Serial No. 2,707,363, First Examiners Report dated Jun. 16, 2011", 2 pgs.
"Canadian Application Serial No. 2,757,309, Office Action dated Dec. 7, 2015", 3 pgs.
"Canadian Application Serial No. 2,757,309, Response filed Jun. 6, 2016 to Office Action dated Dec. 7, 2015", 13 pgs.
"Canadian Application Serial No. 2,757,309, Voluntary Amendment filed Jan. 30, 2015", 27 pgs.
"Canadian Application Serial No. 2,871,422, Response filed Feb. 26, 2016 to Office Action dated Sep. 9, 2015", 13 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Apr. 2, 2015", 5 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Apr. 24, 2018", 4 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Aug. 31, 2017", 4 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Sep. 9, 2015", 3 pgs.
"Canadian Application Serial No. 2,871,422, Office Action dated Dec. 22, 2016", 5 pgs.
"Canadian Application Serial No. 2,871,422, Response filed Feb. 26, 2018 to Office Action dated Aug. 31, 2017", w/ Amended Claims, 53 pgs.
"Canadian Application Serial No. 2,871,422, Response filed Jun. 21, 2017 to Office Action dated Dec. 22, 2016", 41 pgs.
"Canadian Application Serial No. 2,871,422, Response filed Aug. 28, 2015 to Canadian Office Action dated Apr. 2, 2015", 22 pgs.
"Chinese Application Serial No. 200480017704.4, Office Action dated Dec. 8, 2011", (w/ English Translation), 6 pgs.
"Chinese Application Serial No. 200480017704.4, Response filed Jan. 20, 2012 to Office Action dated Dec. 8, 2012", (w/ English Translation of Amended Claims), 10 pgs.
"Chinese Application Serial No. 200580037037.0, Chinese Office Action, dated Jun. 25, 2013 (and English translation)", no english translation, 46 pgs.
"Chinese Application Serial No. 201380033231.6, Office Action dated Sep. 21, 2015", w/ Partial English Translation, 6 pgs.
"Chinese Application Serial No. 201380033231.6, Response filed Jan. 14, 2016 to Office Action dated Sep. 21, 2015", w/ English Claims, 7 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Jan. 16, 2018", (w/ English Translation), 8 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Jul. 12, 2017", W/ English Translation, 8 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Jul. 25, 2016", (With English Translation), 4 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Dec. 23, 2016", W/ English Translation, 39 pgs.
"Chinese Application Serial No. 201480025701.9, Office Action dated Dec. 23, 2016", 24 pgs.
"Chinese Application Serial No. 201480025701.9, Response filed Mar. 27, 2018 to Office Action dated Jan. 16, 2018", w/ English Claims, 20 pgs.
"Chinese Application Serial No. 201480025701.9, Response filed Sep. 15, 2017 to Office Action dated Jul. 12, 2017", w/ English Translation, 21 pgs.
"DARCO® FGD—Powdered Activated Carbon", Norit Americas Inc. Datasheet No. 1100, (May 2009), 1 pg.
"Database WPI Week 197450", Thomson Scientific, London, GB; AN 1974-86199V XP002514926.
"European Application Serial No. 05814011.2, Response filed Sep. 9, 2011 to European Search Report dated Apr. 14, 2009 and Office Actioin dated Nov. 5, 2009", 20 pgs.
"European Application Serial No. 05814011.2, Communication Pursuant to Article 94(3) EPC dated Nov. 5, 2009", 4 pgs.
"European Application Serial No. 05814011.2, Decision to grant dated Jun. 8, 2012", 2 pgs.
"European Application Serial No. 05814011.2, Extended European Search Report dated Apr. 14, 2009", 13 pgs.
"European Application Serial No. 05814011.2, Office Action dated Jan. 25, 2008", 2 pgs.
"European Application Serial No. 05814011.2, Office Action dated Jan. 31, 2012", 4 pgs.
"European Application Serrial No. 05814011.2, Office Action dated Apr. 27, 2012", 6 pgs.
"European Application Serial No. 05814011.2, Office Action dated Nov. 5, 2009", 2 pgs.
"European Application Serial No. 05814011.2, Partial European Search Report dated Apr. 14, 2009", 13 pgs.
"European Application Serial No. 05814011.2, Response filed Feb. 28, 2012 to Office Action dated Jan. 31, 2012", 30 pgs.
"European Application Serial No. 05814011.2, Response filed Apr. 18, 2008 to Office Action dated Jan. 25, 2008 and Third-Party Observations submitted Dec. 4, 2007", 7 pgs.
"European Application Serial No. 05814011.2, Response filed May 11, 2010 to Communication Pursuant to Article 94(3) EPC dated Nov. 5, 2009", 11 pgs.
"European Application Serial No. 05814011.2, Response filed May 11, 2010 to Office Action dated Nov. 5, 2009", 11 pgs.
"European Application Serial No. 05814011.2, Response filed Sep. 9, 2011 to Extended European Search Report dated Apr. 14, 2009", 20 pgs.
"European Application Serial No. 05814011.2, Third Party Observations submitted Mar. 19, 2012", 7 pgs.
"European Application Serial No. 05814011.2, Third Party Observations submitted Dec. 4, 2007", 5 pgs.
"European Application Serial No. 10767465.7, Decision to grant dated Apr. 17, 2014", 2 pgs.
"European Application Serial No. 10767465.7, Extended European Search Report dated Dec. 6, 2012", 5 pgs.
"European Application Serial No. 10767465.7, Intention to Grant dated Mar. 17, 2014", 44 pgs.
"European Application Serial No. 10767465.7, Intention to Grant dated Sep. 30, 2013", 44 pgs.
"European Application Serial No. 10767465.7, Response filed Feb. 3, 2014 to Intention to Grant dated Sep. 30, 2013", 11 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"European Application Serial No. 10767465.7, Response filed Jun. 20, 2013 to Extended European Search Report dated Dec. 6, 2012", 18 pgs.
"European Application Serial No. 10767465.7, Supplementary European Search Report dated Dec. 6, 2012", 2 pgs.
"European Application Serial No. 11189249.3, Communication Pursuant to Article 94(3) EPC dateed Nov. 26, 2012", 4 pgs.
"European Application Serial No. 11189249.3, Decision to Refuse dated Dec. 19, 2013", 18 pgs.
"European Application Serial No. 11189249.3, Extended European Search Report dated Feb. 1, 2012", 7 pgs.
"European Application Serial No. 11189249.3, Office Action dated Nov. 4, 2013", 4 pgs.
"European Application Serial No. 11189249.3, Response filed Feb. 4, 2013 to Communication Pursuant to Article 94(3) EPC dated Nov. 26, 2012", 9 pgs.
"European Application Serial No. 11189249.3, Response filed Aug. 28, 2012 to Extended European Search Report dated Feb. 1, 2012", 9 pgs.
"European Application Serial No. 11189249.3, Summons to Attend Oral Proceedings mailed Apr. 15, 2013", 7 pgs.
"European Application Serial No. 11189252.7, Communication Pursuant to Article 94(3) EPC dated Jan. 9, 2013", 4 pgs.
"European Application Serial No. 11189252.7, Decision to grant dated May 2, 2014", 2 pgs.
"European Application Serial No. 11189252.7, Extended European Search Report dated Jan. 23, 2012", 6 pgs.
"European Application Serial No. 11189252.7, Extended European Search Report dated May 9, 2012", 12 pgs.
"European Application Serial No. 11189252.7, Office Action dated Oct. 30, 2013", 4 pgs.
"European Application Serial No. 11189252.7, Office Action dated Dec. 11, 2013", 6 pgs.
"European Application Serial No. 11189252.7, Response filed Feb. 11, 2013 to Communication Pursuant to Article 94(3) EPC dated Jan. 9, 2013", 5 pgs.
"European Application Serial No. 11189252.7, Response filed Oct. 10, 2013 to Office Action dated Apr. 15, 2013", 18 pgs.
"European Application Serial No. 11189252.7, Response filed Nov. 22, 2012 to Extended European Search Report dated May 9, 2012", 13 pgs.
"European Application Serial No. 11189252.7, Summons to Attend Oral Proceedings mailed Apr. 15, 2013", 6 pgs.
"European Application Serial No. 13719338.9, Notification Regarding Rule 164 and Article 94(3) EPC dated Apr. 24, 2017", 8 pgs.
"European Application Serial No. 13719338.9, Office Action dated May 12, 2017", 6 pgs.
"European Application Serial No. 13719338.9, Office Action dated Dec. 19, 2014", 2 pgs.
"European Application Serial No. 13719338.9, Response filed Jun. 29, 2015 to Office Action dated Dec. 19, 2014", 19 pgs.
"European Application Serial No. 13719338.9, Response filed Sep. 4, 2017 to Notification Regarding Rule 164 and Article 94(3) EPC dated Apr. 24, 2017", 7 pgs.
"European Application Serial No. 14711106.6, Communication Pursuant to Article 94(3) EPC dated Feb. 22, 2017", 6 pgs.
"European Application Serial No. 14711106.6, Response filed Aug. 17, 2017 to Communication Pursuant to Article 94(3) EPC dated Feb. 22, 2017", 10 pgs.
"International Application No. PCT/US2008/071986, International Search Report dated Jan. 30, 2009", 3 pgs.
"International Application Serial No. PCT/US2005/030018, International Preliminary Report on Patentability dated Dec. 27, 2006", 3 pgs.
"International Application Serial No. PCT/US2005/030018, International Search Report dated Jul. 25, 2006", 2 pgs.
"International Application Serial No. PCT/US2005/030018, Written Opinion dated Jul. 25, 2006", 3 pgs.
"International Application Serial No. PCT/US2010/022807, International Preliminary Report on Patentability dated Nov. 3, 2011", 6 pgs.
"International Application Serial No. PCT/US2010/022807, International Search Report dated Sep. 13, 2010", 3 pgs.
"International Application Serial No. PCT/US2010/022807, Written Opinion dated Sep. 13, 2010", 4 pgs.
"International Application Serial No. PCT/US2013/036964, International Preliminary Report on Patentability dated Jul. 17, 2014", 11 pgs.
"International Application Serial No. PCT/US2013/036964, International Search Report dated Nov. 29, 2013", 7 pgs.
"International Application Serial No. PCT/US2013/036964, Invitation to Pay Additional Fees and Partial Search Report dated Aug. 2, 2013", 7 pgs.
"International Application Seril No. PCT/US2013/036964, Written Opinion dated Apr. 15, 2014", 10 pgs.
"International Application Serial No. PCT/US2013/036964, Written Opinion dated Nov. 29, 2013", 13 pgs.
"International Application Serial No. PCT/US2014/019916, International Search Report dated Oct. 13, 2014", 6 pgs.
"International Application Serial No. PCT/US2014/019916, Invitation to Pay Additional Fees and Partial Search Report dated May 30, 2014", 6 pgs.
"International Application Serial No. PCT/US2014/019916, Written Opinion dated Oct. 13, 2014", 13 pgs.
"Powdered Activated Carbon", Cabot Corp, [Online] retrieved from the internet: <http://www.cabotcorp.com/solutions/products-plus/activated-carbon/powdered>, (Jan. 3, 2015), 3 pgs.
Arenillas, A, et al., "CO2 removal potential of carbons prepared by co-pyrolysis of sugar and nitrogen containing compounds", Journal of Analytical and Applied Pyrolysis 74.1, (2005), 298-306.
Bakandritsos, A., et al., "Aqueous and Gaseous Adsorption from Montmorillonite—Carbon Composites and from Derived Carbons", Langmuir, 21, (2005), 2349-2355.
Bakandritsos, A., et al., "High Surface Area Montmorillonite—Carbon Composites and Derived Carbons", Chemistry of Materials, vol. 16, No. 8, (Mar. 16, 2004), 1551-1559.
Bimer, Jan, et al., "Modified active carbons from precursors enriched with nitrogen functions: sulfur removal capabilities", (1998), 519-525.
Chang, Shih-Ger, "Method for Oxidation of Mercury Vapor", U.S. Appl. No. 60/560,904, filed Apr. 9, 2004, (Apr. 9, 2004), 9 pgs.
Criswell, Gordon, et al., "Progress Report on Mercury Control Retrofit at the Colstrip Power Station", Paper #91, Mega Symposium, Baltimore, MD, (Aug. 2011), 1-23.
Darder, M., et al., "Caramel-clay nanocomposites", Journal of Materials Chemistry, 15, (2005), 3913-3918.
Diamantopoulou, IR., et al., "Sorption of mercury by activated carbon in the presence of flue gas components", Fuel Processing Technology 91.2, (2010), 158-163.
Dong, J., et al., "Mercury Removal from Flue Gases by Novel Regenerable Magnetic Nanocomposite Sorbents", Environ. Sci. Technol., 43, (2009), 3266-3271.
Dunham, G. E., et al., "Mercury Capture by an Activated Carbon in a Fixed-Bed Bench-Scale System", Environmental Progress, 17(3), (1998), 203-208.
Eisazadeh, H,, "Removal of Mercury from Water Using Polypyrrole and its Composites", Chinese Journal of Polymer Science, 25(4), (2007), 393-397.
Felsvang, K., et al., "Mercury Reduction and Control Options", The U.S. EPA-DOE-EPRI Combined Power Plant Air Pollutant Control Symposium; The Mega Symposium and The A&WMA Specialty Conference and Mercury Emissions: Fate, Effects and Control; Chicago, IL, (Aug. 2001), 1-19.
Fernandez-Saavedra, R., et al., "Polymer-Clay Nanocomposites as Precursors of Nanostructured Carbon Materials for Electrochemical Devices: Templating Effect of Clays", Journal of Nanoscience and Nanotechnology, 8, (2008), 1741-1750.
Ghorbani, M., et al., "Application of polyaniline nanocomposite coated on rice husk ash for removal of Hg(II) from aqueous media", Synthetic Metals, (2001), 4 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

Ghorishi, Behrooz, et al., "Sorption of Mercury Species by Activated Carbons and Calcium-Based Sorbents: Effect of Temperature, Mercury Concentration and Acid Gases", Waste Manage. Res., 16:6, (1998), 582-593.
Gomez-Aviles, A., et al., "Functionalized Carbon-Silicates from Caramel-Sepiolite Nanocomposites", Angew. Chem. Int. Ed., 46, (2007), 923-925.
Gomez-Aviles, A., et al., "Multifunctional materials based on graphene-like/sepiolite nanocomposites", Applied Clay Science, 47, (2010), 203-211.
Ha, et al., "Effect of unburnt carbon on the corrosion performance of fly ash cement mortar", Construction and Building Materials, (Sep. 1, 2005), 7 pgs.
Ikeue, K., et al., "Noble-metal-containing nano porous carbon synthesized within the interlayer space of montmorillonite and its catalytic property", Applied Catalysis A: General, 351, (2008), 68-74.
Kawabuchi, Yuji, et al., "Chemical vapor deposition of heterocyclic compounds over active carbon fiber to control its porosity and surface function", Langmuir 13.8, (1997), 2314-2317.
Kyotani, T., et al., "Formation of highly orientated graphite from polyacrylonitrile by using a two-dimensional space between montmorillonite lamellae", Nature, 331, (1988), 331-333.
Lancia, A., et al., "Adsorption of Mercuric Chloride Vapours from Incinerator Flue Gases on Calcium Hydroxide Particles", Combust. Sci. & Tech., 93, (1993), 277-289.
Laumb, Jason D., et al., "X-ray photoelectron spectroscopy analysis of mercury sorbent surface chemistry", Fuel Processing Technology, 85, (2004), 577-585.
Li, Y., et al., "Removal of elemental mercury from simulated coal-combustion flue gas using a SiO2—TiO2 nanocomposite", Fuel Processing Technology, 89, (2008), 567-573.
Hocquel, M., "Quecksilber and seine Verbindungen bei der Abfallverbrennung", (w/ English Abstract p. 4), (Dec. 31, 2000), 113 pgs.
Maroto-Valer, M. Mercedes, et al., "Development of Activated Carbons from Coal and Biomass Combustion and Gasification Chars", Prepr. Pap.-Am. Chem. Soc., Div. Fuel Chem., 49(2), (2004), 2 pgs.
Mochida, I., et al., "Preparation of nitrogen containing pitches from quinoline and isoquinoline by AID of AlCl3", Carbon, 33(8), (1995), 1069-1077.
Nguyen-Thanh, D., et al., "High Porosity Carbonaceous Adsorbents Templated From Porous Clay Heterostructures", Prepr. Pap.-Am. Chem. Soc., Div. Fuel Chem., 51(1), (2006), 7-8.
Nguyen-Thanh, D., et al., "Metal-loaded carbonaceous adsorbents templated from porous clay heterostructures", Microporous and Mesoporous Materials, 92, (2006), 47-55.
Nickels, Dale L, et al., "Processing and reuse of activated carbon used to adsorb mercury from power plant flue gases", Final report, (2004).
Olson, David, et al., "The reduction of gas phase air toxics from combustion and incineration sources using the MET-Mitsui-BF activated coke process", Fuel Processing Technology, (2000), 13 pgs.
Olson, David G., et al., "The Reduction of Gas Phase Air Toxics from Combustion and Incineration Sources using the MET-Mitsui-BF Activated Coke Process", Fuel Processing Technology, 65-66, (2000), 393-405.
Olson, E. S., et al., "Catalytic effects of carbon sorbents for mercury capture", Journal of Hazardous Materials, 74, (2000), 61-79.
Olson, Edwin S., et al., "Surface Compositions of Carbon Sorbents Exposed to Simulated Low-Rank Coal Flue Gases", J. Air & Water Waste Manage. Assoc., 55, (2005), 747-754.
Padak, Bihter, "Understanding mercury binding on activated carbon", Carbon 47.1 2, (2009), 2855-2864.
Pietrzak, et al., "Preparation of nitrogen-enriched activated carbons from brown coal", Energy and Fuels 20.3, (2006), 1275-1280.
Przepiorski, J, et al., "High temperature ammonia treatment of activated carbon for enhancement of CO2 adsorption", Applied Surface Science 225.1, (2004), 235-242.
Rachel, Ribeirovieira Azzi Rios, et al., "Tailoring Activated Carbon by Surface Chemical Modification with O, S, and N Containing Molecules", Materials Research. 6 (2), (2003), 129-135.
Raymundo-Pinero, E, et al., "Structural characterization of N-containing activated carbon fibers prepared from a low softening point petroleum pitch and a melamine resin", Carbon 40.4, (2002), 597-608.
Smokey, et al., "Alternative to Activated Carbon for Mercury Control", Power Engineering, (Oct. 2012), 10 pgs.
Streng, Sabine, et al., "Toxics control by activated charcoal within the "System Dusseldorf" full scale experience", B. Fuel Processing Technology, (1994), 14 pgs.
Tsuji, K, et al., "The Activated Coke Process for Combinded SOx/NOx/Air Toxics Reduction", Air and Water Management Assoc., (Mar. 10, 1993), 27 pgs.
Vosteen, B, et al., "Chlor-und Bromgestutzte Hg-Sorption an Elektrofilter-Flugaschen eines kohlegefeuerten Schmelzkammerkessels und an Zementrohmehl", Contribution to VDI Seminar 431802, "Mercury—Emissions, Measurement and Abatement Techniques", Dusseldorf, DE, (2003), 32 pgs.
Vosteen, B. W., "Bromine-enhanced Mercury Abatement from Combustion Flue Gases—Recent Industrial Applications and Laboratory Research", VGB PowerTech, vol. 86, Issue Mar. 2006, (2006), 70-75.
Vosteen, B. W., et al., "Mercury—Emissions, Measuring and Mitigation Techniques", Flyer on Mercury Abatement given at the VDI-Wissensforum, Dusseldorf, Germany, German language with machine translation, (Sep. 2003), 11 pgs.
Vosteen, B.W., et al., "Emissionsminderung von Quecksilber durch chlor- und bromgestutzte Hg-Oxidation in Rauchgas", Contribution to VDI Seminar 431802, "Mercury—Emissions, Measurement and Mitigation Techniques", Dusseldorf, DE, (Sep. 2003), 25 pgs.
Wan, Q., et al., "Removal of gaseous elemental mercury over a CeO2—WO3/TiO2 nanocomposite in simulated coal-fired flue gas", Chemical Engineering Journal, 170, (2011), 512-517.
Wang, B., et al., "Performance of a diatomite-based sorbent in removing mercury from aqueous and oil matrices", J. Environ. Eng. Sci., 6, (2007), 469-476.
Zhang, Y., et al., "High efficient removal of mercury from aqueous solution by polyaniline/humic acid nanocomposite", Journal of Hazardous Materials, 175, (2010), 404-409.
Zhao, Yongxin, et al., "Effects of Sulfur Dioxide and Nitric Oxide on Mercury Oxidation and Reducton under Homogeneous Conditions", J. Air & Waste Manage. Assoc., 56, (2006), 628-635.
Zheng, Yuanjing, et al., "Review of technologies for mercury removal from flue gas from cement production processes", Progress in Energy and Combustion Science, vol. 38, No. 5, (Apr. 26, 2012), 599-629.
Zhu, Jianzhong, et al., "Enhanced mercury ion adsorption by amine-modified activated carbon", Journal of Hazardous Materials 166, (2009), 866-872.
U.S. Appl. No. 11/209,163, U.S. Pat. No. 7,435,286, filed Aug. 22, 2005, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 12/201,595, filed Aug. 29, 2008, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 12/419,219, U.S. Pat. No. 8,168,147, filed Apr. 6, 2009, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 13/427,665, U.S. Pat. No. 8,512,655, filed Mar. 22, 2012, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 13/966,768, U.S. Pat. No. 8,821,819, filed Aug. 14, 2013, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 14/318,270, U.S. Pat. No. 9,757,689, filed Jun. 27, 2014, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 14/712,558, filed May 14, 2015, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 15/951,970, filed Apr. 12, 2018, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 14/195,360, U.S. Pat. No. 9,669,355, filed Mar. 3, 2014, Activated Carbon Sorbent Including Nitrogen and Methods of Using the Same.

(56) **References Cited**

OTHER PUBLICATIONS

U.S. Appl. No. 15/974,343, filed May 8, 2018, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 15/589,359, filed May 8, 2017, Activated Carbon Sorbent Including Nitrogen and Methods of Using the Same.
U.S. Appl. No. 15/382,114, filed Dec. 16, 2016, Promoted Ammonium Salt-Protected Activated Carbon Sorbent Particles for Removal of Mercury From Gas Streams.
U.S. Appl. No. 15/449,112, U.S. Pat. No. 10,130,930, filed Mar. 3, 2017, Sorbent Comprising Carbon and Nitrogen and Methods of Using the Same.
U.S. Appl. No. 16/130,670, filed Sep. 13, 2018, Sorbent Comprising Carbon and Nitrogen and Methods of Using the Same.
U.S. Appl. No. 12/429,058, U.S. Pat. No. 8,652,235, filed Apr. 23, 2009, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 14/102,896, U.S. Pat. No. 9,468,886, filed Dec. 11, 2013, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 15/295,594, filed Oct. 17, 2016, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 15/978,760, filed May 14, 2018, Sorbents for the Oxidation and Removal of Mercury.
U.S. Appl. No. 15/853,029, filed Dec. 22, 2017, Sorbents for the Oxidation and Removal of Mercury.
"U.S. Appl. No. 15/382,114, Final Office Action dated Jun. 21, 2019", 31 pgs.
"U.S. Appl. No. 15/589,359, Advisory Action dated May 22, 2019", 3 pgs.
"U.S. Appl. No. 15/589,359, Non Final Office Action dated Jun. 21, 2019", 7 pgs.
"U.S. Appl. No. 15/978,760, Notice of Allowability dated May 30, 2019", 3 pgs.
"U.S. Appl. No. 15/978,760, Notice of Allowance dated May 8, 2019", 7 pgs.
"U.S. Appl. No. 15/295,594, Response filed Apr. 23, 2019 to Non Final Office Action dated Oct. 23, 2018", 45 pgs.
"U.S. Appl. No. 15/382,114, Response filed Mar. 12, 2019 to Non Final Office Action dated Dec. 12, 2018", 24 pgs.
"U.S. Appl. No. 15/589,359, Final Office Action dated Mar. 1, 2019", 10 pgs.
"U.S. Appl. No. 15/589,359, Response filed Apr. 30, 2019 to Final Office Action dated Mar. 1, 2019", 11 pgs.
"U.S. Appl. No. 15/978,760, Ex Parte Quayle Action mailed Apr. 19, 2019", 13 pgs.
"U.S. Appl. No. 15/978,760, Response filed Mar. 20, 2019 to Final Office Action dated Dec. 26, 2018", 90 pgs.
"U.S. Appl. No. 15/978,760, Response filed Apr. 23, 2019 to Ex Parte Quayle Action mailed Apr. 19, 2019", 15 pgs.
"Coal Combustion Products (CCPS): Characteristics, Utilization and Beneficiation", Edited by Tom Robl, et al., Woodhead Publishing (Elsevier), (2017), 565 pgs.
"Control of Mercury Emissions from Coal Fired Electric Utility Boilers: An Update", US EPA Air Pollution Prevention and Control Division, National Risk Management Research Laboratory, Office of Research and Development, (Feb. 18, 2005), 59 pgs.
"Sorbent Enhancement Additives for Mercury Control", US DOE Office of Fossil Energy, National Energy Technology Laboratory, (Jun. 2008), 4 pgs.
Benson, Steven A., et al., "JV Task 73—Mercury Control Technologies for Electric Utilities Burning Subbituminous Coals—Draft Final Report", University of North Dakota Energy and Environmental Research Center, (Jun. 2005), 165 pgs.
Benson, Steven A., et al., "Pilot-and Full-Scale Demonstration of Advanced Mercury Control Technologies for Lignite-Fired Power Plants", University of North Dakota Energy and Environmental Research Center, (Feb. 2005), 97 pgs.
Berry, Mark, et al., "Mercury control evaluation of calcium bromide injection into a PRB-fired furnace with and SCR", Proc. of the Air Quality VI Conference, Arlington, VA, (2007), 9 pgs.
Brown, Thomas D., et al., "Mercury Measurement and Its Control: What We Know, Have Learned, and Need to Further Investigate", Journal of the Air and Waste Management Association, 49(6), (Jun. 1999), 98 pgs.
Feeley, Thomas J., et al., "A Review of DOE/NETL's Mercury Control Technology R and D Program for Coal-Fired Power Plants", DOE/NETL Hg R and D Program Review, (Apr. 2003), 32 pgs.
French, Charles L., et al., "Study of Hazardous Air Pollutant Emissions from Electric Utility Steam Generating Units—Final Report to Congress: vol. 1", US EPA Office of Air Quality Planning and Standards, (Feb. 1998), 502 pgs.
Ghorishi, Behrooz S., et al., "In-Flight Capture of Elemental Mercury by Chlorine-Impregnated Activated Carbon", Proc. of the 94th Annual Meeting of the Air and Waste Management Association, Orlando, FL, (Jun. 2001), 14 pgs.
Jones, Andrew P., et al., "DOE/NETL's Phase II Mercury Control Technology Field Testing Program: Preliminary Economic Analysis of Activated Carbon Injection", Environmental Science and Technology, 41(4), (2007), 7 pgs.
Keating, Martha H., et al., "Mercury Study Report to Congress vol. 1: Executive Summary", US EPA Office of Air Quality Planning and Standards, (Dec. 1997), 95 pgs.
Kilgroe, James D., et al., "Control of Mercury Emissions from Coal-Fired Electric Utility Boilers: Interim Report", US EPA Office of Research and Development, National Risk Management Laboratory, Air Pollution Prevention and Control Division, (Dec. 2001), 485 pgs.
Nelson, Sid Jr., et al., "How China Can Leapfrog the World in Mercury Emission Reductions", Proc. of the AWMA Intl. Specialty Conference on Leapfrogging Opportunities for Air Quality Improvement, (2010), 24 pgs.
Pavlish, John H., et al., "Status review of mercury control options for coal-fired power plants", Fuel Processing Technology, vol. 82, (2003), 77 pgs.
Yang, Yang, et al., "Effect of HBr formation on mercury oxidation via CaBr(2) addition to coal during combustion", RSC Advances, 6(64), (2016), 7 pgs.
"U.S. Appl. No. 14/712,558, Amendment and Response filed Dec. 3, 2018 to Non Final Office Action dated Oct. 19, 2018", 28 pgs.
"U.S. Appl. No. 14/712,558, Final Office Action dated Jan. 11, 2019", 27 pgs.
"U.S. Appl. No. 15/382,114, Non Final Office Action dated Dec. 12, 2018", 46 pgs.
"U.S. Appl. No. 15/589,359, Amendment and Response filed Jan. 17, 2019 to Non Final Office Action dated Oct. 22, 2018", 14 pgs.
"U.S. Appl. No. 15/974,343, Amendment and Response filed Dec. 3, 2018 to Non Final Office Action dated Oct. 29, 2018", 37 pgs.
"U.S. Appl. No. 15/974,343, Final Office Action dated Jan. 14, 2019", 25 pgs.
"U.S. Appl. No. 15/978,760, Amendment and Response filed Dec. 3, 2018 to Non Final Office Action dated Oct. 10, 2018", 25 pgs.
"U.S. Appl. No. 15/978,760, Final Office Action dated Dec. 26, 2018", 21 pgs.
"U.S. Appl. No. 14/712,558, Response filed Jul. 10, 2019 to Final Office Action dated Jan. 11, 2019", 57 pgs.
"U.S. Appl. No. 15/295,594, Final Office Action dated Aug. 2, 2019", 18 pgs.
"U.S. Appl. No. 15/589,359, Notice of Allowance dated Jul. 31, 2019", 7 pgs.
"U.S. Appl. No. 15/589,359, Response filed Jul. 16, 2019 to Non Final Office Action dated Jun. 21, 2019", 7 pgs.
"U.S. Appl. No. 15/974,343, Non Final Office Action dated Aug. 21, 2019", 13 pgs.
"U.S. Appl. No. 15/974,343, Response Filed Jul. 10, 2019 to Final Office Action dated Jan. 14, 2019", 81 pgs.
"U.S. Appl. No. 16/509,071, Non Final Office Action dated Sep. 11, 2019", 21 pgs.
"U.S. Appl. No. 14/712,558, Non Final Office Action dated Sep. 12, 2019", 15 pgs.
"U.S. Appl. No. 15/382,114, filed Oct. 3, 2019 to Final Office Action dated Jun. 21, 2019", 23 pgs.
"U.S. Appl. No. 15/589,359, Corrected Notice of Allowability dated Oct. 11, 2019", 2 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"U.S. Appl. No. 15/974,343, Corrected Notice of Allowability dated Oct. 23, 2019", 2 pgs.
"U.S. Appl. No. 16/509,071, Response filed Oct. 3, 2019 to Non Final Office Action dated Sep. 11, 2019", 26 pgs.
"U.S. Appl. No. 16/509,102, Non Final Office Action dated Oct. 23, 2019", 26 pgs.
"U.S. Appl. No. 16/509,146, Non Final Office Action dated Oct. 17, 2019", 24 pgs.
"Ch. 35: Mercury, Hazardous Air Pollutants and other Multi-Pollutant Control", Tomei, G. L. (Ed.). Steam: its generation and use, Babcock and Wilcox Co., (2015), 24 pgs.
"Defendant's Answer and Counterclaim", *Midwest Energy Emissions Corp., et al.*, v. *Vistra Energy Corp., et al.*—Case 1:19-cv-01334-RGA, 71 pgs.
"Original Complaint for Patent Infringement", *Midwest Energy Emissions Corp., et al.*, v. *Vistra Energy Corp., et al.*—Case 1:19-cv-01334-UNA, 31 pgs.
"Plaintiff's Answer to Defendant's Counterclaims", *Midwest Energy Emissions Corp., et al.*, v. *Vistra Energy Corp., et al.*—Case 1:19-cv-01334-RGA, 37 pgs.
Olson, E.S., et al., "Chemical mechanisms in mercury emission control technologies", J. Phys. IV France 107, Proc. of the XIIth Intl. Conference on Heavy Metals in the Environment vol. II, pp. 979-982, (2003), 6 pgs.
Olson, Edwin S., "Abstract—Multiple Site Model for Flue Gas—Mercury interactions on Activated Carbons: The Basic Site", Abstracts of Papers Part 1, 225th ACS National Meeting, New Orleans, LA, (2003), 3 pgs.
Olson, Edwin S., et al., "An Improved Model for Flue Gas—Mercury Interactions on Activated Carbons", Proceedings of the Combined Power Plant Air Pollutant Control Mega Symposium, (May 2003), 8 pgs.
Olson, Edwin, et al., "The Multiple Site Model for Flue Gas—Mercury Interactions on Activated Carbons: The Basic Site", Fuel Chemistry Preprints, 48(1), (2003), 3 pgs.

* cited by examiner




FIG. 1

ME2C-RC-00074556
PTX-003.0013






FIG. 2


100
Exhaust
206
205
35
42
160
150
140
161
151
141
207
162
152
Waste
Ash
25
110
120
130
201
131c
121c
202
203
121b
131b
204
170
111
121
131
115
116
208
15
180
117
209
171
118
119

FIG. 3

ME2C-RC-00074558
PTX-003.0015






FIG. 4

Case: 26-1403 Document: 31 Page: 285 Filed: 08/25/2026

ME2C-RC-00074559
PTX-003.0016






FIG. 5

ME2C-RC-00074560
PTX-003.0017






FIG. 6


ESP/FF, FGD
ESP, FGD
ESP, Treated, Large Carbon
FF, Treated, Large Carbon
Mercury Removal, %
100
90
80
70
60
50
40
30
20
10
0
0
5
10
15
20
25
30
Injection Rate, lb/Macf

FIG. 7


Total
Elemental
EOT
% Inlet Total
120
100
80
60
40
20
0
0
1
2
Time, hr

FIG. 8


% Inlet Total
120
100
80
60
40
20
0
0
1
2
Time, hr
Total
Elemental
EOT

FIG. 9


Standard AC with Alkali
Standard AC
Mercury Removal
100%
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
0
1
2
3
4
5
6
7
8
9
Carbon Injection Rate, lb/Macf
Standard AC with alkali is plotted as a function of carbon feed rate. The carbon feed rate was 25% of the total additive blend feed rate.

FIG. 10

ME2C-RC-00074565
PTX-003.0022






FIG. 11

# SORBENTS FOR THE OXIDATION AND REMOVAL OF MERCURY

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/974,343, filed May 8, 2018, which is a continuation of U.S. patent application Ser. No. 15/951,970, filed Apr. 12, 2018, which is a continuation of U.S. patent application Ser. No. 14/712,558, filed May 14, 2015, which is a continuation of U.S. patent application Ser. No. 14/318,270, filed Jun. 27, 2014, which is a continuation of U.S. patent application Ser. No. 13/966,768, filed Aug. 14, 2013, issued as U.S. Pat. No. 8,821,819, which is a continuation of U.S. patent application Ser. No. 13/427,665, filed Mar. 22, 2012, issued as U.S. Pat. No. 8,512,655, which is a continuation of U.S. patent application Ser. No. 12/419,219, filed Apr. 6, 2009, issued as U.S. Pat. No. 8,168,147, which is a continuation of U.S. patent application Ser. No. 12/201,595, filed Aug. 29, 2008, which is a division of U.S. patent application Ser. No. 11/209,163, filed Aug. 22, 2005, issued as U.S. Pat. No. 7,435,286, which application claims the benefit under 35 U.S.C. § 119 (e) of U.S. Provisional Patent Application No. 60/605,640 filed Aug. 30, 2004, the disclosure of which is hereby incorporated by reference in its entirety.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

This invention was made with United States Government support under Grant Numbers R 827649-01 and CR 830929-01 awarded by the United States Environmental Protection Agency and under Contract Number DE-FC26-98FT40320 awarded by the United States Department of Energy. The United States Government has certain rights in this invention.

## BACKGROUND OF THE INVENTION

### 1. Technical Field of the Invention

The present invention relates to methods and materials for the removal of pollutants from flue gas or product gas from a gasification system. In particular, mercury is removed from gas streams generated during the burning or gasification of fossil fuels by highly reactive regenerable sorbents.

### 2. Background of the Invention

The combustion and gasification of fossil fuel such as coal generates flue gas that contains mercury and other trace elements that originate from the fuel. The release of the mercury (and other pollutants) to the environment must be controlled by use of sorbents, scrubbers, filters, precipitators, and other removal technologies. Mercury is initially present in the elemental form during combustion and gasification. In downstream process sections, such as in the ducts and stack of a combustion system, some of the elemental mercury is oxidized. The amount that is oxidized depends on the amount of acid gases present in the flue gas and other factors. Amounts of mercury vary with the fuel, but concentrations of mercury in the stream of flue gas from coal combustion are typically less than 5 parts per billion (ppb). Large coal combustion facilities such as electric utilities may emit a pound of mercury, or more, per day.



Mercury removal applications include, without limitation, flue gas from coal (or other fossil fuel) combustion, waste incineration, product gas from gasification, as well as off gases from mineral processing, metal refining, retorting, cement manufacturing, chloralkali plants, dental facilities, and crematories.

Mercury Sorbent Technologies

Several types of mercury control methods for flue gas have been investigated, including injection of fine sorbent particles into a flue gas duct and passing the flue gas through a sorbent bed. Fine-particle injection sorbents include activated carbon, metal oxide sorbent, sodium sulfide particles, and basic silicate or oxide sorbents. When particle injection is employed, the mercury captured on the sorbent particles is removed from the gas stream in a bag house or electrostatic precipitator (ESP) and collected along with ash particulate. The sulfide and basic silicate and oxide particles are effective only for the oxidized mercury, and the metal oxide sorbents exhibit slower capture kinetics than the carbon particles. Additionally, injection of fine carbon particles into the flue gas stream has been only partially successful in removing mercury, especially elemental mercury, where effective removal of only about 60% is attained for some applications with a FF (fabric filter) to collect carbon and ash. Even lower removal rates have been observed when using an ESP to collect the carbon because the contact time of the carbon with the gas is very short.

A major problem with existing carbon injection systems is that the sorbent is initially unreactive, and only after extended exposure to the flue gas does the sorbent become effectively seasoned and provide increased reactivity with the mercury in the gas. Consequently, these sorbents must be used in large amounts, at high sorbent-to-mercury ratios, to effectively capture the mercury. These sorbents tend to be relatively expensive and cannot be easily separated from the ash for regeneration and reuse. The collection of carbon in the ash also creates solid waste disposal problems, and the spent sorbent may contaminate the collected ash, preventing its use in various applications.

Accordingly, there remains a need for more economical and effective mercury removal technology. This invention provides for cost-effective removal of pollutants including mercury, using sorbent enhancement additives and/or highly reactive sorbents, with contact times of seconds (or less), and that may be regenerated and reused.

## SUMMARY OF THE INVENTION

It is thus an object of the present invention to overcome the deficiencies of the prior art and thereby to provide new and economical methods for the removal of mercury from the gases produced in the utilization of fossil fuels.

A halogen/halide promoted activated carbon sorbent is described that is highly effective for the removal of mercury from flue gas streams. The sorbent comprises a new halide-modified carbon form containing a reactive compound produced by the reaction of bromine (or halide or other halogen) with the carbon. Optional secondary components and alkali may be added to further increase reactivity and mercury capacity. Mercury removal efficiencies obtained exceed or match conventional methods with added benefits such as reduced costs. Optionally, the sorbent can be regenerated and reused. Sorbent treatment and/or preparation methods are also described. New methods for in-flight preparation, introduction, and control of the active sorbent into the mercury contaminated gas stream are described.

In some embodiments, a promoted carbon sorbent is provided comprising a base activated carbon that has reacted with a promoter selected from the group consisting of halides, halogens, and combinations thereof, such that the reaction product is effective for the removal of mercury from a gas stream.

In an embodiment, a promoted carbon sorbent is provided wherein the base activated carbon is selected from the group consisting of powdered activated carbon, granular activated carbon, carbon black, carbon fiber, aerogel carbon, pyrolysis char, activated carbon with an average particle size greater than that of flyash produced such that it is physically separable therefrom, and combinations thereof, and the promoter is selected from the group consisting of molecular halogens, Group V (CAS nomenclature is used throughout) halides, Group VI halides, hydrohalides, and combinations thereof. In an embodiment, the base activated carbon may have an mass mean particle diameter such that it can be substantially separated by physical means from entrained ash in the gas stream from which mercury is to be removed. In an embodiment, the base activated carbon may have a mass mean particle diameter greater than about 40 micrometers.

In another embodiment, the sorbent comprises from about 1 to about 30 grams promoter per 100 grams of base activated carbon. Another embodiment further comprises an optional secondary component comprising a halogen or a hydrohalide such that the reactivity and mercury capacity of the sorbent are enhanced.

In another embodiment, the concentration of the optional secondary component on the finished sorbent is within the range of from about 1 to about 15 wt-% of the concentration of the promoter on the finished sorbent.

In another embodiment, an optional alkali component may preferably be added to provide a synergistic effect through combination of this alkali with the primary sorbent.

In another embodiment, the optional secondary component is selected from the group consisting of Group V halides, Group VI halides, HI, HBr, HCl, and combinations thereof. In another embodiment, the promoter is substantially in vapor form when combined with the base activated carbon. In another embodiment, the promoter is combined with an organic solvent prior to reaction with the base activated carbon. In another embodiment, the promoter and optional secondary component are combined with the base activated carbon substantially simultaneously. Another embodiment further comprises adding a mercury-stabilizing reagent selected from the group consisting of S, Se, $H_2S$, $SO_2$, $H_2Se$, $SeO_2$, $CS_2$, $P_2S_5$, and combinations thereof. Another embodiment further comprises adding an optional alkali component.

In an embodiment, a method is provided comprising providing a granular activated carbon; reacting the activated carbon with a promoter selected from the group consisting of halogens, halides, and combinations thereof, such that the reaction product comprises a promoted carbon sorbent effective for removal of mercury from a gas stream. In a further embodiment, the reaction product comprises from about 1 to about 30 grams promoter per 100 grams activated carbon. In another embodiment the reaction product has an average particle size distribution greater than the average size of entrained ash particles in the gas stream from which mercury is to be removed, such that the reaction product can be substantially removed from the entrained ash particles by physical means. In another embodiment the reaction product has a mass mean particle diameter greater than about 40 micrometers.

In another embodiment, the promoter is selected from the group consisting of molecular halogens, hydrohalides, Group V halides, Group VI halides, and combinations thereof. In another embodiment the promoter is in the gas phase when contacting the activated carbon. In another embodiment, the promoter is in an organic solvent when contacting the activated carbon.

In another embodiment, the promoter is selected from the group consisting of $Br_2$, a Group V bromide, a Group VI bromide, and combinations thereof.

In another embodiment, the method further comprises reacting the granular activated carbon with an optional secondary component comprising a halogen or a hydrohalide such that the reactivity and mercury capacity of the sorbent are enhanced. In another embodiment, the promoter and optional secondary component are contacted simultaneously with the activated carbon. In another embodiment the method further comprises adding a mercury-stabilizing reagent selected from the group consisting of S, Se, $H_2S$, $SO_2$, $H_2Se$, $SeO_2$, $CS_2$, $P_2S_5$, and combinations thereof. In an embodiment, a method is provided for control of mercury in a flue gas with substantially lower sorbent requirements. Through enhanced sorbent reactivity, mercury removal per grain of sorbent is increase, thereby decreasing the capital and operating costs by decreasing sorbent requirements.

In an embodiment, a method is provided for reducing mercury in flue gas comprising providing a sorbent, injecting the sorbent into a mercury-containing flue gas stream, collecting greater than 70 wt-% of the mercury in the flue gas on the sorbent to produce a cleaned flue gas, and substantially recovering the sorbent from the cleaned flue gas. In embodiments where less than 70 wt-% mercury removal is desired, the required removal may preferably be attained using less than half as much carbon as would be required with standard (non-enhanced) carbon. In a further embodiment, the method further comprises monitoring the mercury content of the clean flue gas, regenerating the recovered sorbent, and using the monitored mercury content of the cleaned flue gas to control the rate of injection of the sorbent. In another embodiment the injected sorbent is prepared in-flight by reacting an activated carbon and a promoter within a pneumatic transport line from which the reaction product is injected to the mercury-containing flue gas stream.

In another embodiment, the promoter is selected from the group consisting of molecular halogens, halides, and combinations thereof. In another embodiment, the promoter is reacted in the gas phase or as a vapor. In another embodiment, the promoter is added at from about 1 to about 30 grams per 100 grams of activated carbon.

In another embodiment, the injected sorbent is prepared in-flight by reacting an activated carbon, a promoter, and an optional secondary component to enhance the reactivity and capacity of the sorbent within a pneumatic transport line from which the reaction product is injected to the mercury-containing flue gas stream.

In another embodiment, the optional secondary component is selected from the group consisting of iodine, hydrohalides, Group V halides, Group VI halides, and combinations thereof. In another embodiment, the optional secondary component is added at from about 1 to about 15 wt % of the promoter content. In another embodiment, the method further comprises adding to the sorbent a mercury-stabilizing reagent selected from the group consisting of S, Se, $H_2S$, $SO_2$, $H_2Se$, $SeO_2$, $CS_2$, $P_2S_5$, and combinations thereof.

In an embodiment, the method further comprises co-injecting an optional alkaline material, including without limitation alkaline and alkaline earth components, to improve the efficiency of mercury capture by capturing oxidized mercury and/or capturing gaseous components that might otherwise reduce sorbent capacity. In another embodiment, the optional alkaline material may preferably comprise calcium oxide, sodium carbonate, and the like, as are known in the art.

In another embodiment, the method further comprises using the monitored mercury content of the cleaned flue gas to control the composition of the sorbent. In another embodiment, the injected sorbent is prepared in-flight by reacting an activated carbon and a promoter within a pneumatic transport line from which the reaction product is injected to the mercury-containing flue gas stream, wherein the promoter is selected from the group consisting of molecular halogens, halides, and combinations thereof, wherein the promoter is reacted in the gas phase or as a vapor, wherein the promoter is added at from about 1 to about 30 grams per 100 grams of activated carbon, wherein the rate at which the promoter is added and the rate of sorbent injection are determined by a digital computer based at least in part on the monitored mercury content of the cleaned flue gas.

In an embodiment, a method for reducing the mercury content of a mercury and ash containing gas stream is provided wherein particulate activated carbon sorbent with a mass mean size greater than 40 μm is injected into the gas stream, mercury is removed from the gas by the sorbent particles, the sorbent particles are separated from the ash particles on the basis of size, and the sorbent particles are re-injected to the gas stream. In another embodiment, the mercury-containing sorbent particles are regenerated to remove some or substantially all of the mercury. In another embodiment, an alkaline component is co-injected into the gas stream. In another embodiment, the sorbent may further comprise a promoter. The promoter may preferably comprise a halide, a halogen, or both.

As will be described in more detail below, the present invention thus provides several advantages over previously known techniques, including significantly more effective and economical mercury sorbents for effluent gases, advantageously applicable to treating gas streams from fired equipment and gasification systems.

The foregoing has outlined rather broadly the features and technical advantages of the present invention in order that the detailed description of the invention that follows may be better understood. Additional features and advantages of the invention will be described hereinafter that form the subject of the claims of the invention. It should be appreciated by those skilled in the art that the conception and specific embodiments disclosed may be readily utilized as a basis for modifying or designing other structures for carrying out the same purposes of the present invention. It should also be realized by those skilled in the art that such equivalent constructions do not depart from the spirit and scope of the invention as set forth in the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more detailed description of the preferred embodiments of the present invention, reference will now be made to the accompanying drawings.

FIG. **1** schematically illustrates methods for preparation of promoted carbon sorbents in accordance with the present invention.

FIG. **2** illustrates a proposed mechanistic model of the chemical reactions resulting in the oxidation and capture of mercury.

FIG. **3** schematically illustrates preparation of promoted carbon sorbents and processes for flue gas mercury reduction in flue gases and/or product gases from a gasification system in accordance with the present invention, including in-flight preparation of promoted carbon sorbent.

FIG. **4** is a diagram illustrating breakthrough curves for 5 wt/wt % brominated NORIT Darco FGD sorbent (37 mg+113 mg sand) in low-HCl (1 ppm) synthetic flue gas.

FIG. **5** is a diagram illustrating breakthrough curves for non-halogenated NORIT Darco FGD sorbent (37 mg+113 mg sand) in low-HCl (1 ppm) synthetic flue gas.

FIG. **6** is a bar chart illustrating pilot-scale mercury removal results, including large-size sorbent results.

FIG. **7** is a diagram illustrating the effects of sorbent size and injection rate on mercury removal for ESPs and fabric filters.

FIG. **8** is a diagram illustrating the breakthrough curves for a brominated NORIT Darco FGD sorbent with inert sand.

FIG. **9** is a diagram illustrating the breakthrough curves for brominated NORIT Darco FGD sorbent with a co-injected alkali material.

FIG. **10** is a plot of mercury removal vs. carbon injection rate with and without co-injection of alkali material.

FIG. **11** is a block diagram illustrating the use of the invention in a coal fueled facility.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Herein will be described in detail specific preferred embodiments of the present invention, with the understanding that the present disclosure is to be considered an exemplification of the principles of the invention, and is not intended to limit the invention to that illustrated and described herein. The present invention is susceptible to preferred embodiments of different forms or order and should not be interpreted to be limited to the specifically expressed methods or compositions contained herein. In particular, various preferred embodiments of the present invention provide a number of different configurations and applications of the inventive method, compositions, and their uses.

The present invention provides a cost-effective way to capture pollutants by utilizing exceptionally reactive halogen/halide promoted carbon sorbents using a bromide (or other halogen/halide) treatment of the carbon, that capture mercury via mercury-sorbent surface reactions, at very short contact times of seconds or less. The sorbent does not require in situ activation (no induction period) in the gas stream to achieve high reactivity, as do conventional activated carbon sorbents. The reactivity of the sorbent toward the pollutants is greatly enhanced and the sorption capacity can be regenerated, the promoted sorbent may be regenerated, recycled and/or reused.

The treated carbons, treatment techniques, and optional additives discussed herein have applicability to mercury control from the product or effluent gas or gases from gasification systems, syngas generators, and other mercury-containing gas streams, in addition to the flue gas from combustion systems. Thus, it should be understood that the terms combustion system and flue gas as used throughout

this description may apply equally to gasification systems and syngas or fuel gas, as will be understood by those skilled in the art.

Referring now to FIG. **1**, there is shown a block flow diagram illustrating some preferred embodiments of the process of the present invention to prepare promoted sorbents useful for mercury capture from flue gas and/or product gas form a gasification system streams. In a preferred embodiment illustrated by path **10**-**20**, block **10** illustrates providing a base activated carbon, and adding a halogen or halide promoter that reacts with the carbon, illustrated at block **20**, to produce a product promoted carbon sorbent. In embodiments where the halogen or halide is added, for example, as a vapor, no further steps may be necessary. In embodiments where the halogen or halide is added in, for example, a solvent, it may be desirable to employ solvent removal as illustrated by block **20**A.

Referring still to FIG. **1**, another preferred embodiment of the process of the present invention is illustrated by path **10**-**20**-**30**, comprising providing a base activated carbon as shown by block **10**, adding a halogen or halide promoter that reacts with the carbon, illustrated at block **20**, and adding a secondary component illustrated at block **30** that reacts with the result of block **20** to produce a product promoted carbon sorbent. In embodiments where both the halogen or halide promoter and the secondary component are added, for example, as a vapor, no further steps may be necessary. In embodiments where the halogen or halide promoter and/or secondary component are added in, for example, a solvent, it may be desirable to employ solvent removal as illustrated by block **30**A.

Referring still to FIG. **1**, another preferred embodiment of the process of the present invention is illustrated by path **10**-**40**, comprising providing a base activated carbon as illustrated at block **10**, and adding a halogen or halide promoter and a secondary component to the activated carbon together, with which they react as illustrated by block **40**, producing a product promoted carbon sorbent. As above, in embodiments where vapor additions are made to the activated carbon no further steps may be desired. In embodiments where one or more components are added in solvent, a solvent removal step may be provided as illustrated by block **40**A.

Referring still to FIG. **1**, also illustrated are preferred embodiments in which, as illustrated by block **50**, a flue gas stream is treated with product promoted carbon sorbent prepared as described above.

In some preferred embodiments the activated carbon provided may preferably be any of several types, as understood by those skilled in the art. For example, the activated carbon may include powdered activated carbon, granular activated carbon, carbon black, carbon fiber, carbon honeycomb or plate structure, aerogel carbon film, pyrolysis char, regenerated activated carbon from product promoted carbon sorbent, or other types as known in the art.

In some preferred embodiments the activated carbon provided may preferably be any of several types, as understood by those skilled in the art. For example, the activated carbon may include powdered activated carbon, granular activated carbon, carbon black, carbon fiber, carbon honeycomb or plate structure, aerogel carbon film, pyrolysis char, an activated carbon or regenerated activated carbon with a mass mean particle size greater than fly ash in a flue gas stream to be treated.

In some preferred embodiments the activated carbon provided may preferably be any of several types, as understood by those skilled in the art. For example, the activated carbon may include powdered activated carbon, granular activated carbon, carbon black, carbon fiber, carbon honeycomb or plate structure, aerogel carbon film, pyrolysis char, an activated carbon or regenerated activated carbon with a mass mean particle diameter preferably greater than 40 micrometers, more preferably greater than 60 micrometers, or a particle size distribution greater than that of the fly ash or entrained ash in a flue gas stream to be treated, such that the activated carbon and ash can be separated by physical means.

In some preferred embodiments, the halogen or halide promoter that is added to, and reacts with, the base activated carbon may preferably comprise, by way of illustration and not limitation, a molecular halogen in vapor or gaseous form, a molecular halogen in an organic solvent, a Group V or Group VI halide, such as $PBr_3$ or $SCl_2$, respectively, in vapor, liquid, or solution form (though not in an aqueous solvent).

Embodiments are also provided in which the organic solvent may preferably comprise a chlorinated hydrocarbon, such as dichloromethane, a hydrocarbon solvent, including for example, petroleum ether, ligroin, pentane, hexane, toluene, and benzene, carbon disulfide, a waste solvent, an ether, a recycled solvent, a supercritical solvent, such as supercritical $CO_2$, water (though not in the case of a Group V or Group VI halide), and others as will be apparent to those of skill in the art.

Referring now to FIG. **2**, there is illustrated a theory developed from scientific evidence to explain the nature of the promoting compounds. For example, as illustrated in FIG. **2**, hydrogen bromide reacts with the unsaturated structure of the activated carbon. This may be, by way of illustration only, a carbene species on the edge of the graphene sheet structures of the carbon. Molecular bromine or a bromine compound reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury with subsequent capture by the sorbent.

It has now been found that the formation of the new bromide compound with carbon increases their reactivity toward mercury and other pollutants. Additionally, the resulting bromide compound is uniquely suited to facilitate oxidation of the mercury. The effectiveness of the oxidation apparently results from the promotion effect of the halide, exerted on the developing positive charge on the mercury during the oxidation, known in the chemical art as a specific catalytic effect. Thus, as the mercury electrons are drawn toward the positive carbon, the halide anion electrons are pushing in from the other side, stabilizing the positive charge developing on the mercury and lowering the energy requirement for the oxidation process. Bromide is especially reactive, owing to the highly polarizable electrons in the outer 4p orbitals of the ion. Thus, adding HBr or $Br_2$ to the carbon forms a similar carbon bromide, in which the positive carbon oxidizes the mercury with the assistance of the bromide ion.

Referring now to FIG. **3**, a schematic flow diagram is provided of mercury control system **100** comprising preparation of promoted carbon sorbents, and flue gas mercury reduction, in accordance with preferred embodiments of the present invention. There is provided base activated carbon reservoir **110**, an optional halogen/halide promoter reservoir **120**, an optional secondary component reservoir **130**, and an optional akali component reservoir **180**, each of which with corresponding flow control device(s) **201**, **202**, **203**, and **208**/**209**, respectively. In conjunction with the optional alkali component reservoir **180**, optional flow control devices **208** and **209** can be used independently, together, or not at all.

Reservoirs **110**, **120**, **130**, and **180** connect through their respective flow control devices and via associated piping, to transport line **115**. Optional alkali component reservoir **180** may also connect, through respective flow control devices and via associated piping, to transport line **118**. A source of air, nitrogen, or other transport gas(es) is provided by gas source **170** to transport line **115** for the purpose of entraining materials discharged from reservoirs **110**, **120**, **130**, and **180** and injecting such materials, via injection point **116**, into contaminated flue gas stream **15**. A source of air, nitrogen, or other transport gas(es) may be provided by gas source **171** to transport line **118** for the purpose of entraining materials discharged from reservoirs **180** and injecting such materials, via injection point **119**, into flue gas stream **15**. Gas sources **170** and **171** may be the same or different, as desired. Alternatively, transport gas(es) may be provided to both transport lines **115** and **118** by gas source **170** (connection from source **170** to line **118** not shown). Although gas sources **170** and **171** are shown in FIG. **3** as compressors or blowers, any source of transport energy known in the art may be acceptable, as will be appreciated by those of skill in the art.

For clarity, single injection points **116** or **119** are shown in FIG. **3**, although one skilled in the art will understand that multiple injection points are within the scope of the present invention. Optical density measuring device(s) **204** is connected to transport line **115** and/or **118** to provide signals representative of the optical density inside transport line **115** and/or **118** as a function of time.

Downstream from injection point **116** and **119** is provided particulate separator **140**. By way of illustration and not limitation, particulate separator **140** may comprise one or more fabric filters, one or more electrostatic precipitators (hereinafter "ESP"), or other particulate removal devices as are known in the art. It should be further noted that more than one particulate separator **140** may exist, sequentially or in parallel, and that injection point **116** and **119** may be at a location upstream and/or downstream of **140** when parallel, sequential, or combinations thereof exist. Particulate separator **140** produces at least a predominantly gaseous ("clean") stream **142**, and a stream **141** comprising separated solid materials. A sorbent/ash separator **150** separates stream **141** into a largely ash stream **152**, and a largely sorbent stream **151**. Stream **151** may then preferably be passed to an optional sorbent regenerator **160**, which yields a regenerated sorbent stream **161** and a waste stream **162**.

An optional Continuous Emission Monitor (hereinafter "CEM") **205** for mercury is provided in exhaust gas stream **35**, to provide electrical signals representative of the mercury concentration in exhaust stream **35** as a function of time. The optional mercury CEM **205** and flow controllers **201**, **202**, **203**, **208**, and **209** are electrically connected via optional lines **207** (or wirelessly) to an optional digital computer (or controller) **206**, which receives and processes signals and preferably controls the preparation and injection of promoted carbon sorbent into contaminated flue gas stream **15**.

In operation, promoted carbon sorbent and/or an optional alkali component is injected into contaminated flue gas stream **15**. After contacting the injected material with the contaminated flue gas stream **15**, the injected material reduces the mercury concentration, transforming contaminated flue gas into reduced mercury flue gas, **25**. The injected material is removed from the flue gas **25**, by separator **140**, disposed of or further separated by optional separator **150**, and disposed of or regenerated by an optional regenerator **160**, respectively. The reduced mercury "clean" flue gas stream **142** is then monitored for mercury content by an optional CEM **205**, which provides corresponding signals to an optional computer/controller **206**. Logic and optimization signals from **206** then adjust flow controllers **201**, **202**, **203**, **208**, **209** to maintain the mercury concentration in exhaust stream **35** within desired limits, according to control algorithms well known in the art. Flow controllers **201**, **202**, **203**, **208**, **209** can also be adjusted manually or be some other automated means to maintain the mercury concentration in exhaust stream **35** within desired limits, according to control algorithms well known in the art.

Referring still to FIG. **3**, there are illustrated several preferred embodiments for preparation and injection of promoted carbon sorbents and/or alkali components in accordance with the present invention. Stream **111** provides for introduction of base activated carbon from reservoir **110**, as metered by flow controller **201** manually or under the direction of computer **206**. The halogen/halide may be combined and react with the base activated carbon according to any of several provided methods. The halogen/halide may preferably be combined via line **121** directly into transport line **115**, within which it contacts and reacts with the base activated carbon prior to injection point **116**. This option is one form of what is referred to herein as "in-flight" preparation of a promoted carbon sorbent in accordance with the invention. Further, the halogen/halide may be combined via line **121*b*** with base activated carbon prior to entering transport line **115**. Still further, the halogen/halide may be contacted and react with the base activated carbon by introduction via line **121*c*** into reservoir **110**. This option is preferably employed when, for example, reservoir **110** comprises an ebullated or fluidized bed of base activated carbon, through which halogen/halide flows in gaseous form or as a vapor. Of course, the halogen/halide may also preferably be contacted with the base activated carbon in liquid form or in a solvent, as discussed previously, and solvent removal (not shown in FIG. **3**) may then be provided if necessary as mentioned with respect to embodiments discussed with reference to FIG. **1**.

Similarly, the optional secondary component may be contacted and react directly in transport line **115** via line **131**, or optionally as described above with respect to the halogen/halide, via lines **131*b*** and **131*c***.

Similarly, the optional alkali component from **180** may either be added in transport line **115** directly, or may be injected separately by transport line **118**, combining downstream in flue gas **15** for synergistic effects with base activated carbon, promoted carbon, or optional secondary components. Being able to vary onsite the amount of the optional alkali component relative to base activated carbon, promoted carbon, or optional secondary components is a key feature to overcome and optimize for site-specific operating and flue gas conditions.

In some preferred embodiments wherein contacting between components and reaction is performed in a liquid or solvent phase, stirring of such liquid and/or slurry mixtures may be provided. In other embodiments, the halogen/halide promoter and optional secondary component(s) may preferably be sprayed in solution form into or on the base activated carbon. In some such embodiments, drying, filtering, centrifugation, settling, decantation, or other solvent removal methods as are known in the art may then be provided.

In embodiments wherein the halogen/halide promoter is in gaseous or vapor form, it may be diluted in air, nitrogen, or other gas as appropriate. The halide/halogen gas, for example, gaseous HBr or $Br_2$, may be passed through an ebullated or fluidized bed of granular or fibrous activated

carbon, with the promoted carbon sorbent so produced removed from the top of the bed via gas entrainment for injection.

In some embodiments, the secondary component(s) may preferably comprise iodine or other halogens, hydrohalides, including without limitation HI, HBr, HCl, a Group V or Group VI element with a molecular halogen, such as $SCl_2$ and others. In some preferred embodiments, the promoted carbon sorbent may comprise from about 1 to about 30 g halogen/halide per 100 g base activated carbon. In some preferred embodiments, the promoted carbon sorbent may comprise an secondary component in concentration of from about 1 to about 15 wt-% of the concentration of the halogen/halide component.

In still other embodiments, the product promoted carbon sorbent may be applied to a substrate. In other embodiments, such prepared substrate(s) may be caused to contact a contaminated flue gas or gasification system product gas stream for mercury reduction purposes. Such substrates may be monolithic, rotating, or exposed to the gas stream in any number of ways known to those skilled in the art.

In some embodiments, a method is provided whereby a mercury stabilizing reagent is added to a promoted carbon sorbent to produce a bifunctional sorbent. Such stabilizing reagents) may be sequentially added, either before or after the addition and reaction of the halogen/halide. In some preferred embodiments, the halogen/halide preferably comprises Br or HBr, and the mercury-stabilizing reagent may comprise S, Se, $H_2S$, $SO_2$, $H_2Se$, $SeO_2$, $CS_2$, $P_2S_5$, and combinations thereof.

Halogens in Mercury Capture

Methodologies for using halogens for the treatment of flue gas have been problematic, owing to their reactivity with other gases and metals, resulting in corrosion and health issues. A "halogen" is defined as a member of the very active elements comprising Group VIIA (CAS nomenclature is used throughout; Group VIIA (CAS) corresponds to Group VIIB (IUPAC)) of the periodic table. In the molecular elemental form of the halogens, including $F_2$, $Cl_2$, $Br_2$, and $I_2$, the reaction with a hot flue gas components leave little to react with elemental mercury. The atomic elemental halogen form, which includes the fluorine, chlorine, bromine, and iodine atoms, is about a million times more reactive to mercury but the concentration of the atomic forms is typically extremely low. In a large portion of electric utility coal combustion facilities, the concentrations are generally not sufficient to oxidize a significant amount of mercury.

The term "halide" as used herein is defined as a compound formed from the reaction of a halogen with another element or radical. In general, halide compounds are much less reactive than the molecular halogens, having a low chemical potential. Halides are considered reduced forms that do not, alone, oxidize other compounds. In the conventional view therefore, a halide-salt-treated activated carbon will not effectively oxidize elemental mercury and capture elemental mercury.

Halogen Promoted Sorbent Characteristics

The sorbent described here has a very high initial reactivity for oxidizing mercury and therefore can be used in very small amounts to achieve very high capture efficiencies, thus lowering operation costs and lessening waste disposal problems. In addition, further disposal reductions are obtainable by regenerating and reusing the sorbents produced using the inventive technology. The time interval required for the mercury and the promoted carbon sorbents of the present invention to successfully interact in a flue gas duct, with the subsequent collection of the mercury on the sorbent and ash is very short less than seconds. Clearly, such collection times require the sorbent to have both high capacity and high reactivity toward mercury. The promoted carbon sorbent can be utilized in a very finely powdered form to minimize mass transfer limitations. However, again, the reactivity should be very high to capture all of the mercury encountered by the fine particles. Additionally, use of these enhancement technologies allows capture to be effective for larger sorbent particles which also allows separation of the sorbent from the ash to enable subsequent regeneration as well as ash utilization. One feature of this invention is the process to prepare a sorbent containing a halide compound formed on the carbon structure that provides a sorbent that is highly active on initial contact with the mercury contaminated gas stream, which allows for very effective capture of the mercury.

It appears that the inventive sorbents chemically combine molecular bromine, for example, from solution, with activated carbon (edge sites). X-ray photoelectron spectroscopy has established that the addition of bromine, chlorine, HBr, or HCl formed a chemical compound in the carbon structure. Thus, the sorbent produced from halogen and activated carbon does not represent a molecular halogen form, but rather a new chemically modified carbon (or halocarbon) structure. This phenomenon may not occur with the less reactive iodine, where an $I_2$ molecular complex can exist on the carbon basal plane. In the case of bromine, modified cationic carbon has a high chemical potential for oxidation of mercury. Thus, an entirely new model is presented for the reactivity of the bromine-treated carbon with mercury. The reactive carbon form can preferably be generated by the addition of bromine, hydrogen bromide, or combinations of bromine and other elements, as described herein. Halogen treatment resulted in higher-activity carbons because the halide anions (especially bromide and iodide) were effective in promoting the oxidation by stabilizing the developing positive charge on the mercury in the transition state for oxidation. Based on this model, several innovative, inexpensive, activity-enhancing features have been developed.

Optional Second Component

It has been demonstrated that addition of an optional second component, in addition to the bromine, results in improved reactivity and capacity for the sorbent, typically exceeding that of both the untreated carbon and the brominated carbon. The second compound comprises either a second halogen or a compound derived from a second halogen, such as HI. Thus, in addition to having a reactive carbon form present, the second component generates a Lewis base with greater ability to stabilize the developing positive charge on the mercury. Thus, the second component is an element with more polarized electrons (4p and 5p).

Optional Alkali Component

It has been demonstrated that addition of an optional alkali component with a base or promoted activated carbon results in improved mercury capture, typically exceeding that of both the untreated carbon and the promoted carbon. Test data indicate that flue gas contaminants, flue gas constituents ($SO_2$, $NO_x$, HCl, etc), operating temperature, mercury form, and mercury concentration may impact the effectiveness of the alkali addition. This suggests the need to be able to adjust and tailor the alkali-to-activated-carbon ratio onsite in order to overcome and optimize for a given set of site conditions.

The synergy that can be gained when co-injecting the two materials can be explained as follows. First, testing shows that binding sites on activated carbon (hereinafter "AC") can be consumed by chlorine species, sulfur species (i.e. sul-

fates), and other flue gas contaminants (arsenates, selenates, etc). The addition of optional alkali material will interact and react with these species/contaminants thus minimizing their consumption of AC mercury binding sites. Second, testing also shows that standard AC will continue to oxidize mercury, even though the binding sites are fully consumed. This oxidized mercury can then react with alkali material and subsequently be captured by particulate control devices. Consequently, the addition of the optional alkali component acts to protect mercury binding sites and capture oxidized mercury, thereby resulting in improved mercury reduction at lower cost. Alkali is generally much lower in cost (~an order of magnitude less) than activated carbon, thus more of it can be used still resulting in overall lower costs.

"In-Flight" Sorbent Preparation

Furthermore, we have demonstrated that the halogen promoted carbon sorbent can be readily produced "in-flight". This is accomplished by, for example, contacting the vapors of any combination of halogens and optionally a second component, in-flight, with very fine carbon particles. The particles may be dispersed in a stream of transport air (or other gas), which also conveys the halogen/halide promoted carbon sorbent particles to the flue gas duct, or other contaminated gas stream, from which mercury is to then be removed. There is no particular temperature requirement for this contact. This technology is obviously very simple to implement, and results in a great cost savings to facilities using this technology for mercury capture.

Advantages of On-Site Preparation

In-flight preparation of the halogen/halide promoted carbon sorbent on location produces certain advantages. For example, the treatment system can be combined with the carbon injection system at the end-use site. With this technique, the halogen/halide is introduced to the carbon-air (or other gas) mixture in a transport line (or other part of the sorbent storage and injection system). This provides the following benefits over current conventional concepts for treating sorbents off-site:

- Capital equipment costs at a treatment facility are eliminated.
- Costs to operate the treatment facility are eliminated.
- There are no costs for transporting carbon and additive to a treatment facility.
- The inventive process uses existing hardware and operation procedures.
- The inventive technology ensures that the sorbent is always fresh, and thus, more reactive.
- No new handling concerns are introduced.
- There are no costs for removing carbon from treatment system.
- The inventive process allows rapid on-site tailoring of additive-sorbent ratios in order to match the requirements of flue gas changes, such as may be needed when changing fuels or reducing loads, thus further optimizing the economics.
- The inventive technology reduces the amount of spent sorbents that are disposed.

With the foregoing and other features in view, there is provided, in accordance with the present invention, embodiments including a process for preparing and regenerating halogen/halide promoted carbon sorbents, whose activity for mercury capture is enhanced by the addition of halogen (e.g. bromine) to the carbon structure.

Sorbent Injection Location

Some of the preferred embodiments contemplate the use of a halogen promoted sorbent in a powdered form that has been injected into a flue gas stream before or after ash particulates have been removed. Other embodiments of the inventive composition of the halogen promoted carbon sorbent comprise a powdered modified activated carbon prepared by adding $Br_2$ or HBr plus a second optional component. Other embodiments allow the addition of the optional alkali component in conjunction with a base activated carbon and/or with the use of a halogen based sorbent and any other combinations of the sorbent technologies provided in this patent. Alternatively, embodiments include methods wherein the sorbent is on a moving contactor consisting of particles or fibers containing one or more of the compositions listed above.

Sorbent Regeneration

Any of the above embodiments of the halogen/halide promoted carbon sorbent can be easily regenerated; the poisoning contaminants from the flue gas are preferably removed and an inexpensive promoting agent added, to restore mercury sorption activity. This process of promoting the activity of the carbon itself contrasts with the earlier, more expensive, conventional methods of adding a reagent (such as peroxide, gold, triiodide, etc.) to a sorbent. The halogen/halide promoted carbon sorbent of the present invention, treated with bromine and/or optional components, is noncorrosive. Detailed examples of sorbent regeneration techniques are described in co-pending, commonly owned PCT patent application No. PCT/US04/12828, titled "PROCESS FOR REGENERATING A SPENT SORBENT", which is hereby incorporated by reference in its entirety.

Sorbent Injection Control Schemes

Another advantage of the present invention relates to the use of a feedback system to more efficiently utilize certain aspects of the invention. Where possible and desirable, the mercury control technology of the present invention may preferably utilize continuous measurement of mercury emissions as feedback to assist in control of the sorbent injection rate. Tighter control on the sorbent and optional component (s) levels can be achieved in this way, which will ensure mercury removal requirements are met with minimal material requirements, thus minimizing the associated costs. In an embodiment, the mercury emissions are continuously measured downstream of the injection location, preferably in the exhaust gas at the stack.

Promoted Carbon Sorbents

Reactions of halogens and acidic species with the basic binding sites on the activated carbon sorbent create sites for oxidizing mercury. Other metal ions, such as boron, tin, arsenic, gallium, Sb, Pb, Bi, Cd, Ag, Cu, Zn, or other contaminants, will also react with the oxidation sites generated on the carbon.

According to our model, adding the bromine from the bromine reagent or a proton from a hydrogen halide acid to a basic carbene site on the carbon edge structure forms a carbocation that accepts electrons from the neutral mercury atom forming the oxidized mercury species that is bound to the sorbent surface. The reactive site may also generate reactive bromine radicals or carbon radicals at the active sites on the carbon. Thus, the activated carbon serves to stabilize the bromine, yet provides a highly reactive bromine-containing reagent that can oxidize the mercury and promote its capture on the activated carbon. The sorbent that contains bromine is expected to be more reactive than the corresponding sorbent containing chlorine and much less expensive than the sorbent containing iodine.

## EXAMPLES

To more clearly illustrate the present invention, several examples are presented below. These examples are intended

to be illustrative and no limitations to the present invention should be drawn or inferred from the examples presented herein.

Example 1

Preparation and Testing of Halogenated Carbon (& Comparative Example) Gas Phase Halogenation

Finely powdered activated carbon (such as NORIT Darco FGD, NORIT Americas, Inc., Marshall, Tex. (USA), although others are suitable, as will be recognized by those skilled in the art), was placed in a rotating plastic barrel with side blades (a 5 $ft^3$ (0.14 $m^3$) cement mixer) fitted with a tight plastic lid to prevent loss of the fine powder during the preparation. In a separate vessel, gas phase bromine was generated by passing a nitrogen stream over a weighed amount of liquid bromine that is warmed to about 40°-50° C. The vapor pressure of the bromine was such that a dark red gas is generated and passed out of the generator. The outlet from the gaseous bromine generator is connected via a ¼ inch (0.64 cm) plastic hose to a stationary metal tube inserted through a flange in the center of the plastic lid and passing into the center of the barrel. The flange is not air tight so that the excess of nitrogen is released after the bromine is transferred to the tumbling carbon. Thus, the bromine gas stream continuously passed into the rotating barrel where it contacted the tumbling carbon. The unit is then operated until the desired amount of bromine has combined with the carbon. Typically, this is 0.4 to 1 kg of bromine to 20 kg of carbon (2-5 wt. %). When the reaction is completed, the carbon is weighed. The treated carbon is odorless and does not cause skin irritation since the bromine has completely reacted with the carbon to produce the brominated carbon.

XPS spectra demonstrate that the brominated carbon contains both covalent carbon-bound (organic) bromide as well as anionic bromide. The product contains the same moisture originally present in the activated carbon (5-17 wt %), but does not require further drying for use. The moisture is driven out at higher temperatures (>150° C.), and the bromine was not released until very high temperatures

Bench-Scale Testing of Mercury Oxidation and Capture Efficiency

A bench-scale apparatus and procedure based on the above description was used to test the initial activities and capacities of several promoted activated carbon sorbents using powdered carbon, including bromine-containing activated carbons prepared from a variety of carbons, including commercially available sorbents, aerogel film sorbents, and the original precursor carbons for comparison.

A detailed description of the apparatus and its operation is provided in Dunham, G. E.; Miller, S. J. Chang, R.; Bergman, P. *Environmental Progress* 1998, 17, 203, which is incorporated herein by reference in its entirety. The bench scale mercury sorbent tests in the flue gas compositions were performed with finely (—400 mesh) powdered sorbents (37 mg) mixed with 113 mg sand and loaded on a quartz filter (2.5 inch (6.35 cm)) The loaded filter and holder were heated in an oven (125° C.) in the simulated flue gas stream (30 SCFH (standard cubic feet/hr) or 0.79 NCMH (normal cubic meters per hour)) containing the following: $O_2$ (6%), $CO_2$ (12%), $SO_2$ (600 ppm), NO (120 ppm) $NO_2$ (6 ppm), HCl (1 ppm), $Hg^0$ (11 μg/$m^3$), $H_2O$ (15%), and $N_2$ (balance). Elemental mercury was provided by a standard permeation tube source placed in a double jacketed glass condenser, and heated to the desired temperature. Mercury concentrations in the gas streams were determined with a continuous mercury emission monitor (Sir Galahad mercury CEM mfr. P.S. Analytical Deerfield Beach Fla. USA), and a $SnCl_2$ cell was used to convert oxidized species to elemental, so that both elemental and oxidized mercury concentration data could be obtained for both the influent and the effluent concentrations from the sorbent bed. Mercury concentrations were calibrated for the flow rates used. Spent sorbents were analyzed for mercury to determine the mass balance.

Referring now to FIG. **4**, the effluent mercury concentration data are plotted as a percent of the influent mercury versus time. The resulting curve (breakthrough curve) for the halogenated sorbents typically showed 0%-1% Hg in the effluent (99+% capture) at the beginning, and increasing only after 30-60 minutes (breakthrough point), depending on the sorbent. FIG. **4** illustrates the breakthrough curves for 5 wt/wt % brominated NORIT Darco FGD sorbent (37 mg+113 mg sand) with synthetic flue gas containing 1 ppm HCl. Total Hg (solid circles) and elemental Hg (solid squares) in the effluent are presented as a percent of the inlet Hg. "EOT" indicates the end of test (the later data points shown are for calibration checks).

FIG. **5** presents the comparative breakthrough curves for the corresponding nonhalogenated sorbents typically initiated at 5%-50% of inlet mercury, depending on the HCl concentration in the synthetic flue gas, thus indicating considerably lower reactivity for oxidation and capture of the mercury for the nonhalogenated sorbents. After breakthrough of either halogenated or nonhalogenated sorbent, most of the mercury in the effluent was oxidized mercury.

Example 2

Gas Phase Halogenation of Fluidized Carbon

A bed of activated carbon supported in a vertical tube by a plug of glass wool was fluidized by a nitrogen stream. The top of the fluidized bed tube was connected to a catching trap for carbon fines that blow out the top of the tube. The bromine gas generator as described in Example 1 was attached to the fluidized carbon bed and the desired amount of gaseous bromine was passed into the bed. The contents of the trap were then mixed with the material in the bed and weighed. The resulting brominated carbon exhibited properties similar to the brominated carbon of Example 1.

Example 3

Liquid Phase (Water) Halogenation

A 5% solution of bromine in water was prepared by carefully adding 50 g of bromine to 1 liter of cold water One kg of activated carbon was added to the bromine solution in a large metal can. The resulting slurry was stirred with a large paddle during the addition and for a short time afterwards until all the bromine had reacted with the carbon, as indicated by the disappearance of the red color. The slurry was then filtered using a Buchner funnel under vacuum. The moist carbon that was collected on the filter was dried in an oven at 110° C. for several hours to constant weight. As in Example 1, some moisture remains in the carbon, however.

The dried carbon was then tumbled in the rotating barrel with metal pieces to break up and fluff the carbon.

Example 4

Addition of the Optional Second Halide Component

Brominated carbon was produced by solution phase bromination similar to that described with reference to Example 3. However, before filtration, a solution of hydriodic acid (HI) was added to the slurry in an amount equal to 10% of the bromine amount. The slurry was stirred to complete the reaction and then filtered and dried as described in Example 3.

Example 5

Liquid Phase Phosphohalogenation

A solution of phosphorus tribromide (500 g) in ligroin (10 liters) was stirred in a large metal can and 10 kg of activated carbon was added. The resulting slurry was stirred with a large paddle at ambient temperature to complete the reaction. The slurry was filtered under vacuum on a large Buchner funnel in several batches. The wet filter cake was dried at 110° C. in an oven to constant weight. The dried product was fluffed in the rotating barrel as described in Example 3.

Example 6

Preparation and Sorption on Larger-Particle Carbon

Tests were conducted on a pilot-scale combustor while firing a subbituminous coal, to evaluate mercury control by injecting larger-than-normal sized treated activated carbon. Standard AC sorbents generally are of fine size with a mean particle diameter of less than 20 micrometers, which is also typical of the flyash that is generated from pulverized coal combustion. Consequently, because the sizes of standard AC and flyash are similar, separation of the two is difficult. Injection of larger sized AC is generally not considered because the sorbent effectiveness decreases with size. In a scheme to recycle the injected carbon, the carbon is separated from the flyash. A separation based on size fractionation requires a treated larger particle sorbent. To test this concept, a treated larger sized (>60 μm) sorbent was developed, prepared, and tested.

Treatment Gas Phase Halogenation

Granular activated carbon (Calgon F400) was ground and sieved through conventional mesh screens. The mesh size fraction −170 to +240 (corresponding to about 60 to about 88 micrometers) was collected and placed in a rotating vessel as described in Example 1 above. In a separate vessel, gas phase bromine was generated by passing a nitrogen stream over a weighed amount of liquid bromine that was warmed to about 40°-50° C., and the outlet from this gaseous bromine generator was connected via a ¼ inch (635 mm) plastic hose to a stationary metal tube inserted through a flange in the center of the lid and passing into the center of the rotating vessel, also as described in Example 1. The unit was operated until the desired amount of bromine had combined with the carbon, in this case 0.05 kg of bromine to 1 kg of carbon (5 wt. %). When the reaction was completed, the carbon was weighed. The treated carbon was odorless as has been described above.

PTC Apparatus

The pilot-scale combustor, known as the "Particulate Test Combustor" (hereinafter "PTC"), is a 550,000-Btu/hr (about 161 kW) pulverized coal ("PC")-fired unit, designed to generate combustion flue gas properties and fly ash that are representative of those produced in a full-scale utility boiler. The combustor is oriented vertically to minimize wall deposits. A refractory lining helps to ensure adequate flame temperature for complete combustion and prevents rapid quenching of the coalescing or condensing fly ash. Based on the superficial gas velocity, the mean residence time of a particle in the combustor is approximately 3 seconds. The coal nozzle of the PTC fires axially upward from the bottom of the combustor, and secondary air is introduced concentrically to the primary air with turbulent mixing. Coal is introduced to the primary air stream via a screw feeder and eductor. An electric air preheater is used for precise control of the combustion air temperature. Originally, the PTC used cold-water annular heat exchangers to provide flue gas temperature control to the baghouse (also referred to as a "fabric filter") or electrostatic precipitator (ESP). However, analysis of ash deposits collected from the heat exchangers indicated that some mercury was collected on the duct walls. To minimize this effect, the heat exchangers were modified to provide for higher duct wall temperatures.

The PTC instrumentation permits system temperatures, pressures, flow rates, flue gas constituent concentrations, and particulate control device (baghouse, Advanced Hybrid Particle Collector/AHPC™, and/or electrostatic precipitator/ESP) operating data to be monitored continuously and recorded on a data logger.

PTC Procedure

Flue gas samples were taken at combinations of two of the three available system sample points: the furnace exit, the particulate control device inlet, and the particulate control device outlet. After passing through sample conditioners to remove moisture, the flue gas was typically analyzed for $O_2$, CO, $CO_2$, $SO_2$, and $NO_x$. Each constituent was normally analyzed at both the furnace exit and the outlet of the particulate control device simultaneously, using two analyzers. The concentration values from all of the instruments were recorded continuously. In addition, data were manually recorded at set time intervals. $NO_x$ was determined using a pair of Rosemount Analytical $NO_x$ chemiluminescent analyzers. $SO_2$ was measured using a pair of Ametek Instruments photometric gas analyzers. The remaining gases were measured by a pair of Rosemount Analytical multi-gas continuous emissions monitors. Each of these analyzers was regularly calibrated and maintained to provide accurate flue gas concentration measurements.

The baghouse vessel was a 20 inch (50.8 cm) (ID) chamber that is heat-traced and insulated, with the flue gas introduced near the bottom. The combustor produced about 200 ACFM (actual cubic feet per minute; about 5.7 actual $m^3$/min) of flue gas at 300° F. (about 150° C.), therefore three 13-ft by 5-inch (3.96 m by 12.7 cm) bags provided an air-to-cloth ratio of 4 ft/min (1.22 m/min). Each bag was cleaned separately in operation with its own diaphragm pulse valve. In order to quantify differences in pressure drop for different test conditions, the bags were cleaned on a time basis, rather than with the cleaning cycle initiated by pressure drop. Once bag cleaning was initiated, all three bags were pulsed in rapid succession on-line.

Tests were also conducted with a single-wire, tubular ESP replacing the fabric filter. The ESP unit was designed to provide a specific collection area of 125 at 300° F. (150° C.). Since the flue gas flow rate for the PTC is 130 SCFM

(standard cubic feet per minute; about 3.7 NCMM (normal $m^3$/min)), the gas velocity through the ESP is 5 ft/min (about 1.52 m/min). The plate spacing for the ESP unit is it in (27.9 cm). The ESP was designed to facilitate thorough cleaning between tests so that all tests can begin on the same basis.

PTC Results

Results are illustrated in FIG. **6**. As can be observed in FIG. **6**, even though the tested sorbent particle size is significantly larger than normal sorbent particles, the treated larger-than-normal sized (that is, >60 micrometers) activated carbon sorbent was quite effective at capturing mercury. Approximately 75% of the mercury was captured when the larger-sized treated AC was injected ahead of the pilot-scale ESP, while approximately 85% of the mercury was captured when injected ahead of the pilot-scale fabric filter ("FF"). Note that in FIG. **6** (and throughout) "Macf" (and "MACF") indicates million actual cubic feet (1 MACF is about 0.028 million actual cubic meters or "MACM").

Referring now to FIG. **7**, it can be observed that the larger-sized treated AC when injected ahead of the pilot-scale ESP (diamond symbol(s)) performed better than the finer standard AC (triangles) under the same arrangement. In comparison, when injected ahead of the fabric filter (FF), the larger-sized treated AC (square) performed similarly to slightly worse. However, for this application, the larger-sized treated AC can be physically separated from the smaller flyash particles, and the sorbent can then be regenerated, recycled, and reused. This will substantially improve overall utilization and economics. These data thus show that a larger-than-normal sized sorbent can provide effective mercury control and ease flyash and AC separation, thereby also preserving the characteristics of the flyash for sale and beneficial use. Accordingly, because >60 μm sorbent particles have been successfully demonstrated, superior mercury control can be obtained with >40 μm particles, which may be preferred in some applications, depending on the sorbent particle/ash separation system used. Note that in FIG. **7** (and throughout) "Macf" (and "MACF") indicates million actual cubic feet.

Example 7

Liquid Phase (Organic Solvent) Halogenation

A 5% solution of bromine in ligroin was prepared by carefully adding 50 g of bromine to 1 liter of cold ligroin. One kg of activated carbon was added to the bromine solution in a large metal can. The slurry was stirred with a large paddle during the addition and for a short time afterwards until all the bromine had reacted with the carbon as indicated by the disappearance of the red color. The slurry was filtered using a Buchner funnel under vacuum. The carbon cake that was collected on the filter was dried in an oven at 110° C. for several hours until it appeared dry and a constant weight was obtained. As in Example 1, some moisture was left in the carbon, however. The dried carbon was then tumbled in the rotating barrel with metal pieces to break up and fluff the carbon.

Example 8

Promoted Activated Carbon Sorbents

A bench-scale procedure based on the above description was used to test the initial activities and capacities of several promoted activated carbon sorbents using powdered carbon, including the bromine-containing activated carbons prepared from a commercially available sorbent and an aerogel carbon film sorbent, as well as the original precursor carbons for comparison. Bromine-treated carbons were prepared by impregnation of the powdered activated carbon precursors in a stirred solution of bromine in carbon tetrachloride or methylene chloride, or alternatively, in an aqueous solution of HBr, followed by drying in air at ambient temperature and drying in an oven at 100° C. in air or nitrogen. Bromine-treated carbons were also prepared by impregnating bromine from the gas phase by passing the gas through a rotating dry bed of the activated carbon precursor. The results indicated that adding a second component to the solution improved the capacity of the sorbent.

The carbons were initially tested in a heated bed, where a synthetic flue gas stream containing elemental mercury (11 μg/$m^3$) was passed through the bed. Concentrations of total and elemental Hg in the effluent gas were determined using a Sir Galahad mercury CEM ("continuous emission monitor") (mfr. P S Analytical, Deerfield Beach, Fla., USA). The powdered sorbent was supported on a quartz filter during the test, and the other sorbents were tested as a triple layer. A comparison of the original commercial-grade powdered carbon sorbent with the sorbent after it was treated with 0.1 N HBr, and the powder was collected by centrifugation and drying, revealed that the mercury capture activity increased from an initial capture efficiency of about 50% of the Hg in the inlet to 100% capture. A comparison of the sorbent after subsequent regeneration with HBr indicated that it not only captured mercury at the same level as before (100% capture) but its capacity was prolonged by several minutes, and thus enhanced. Similar results were obtained with the carbon film and carbon fiber sorbents by treatment with molecular bromine in solution or in dry beds as described above.

Example 9

Fluidized/Ebullated Bed Preparation

An activated carbon sorbent was prepared by treating the carbon by impregnating molecular bromine from a gas composition containing molecular bromine by flowing the gas through a liquid bromine reservoir in series with a fluidized bed or ebullated bed of the carbon. The amount of bromine taken up by the carbon ranges one example) from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

Example 10

Full-Scale Testing

In this example, a baghouse (fabric filter) or ESP was used to collect particulates in the exhaust of a full-scale commercial pulverized coal-burning facility. A scrubber and sorbent bed were also used to remove undesired constituents from the flue gas stream, before being fed to the stack. In this example, the halogen/halide promoted carbon sorbent was injected into the flue gas after the boiler. In general however, the inventive sorbent can be injected where desired (e.g., before, after, or within the boiler).

In one exemplary test conducted at a facility fired with lignite coal, the flue gas phase mercury (elemental) concentration was between 10 and 11 ƒg/$m^3$. The ash and injected carbon were collected in the baghouse at 350° F. to 375° F. (about 175-190° C.). Injection of commercial-grade activated carbon powder (untreated) at a rate of 1.0 lb/MACF ("MACF" and "Macf" represent one million actual cubic

feet; 1.0 lb/MACF is about 16 kg/MACM (million actual cubic meters)) resulted in mercury effluent concentrations of 3.8-4.2 μg/m$^3$ (representing 62%-58% removal of the mercury from the gas, respectively), and at 2.0 lb/MACF (about 32 kg/MACM), gave 74%-71% removal. Injection of the bromine-treated carbon at 1.0 lb/MACF resulted in 73%-69% removal and at 2.0 lb/MACF gave 86%-84% removal. Thus, a significant increase in the mercury capture was exhibited during use of the bromine promoted carbon sorbent of the present invention.

### Example 11A

### Addition of Optional Alkaline Component—Bench-Scale

The efficiency of the activated carbons for mercury capture can be improved considerably by employing a basic material co-injected with the activated carbon, in order to capture any oxidized mercury that may be released from the sorbent, or to capture some of the sulfur or selenium oxides in the flue gas that can have detrimental effect on the sorbent capacity.

Bench-scale testing was conducted by preparing a filter composed of 37 mg of brominated activated carbon mixed with 113 mg of calcium oxide. The test was conducted as described in Example 1 and compared with the same carbon sorbent but with an inert diluent. The breakthrough curve for the mixture of brominated (2%) NORIT Darco FGD sorbent with inert sand is shown in FIG. **8**, and the breakthrough curve for the mixture with CaO is shown in FIG. **9**. It can be seen that the point of 50% breakthrough improves to 65 minutes with the mixture with CaO from only 48 min with the sand mixture.

### Example 11B

### Addition of Optional Alkaline Component—Pilot-Scale

Tests were conducted on the pilot-scale PTC combustor described above with reference to Example 6 while firing a Texas lignite to evaluate mercury control by co-injecting a standard activated carbon (also referred to herein as "AC") and an alkali material upstream of a fabric filter. Typical results are illustrated in FIG. **10**. As shown in FIG. **10**, co-injecting lime with activated carbon vastly improved mercury removal. Mercury removals of approximately 90% were achieved with the co-injected sorbents, whereas less than 60% removal was achieved with the use of standard AC alone, even at much higher injection rates. Data from similar tests show that injecting similar quantities of sodium carbonate and AC, and lime and AC, resulted in mercury removals of approximately 80%, and 87%, respectively. These data suggest that other alkali can also be co-injected with AC to improve mercury removal. Other data show that flue gas temperature may impact the effectiveness of the alkali addition. Further test data indicate that flue gas contaminants, flue gas constituents ($SO_2$, $NO_x$, HCl, etc.), operating temperature, mercury form, and mercury concentration may impact the effectiveness of the alkali addition. This indicates that it may be desirable to be able to adjust and tailor, onsite, the alkali-to-AC ratio in order to optimize removal for a given set of site conditions.

Without wishing to be bound by any particular theory, the synergy observed in the improved performance when co-injecting the two materials can be explained as follows.



First, tests indicate that binding sites on AC can be consumed by sulfur species and other contaminants. The alkali material interacts and reacts with these species thus minimizing their consumption of AC mercury binding sites. Second, other work has shown that standard AC will continue to oxidize mercury even though the binding sites are fully consumed. This oxidized mercury can then react with alkali material and subsequently be captured by the particulate control device. Thus, combining alkali with treated and/or non-treated AC synergistically takes advantage of these two mechanisms, resulting in improved mercury capture at reduced costs.

### Example 12

### Brominated Carbon Sorbent for Gasification Fuel Gas

Preparation of 5% Br2W-AC

Using a procedure similar to Example 3, a 2.5 wt/vol % solution of bromine in water was prepared. Granular Calgon F400 was added to the bromine solution to give a 5 wt/wt % brominated carbon product. The bromine solution was stirred with a large paddle during and after the addition until the red color in the water disappeared. The suspension was filtered by vacuum on a large Buchner funnel. The filter cake was dried in air, and then in an oven at 110° C. until a stable weight was obtained The moisture was reduced to 15%.

Preparation of 5% Br2D-AC

A brominated sorbent was prepared from $Br_2$ addition in solvent as described in Example 7, except that dichloromethane was used as the solvent instead of ligroin, and granular Calgon F400 was used.

Preparation of 5% PBr3-AC

A phosphohalogenated sorbent was prepared from $PBr_3$ using the method described in Example 5, except granular Calgon F400 was used.

Testing in Hydrogen Atmosphere—Procedure

To simulate the capture of mercury from a heated fuel gas or syngas from coal gasification, tests were conducted employing a stream comprising 10% vol/vol hydrogen in nitrogen passing through the sorbent at 500 cc/min. The stream contained 26.9 micrograms/m$^3$ of elemental mercury from a commercial mercury permeation source.

In the tests, the sorbent (0.5 g) was placed in a 0.39 inch (1 cm, inside diameter) glass tube fitted with a medium fit sintered glass filter disc to hold the sorbent in the gas stream. The tube containing the sorbent bed was connected to a gas inlet tube for introducing the gas stream containing the mercury vapor and at the outlet to a tube connection to the detector. The detector was a Semtech 2000 continuous mercury emission monitor. The tube was equilibrated in a nitrogen flow (450 cc/min) for 5 minutes at ambient temperature to stabilize the system. The detector showed 0 concentration of mercury in the effluent from the sorbent bed. (The blank run with no sorbent read 26.9 micrograms/m$^3$). The tube was then placed in an oven at the selected temperature for the test (from 250° to 400° C.). Effluent mercury concentration data from the detector were collected until the detector showed a constant reading for 5 minutes. Hydrogen (50 cc/min) was then added to the gas stream and detector readings were taken every 5 min. Tests were conducted at several oven temperatures for various periods of time up to 3 hours, depending on the temperature and sorbent. The elemental mercury concentration data were plotted as a percent of inlet mercury concentration versus time as in Example 1. All the mercury in the effluent was

elemental, so a single detector was sufficient, and no $SnCl_2$ trap was needed to convert to elemental mercury (as in Example 1). The time for 50% breakthrough (time to reach 50% capture) was then determined from the breakthrough curves.

Results

The results are shown in Table 1 (below) for the unbrominated sorbent (Calgon F-400), the brominated sorbents (5% Br2W-AC and 5% BrD-AC), and the phosphobrominated sorbent (5% PBr3-AC). The maximum mercury concentration obtained in the effluent in each run is also reported in Table 1 for the time period indicated in the last column.

Under the reducing hydrogen conditions, the unbrominated sorbent broke through immediately and was exhausted after only 6.5 min. This complete failure occurred because the hydrogen reduces the captured mercury in the unbrominated sorbent at any temperature above 100° C. Both of the brominated sorbents exhibited excellent reactivity and good capacity at all temperatures, up to at least 400° C. The phosphobrominated sorbent exhibited superior reactivity and capacity at all temperatures, up to at least 400° C.

| | Times for 50% Breakthrough Maximum Observed Hg Concentrations for Sorbents (10% Hydrogen Streams) | | | |
|---|---|---|---|---|
| Sorbent | Temp (° C.) | 50% breakthrough (min) | Maximum [Hg] (μg/m³) | Time (min) |
| F-400 | 250 | 6 | 20.3 | 6.5 |
| 5% Br2W-AC | 250 | >150 | 1.4 | 150 |
| 5% Br2W-AC | 300 | >180 | 4.3 | 180 |
| 5% Br2W-AC | 350 | 160 | 15.1 | 180 |
| 5% Br2W-AC | 400 | 60 | 13.9 | 65 |
| 5% PBr3-AC | 250 | >140 | 0.4 | 140 |
| 5% PBr3-AC | 300 | >150 | 0.5 | 150 |
| 5% PBr3-AC | 350 | >150 | 1.4 | 150 |
| 5% Br2D-AC | 350 | >180 | 2.1 | 180 |
| 5% Br2D-AC | 400 | >180 | 10.9 | 180 |

While the preferred embodiments of the invention have been shown and described, modifications thereof can be made by one skilled in the art without departing from the spirit and teachings of the invention. The embodiments described herein are exemplary only, and are not intended to be limiting. Many variations and modifications of the invention disclosed herein are possible and are within the scope of the invention. According y, the scope of protection is not limited by the description set out above, but is only limited by the claims which follow, that scope including all equivalents of the subject matter of the claims.

The examples provided in the disclosure are presented for illustration and explanation purposes only and are not intended to limit the claims or embodiment of this invention. While the preferred embodiments of the invention have been shown and described, modifications thereof can be made by one skilled in the art without departing from the spirit and teachings of the invention. Process criteria, equipment, and the like for any given implementation of the invention will be readily ascertainable to one of skill in the art based upon the disclosure herein. The embodiments described herein are exemplary only, and are not intended to be limiting. Many variations and modifications of the invention disclosed herein are possible and are within the scope of the invention. Use of the term "optionally" with respect to any element of the invention is intended to mean that the subject element is required, or alternatively, is not required. Both alternatives are intended to be within the scope of the invention.



The discussion of a reference in the Background is not an admission that it is prior art to the present invention, especially any reference that may have a publication date after the priority date of this application. The disclosures of all patents, patent applications, and publications cited herein are hereby incorporated herein by reference in their entirety, to the extent that they provide exemplary, procedural, or other details supplementary to those set forth herein.

Although the invention is described herein as a sorbent material and associated processes for its preparation and use, it is nevertheless not intended to be limited to the details described, since various modifications and structural changes may be made therein without departing from the spirit of the invention and within the scope and range of equivalents of the claims.

## PROVISIONAL APPLICATION

A reactive sorbent material is described for capture of mercury in a vapor stream. The vapor stream includes flue gas from coal combustion or incineration, synthesis gas from gasification, as well as offgases from mineral processing, metal refining, retorting, cement manufacturing, chloralkali plants, dental facilities, and crematories. The sorbent is especially suited to, but not limited to, use in low-chlorine flue or exhaust gases where the mercury is mainly elemental. The sorbent comprises a bromide-modified carbon form containing a reactive compound produced by the reaction of bromine with the carbon. Other additional promoting substances can be added in smaller amounts to increase the reactivity with and sorption of elemental mercury. This combination results in a carbon bromide structure in the carbon lattice that can oxidize the mercury to a species that is strongly bonded to the carbon structure and, therefore, easily retained on the sorbent at higher temperatures in the presence of flue gas constituents. In some examples, the sorbent consists of a fine or coarse powdered material for injection into the gas stream or a granular or fibrous material for use in a fixed or moving bed. In some examples, the sorbent does not require in situ activation (an induction period) in a flue gas stream as do conventional activated carbon sorbents. Other additives of base chemistry (Ca, Na, and others) may be added to flue gas as a sorbent mixture, or co-injected to selectively sorb acid gases or other flue gas constituents to keep available reactive sites for mercury oxidation and subsequent capture. The sorbent can be regenerated by washing off contaminating components derived from flue gas that poison the spent sorbent. Novel methods for introduction of the sorbent dispersion into the mercury contaminated gas stream are described.

Following is an outline of examples of the invention. The invention may also take on various other examples or embodiments, as a person skilled in the art would understand.

1. A modified carbon sorbent was prepared by reacting the carbon with molecular bromine by applying a solution of molecular bromine in an organic solvent to the carbon, followed by removal of the modified carbon from the bulk of solvent and further removal of solvent from the pores by drying the carbon in air or nitrogen. The solution may also contain an additional promoting substance in small amounts. In one example, the amount of bromine taken up by the carbon ranges from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

1A. (Dependent)

Same as 1, carbon is powdered activated carbon.

Carbon is granular activated carbon.

Carbon is very fine carbon black.

Carbon is very fine carbon fiber.

Carbon is aerogel carbon film.

Carbon is char recovered from pyrolysis process.

Carbon is powdered activated carbon of size distribution larger than fly ash size distribution, so that it can be physically separated from the ash and regenerated for reuse.

Carbon is regenerated from previous usage cycle and recycled.

Other desired types of carbon may also be used.

1B. (Dependent)

Same as 1, Solvent is chlorinated hydrocarbon such as dichloromethane.

Same as 1, Solvent is hydrocarbon solvent such as petroleum ether or ligroin or pentane or hexane or toluene or benzene.

Same as 1, Solvent is water.

Same as 1, Solvent is carbon disulfide.

Same as 1, Solvent is a waste solvent.

Same as 1, Solvent is an ether.

Same as 1, Solvent is recycled from previous batch.

Same as 1, Solvent is supercritical solvent such as $CO_2$.

Other desired types of Solvents may also be used.

1C. (Dependent)

Same as 1, solution of bromine is applied by stirring the carbon in the bromine solution.

Same as 1, solution of bromine is applied by spraying a solution of molecular bromine in an organic solvent, followed by removal of solvent from the pores by drying the carbon in air or nitrogen.

The bromine may also be applied using other desired techniques.

1D. (Dependent)

Same as 1, removal of solvent is by filtration, centrifugation, settling, and decantation and drying in vacuum, air, or other gas.

Same as 1, when sprayed or minimal volume, removal of solvent is by drying in air, vacuum, or other gas.

The solvent may also be removed using other desired techniques.

1E. (Dependent)

Same as 1, additional substance is iodine, at 1%-10% of the bromine concentration added.

Same as 1, additional substance is hydrohalide (HI, HBr, HCl), etc:, 1%-10% of bromine.

Same as 1, additional substance is a compound comprised of a Group V or VI element or combination of Group V or VI with Group VII element, such as $SCl_2$, 1-10 wt % of bromine.

2. A modified carbon sorbent was prepared by reacting the carbon with molecular bromine by contacting the carbon with a gas containing molecular bromine. In one example, the amount of bromine taken up by the carbon ranges from <1 to about 30 g per 1.00 g of activated carbon, depending on the proportions used.

Contacting is by passing the $Br_2$ gas through a bed of the carbon.

Bed is ebullated or fluidized.

Bed is moving bed of granules or fibers.

Contacting is by admitting $Br_2$ gas to a duct through which the carbon is transported from a reservoir to the flue gas duct via an air-driven entrainment method, thus promoting the activity of the carbon in-flight.

Same additives as 1E, except these are added in the gas phase, and added in-flight as in 2 above.

3. A modified activated carbon sorbent was prepared by reacting the carbon with hydrogen bromide (HBr) by stirring the carbon in a solution of HBr in an organic solvent or in water, followed by removal of the modified carbon from the bulk of solvent and further removal of solvent from the pores by drying the carbon in air or nitrogen. In one example, the amount of bromine taken up by the carbon ranges from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

Same dependent clauses as in 1A with regard to carbon forms. Same solutions and treatment as 1B, 1C, 1D.

Same additives as 1E, added into the solution phase or later in the gas phase, and added in-flight as in 2 above.

4. An activated carbon sorbent was prepared by impregnating hydrogen bromide by passing a gas composition containing hydrogen bromide diluted with nitrogen or air through a fluidized bed or ebullated bed of the carbon. In one example, the amount of bromine taken up by the carbon ranges from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.

Same dependent clauses as in 1A with regard to carbon forms.

Contacting options are similar to 2.

5. Sequential treatment of activated carbon with bromine or HBr, followed by another mercury stabilizing reagent to generate a highly reactive bifunctional sorbent, the reagent to include sulfur and selenium species, such as $H_2S$, $SO_2$, $H_2Se$, Se, $SeO_2$, $CS_2$, $O_2S_5$.

6. Sequential treatment of activated carbon with mercury stabilizing reagent, followed by bromine or HBr to generate a highly reactive bifunctional sorbent, the reagent to include sulfur and selenium species, such as $H_2S$, $SO_2$, $H_2Se$, Se, $SeO_2$, $CS_2$, $P_2S_5$.

7. Treatment of a carbon with a Group V or VI element combined with Group VII element, such as $PBr_3$ or $SCl_2$. In one example, the amount of Group V or VI halide is 1-30 wt % of the carbon. The compound is added in vapor phase or in solution (solvent is hydrocarbon, chlorinated hydrocarbon, or other solvent as described in 1B, but not water, since the compound is destroyed in water solution).

8. The process for preparing the bromine-containing activated carbon sorbent as described in Examples 1-6 and coupled with the injection of the bromine-containing fine-particle sorbent into the contaminated gas stream and subsequent removal of the fine particles of sorbent from the gas stream in a collection device, such as bag filtration of electrostatic precipitator (ESP).

9. The process of using additives (1-8) in conjunction with sorbents to capture acid gases and other flue gas constituents that block oxidation reactions or consume sorbent sites that would otherwise capture mercury. The additive is a compound comprised of Group I or II elements, such as Ca, Na, and others. These additives of base chemistry may be added to flue gas as a sorbent mixture or co-injected to selectively sorb acid gases or other gas constituents that compete for mercury reactive/sorption sites, thereby improving the effectiveness of activated carbon to capture mercury. In addition, the base additives can augment the treated activated carbon by helping to capture oxidized mercury forms in the flue gas, such as mercuric chloride, or that are produced on the carbon sorbent, such as mercuric bromide, but are released to the gas phase as the sorbent becomes saturated or capacity limited.

10. The process of preparing a larger-than-normal (>40 μm) sorbent particle size, promoting with the halogen treatment as described in 1-8, using the treated sorbent for capture of mercury by injecting in the flue gas, and finally separating and recovering the sorbent from the ash par-

ticles. The larger sorbent size thus will allow easy mechanical/physical separation so that sorbent can be regenerated, recycled, and reused, and the ash can be sold as a low-carbon cementatious byproduct for concrete. The separation can be effected by various methods, such as density (gravity), floatation, or sieving methods.

11. The process for preparing the bromine-containing activated carbon sorbent as described in Example 1-10, coupled with the direct injection of the slurry of the prepared fine-particle sorbent in the solvent or aqueous phase, so that the aerosol particles of the slurry achieve a high degree of dispersion in the gas stream and evaporation of the solvent in the hot gas occurs rapidly. The amount of slurry added is flow-controlled, and the concentration of particles in the slurry is monitored by optical density measurements prior to injection. Collection of particles is performed.
12. The process for preparing the bromine-containing activated carbon sorbent, as described in Examples 2 and 4, coupled where the fine-particle dispersion of brominated sorbent in the gas stream at the top of the ebullated bed is led to the flue gas or offgas duct where the said dispersion is contacted with mercury-contaminated flue gas or offgas stream. The amount of aerosol dispersion added is controlled by the gas flow to the ebullated bed, and the concentration of particles in the dispersion can be monitored by optical density measurements prior to injection. Collection of particles is performed by the existing particulate-collection equipment.
13. The process for preparing the bromine-containing activated carbon sorbent bed, coupled with contacting the bed with the mercury-contaminated flue gas or offgas.
14. The process for preparing the bromine-containing activated carbonBsorbent, as described in Examples 2 and 4, or untreated activated carbon, coated on a substrate or as activated carbon material. This material is placed in a moving system that geometrically allows for control of rate of exposure, sorption, and exchange of material in a continuous or semicontinuous manner.
15. In the sorbent and mercury removal process outlined in paragraphs above, the bromine reagents promote metal oxidation activity by creating cationic or radical character on the carbon edge structure that attracts mercury atoms and extracts electrons from said mercury atoms, resulting in oxidized mercury, which is more easily captured on a sorbent. A similar mechanism applies to oxidation and capture of reduced arsenic and other pollutant species.

The invention relates to the process for the removal of mercury and other pollutant species from gas streams generated during the burning of fossil fuels, such as in a coal-fired utility or synthesis gas from gasification facilities. This removal process would utilize a sorbent and/or a combination of additives to remove pollutants from the gas stream, which are at the same time interacting with other gas components that result in poisoning or deactivating the sorbent and reducing its capacity or reaction rates with the targeted pollutant species. The present invention provides a cost-effective way to capture the pollutants by utilizing exceptionally active carbon sorbents and promoting mercury sorbent surface reactions, containing a bromide form of the carbon, that capture mercury with high kinetic chemisorption (oxidation) activity, so that capture can occur during contact times of seconds or less. The sorbent does not require in situ activation (induction period) in the gas stream to achieve high activity as do conventional activated carbon sorbents. The reactivity of the sorbent toward the pollutants and the sorption capacity can be regenerated, recycled, and reused.

Burning fossil fuels generates a flue gas that contains mercury (and other trace elements) that was in the coal, plus oxides of sulfur and nitrogen (acid gas emissions) and particulates whose release to the environment must be controlled by use of sorbents, scrubbers, filters, precipitators, and other removal technologies. While control of other elements and/or flue gas pollutants may apply, the discussion provided is focused on mercury. Initially, mercury is released in the elemental form during combustion/gasification, but downstream of the boiler, in the ducts and stack of the combustion system, part of the elemental mercury is oxidized. The amount oxidized depends on the amount of acid gases present in the flue gas and other factors. Amounts of mercury vary with the coal, but a typical concentration of mercury in the stream of combustion gas is about 5 parts per billion (ppb). A pound of mercury or more per day may be emitted in some utilities.

Discussion of Sorbent Technologies

Several types of mercury control methods for flue gas have been investigated, including injection of fine sorbent particles into a flue gas duct and passing the flue gas through a sorbent bed. Fine-particle injection sorbents include activated carbon, metal oxide sorbent, sodium sulfide particles (for example, see U.S. Pat. No. 6,214,304), and basic silicate or oxide sorbents (for example, see the Ghorishi reference (Ghorishi, B.; Gullet, B K. Waste Manage Res. 1993, 16, 582) and Lancia references). When particle injection is employed, the mercury chemisorbed to the sorbent particle is removed from the gas stream in a bag house or ESP and collected along with ash particulates (for example, see U.S. Pat. Nos. 4,889,698, 4,956,162, 5,672,323, 5,827,352, 6,027,551, and 5,505,766). The sulfide and basic silicate and oxide particles are effective only for the oxidized mercury, and the metal oxide sorbents exhibit slower capture kinetics than the carbon particles. Additionally, injection of fine carbon particles into the flue gas stream has been only partially successful in removing mercury, especially elemental mercury, where effective removal of approximately 60% was attained with a baghouse to collect carbon and ash. Even lower removal rates have been observed when using an ESP to collect the carbon, since the contact time of the carbon with the gas is very short.

A major problem with existing carbon injection systems is that the sorbent is initially unreactive, and only after exposure to the flue gas for about 20 minutes does the seasoned sorbent become effective and provide capture of 60% of the mercury in the gas. Consequently, these sorbents must be used in large amounts (high sorbent-to-mercury ratios) to effectively capture the mercury. These sorbents can be relatively expensive and cannot be easily separated from the ash, regenerated and reused. The collection of carbon in the ash also creates solid waste disposal problems, and the spent sorbent may contaminate the collected ash for use in various applications.

Use of Halogens in Mercury Capture

Methodologies for using halogens for the treatment of flue gas have not previously been effective Halogen is defined as a member of the very active elements comprising Group VII-A of the periodic table. In the molecular elemental halogen form, including $F_2$, $Cl_2$, $Br_2$, and $I_2$, the reaction with elemental mercury is not fast enough to result in the formation of oxidized mercury in a coal combustion flue gas with conventional ash control technology. The atomic elemental halogen form, which includes F atom, Cl atom, Br

atom, and I atom, is about a million times more reactive to mercury, but the concentrations of these forms are extremely low, and also, therefore, cannot result in oxidation of mercury in a utility flue gas.

A halide is a compound formed from reaction of a halogen with another element or radical. In general, the halide compounds are normally very much less reactive than the molecular halogens, having expended their high chemical potential in forming the low energy halide. The halide is considered a reduced form and cannot therefore oxidize anything by itself. It is for this reason that it is not obvious that a halide-halogen treated activated carbon would be effective at oxidizing elemental mercury and provide effective capture of elemental mercury. In fact, for tests with salts, analytical data show the addition of bromine to an activated carbon or carbon black or soot does form a compound by reacting with the unsaturated groups on the carbon. By applying x-ray photoelectron spectroscopy, it has been determined that bromine or HBr added to carbon black forms chemical compounds within a carbon structure.

A body of theory has been developed from scientific evidence to explain the nature of the promotion effect of the bromine compounds. This principle is illustrated in FIG. **2**, which in step **1** shows the reaction of the hydrogen bromide with the unsaturated structure of the activated carbon. This may be a carbene species on the edge of the graphene sheets structures of the carbon. Molecular bromine or a bromine compound reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury.

We now teach that the formation of the new bromide compound with carbon increases the reactivity of the carbon forms toward mercury and other pollutants. The resulting bromide compound is uniquely suited to facilitate oxidation of the mercury. The effectiveness of the oxidation results from the promotion effect of the halide exerted on the developing positive charge on the mercury during the oxidation, known in the chemical art as a specific catalytic effect. Thus, as the mercury electrons are drawn toward the positive carbon, the halide anion electrons are pushing in from the other side, which stabilizes the positive charge developing on the mercury and lowers the energy requirement for the oxidation process. Bromide is especially reactive, owing to the highly polarizable electrons in the outer 4p orbitals of the ion. Thus, adding HBr or $Br_2$ to the carbon forms a similar carbon bromide, in which the positive carbon oxidizes the mercury with the assistance of the bromide ion.

## PRIOR ART PUBLICATIONS

The earliest patents that relate to mercury capture on a sorbent are actually not for flue gas mercury control but for capture of mercury from air or other gas mixtures on a carbon or other sorbent. These patents were based on a model that recognized the affinity of halogens for mercury, rather than the formation of a reactive carbon. These patents are discussed below according to the type of halogen used for impregnation.

One patent that teaches a halogen impregnation (Stock, U.S. Pat. No. 1,984,164, issued in 1934) describes the use of activated carbon or other solid impregnated with a halogen for removing Hg from air. The impregnation method is not specified. This seems to be the most general claim with respect to halogen impregnation. All the statements and claims appear to refer to halogen or iodine, but the patent does not appear to address bromides or other halides or bromide compounds or even specifically iodide or an iodine compound. The only example in the description is iodine impregnation. The patent also is restricted to air systems and did not pertain to flue gas systems with reactive acid gases. The description did not assume that the iodine formed a reactive carbon species.

Japanese Patent JP 49-43197 describes the treatment of Hg-contaminated electrolysis cell gas using a metal iodide salt on a support. A similar treatment using a resin impregnated with a metal iodide is described in JP 50-6438. These patents do not appear to represent a carbon bromide compound as specified in this patent application.

Another early patent (Hilgen, U.S. Pat. No. 3,849,267, issued in 1974) describes a method for Hg removal from a gas which claims mixing molecular chlorine ($Cl_2$) with the gas to be cleaned and passing it through a nonporous sorbent such as glass wool and NaCl (not carbon). This was evidently not an obvious extension of the Stock patent, since a halogen was introduced as part of the gas phase being cleaned.

A later patent (deJong, et al., U.S. Pat. No. 4,196,173, issued in 1980) describes a method for Hg removal in air which claims using a bed of activated carbon impregnated with halogen-only $Cl_2$ is specified in the other claims and examples, and it is prepared by flowing the $Cl_2$ stream through a carbon bed.

An improved sorbent for mercury in air was patented by Revoir and Jones (U.S. Pat. No. 3,662,523, issued in 1972), in which ICl and $ICl_3$ vapors were impregnated into the activated carbon. No explanation of the increased activity was provided. Since these compounds are interhalogen compounds, the patent did not infringe Stock.

U.S. Pat. No. 5,891,324 describes an activated carbon containing an acid (HCl, $H_2SO_4$, or $H_3PO_4$) for the removal of mercury contained in a liquid phase, such as would occur in a process steam in the oil industry. In this case, the model presented was that mercury is adsorbed from the liquid into the solid carbon phase at relatively low temperatures.

In U.S. Patent Application 2004/0003716, a method is described for removing mercury from a combustion gas. This method employs an exposure of a finely powdered activated carbon to a molecular bromine gas at an elevated temperature or to HBr to produce a sorbent with good mercury removal ability when injected into the flue gas duct. The model for the efficacy of the Nelson sorbent is not clearly stated, so it can be presumed that the reasoning for using bromine is the simple premise that some bromine form will help capture the mercury, as does iodine and chlorine. The methods for incorporation of the bromine in the Nelson application are not the same as with the present invention, and the Nelson method will not produce the identical carbon bromide species that are obtained in the art described in this application. The Nelson method lacks many of the features described in this application that impart exceptional activity to the sorbent in a convenient way, for example, the addition of smaller amount of a second more powerful promoting agent, the use of facile solvent systems, including aqueous bromine, and the use of in-flight bromine treatment. Additionally, the patent application does not mention regeneration, recycling, or reuse, or the use of moving contactors or larger particle size to facilitate sorbent-ash separation.

## EMBODIMENTS OF THE INVENTION

A sorbent that is initially very reactive in oxidizing mercury can be used in very small amounts to achieve high capture efficiencies, thus lowering operation costs and lessening the disposal problem. In addition, further disposal reduction is made possible by recycling and reusing the

sorbent that is produced using this technology. The time interval for the mercury and sorbent to interact in a flue gas duct and the subsequent collection of the mercury on the sorbent and ash may be very short-only seconds. This requires the sorbent to have high capacity and be very reactive toward mercury. A sorbent can be utilized in a very finely powdered form (e.g., 1-10 μm) to minimize mass transfer limitations. But, again, the reactivity should be very high to capture all of the mercury encountered by the fine particles. One feature of this invention is the process to prepare a sorbent containing a bromide compound formed on the carbon structure that provides a sorbent that is highly active on initial contact with the mercury contaminated gas stream, which allows for effective capture of the mercury.

One possible way to do this is to chemically combine molecular bromine from solution with activated carbon (edge sites). X-ray photoelectron spectroscopy established that the addition of bromine formed a chemical compound in the carbon structure. Thus, the sorbent does not represent a molecular bromine halogen form but a new chemically modified carbon structure. This may not occur with the less reactive iodine, where an $I_2$-molecular complex can exist on the carbon basal plane. In the bromine case, it is actually the carbon that oxidizes the mercury. Thus, an entirely new model is presented for the reactivity of the bromine-treated carbon with mercury. The reactive carbon form can be generated by the addition of bromine, hydrogen bromide, or combinations of bromine and other elements as described herein. Chlorine treatment resulted in lower-activity carbons because the chloride anion was less effective in promoting the oxidation by stabilizing the developing positive charge on the mercury in the transition state for oxidation. Based on this model, several innovative, inexpensive, activity-enhancing features have been developed.

It has been demonstrated that addition of an optional second component, in addition to the bromine, results in improved reactivity and capacity for the sorbent, exceeding that of both the untreated carbon and the brominated carbon. The second compound comprises either a second halogen or a compound from a second halogen, such as HBr. Thus, in addition to having a reactive carbon form present, the second component generates a Lewis base with greater ability to stabilize the developing positive charge on the mercury. Thus the second component is an element with more polarized electrons (4p and 5p).

Furthermore, we demonstrated that the sorbent can be readily treated with any combination of bromine and the second component in-flight using vapors of these components contacting the very fine carbon particles dispersed in air or other gas stream that conveys the particles to the flue gas duct. There is no particular temperature requirement for this contact. This technology is very simple to implement, so it will result in a great cost savings to the utility using this technology for mercury capture.

A unique, nonobvious technique for preparation of the treated carbon is through combining the treatment system with the carbon injection system at the end-use site. With this technique, the halogen is introduced to the carbon-air mixture in the transport line (or other part of the sorbent storage and injection system). Benefits over current concepts to treat sorbents off-site include the following:

Capital equipment costs at a treatment facility are eliminated.

Costs to operate the treatment facility are eliminated.

here are no costs for transporting carbon and additive to a treatment facility.

his process uses existing hardware and operation procedures.

This technology ensures that the sorbent is always fresh, and thus, more reactive.

No new handling concerns are introduced.

There are no costs for removing carbon from treatment system.

This process allows rapid on-site tailoring of additive-sorbent ratios in order to match the requirements of flue gas changes, such as needed when changing fuels or reducing loads, thus further optimizing the economics.

This technology reduces the amount of spent sorbents that are disposed.

With the foregoing and other features in view, there is provided, in accordance with the invention, a process for preparing and regenerating carbon sorbents whose activity for mercury capture is promoted by the addition of bromine to the carbon structure.

The invention applies to use of a sorbent in a powdered form that has been injected into a flue gas stream before or after ash particulates have been removed. Examples of the composition of the sorbent are a powdered modified activated carbon prepared by adding $Br_2$ or HBr plus a second optional component. Alternatively, the sorbent is on a moving contactor consisting of particles or fibers containing the compositions listed in the previous sentence. Either type can be regenerated; the poisoning contaminants from the flue gas are removed and an inexpensive promoting agent added to restore mercury sorption activity. This process of promoting the activity of the carbon itself contrasts with the earlier, more expensive art of adding a reagent (such as peroxide, gold, triiodide, etc.) to the sorbent. The activated carbon sorbent treated with bromine and/or the other components is noncorrosive.

Detailed examples of sorbent regeneration techniques are described in co-pending, commonly-owned PCT patent application No. PCT/US04/12828, titled "PROCESS FOR REGENERATING A SPENT SORBENT", which is incorporated by reference herein.

Although the invention is described herein as a sorbent material, it is nevertheless not intended to be limited to the details described, since various modifications and structural changes may be made therein without departing from the spirit of the invention and within the scope and range of equivalents of the claims.

The construction and method of operation of the invention, however, together with additional objects and advantages thereof will be best understood from the following description of specific exemplary embodiments.

FIG. **11** is a block diagram illustrating the use of the invention in a coal fueled facility. Of course, the invention can also be used in any other desired type of facility. FIG. **11** shows a boiler for burning pulverized coal. The facility utilizes various devices to clean the exhaust of the boiler. In this example, a baghouse or ESP is used to collect particulates in the exhaust. A scrubber and sorbent bed are also used to remove undesired constituents from the flue gas stream, before being fed to the stack. In the example shown, the sorbent is injected into the flue gas after the boiler. The additive can be injected where desired (e.g., before, after, or within the boiler).

Another advantage of the present invention relates to the use of a feedback system to more efficiently utilize the invention. Where possible, the mercury control technology of the present invention will utilize measurement of mercury emissions as feedback to assist in control of the sorbent injection rate. Tighter control on the sorbent levels in this

way will ensure mercury removal requirements are met with the minimal sorbent requirements and therefore the associated costs will be minimized. In one example, the emissions are measured at the stack.

Carbon Sorbent

Reactions of halogens and acidic species with the basic binding sites on the activated carbon sorbent create sites for oxidizing mercury. Other metal ions, such as boron, tin, arsenic, galium, Sb, Pb, Bi, Cd, Ag, Cu, Zn, or other contaminants, will also react with the oxidation sites generated on the carbon.

According to our model, adding the bromine from the bromine reagent or a proton from a hydrogen halide acid to a basic carbene site on the carbon edge structure forms a carbocation that accept electrons from the neutral mercury atom forming the oxidized mercury species that is bound to the sorbent surface. The reactive site may also generate reactive bromine radicals or carbon radicals at the active sites on the carbon. Thus, the activated carbon serves to stabilize the bromine, yet provides a highly reactive bromine-containing reagent that can oxidize the mercury and promote its capture on the activated carbon. The sorbent that contains bromine is expected to be more reactive than the corresponding sorbent containing chlorine and much less expensive than the sorbent containing iodine.

A bench-scale procedure based on the above description was used to test the initial activities and capacities of several powdered carbon sorbents, including the bromine-containing activated carbons prepared from a commercially available sorbent and an aerogel carbon film sorbent, as well as the original precursor carbons for comparison. Bromine-treated carbons were prepared by impregnation of the powdered activated carbon precursors in a stirred solution of bromine in carbon tetrachloride or methylene chloride, or alternatively, in an aqueous solution of HBr, followed by drying in air at ambient temperature and drying in an oven at 100° C. in air or nitrogen. Bromine-treated carbons were also prepared by impregnating bromine from the gas phase by passing the gas through a rotating dry bed of the activated carbon precursor. Adding a second component to the solution was demonstrated to improve the capacity of the sorbent.

The carbons were initially tested in a heated bed, where a synthetic flue gas stream containing elemental mercury (11 $\mu g/m^3$) was passed through the bed. Concentrations of total and elemental Hg in the effluent gas were determined using a Sir Galahad mercury CEM. The powdered sorbent was supported on a quartz filter during the test, and the other sorbents were tested as a triple layer.

A comparison of the original commercial-grade powdered carbon sorbent with the sorbent after it has been treated with 0.1 N HBr, collecting the powder by centrifugation and drying, revealed that the mercury capture activity is increased from an initial capture efficiency of about 50% of the Hg in the inlet to 100% capture. A comparison of the sorbent after subsequent regeneration with HBr indicates that it not only captures mercury at the same level as before (100% capture) but is enhanced such that its capacity is prolonged by several minutes. Similar results were obtained with the carbon film and carbon fiber sorbents by treatment with molecular bromine in solution or in dry beds as described above.

An activated carbon sorbent was prepared by treating the carbon by impregnating molecular bromine from a gas composition containing molecular bromine by flowing the gas through a liquid bromine reservoir in series with a fluidized bed of ebullated bed of the carbon. The amount of bromine taken up by the carbon ranges (in one example) from <1 to about 30 g per 100 g of activated carbon, depending on the proportions used.



In one exemplary test conducted at a facility fired with lignite coal, the flue gas phase mercury (elemental) concentration was between 10 and 11 $\mu g/m^3$. The ash and injected carbons were collected in the baghouse at 350 E to 375 EF. Injection of commercial-grade activated carbon powder (untreated) at a rate of 1.0 lb/Macf resulted in mercury effluent concentrations of 3.8-4.2 $\mu g/m^3$ (representing 62%-58% removal of the mercury from the gas), and at 2.0 lb/Macf, gave 74%-71% removal. Injection of the bromine-treated carbon at 1.0 lb/Macf resulted in 73%-69% removal and at 2.0 lb/Macf gave 86%-84% removal. Thus, a significant increase in the mercury capture was exhibited during use of the bromine-treated carbon.

Addendum: Other References to Hg Sorption

Sorbent Beds with Particulate Removal

Carbon beds have also been utilized for mercury capture in flue gas. The German Patent 34 26 059 describes the use of a very thick carbon bed for treatment of flue gases containing polyhalogenated compounds. Although the system employed at Dusseldorf would also have the potential for Hg removal (for example, see the Streng reference), it is not very practical to use such a thick bed. Spent sorbent is burned and not regenerated. The carbons are not pretreated.

The GE-Mitsui-BF system (Tsuji, K.; Shiraishi, I.; Dague, R. F. Proceedings, Sixth International Symposium, Air & Water Management Assoc., New Orleans, La., Mar. 10-12, 1993) employs a recirculating carbon bed, where mercury is removed along with acid gases (as ammonium salts) and the carbon is regenerated at high temperatures where ammonium sulfate is decomposed to $SO_2$ and $N_2$ and mercury is converted to the elemental form, which desorbs from the sorbent. Attrition of the sorbent results in a significant sorbent cost. The carbons are not pretreated.

Sorbent Injection After Particulate Removal

A process of injecting manganese oxide sorbent particles is described in U.S. Patent Application 2002/0150516. Regeneration is claimed by removal of spent oxide particles from the reaction zone and rinsing with dilute aqueous acid.

Sorbent Beds After Particulate Removal

Of particular interest in designing a mercury control process is to use the sorbent downstream of a particulate control device so the sorbent is not highly diluted with the ash particles. The sorbent could then be more easily regenerated and recycled. The prior art teaches several examples of this type of configuration and sorbent processing.

U.S. Pat. No. 5,607,496 teaches the oxidation of mercury on a metal oxide sorbent bed and subsequent absorption to sorbent. The sorbent bed follows the particulate-removal equipment and, thus, the gas still contains the $SO_x$ and $NO_x$, which react with the metal oxide sorbent to form the metal sulfates, which poison the bed. High temperatures are proposed to regenerate the bed. However, Hg is only partially removed from the sorbent at temperatures up to 500° C. The sorbents do not work effectively after regeneration using this technique; the problem may be that manganese sulfate formed during the sorption cycle does not completely decompose back to an active manganese oxide form.

U.S. Pat. No. 6,383,981 describes a fixed $MnO_2$ or $Fe_2O_3$ bed for removal of Hg from a hydrocarbon stream. No regeneration method appears to be included.

A recent U.S. Patent application (2001/0003116) describes the regeneration of a plate or honeycomb material composed of transition metal oxides that was used for sorption of mercury in flue gas. The claimed process

involves heating the sorbent in a reducing gas stream to remove poisons, followed by impregnation with a polyfunctional complex-forming reagent containing the catalyst active component to restore mercury capture capacity. The first of these steps can remove the mercury, but it is unclear whether it actually removes the sulfate poison. The second of these steps is rather expensive, because one is actually reconstituting the reagent on the sorbent

Porous beds containing a mercury oxidizing reagent on a solid support are described in several patents for removal of mercury from gas streams. These include peroxomonosulfate (for example, see U.S. Pat. No. 4,786,483), triiodide or other mixed halogens (for example, see U.S. Pat. Nos. 3,194,629; 3,662,523), or sulfur (for example, see U.S. Pat. Nos. 3,194,629, 4,101,631, 4,708,853, 6,258,334). The reagent material is destroyed either by reaction with the flue gas during sorption or by attempts to regenerate the sorbent; there is no way to regenerate these sorbents, except by reimpregnation of the expensive reagent.

Amalgamating noble metals (gold, silver) on a suitable support can be regenerated by microwave heating (for example, see U.S. Pat. No. 6,136,072), but they are expensive and not especially active for sorption in flue gas.

Hg Sorbents for Air or Natural Gas Treatment

Melkersson (U.S. Pat. No. 3,786,619) described a Hg sorbent comprising $SeO_2$ or $SeS_2$ for air treatment. This method did not appear to employ a carbon support or halide.

Yan (U.S. Pat. No. 4,814,152) described a Hg sorbent comprising elemental sulfur and a metal catalyst on a carbon support. This method did not appear to employ a halide.

Attia (U.S. Pat. No. 65,080,281) described a sorbent for mercury and a variety of other contaminants comprising an inorganic aerogel composition. This method did not appear to employ a carbon support or halide.

Following is a List of Various Background References:

Lancia, A.; Musmarra, D.; Pepe, F.; Volpicelli, G. *Combust. Sci. & Technol* 1993, 93, 277.
Streng, S.; Kassebohm, B. *Fuel Proc. Tecnol.* 1994, 39, 431.
U.S. Pat. No. 6,214,304 Rosenthal
U.S. Pat. No. 4,889,698 Moller
U.S. Pat. No. 4,956,162 Smith
U.S. Pat. No. 5,672,323 Bhat
U.S. Pat. No. 5,827,352 Altman
U.S. Pat. No. 6,027,551 Hwang
U.S. Pat. No. 5,505,766 Chang
U.S. Pat. No. 5,607,496 Brooks
U.S. Pat. No. 6,383,981 Blankenship
U.S. Pat. No. 4,786,483 Audeh
U.S. Pat. No. 3,194,629 Dreibelbis, et al
U.S. Pat. No. 4,101,631 Ambrsini, et al
U.S. Pat. No. 3,662,523 Revoir
U.S. Pat. No. 4,708,853 Matviya
U.S. Pat. No. 6,258,334 Gadkaree
U.S. Pat. No. 6,136,072 Sjostrom
U.S. Patent Application 2002/0150516
U.S. Patent Application 2001/0003116 Neufert

The invention claimed is:

1. A method for reducing mercury in a mercury-containing gas, the method comprising:
  combusting coal in a combustion chamber, the coal comprising an additive comprising $Br_2$, HBr, a bromide compound, or a combination thereof, to form the mercury-containing gas; and
  collecting mercury in the mercury-containing gas with a sorbent added to the mercury-containing gas, the sorbent comprising activated carbon.

2. The method of claim 1, further comprising injecting an alkaline sorbent into the mercury-containing gas stream.

3. The method of claim 2, wherein the alkaline sorbent is selected from the group consisting of alkali elements, alkaline earth elements, alkali salts, alkaline earth salts, and combinations thereof.

4. The method of claim 1, wherein the activated carbon is chosen from powdered activated carbon, granular activated carbon, carbon black, carbon fiber, aerogel carbon, pyrolysis char, and combinations thereof.

5. The method of claim 1, wherein the sorbent has a composition comprising from about 1 to about 30 grams of the element bromine per 100 grams of activated carbon.

6. The method of claim 1, comprising collecting greater than 70 wt % of the mercury in the mercury-containing gas.

7. The method of claim 1, comprising collecting greater than 70 wt % of the mercury in the mercury-containing gas with the sorbent.

8. The method of claim 1, further comprising:
  measuring mercury content of the mercury-containing gas; and
  modifying, in response to the measured mercury content,
    an injection rate of injecting the sorbent comprising activated carbon into the mercury-containing gas,
    an amount of the additive comprising the $Br_2$, HBr, bromide compound, or a combination thereof, added to the coal, or
    a combination thereof.

9. The method of claim 8, wherein the measuring of the mercury content of the mercury-containing gas is performed substantially continuously.

10. The method of claim 1, further comprising:
  modifying, in response to a measured mercury content,
    an injection rate of injecting the sorbent comprising activated carbon into the mercury-containing gas,
    an amount of the $Br_2$, HBr, bromide compound, or a combination thereof, added to the coal, or
    a combination thereof.

11. The method of claim 1, wherein the coal comprises a subbituminous coal.

12. The method of claim 1, wherein the coal comprises a lignite coal.

13. The method of claim 1, wherein the coal comprises the added $Br_2$, HBr, the bromide compound, or a combination thereof, added to the coal before the coal enters the combustion chamber.

14. The method of claim 1, wherein the combustion chamber comprises the added $Br_2$, HBr, the bromide compound, or a combination thereof.

15. The method of claim 1, wherein the coal is combusted in the combustion chamber at a coal-combustion facility, wherein the $Br_2$, HBr, bromide compound, or combination thereof, is added to the coal before the coal enters the combustion chamber, wherein the addition of the $Br_2$, HBr, bromide compound, or combination thereof, to the coal is performed at the coal-combustion facility.

16. The method of claim 1, wherein the coal is combusted in the combustion chamber at a coal-combustion facility, wherein the $Br_2$, HBr, bromide compound, or combination thereof, is added to the coal before the coal enters the combustion chamber, wherein the addition of the $Br_2$, HBr, bromide compound, or combination thereof, to the coal is performed at a site other than the coal-combustion facility.

17. The method of claim 1, wherein the combustion chamber is an electric utility coal combustion chamber.

**18**. The method of claim **1**, further comprising:

measuring mercury content of the mercury-containing gas; and

modifying, in response to the measured mercury content, an injection rate of injecting the sorbent comprising activated carbon into the mercury-containing gas.

**19**. The method of claim **1**, wherein the mercury-containing gas comprises about 1 g to about 30 g of the element bromine per 100 g of the sorbent.

**20**. The method of claim **1**, further comprising:

measuring mercury content of the mercury-containing gas; and

modifying, in response to the measured mercury content, an amount of the additive comprising the $Br_2$, HBr, bromide compound, or a combination thereof, added to the coal.

**21**. The method of claim **1**, wherein the sorbent in the mercury-containing gas comprises about 1 g to about 30 g of the added $Br_2$, HBr, the bromide compound, or a combination thereof, per 100 g of the sorbent.

**22**. The method of claim **1**, wherein the $Br_2$, HBr, or the bromide compound is contacted with the sorbent in vapor form, gaseous form, liquid form, or in an organic solvent.

**23**. The method of claim **1**, wherein the sorbent injected into the mercury-containing gas is a sorbent obtained by contacting a base sorbent with a halogen or halide promoter prior to injection of the sorbent to the mercury-containing gas.

**24**. The method of claim **1**, wherein the sorbent injected into the mercury-containing gas is free of contact with a halogen or halide promoter prior to injection of the sorbent into the mercury-containing gas.

**25**. The method of claim **1**, wherein the injection of the sorbent into the mercury-containing gas occurs upstream of a particulate separator or a scrubber.

**26**. The method of claim **25**, wherein the particulate separator comprises an electrostatic precipitator, a baghouse, a fabric filter, or a combination thereof.

**27**. The method of claim **1**, wherein the coal comprises added halide sorbent enhancement additive that comprises the added $Br_2$, HBr, the bromide compound, or combination thereof.

**28**. The method of claim **1**, wherein the sorbent enhancement additive comprises the bromide compound.

**29**. A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, wherein

the coal comprises added $Br_2$, HBr, bromide compound, or a combination thereof, added to the coal before the coal enters the combustion chamber, or

the combustion chamber comprises added $Br_2$, HBr, bromide compound, or a combination thereof, or

a combination thereof; and

collecting mercury in the mercury-containing gas with a sorbent added to the mercury-containing gas, the sorbent comprising activated carbon.

**30**. A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein the mercury-containing gas comprises a halogen or halide promoter comprising HBr, $Br^-$, or a combination thereof, wherein

the coal comprises added $Br_2$, HBr, bromide compound, or a combination thereof, added to the coal before the coal enters the combustion chamber, or

the combustion chamber comprises added $Br_2$, HBr, bromide compound, or a combination thereof, or

a combination thereof;

collecting mercury in the mercury-containing gas with a sorbent added to the mercury-containing gas, the sorbent comprising activated carbon;

separating the sorbent contacted with the mercury from the mercury-containing gas;

measuring the mercury content of the mercury-containing gas; and

modifying, in response to the measured mercury content of the mercury-containing gas,

an injection rate of injecting the sorbent into the mercury-containing gas,

an amount of the $Br_2$, HBr, bromide compound, or a combination thereof, added to the coal or the combustion chamber, or

a combination thereof.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 10,596,517 B2
APPLICATION NO. : 15/997091
DATED : March 24, 2020
INVENTOR(S) : Olson et al.



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

On page 3, in Column 2, item (56) under “Other Publications”, Line 3, delete “ated” and insert --dated-- therefor

On page 6, in Column 2, item (56) under “Other Publications”, Line 28, delete “Actioin” and insert --Action-- therefor

On page 6, in Column 2, item (56) under “Other Publications”, Line 39, delete “Serrial” and insert --Serial-- therefor

On page 7, in Column 1, item (56) under “Other Publications”, Line 7, delete “dateed” and insert --dated-- therefor

On page 7, in Column 2, item (56) under “Other Publications”, Line 16, delete “Seril” and insert --Serial-- therefor

On page 8, in Column 2, item (56) under “Other Publications”, Line 16, delete “Combinded” and insert --Combined-- therefor

On page 8, in Column 2, item (56) under “Other Publications”, Line 46, delete “Reducton” and insert --Reduction-- therefor

In the Drawings

On sheet 6 of 11, Fig. 6, Line 1, delete “O2” and insert --$O_2$-- therefor

On sheet 6 of 11, Fig. 6, Line 1, delete “μg/dNm3,” and insert --$\mu g/dNm^3$,-- therefor

Signed and Sealed this
Fifteenth Day of December, 2020

Andrei Iancu
*Director of the United States Patent and Trademark Office*

In the Specification

In Column 4, Line 25, delete "grain" and insert --gram-- therefor

In Column 11, Line 25, delete "reagents)" and insert --reagent(s)-- therefor

In Column 15, Line 59, after "(2.5 inch (6.35 cm))", insert --.--

In Column 16, Line 58, after "water", insert --.--

In Column 17, Line 59, delete "(635" and insert --(6.35-- therefor

In Column 19, Line 3, delete "it" and insert --11-- therefor

In Column 20, Line 44, after "ranges", insert --(in--

In Column 20, Line 63, delete "fg/$m^3$." and insert --μg/$m^3$.-- therefor

In Column 21, Line 22, after "have", insert --a--

In Column 22, Line 46, delete "fit" and insert --frit-- therefor

In Column 23, Line 47, delete "According y," and insert --Accordingly,-- therefor

In Column 25, Line 54, delete "1.00 g" and insert --100 g-- therefor

In Column 26, Line 26, delete "$O_2S_5$." and insert --$P_2S_5$.-- therefor

In Column 28, Line 60, after "effective", insert --.--

In Column 31, Line 66, delete "here" and insert --There-- therefor

In Column 32, Line 1, delete "his" and insert --This-- therefor

In Column 33, Line 9, delete "galium," and insert --gallium,-- therefor

In Column 35, Line 8, after "sorbent", insert --.--

In the Claims

In Column 38, Lines 10-11, in Claim 29, delete "or a combination thereof, or a combination thereof;" and insert --or a combination thereof;-- therefor

In Column 38, Lines 25-26, in Claim 30, delete "or a combination thereof, or a combination thereof;" and insert --or a combination thereof;-- therefor

## CERTIFICATE OF SERVICE

Douglas R. Nemec, an attorney, hereby certifies that on August 25, 2026, he caused true and correct copies of the foregoing CONFIDENTIAL AND NONCONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLANTS to be electronically filed via this Court's electronic filing system. I further certify that on the same date I caused the following attorneys of record in this matter, who have consented to service by electronic means, to be served with true and correct copies of the foregoing CONFIDENTIAL AND NONCONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLANTS via electronic mail:

James Michael Lennon
**Peter Akawie Mazur**
Devlin Law Firm
1526 Gilpin Avenue 19806
Wilmington, DE 19806
302-449-9010
dlflitparas@devlinlawfirm.com
pmazur@devlinlawfirm.com

Bradley W. Caldwell
Jason D. Cassady
John Austin Curry
Justin T. Nemunaitis
Adrienne R. Dellinger
**Caldwell Cassady Curry PC**
2121 N. Pearl Street, Suite 1200
Dallas, Texas 75201
Phone: (214) 888-4848
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com
adellinger@caldwellcc.com

*Attorneys for Plaintiffs Midwest Energy Emissions Corp. and MES Inc*

Dated: August 25, 2026,
in New York, NY.

*<u>/s/ Douglas R. Nemec</u>*
Douglas R. Nemec
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West

New York, NY 10001
(212) 735-2419

*Counsel for Appellants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescense Energy Products LLC, Rutledge Products LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC*

## CERTIFICATE OF CONFIDENTIAL INFORMATION

The foregoing CONFIDENTIAL AND NONCONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLANTS contains 46 unique words (including numbers) marked confidential, as authorized by the Court's order of August 13, 2026 granting Appellants' motion to waive confidentiality requirements with respect to these markings. Dkt. 28. The addendum contains no information marked confidential.

Dated: August 25, 2026,
in New York, NY.

*/s/Douglas R. Nemec*

Douglas R. Nemec
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
(212) 735-2419

*Counsel for Appellants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescense Energy Products LLC, Rutledge Products LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)(7) AND FEDERAL CIRCUIT RULE 32

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1. The filing has been prepared using a proportionally-spaced typeface and contains 13,984 words, including footnotes and endnotes, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7) and Fed. Cir. R. 32(b).

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: August 25, 2026,
in New York, NY.

*/s/Douglas R. Nemec*

Douglas R. Nemec
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
(212) 735-2419

*Counsel for Appellants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescense Energy Products LLC, Rutledge Products LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC*